**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
**In re Cablevision Consumer Litigation**          :          Master File No.
:          10-CV-4992 (JS) (AKT)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:          **ECF CASE**
This Document Relates to:          :          **Electronically Filed**
:
All Actions          :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

WILLKIE FARR & GALLAGHER LLP

Thomas H. Golden
Norman P. Ostrove
787 Seventh Avenue
New York, New York  10019
Phone:  (212) 728-8000
Fax:  (212) 728-8111

*Attorneys for Defendants Cablevision*
*Systems Corporation and CSC Holdings,*
*LLC*

## TABLE OF CONTENTS

Table of Contents ............................................................................................................. i

Table of Authorities ......................................................................................................... ii

Preliminary Statement ...................................................................................................... 1

Relevant Regulatory Background and Statement of Facts .............................................. 2

Argument ......................................................................................................................... 7

I.       Plaintiffs Have Not Established That They Are Owed a Credit for the Fox
         Withdrawal ............................................................................................................ 7

II.      Plaintiffs Are Not Entitled to a Ruling That Any Credit Should Be Uniform as to
         Each Package of Channels ................................................................................... 22

Conclusion ..................................................................................................................... 25

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                    **Pages**

*67 Wall St. Co. v. Franklin Nat'l Bank,*
    37 N.Y.2d 245 (1975) ..................................................................................15

*ALJ Capital I, L.P. v. David J. Joseph Co.,*
    851 N.Y.S.2d 154 (N.Y. App. Div. 2008) ......................................................18

*Analect LLC v. Fifth Third Bancorp,*
    380 F. App'x 54 (2d Cir. 2010) ....................................................................12

*Birdsong Estates Homeowners Ass'n v. D.P.S. Southwestern Corp.,*
    No. 12-CV-00877, 2012 WL 6720860 (N.Y. App. Div. Dec. 28, 2012) ........................17

*Brissenden v. Time Warner Cable of New York City,*
    885 N.Y.S.2d 879 (N.Y. Sup. Ct. 2009) ........................................................21

*Broder v. Cablevision Sys. Corp.,*
    418 F.3d 187 (2d Cir. 2005)..........................................................................12

*Cole v. Macklowe,*
    99 A.D.3d 595 (N.Y. App. Div. 2012) .............................................................9

*Dillon v. U-A Columbia Cablevision,*
    100 N.Y.2d 525 (2003) .................................................................................21

*Eighth Ave. Coach Corp. v. City of New York,*
    286 N.Y. 84 (1941) ......................................................................................13

*Environmental Safety & Control Corp. v. Bd. of Educ., Camden Cent. Sch. Dist.,*
    179 A.D.2d 1012 (N.Y. App. Div. 1992) ........................................................18

*Eskimo Pie Corp. v. Whitelawn Dairies, Inc.,*
    284 F. Supp. 987 (S.D.N.Y. 1968)..................................................................12

*Faulkner v. Nat'l Geographic Soc'y,*
    452 F. Supp. 2d 369 (S.D.N.Y. 2006)........................................................15, 24

*Fireman's Fund Ins. Cos. v. Siemens Energy & Automation, Inc.,*
    948 F. Supp. 1227 (S.D.N.Y. 1996)...............................................................15

*Green Harbour Homeowners' Ass'n v. Chicago Title Ins. Co.,*
    74 A.D.3d 1655 (N.Y. App. Div. 2010) ..........................................................14

*Guardian Life Ins. Co. of Am. v. Schaefer,*
    70 N.Y.2d 888 (1987) ............................................................................................15

*Hadar v. Concordia Yacht Builders,*
    886 F. Supp. 1082 (S.D.N.Y. 1995)........................................................................20

*Hartford Accident & Indem. Co. v. Wesolowski,*
    33 N.Y.2d 169 (1973) ......................................................................................15, 17

*Hugo Boss Fashions, Inc. v. Fed. Ins. Co.,*
    252 F.3d 608 (2d Cir. 2001)....................................................................................13

*In re Cablevision Consumer Litig.,*
    864 F. Supp. 2d 258 (E.D.N.Y. 2012) ............................................................7, 9, 12, 18

*In re Cheerios Mktg. & Sales Practices Litig.,*
    No. 09-CV-2413, 2012 WL 3952069 (D.N.J. Sept. 10, 2012) .........................................23

*Jenoure v. Body Solutions Plus, LLC of Westbury,*
    912 N.Y.S.2d 370 (N.Y. App. Div. 2010) ......................................................................21

*La Reunion Francaise, S.A. v. Halbart,*
    No. 96-CV-1445, 1998 WL 1750128 (E.D.N.Y. Sept. 28, 1998) .....................................15

*Laish, Ltd. v. Jafora-Tabori, Ltd.,*
    No. 02-CV-1322, 2006 WL 270250 (E.D.N.Y. Feb. 1, 2006) .........................................19

*Laumann v. Nat'l Hockey League,*
    No. 12-CV-1817, 2012 WL 6043225 (S.D.N.Y. Dec. 9, 2012) .......................................23

*Lebowitz v. Dow Jones & Co.,*
    847 F. Supp. 2d 599 (S.D.N.Y. 2012)......................................................................18

*Lebowitz v. Dow Jones & Co.,*
    No 12-CV-1253, 2013 WL 309996 (2d Cir. Jan. 28, 2013) ............................................10

*Mattingly v. Hughes Elec. Corp.,*
    107 F. Supp. 2d 694 (D. Md. 2000) ...........................................................................19

*McDowell Research Corp. v. Tactical Support Equip., Inc.,*
    No. 08-CV-6499, 2009 WL 2901594 (W.D.N.Y. Sept. 4, 2009).....................................19

*Morgan Stanley Grp. Inc. v. New England Ins. Co.,*
    225 F.3d 270 (2d Cir. 2000)....................................................................................14

*Padberg v. Dish Network LLC*,
 No. 11-CV-04035, 2012 WL 2120765 (W.D. Mo. June 11, 2012) ...................................10

*Pagan v. v. Abbott Labs., Inc.*,
 No. 10-CV-4676, 2012 WL 5289622  (E.D.N.Y. Oct. 20, 2012)...............................20, 24

*Record Club of Am., Inc. v. United Artists Records, Inc.*,
 890 F.2d 1264 (2d Cir. 1989)........................................................................................17

*Salzberg v. Brooks*,
 No. 150613/2012, 2012 WL 5678880 (N.Y. Sup. Ct. Nov. 13, 2012) ............................20

*Seiden Assoc., Inc. v. ANC Holdings, Inc.*,
 959 F.2d 425 (2d Cir. 1992).........................................................................................17

*Starke v. UPS, Inc.*,
 No. 10-CV-1225, 2012 WL 4370114 (E.D.N.Y. Sep 24, 2012) ....................................18

*Tanita Corp. of Am. v. Befour, Inc.*,
 No 06-CV-4459, 2009 WL 54509 (N.D. Ill. Jan. 6, 2009) .................................................21

*Viacom Int'l, Inc. v. Lorimar Prods., Inc.*,
 486 F. Supp. 95 (S.D.N.Y. 1980).................................................................................15

*Whitnum v. Yahoo!, Inc.*,
 No. 110987/06, 2007 WL 2609825 (N.Y. Sup. Ct. Sept. 5, 2007)...................................10

*Yeger v. E\*Trade Sec. LLC*,
 65 A.D.3d 410 (N.Y. App. Div. 2009) ..........................................................................23

**Statutes**

16 N.Y.C.C.R. § 890.64(b) .............................................................................................21

N.J.A.C. 14:18-3.11 ......................................................................................................21

**Other Authorities**

Farnsworth, *Contracts* § 12.8 (3d ed.) ....................................................................22, 23

Defendants Cablevision Systems Corporation and CSC Holdings, LLC (collectively, "Cablevision") respectfully submit this memorandum of law in opposition to the Motion for Partial Summary Judgment (the "Motion") of Plaintiffs Eric Bohm, John Brett, Arthur Finkel, Theodore Pearlman, Vincent Pezzuti, and Stanley Somer ("Plaintiffs").

## **PRELIMINARY STATEMENT**

Plaintiffs move for partial summary judgment that (1) Cablevision breached its Terms of Service ("TOS") by failing to provide a pro rata credit for a two-week period during which six channels (the "Fox Channels") – none of which Cablevision ever guaranteed would remain as part of its service – were removed from bundled packages containing many times that number of channels, and (2) the credit should be in uniform amounts, based on the particular package the subscriber purchased. The Motion is deficient and should be denied in its entirety.

Plaintiffs have not shown that the TOS unambiguously required Cablevision to provide a credit for the two weeks during which the Fox Channels were removed from its lineups (the "Fox Withdrawal," as defined below), which Plaintiffs mischaracterize as a "service interruption" within the meaning of the TOS. This claim is based on a selective reading of the TOS that ignores their full textual and regulatory context. In fact, the TOS give Cablevision broad flexibility in composing and changing its channel lineups. Plaintiffs effectively concede that Cablevision had the right to drop permanently the Fox Channels, undermining any argument that it had a duty to provide particular programming. If anything, the record now before the Court shows that the TOS unambiguously allowed Cablevision to remove the Fox Channels without liability. Plaintiffs' invocation of *contra proferentem* is unavailing because that interpretive tool is one of last resort and does not apply where, as here, extrinsic evidence resolves any possible ambiguity in the drafter's favor.

1

Even if the Fox Withdrawal could be construed as an "interruption," Plaintiffs still have failed to demonstrate their entitlement to summary judgment.  They provide no evidence that they fulfilled their obligations under the TOS to provide Cablevision with "prompt notification" of the supposed "interruption," a prerequisite for obtaining a credit under Paragraph 4.  Furthermore, several Plaintiffs have waived their claims under the voluntary payment doctrine.

Plaintiffs also fail to establish that the TOS mandate "a pro rata credit in the same amount as every other subscriber of that same package."  Plaintiffs absurdly suggest that they are entitled to a *full refund* of their monthly package fee for the two weeks of the Fox Withdrawal, even though it resulted in the removal of only a small fraction of the programming they received. Plaintiffs' argument for uniform credits also fails because damages must be measured by the injured party's particular circumstances, and customers were impacted by the removal of the Fox Channels in markedly different ways (if at all).  In any event, in order to be entitled to a "credit in the same amount" as all other subscribers to the "same package," Plaintiffs must, at the very least, establish that subscribers *actually paid* "the same amount" for the "same package."  They do not – and cannot – make even that showing.

Plaintiffs have not established that they are entitled to summary judgment.  On the contrary, if anything, Cablevision is entitled to summary judgment.  It intends to so move at the close of discovery, when the record is complete.

## RELEVANT REGULATORY BACKGROUND AND STATEMENT OF FACTS

Cablevision respectfully incorporates by reference the Statement of Facts from its Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification (Dkt. No. 90). Cablevision supplements that discussion as follows.

I.     **The Regulatory Environment.**

Cablevision is subject to regulatory oversight by the various states in which it operates.  The pertinent regulations make a clear distinction between an "interruption" (which involves technical problems) and a network "change" (which involves program deletions).

New York cable regulations define a "service interruption" as the "loss of picture or sound on one or more cable channels."  (Defendants' Opposing Local Rule 56.1 Statement, ¶ 13)[1]  Those regulations contemplate that this "loss of picture or sound" would be due to a mechanical or technical problem that the "cable company" would "begin working on . . . promptly."  (*Id.*)[2]  Distinct from an interruption, New York law defines a "network change" as "the removal of a network from a service tier."  (¶ 14.)  A "network change" triggers various notification requirements, including "a written on-screen visual message prominently displayed on the affected television program channel."  (*Id.*)

The distinction between a service outage or interruption, on the one hand, and a channel change, on the other, is also found in New Jersey's and Connecticut's cable laws.  New Jersey contemplates that an "interruption" would be caused by either a mechanical issue requiring the "dispatch [of] personnel to begin corrective action," or actual work on the system itself.  (¶ 15.)  In contrast, New Jersey separately regulates "changes" – including in situations where, like here, "programming service has been discontinued or withdrawn by the provider" – through various notice requirements.[3]  (¶¶ 16, 17.)  Connecticut does not define the term

---

[1]   Hereafter, "¶ __."
[2]   New York law contemplates that an "outage," which is the "total loss of picture or sound" across all channels of a package, would also be caused by a mechanical or technical problem, such as "a major failure in the system's headend or distribution electronic equipment." (¶ 12.)
[3]   Likewise, under federal regulations, subscribers are to "be notified of any changes in rates, programming services or channel positions as soon as possible in writing." (¶ 20.)

"interruption," but its Department of Public Utilities has used it to describe issues "caused by severe weather events or other disasters" or resulting from problems with "network architecture." (¶ 18.)  Like New York and New Jersey, Connecticut regulates disruptions caused by system reliability separately from "deletion[s] or channel reassignment[s]."  (¶ 19.)

## II.     The TOS.

Cablevision's TOS mirror these regulations by distinguishing between (i) a change in "program packages, . . . channel allocations, [and] broadcast channels" (Paragraph 17) and (ii) a service "outage" or "interruption" (Paragraph 4).  (¶¶ 27, 50.)  The TOS provide for a possible credit only in the second scenario (if various conditions are met and Cablevision elects to provide a credit rather than alternative programming), and not in the first.  (*Id.*)

Paragraph 1 of the TOS provides that "Subscriber will be billed monthly in advance for services to be received."  (¶ 22.)  Paragraph 2 obligates Cablevision to provide "video programming and video-related services, and interactive television services," among other electronic services.  (¶ 10.)  As such, the TOS do not obligate Cablevision to provide any particular video programming as part of that service.  To the contrary, Paragraph 17 expressly allows for channel changes.  It states:

> **Programming:**  All programming, program services, program packages, number of channels, channel allocations, broadcast channels, interactive services, e-mail, data offerings and other Services are subject to change in accordance with applicable law.

(¶ 27 .)

Unlike Paragraph 17, which covers channel changes, Paragraph 4 of the TOS, on which Plaintiffs' breach of contract claim is based, concerns "outages" and "interruptions." (¶ 50.)  Neither term is defined in the TOS.  Paragraph 4 provides that, in certain circumstances, Cablevision will provide subscribers with either a credit or, at Cablevision's discretion,

alternative programming in response to a "known program or service interruption." (*Id.*)  It
requires subscribers to give Cablevision "prompt notification" of a known interruption in order
to be entitled to the credit or alternative programming.  (*Id.*)

   The TOS allow a subscriber to terminate her subscription at any time on seven
days' written notice.  (¶ 34.)  In practice, Cablevision generally allows subscribers to terminate
immediately, without further obligation.  (*Id.*)  Indeed, subscribers who choose to terminate their
services receive a refund of any prepayments made that cover the period following notice of
termination.  (*Id.*)  Given that subscribers have the right to cancel their service at any time,
Cablevision regularly offers promotions, discounts, and other accommodations to subscribers
who threaten to terminate their service in an effort to retain them as customers.  (*Id.*)

### III. From Time to Time Cablevision Drops Channels, Including Due to Contractual Disputes, Without Giving Credits.

   From time to time Cablevision adds and removes channels from its lineups, and
repositions channels among its various packages.  (¶¶ 30-31.)  These changes may be made for
any number of reasons, including that certain content has recently become available or is no
longer available, or agreements with providers mandate repositioning or re-tiering.  (*Id.*)
Cablevision does not increase or decrease its subscription fees in direct response to each such
change.  (*Id.*)  Its approach is no different when channels are removed due to contractual disputes
with programmers.  For example, on January 1, 2010, the Food Network and HGTV were
removed from Cablevision's lineups due to the expiration of its contract with Scripps Networks
Interactive, Inc.  (¶ 32.)  A new agreement was subsequently reached, and the channels were
added back to Cablevision's lineup on January 21, 2010.  (*Id.*)  Cablevision did not issue a
system-wide credit or provide alternative programming to its customers for any portion of their
monthly fee based on the temporary removal of those channels.  (*Id.*)  On March 6, 2010, a

contract between Cablevision and The Walt Disney Company ("Disney") expired, so that

Cablevision no longer had the contractual right to carry WABC-TV. (¶ 33.)  Consequently,

WABC-TV was removed from Cablevision's lineups. (*Id.*)  On March 7, 2010, Cablevision and

Disney reached agreement on a new contract, and WABC-TV returned to Cablevision's lineup.

(*Id.*)  Cablevision did not issue a system-wide credit or alternative programming to its customers

for any portion of their monthly fee based on the temporary removal of WABC-TV.  (*Id.*)

## IV.    Cablevision Notifies Regulators and Customers of the Network Changes Mandated by the Fox Withdrawal.

In October 2009, Cablevision and Fox signed a one-year agreement giving

Cablevision the right to include the Fox Channels in its packages. (¶ 36.)  As the end of the term

approached, Cablevision sought to renew those retransmission rights. (¶ 40.)  Recognizing that

Fox's hard-line negotiating posture could result in the removal of the Fox Channels from its

packages, Cablevision advised its subscribers of that possibility in advance, including in an email

sent on October 12, 2010. (¶ 44.)  The next day, Cablevision notified state regulators of the

"[p]otential *[p]rogramming [c]hange*" that would occur if Cablevision and Fox were unable to

finalize a new retransmission agreement. (¶ 45 (emphasis added).)

Despite Cablevision's efforts, its retransmission rights expired at midnight on

October 16, 2010, requiring Cablevision to delete the Fox Channels from its lineups (the "Fox

Withdrawal"). (¶ 46.)  Shortly after that deletion, Cablevision emailed subscribers and began

broadcasting a message on the Fox Channels notifying subscribers that the programming was no

longer available. (¶ 47.)  On October 18, 2010, Cablevision notified state regulators of the

"removal" or "elimination" of the Fox Channels from Cablevision's packages. (¶¶ 48-49.)

Of the six moving Plaintiffs, only Pezzuti contacted Cablevision to complain

about the removal of the Fox Channels. (¶ 51.)  Additionally, Plaintiffs Bohm, Finkel, and

Pezzuti each paid their Cablevision bill for the period of the Fox Withdrawal after they knew that the Fox Channels were not available.  (¶ 1.)

Plaintiffs continued to watch television through their Cablevision subscriptions during the Fox Withdrawal.  (¶ 54.)  Throughout that two-week period, each Plaintiff received 100 to 350 channels as part of their Cablevision service (excluding the six Fox Channels), depending on the package to which they subscribed.  (¶ 25.)

## V.   This Court's Decision on Cablevision's Motion to Dismiss.

On March 18, 2011, Cablevision moved to dismiss Plaintiffs' breach of contract claim under Rule 12(b)(6).  In denying the motion, this Court ruled that Plaintiffs' allegations "stated a plausible entitlement for relief," but recognized that theirs was not the only reasonable interpretation of the TOS.  *In re Cablevision Consumer Litig.*, 864 F. Supp. 2d 258, 264 n.3 (E.D.N.Y. 2012).

## ARGUMENT

## I.   PLAINTIFFS HAVE NOT ESTABLISHED THAT THEY ARE OWED A CREDIT FOR THE FOX WITHDRAWAL.

Plaintiffs do not establish, as a matter of law, that the TOS require Cablevision to provide a credit for the Fox Withdrawal.  To do so, Plaintiffs must show each of the following: (1) that Cablevision had a duty to provide the Fox Channels; (2) that the term "interruption," read in the larger context of the TOS as a whole and in light of the regulatory environment in which Cablevision operates, unambiguously includes events like the Fox Withdrawal; and (3) that each Plaintiff gave "prompt notification" of such "interruption."  In addition, for certain Plaintiffs, the Court would have to conclude that Cablevision's affirmative defense of waiver was without merit.  Plaintiffs cannot make the requisite showings.

### A.  Plaintiffs Have Failed to Prove that Cablevision Had a Duty to Deliver the Fox Channels in Particular.

Plaintiffs predicate their claim on the assertion that Cablevision was contractually required to "provide the Fox Channels to each of the Class members." (2AC ¶ 45.) Because the TOS contain no promise by Cablevision to deliver particular channels and *expressly permit* Cablevision to change its channel lineups, summary judgment should be denied.[4]

The TOS provide Cablevision with flexibility in the composition of its channel lineups. The basic agreement between Cablevision and its subscribers is that the "[s]ubscriber will be billed monthly in advance" for "services to be received" (¶ 22), which are generally described as "video programming and video-related services," without further specification. (¶ 10.) The TOS do not mandate that Cablevision provide any specific list of channels to its subscribers, nor do they prohibit Cablevision from changing its channel lineups. To the contrary, Paragraph 17 of the TOS (captioned "Programming") expressly states that Cablevision has the right to change, "in accordance with applicable law," "[a]ll programming," as well as "program packages," "numbers of channels," and "broadcast channels." (¶ 27.) The "applicable law" refers to the regulations governing channel changes discussed above, and the commitment to make such changes "in accordance with" applicable law is merely a commitment to comply with

---

[4]   Perhaps recognizing that the TOS expressly relieve Cablevision of the obligation to provide any particular programming, Plaintiffs appear to argue that such an obligation nevertheless arose because subscribers allegedly paid for the period of the Fox Withdrawal in advance of its inception, supposedly entitling them to receive, for the coming month, all of the channels that were in their package's lineup when they paid their bill. (Plfs.' Br. at 7-9, 13.) As discussed above, the predicate of Plaintiffs' theory – that the "agreed-upon package" is made up of channels that could never change – is incorrect. And taken to its logical conclusion, Plaintiffs' theory would mean that any subscriber who paid his bill for the period of the Fox Withdrawal after it had begun – such as Bohm, Finkel, and Pezzuti – would not be owed a credit because the "agreed-upon package" (Plfs.' Br. at 13) at that time did not include the Fox Channels. (¶ 1.)

the state law requirements that are triggered by such changes.[5]  (*Id.*)

Plaintiffs' response to all of this is that the removal of the Fox Channels from Cablevision's channel packages was not a "change" because it was reversed two weeks later. (Plfs.' Br. at 2.)  Plaintiffs seem to recognize that no credit would be owed if Cablevision never returned the Fox Channels to its lineups, apparently conceding (as they must) that this would constitute a "change" within the meaning of Paragraph 17.  Thus, Plaintiffs' position appears to be that the Fox Withdrawal should be viewed, in hindsight, as an "interruption" because Cablevision was able to regain consent to provide the Fox Channels in a relatively short period of time.[6]  But nothing in the TOS or the statutory schemes they mirror supports the idea that a "change" becomes a "interruption" simply because it is short-lived.  Plaintiffs, who criticize Cablevision for "hurt[ing] subscribers" (Plfs.' Br. At 11), base their claim on an interpretation of the TOS that would offer relief *inversely proportionate* to any conceivable harm to subscribers: a channel's permanent deletion would result in no relief to the customer, but its temporary removal would require a credit.  "Not only is the agreement void of any language mandating this result, but such interpretation of the agreement runs afoul of the well-settled principle that a contract should not be interpreted to produce an absurd result."  *Cole v. Macklowe*, 99 A.D.3d 595, 596 (N.Y. App. Div. 2012).  Furthermore, Plaintiffs' own conduct in this lawsuit undermines their own theory.  If one could not know whether the Fox Withdrawal was a

---

[5]   This Court's opinion on Cablevision's Motion to Dismiss found that Paragraph 17 could be read to "reliev[e] Cablevision of providing particular content only in the event of a change in applicable law."  *In re Cablevision Consumer Litig.*, 864 F. Supp. 2d at 263.  Cablevision respectfully disagrees with that interpretation.  Paragraph 17 does not provide that Cablevision may change its programming *if* the law changes; rather, it says that channel lineups are subject to change as a matter of contractual right, but when Cablevision exercises that right, it must do so "in accordance with" applicable law.

[6]   Perhaps Plaintiffs' view is that the Fox Withdrawal was not a "change" because some Cablevision employees expected that they would be able to reach an agreement with Fox in a relatively short period of time.  There is no support for this view in the text of the TOS or applicable law, and in any event this would present an issue of fact that precludes summary judgment.

"change" or an "interruption" until one knew whether the channels returned, then when the first of these cases were filed – during the Fox Withdrawal and before the channels were restored – there was no justiciable controversy and no claim because no "interruption" had yet occurred.

Plaintiffs further attack the applicability of Paragraph 17 on the grounds that applying it here would mean that Cablevision could remove "all channels at any time," rendering the TOS illusory.  (Plfs.' Br. at 2.)  To be sure, Paragraph 17 gives Cablevision discretion to remove particular channels, but "a contract is not illusory merely because its terms give discretion to one party to the contract, as every contract encompasses the implied duty of good faith and fair dealing." *Lebowitz v. Dow Jones & Co.*, No 12-CV-1253, 2013 WL 309996, at *1 (2d Cir. Jan. 28, 2013) (citations omitted); *see also Padberg v. Dish Network LLC*, No. 11-CV-04035, 2012 WL 2120765, at *3 (W.D. Mo. June 11, 2012) (contract that granted Dish Network discretion to change programming was not illusory in light of the duty of good faith and fair dealing, which required "that [it] exercise" its "discretion to change [plaintiff's] programming" in a reasonable manner); *Whitnum v. Yahoo!, Inc*., No. 110987/06, 2007 WL 2609825, at *1 (N.Y. Sup. Ct. Sept. 5, 2007) (dismissing plaintiff's claims based on Terms of Service's limitation on liability and provision stating that the company "reserves the right at any time . . . to modify or discontinue, temporarily or permanently, the Service (or any part therefore)"). Beyond the implied duty of good faith and fair dealing, regulatory restrictions and the TOS itself establish that Cablevision may not remove *all* channels from its system.  First, Cablevision is required by Federal law to carry certain channels.  (¶ 21.)  More basically, the non-provision of *all* channels would run afoul of Cablevision's obligation under the TOS to "provide video programming."  (¶ 10.)  Finally, it is not just Cablevision that has discretion under the TOS; Cablevision allows subscribers who are unhappy to terminate their subscriptions at any time,

without further obligation or liability.  (¶ 34.)  Consequently, subscribers who conclude that Cablevision's services are no longer worth the price due to the deletion of channels have the ultimate remedy – they can simply walk away and receive a refund for any prepayments made for periods following such termination – a practice by Cablevision that is in contrast to other providers that charge subscribers early termination penalties.

In short, Plaintiffs have simply failed to identify anywhere in the TOS a duty on Cablevision's part to deliver the specific Fox Channels.  That failure precludes entry of summary judgment for Plaintiffs.

Insofar as Plaintiffs mean to argue that Paragraph 4 established a duty to carry the Fox Channels, that is unpersuasive.  Paragraph 4 merely addresses what happens in the event of a program or service "interruption."  (¶¶ 3, 50.)  To interpret it as a commitment by Cablevision to carry each and every one of its channels indefinitely would be contrary to the entire thrust of the TOS and would be incompatible with Paragraph 17.  As discussed below, a more reasonable reading of the TOS is that Paragraph 17 and Paragraph 4 deal with entirely different situations: Paragraph 17 deals with programming or channel "change" (the removal of a channel from a tier or the entire system); whereas Paragraph 4 deals with "interruptions" (the loss of picture or sound caused by mechanical or technical problems).

**B.**     **Plaintiffs Do Not Establish that the Fox Withdrawal Was Unambiguously an "Interruption" Under the TOS.**

Plaintiffs ask the Court to hold that the TOS are unambiguous and that the Fox Withdrawal manifestly constitutes an "interruption" under Paragraph 4.  As the Second Circuit has instructed in another customer class action involving Cablevision's TOS, this requires Plaintiffs to show that "a reasonably intelligent person who has examined the context of the entire integrated agreement and . . . is cognizant of the customs, practices, usages and

terminology as generally understood in the particular trade or business" would necessarily construe the TOS in the manner Plaintiffs suggest. *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 197 (2d Cir. 2005) (internal quotations omitted); *see also Analect LLC v. Fifth Third Bancorp*, 380 F. App'x 54, 57-58 (2d Cir. 2010); *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F. Supp. 987, 994 (S.D.N.Y. 1968) (citing New York cases).

In its ruling on the motion to dismiss, this Court concluded that the TOS were susceptible to competing interpretations. *See In re Cablevision Consumer Litig.*, 864 F. Supp. 2d at 264 n.3.  Yet Plaintiffs now ask the Court to adopt their interpretation as the only plausible one – without presenting anything meaningfully new or different, and ignoring other relevant provisions of the TOS and the industry-specific backdrop that must inform the Court's analysis. Instead, Plaintiffs offer the conclusory statement that the Fox Withdrawal was "objectively" an interruption and the bald assertion that a "reasonable subscriber" reading the sentence in question (and apparently nothing more, and without reference to the regulatory backdrop) would conclude the same.  (Plfs.' Br. at 9, 11.)  Plaintiffs misstate the relevant standard and have not met their burden of establishing "that Paragraph 4 of the [TOS] unambiguously applies" (Plfs.' Br. at 12) to the Fox Withdrawal.

To the contrary, as shown next, a reasonably intelligent person examining the TOS in their entirety and in light of industry norms would conclude that the term "interruption" as used in Paragraph 4 does *not* include instances in which a channel is removed due to a contractual dispute with the content provider.  Thus, if anything, the Court could fairly conclude that the TOS unambiguously provide that the Fox Withdrawal was not an "interruption" but rather a channel change under Paragraph 17 for which Cablevision has no liability.

1.    **"Interruption" and "Change" Should Be Given Their Separate Meanings Provided by State Law and Industry Usage.**

Contract terms should be given their "established definition provided by state law or industry usage . . . and that definition will control unless the parties explicitly indicate, on the face of their agreement, that the term is to have some other meaning." *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 617-18 (2d Cir. 2001). Like the relevant regulations, the TOS separately deal with "interruptions," in a paragraph captioned "Disruption of Service" (Paragraph 4), and programming and channel "change[s]," in a paragraph captioned "Programming" (Paragraph 17). The very structure of the TOS reinforces the applicability of the regulatory framework, as do the references to state law within both paragraphs. And that framework makes plain that an "interruption" refers to a mechanical or technical problem, while the deletion of a channel is a "change" for which no credit is owed.

The isolated portions of Paragraph 4 on which Plaintiffs rely must be read not only against the regulatory backdrop, but also in the context of the contract as a whole, with "the word obtain[ing] its meaning from the sentence, the sentence from the paragraph, and the latter from the whole document, all based upon the situation and circumstances existing at its creation." *Eighth Ave. Coach Corp. v. City of New York*, 286 N.Y. 84, 88-89 (1941). Here, the entirety of Paragraph 4 confirms that an "interruption" is something caused by a mechanical or technical problem. Paragraph 4 specifically states that the "failure or interruption of program[ming]" would relate to "*transmissions* or service." (¶ 50 (emphasis added).) The reference to failed or interrupted "*transmissions*" – the physical delivery of picture and sound – itself suggests that an interruption is a mechanical or technical issue. This conclusion is bolstered by the second sentence of Paragraph 4, which deals with "outages." An outage, as a matter of both plain language and state law, *see supra* n.2, refers to a loss of picture or sound on

13

an entire tier of channels caused by a mechanical or technical problem.  In sum, reading the entirety of Paragraph 4 reveals that the paragraph as a whole deals only with mechanical or technical problems resulting in picture or sound loss, consistent with state law definitions.

Plaintiffs agree that the Fox Withdrawal was caused not by a mechanical or technical problem, but by Cablevision's dispute with Fox over "retransmission and distribution rights." (Plfs.' 56.1 ¶ 6.)  That dispute did not necessitate that Cablevision conduct work on the cable system or dispatch personnel to correct it.  And it did not result in the loss of picture or sound on the Fox Channels.  To the contrary, Plaintiffs admit that they saw the on-screen notification required by New York law for a network change:  "instead of seeing their favorite programming . . . customers were greeted by Cablevision's annoying and self-serving loop, whining about News Corp.'s supposed failure to negotiate in good faith." (2AC ¶ 7.)  In the end, Plaintiffs provide no evidence that the Fox Withdrawal fits any definition of "interruption" other than the one they conjured for the purposes of this lawsuit.  That is not enough.

**C.**    **Even If the Court Determines that the TOS Are Ambiguous Based on the Current Record, the Principle of *Contra Proferentem* Does Not Entitle Plaintiffs to Summary Judgment.**

Plaintiffs fare no better with their alternative argument that any ambiguity in the TOS must be construed against Cablevision as the drafter. (Plfs.' Br. at 12-13.)  *Contra proferentem* is a tool of construction of last resort that applies only when all others, including examination of extrinsic evidence, fail to resolve the ambiguity.  *See Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 276 (2d Cir. 2000); *Green Harbour Homeowners' Ass'n v. Chicago Title Ins. Co.*, 74 A.D.3d 1655, 1658 (N.Y. App. Div. 2010) (*contra proferentem* not applicable where "extrinsic evidence . . . amply resolves any perceived ambiguity").  Indeed, even in the *contra proferentem* cases on which Plaintiffs rely, the courts construed the contract against the drafter only after exhausting other ways to give meaning to the contract terms,

14

including, when applicable, review of extrinsic evidence. *See Guardian Life Ins. Co. of Am. v. Schaefer*, 70 N.Y.2d 888, 890 (1987); *La Reunion Francaise, S.A. v. Halbart*, No. 96-CV-1445, 1998 WL 1750128, at *11 (E.D.N.Y. Sept. 28, 1998); *67 Wall St. Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245, 248 (1975); *Hartford Accident & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169, 173 (1973).

Plaintiffs say nothing about any relevant extrinsic evidence here.[7]  In fact, as discussed next, all such evidence before the Court supports Cablevision's interpretation.  Based on this evidence, the Court could resolve any ambiguity in Cablevision's favor as a matter of law.  *See Faulkner v. Nat'l Geographic Soc'y*, 452 F. Supp. 2d 369 (S.D.N.Y. 2006).  To the extent Plaintiffs genuinely dispute any of this evidence, that would simply create issues of material fact regarding the parties' intentions, precluding summary judgment in their favor.

Where an agreement is ambiguous, the practical construction placed upon it by the parties, as evidenced by their course of performance during the life of the contract, is "powerful evidence of their intention."  *Fireman's Fund Ins. Cos. v. Siemens Energy & Automation, Inc.*,  948 F. Supp. 1227, 1234 n.15 (S.D.N.Y. 1996) (citing New York cases); *Viacom Int'l, Inc. v. Lorimar Prods., Inc.*, 486 F. Supp. 95, 98 n.3 (S.D.N.Y. 1980).  Here, there were two episodes earlier in 2010 (Scripps, in January 2010, and WABC-TV, in March 2010) in which channels were deleted because Cablevision and the programmer could not agree on carriage terms, only to have the channels return after an agreement was reached.  (¶¶ 32-33.)  In

---

[7] ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

neither of those instances did Cablevision issue a system-wide credit to customers for any portion of their cable bills.  (*Id.*)  Furthermore, from time to time channels are permanently removed from Cablevision's system or repositioned from one package to another, and Cablevision has always viewed such events as "changes" governed by Paragraph 17 for which no credit (or alternative programming) was owed.  (¶¶ 30-31.)

In addition, Cablevision made clear to subscribers, even outside the TOS, that its lineups might change from time to time – as illustrated by the channel lineup to which Plaintiffs point in support of their Motion.  That lineup expressly states that "packages, services, number of channels, [and] content . . . are subject to change or discontinuance at any time in accordance with applicable law."  (¶ 28.)  Cablevision included similar warnings in several of its other communications with subscribers.  (*Id.*)  This extrinsic evidence makes clear that Cablevision did not promise – and certainly did not intend to commit to – an unchangeable lineup.

Extrinsic evidence also shows that Cablevision treated the Fox Withdrawal as a channel change, not an interruption.  For example, Cablevision sent an email to all its subscribers on October 12, 2010, four days before the Fox Withdrawal, advising them of the possible unavailability of those channels, and, of course, not promising to issue a credit if that occurred. (¶ 44.)  When the Fox Channels were removed from Cablevision's lineups, customers who tuned to those channels saw a notification screen informing them of the unavailability of Fox programming, consistent with the requirements under New York law for a "network change." (¶ 47.)  Cablevision also notified regulators of the "[p]otential [p]rogramming [c]hange" before it occurred, and of the "removal" or "elimination" of the Fox Channels after their withdrawal. (¶¶ 45, 48-49.)

In short, the record shows that a reasonable customer would have known: that Cablevision reserved the right to alter its channel lineup, as indicated in its TOS and reiterated in various customer communications; that the Fox Channels might be removed and that Cablevision was not promising a credit if that happened; and that Cablevision had declined to issue a credit on previous occasions involving similar loss of programming. This extrinsic evidence strongly supports Cablevision's position that the Fox Withdrawal was a "change" under Paragraph 17 and not an "interruption" under Paragraph 4.

Even if the Court believes that this extrinsic evidence does not remove any ambiguity, the "last resort" principle of *contra proferentem* still should not be applied at this stage of the litigation, because discovery is not yet complete and, in any event, reasonable inferences may be drawn from the extrinsic evidence on the existing record that support Cablevision's interpretation.[8] *See Birdsong Estates Homeowners Ass'n v. D.P.S. Southwestern Corp.*, No. 12-CV-00877, 2012 WL 6720860, at *2 (N.Y. App. Div. Dec. 28, 2012) (declining to apply doctrine of *contra proferentem* at the summary judgment stage); *see also Record Club of Am., Inc. v. United Artists Records, Inc.*, 890 F.2d 1264, 1271 (2d Cir. 1989) (vacating grant of summary judgment because "[t]he question of which of the two plausible interpretations should be credited was a question of fact," notwithstanding the rule of construction favoring the non-drafter); *Wesolowski*, 33 N.Y.2d at 172 ("If there is ambiguity in the terminology used . . . and determination of the intent of the parties depends . . . on a choice among reasonable inferences to be drawn from extrinsic evidence, then such determination is to be made by the jury.").

---

[8]   When the court reviews a summary judgment motion, including one involving the interpretation of a contract, all inferences must be drawn against the moving party. *See, e.g., Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425 (2d Cir. 1992). Thus, summary judgment should not be granted if reasonable inferences from the record support the non-movant's interpretation of the contract, even if the non-movant drafted the contract.

**D.     Even if the Fox Withdrawal Was An "Interruption" Under Paragraph 4, Plaintiffs Have Failed to Prove Their Entitlement to a Credit.**

Even if the Fox Withdrawal could be characterized as an "interruption" under the TOS (which it was not), Plaintiffs' Motion would still fail because (1) they cannot show that they gave the requisite "prompt notification" of the "interruption"; and (2) Cablevision has a viable – and fact-specific – waiver defense.[9]

**1.     Failure To Provide Notice as Required Under the TOS Bars Recovery For Plaintiffs.**

As Plaintiffs concede, to prevail on a breach of contract claim, a plaintiff must establish his own "performance under the contract."  Plfs.' Br. at 7; *see also Lebowitz v. Dow Jones & Co.*, 847 F. Supp. 2d 599, 604 (S.D.N.Y. 2012).

The TOS provide that in the event of a "known failure or interruption" a subscriber must provide Cablevision with "prompt notification" in order to obtain a credit or alternative programming.  Plaintiffs fail to establish that any of them gave notice, and that failure is fatal to their Motion.  *See Environmental Safety & Control Corp. v. Bd. of Educ., Camden Cent. Sch. Dist.*, 179 A.D.2d 1012, 1013 (N.Y. App. Div. 1992) ("counterclaims based upon alleged breach of contract should also have been dismissed" due to "failure to comply with the condition precedent of written notice as required by . . . the Contract"); *ALJ Capital I, L.P. v.*

---

[9]   Cablevision also maintains that Plaintiffs must show that the Fox Withdrawal resulted from circumstances entirely within Cablevision's control.  Plaintiffs' main argument on this point is that force majeure clauses are intended to guard against situations "where performance has been rendered impossible by an unforeseen event." (Plfs.' Br. at 16.)  A recent decision from this District has rejected that view.  *Starke v. UPS, Inc.*, No. 10-CV-1225, 2012 WL 4370114, at*6 (E.D.N.Y. Sep 24, 2012).  While Cablevision recognizes that this Court stated, on its motion to dismiss, that "force majeure clauses are aimed narrowly at events that neither party could foresee or guard against," *In re Cablevision*, 864 F. Supp. 2d at 264, it respectfully maintains that the plain language of the TOS relieves Cablevision of any credit obligation when an interruption (even if foreseeable) was, at least in part, beyond its control.  Cablevision further maintains that the resolution of a contract dispute involving two parties is inherently not entirely in the control of one.  There is, at least, a factual question as to whether the loss of programming resulting from the dispute is attributable entirely to Cablevision.

*David J. Joseph Co.*, 851 N.Y.S.2d 154, 155 (N.Y. App. Div. 2008) (affirming dismissal of complaint where plaintiff failed to give "prompt written notice" of breach and where such notice was a condition precedent to defendant's right to cure and plaintiff's right to repayment under the parties' agreement).

   Plaintiffs attempt to avoid the "express language in Paragraph 4" (Plfs.' Br. at 17) in three ways, none of which suffice. First, they assert that their notice obligation was somehow eliminated because Cablevision was already aware of the Fox Withdrawal, "making it unnecessary and duplicative for subscribers to in turn notify Cablevision of that event." (Plfs'. Br. at 17.) The plain language of the notice requirement itself disproves this argument: Credits are potentially available and notice is required only for a "*known* program or service interruption," meaning notice is required even if Cablevision knows of the interruption. (¶ 50.)

   Plaintiffs next contend that the filing of a lawsuit against Cablevision satisfied the notice requirements, but they provide no support for this theory.[10] Nor do they explain how, given that no credit is due until notice is given, they could sue Cablevision for not providing a credit if no credit was owed until they "provided notice" by suing Cablevision. Plaintiffs' reading is untenable – a customer would *never* have to give notice, but instead could just file a lawsuit, so long as he did so promptly. This "lawsuit-as-notice" theory – which effectively concedes that notice *is* required under Paragraph 4 – also ignores that contractual notice provisions are intended to provide an avenue of resolving disputes *before* they reach the

---

[10]   Plaintiffs' cases on this issue are inapposite. *McDowell Research Corp. v. Tactical Support Equip., Inc.*, No. 08-CV-6499, 2009 WL 2901594 (W.D.N.Y. Sept. 4, 2009), holds that, under the U.C.C., a party's complaint may serve as "notice to the [other party] of its intent to withhold amounts owed." *Id.* at *8. Plaintiffs here did not cease their subscription payments. And *Laish, Ltd. v. Jafora-Tabori, Ltd.*, No. 02-CV-1322, 2006 WL 270250 (E.D.N.Y. Feb. 1, 2006), stands for the same limited proposition, while denying summary judgment due to factual questions regarding whether a breach occurred. *Id.* at *5. In any event, cable service is not a sale of goods under the U.C.C. *See Mattingly v. Hughes Elec. Corp.*, 107 F. Supp. 2d 694, 696 n.1 (D. Md. 2000).

courtroom. *See, e.g., Salzberg v. Brooks*, No. 150613/2012, 2012 WL 5678880, at *5 (N.Y. Sup. Ct. Nov. 13, 2012). This is especially true here, where notice does not generate any automatic entitlement to a credit, but rather leaves Cablevision with *a choice*: either provide a credit or "at its discretion, in lieu of the credit, provide alternative programming." (¶ 50.)

In addition, moving Plaintiff Brett did not join these actions until February 2011 – more than three months after the Fox Withdrawal ended – and his belated joinder, even if "notice" within the meaning of Paragraph 4, certainly does not constitute "prompt" notice. In an effort to overcome this failure, Plaintiffs claim that the filing of a lawsuit by one subscriber satisfies the notice requirement for all. (Plfs.' Br. at 17.) Again, Plaintiffs point to no legal basis for this assertion. Without certification of a class, no one subscriber has the authority to act on behalf of the others. And notice is necessarily individual in nature. One cannot give effective notice on behalf of another (including putative class members) who may not have known or cared about the Fox Withdrawal and, in any event, "did not fe[el] aggrieved enough to seek a refund" by calling Cablevision themselves. *Pagan v. v. Abbott Labs., Inc.*, No. 10-CV-4676, 2012 WL 5289622, at *13 (E.D.N.Y. Oct. 20, 2012).

Plaintiffs' final attempt to circumvent the "plain English" of Paragraph 4 is to argue that Cablevision should be estopped from raising this defense because it was "not raised in its motion to dismiss arguments or in the Answer and Affirmative Defenses." (Plfs.' Br. at 17.) But as noted above, Plaintiffs' notice obligation is an element of their claim, and "a defense is not affirmative where it merely negates an element of plaintiff's prima facie case." *Hadar v. Concordia Yacht Builders*, 886 F. Supp. 1082, 1089 (S.D.N.Y. 1995).

2.      **Claims Of Certain Plaintiffs Are Barred by the Voluntary Payment Doctrine.**

Plaintiffs Finkel, Bohm, and Pezzuti are not entitled to summary judgment for the additional reason that their monthly payments for the period covered by the Fox Withdrawal were made *after* the Fox Withdrawal commenced and with knowledge that the Fox Channels were not available.  (¶ 1.)  Thus, they have waived their claims under the voluntary payment doctrine, which "bars recovery of payments voluntarily made with full knowledge of the facts, and in the absence of fraud or mistake of material fact or law." *Dillon v. U-A Columbia Cablevision*, 100 N.Y.2d 525, 526 (2003).

Plaintiffs' after-the-fact lawsuit does not nullify their voluntary payments because Finkel, Bohm, and Pezzuti did not make their payments "under an appropriate protest" or "demonstrate[d] [their] intention to preserve the right to dispute" the issue.[11] *Jenoure v. Body Solutions Plus, LLC of Westbury*, 912 N.Y.S.2d 370, 371 (N.Y. App. Div. 2010); *see also Brissenden v. Time Warner Cable of New York City*, 885 N.Y.S.2d 879, 889 (N.Y. Sup. Ct. 2009) (denying class certification based on the voluntary payment doctrine because plaintiff should "litigate the issue before, rather than after, payment is made").[12]

---

[11]   That Bohm filed his lawsuit against Cablevision prior to paying his cable bill covering the period of the Fox Withdrawal does not foreclose the applicability of the voluntary payment doctrine because "a principle purpose of the voluntary payment doctrine is to operate as a means to settle disputes without litigation." *Tanita Corp. of Am. v. Befour, Inc*., No 06-CV-4459, 2009 WL 54509, at *7 (N.D. Ill. Jan. 6, 2009) (quotation and alteration omitted).  Bohm's lawsuit should not be permitted to short-circuit that process.  Nor is the doctrine foreclosed by Pezzuti's testimony that his wife contacted Cablevision regarding the Fox Withdrawal and inquired about a credit.  (¶ 51.)  Even crediting this testimony, it raises a factual question as to whether Ms. Pezzuti indicated that she reserved the right to dispute Cablevision's entitlement to payment, which would have been necessary to avoid application of the voluntary payment doctrine. *See Jenoure*, 912 N.Y.S.2d at 371.

[12]   Likewise, Plaintiffs cannot claim that the payments were made "by coercion or duress" or that Cablevision "deprive[d] the payor of a choice of whether to make the payment," *Jenoure*, 912 N.Y.S.2d at 371-72, because of a reasonable fear that Cablevision would discontinue their cable service if they refused to pay their bill.  New York and New Jersey laws prohibit Cablevision from discontinuing service based on non-payment of a disputed bill. *See* 16 N.Y.C.C.R. § 890.64(b); N.J.A.C. 14:18-3.11.

## II. PLAINTIFFS ARE NOT ENTITLED TO A RULING THAT ANY CREDIT SHOULD BE UNIFORM AS TO EACH PACKAGE OF CHANNELS.

Plaintiffs seek a ruling that "each subscriber of a package is entitled to a pro rata credit in the same amount as every other subscriber of that same package." (Plfs.' Br. at 13.) Plaintiffs claim they are entitled to such a ruling because Cablevision supposedly "charges subscribers a uniform amount within each plan of service." (Plfs.' Br. at 14.) Plaintiffs also invite the Court to rule that they are entitled to a credit of their *entire* cable bill for the two weeks that the six Fox Channels were not among the hundreds they received – an absurd result that would compensate Plaintiffs far beyond "the loss caused by the [supposed] shortfall in [Cablevision's] performance." Farnsworth, *Contracts* § 12.8 (3d ed.).

### A. Plaintiffs Have Not Established that Damages Should Be Based on a Credit Rather than the Lack of Alternative Programming.

Plaintiffs proceed in this case – and specifically with respect to damages – as if they were automatically entitled to a credit in the event of a covered "interruption." They were not. Rather, Cablevision's obligation, if all conditions were met, was to provide a subscriber with *either* a pro-rata credit *or, at its discretion*, in lieu of the credit, alternative programming. (¶ 50.) Therefore, any plausible damages theory would have to calculate the value of the foregone alternative programming that Cablevision could have elected to provide instead of a credit, and if that is less than the value of any credit, give that lesser value to Plaintiffs.

### B. Plaintiffs' Proposal for Uniform Credits Would Provide Windfall Recoveries.

In any event, Plaintiffs' request for a *uniform* credit ruling overreaches. Plaintiffs appear to suggest that they should not have been charged for *any* of the cable services they used for the two weeks of the Fox Withdrawal, even though the Withdrawal removed, for example, only five of the over 360 channels to which plaintiff John Brett subscribed, and even though he and the other Plaintiffs continued to watch television throughout the Fox Withdrawal. (¶¶ 25,

54.)  Such a windfall recovery would violate basic hornbook law:  "One is entitled to recover an amount that will put one in as good a position as one would have been in had the contract been performed."  Farnsworth, *Contracts* § 12.8 (3d ed.); *see also In re Cheerios Mktg. & Sales Practices Litig.*, No. 09-CV-2413, 2012 WL 3952069, at *12-13 (D.N.J. Sept. 10, 2012) (plaintiffs not entitled to full refund because they continued to eat Cheerios after learning of alleged misrepresentation, even if they did not get the full benefit they had expected).  Indeed, by Plaintiffs' flawed logic, Mr. Brett would pay nothing if even a single, never-watched channel out of the over 360 channels in his iO Gold package was not available for any portion of the month. That is, of course, not the law.  When, as here, a party has substantially performed under the contract, damages "need only compensate . . . for the loss caused by the shortfall in [its] performance."  Farnsworth, *Contracts* § 12.8 (3d ed.).

But there is an even more fundamental problem with Plaintiffs' request for a ruling that Plaintiffs are due a uniform credit.  As discussed more fully in Cablevision's Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification, damages must be based on actual injury to the individual subscriber, not the harm that a hypothetical reasonable person might have suffered, or some abstract market harm.  Awarding a uniform credit to all plaintiffs – including those who subscribed to Cablevision's bundled services solely to watch non-Fox channels, and for whom the inclusion of the Fox Channels in their packages was merely a "coincidence" – would ignore the differing circumstances of the various Plaintiffs and would provide the type of windfall the law forbids.  *Yeger v. E\*Trade Sec. LLC*, 65 A.D.3d 410, 413 (N.Y. App. Div. 2009) ("A breach of contract claim only exists if [a defendant's] common conduct actually damaged a customer."); *Laumann v. Nat'l Hockey League*, No. 12-CV-1817, 2012 WL 6043225, at *7 (S.D.N.Y. Dec. 9, 2012) (court should not allow suit by plaintiffs "for

23

whom it is merely coincidental that they purchased [the programming in question] at all");
*Pagan*, 2012 WL 5289622, at *11 (customers who "received exactly what they paid to receive" were not injured).

### C.   Plaintiffs Provide No Evidence of the Supposed Uniformity on Which Their Motion Is Based.

Plaintiffs base their request for a uniform credit on the unsupported (and incorrect) assertion that all subscribers to a particular plan are charged a uniform amount for their cable service.  (*See generally* Plfs.' 56.1.)[13]  In fact, Cablevision's subscribers are *not* charged uniform amounts for the various packages Cablevision offers.  (¶¶ 24-25.)  Nor do subscribers to the same packages all receive the same channels.  (*Id.*)  Rather, the specific lineups, even in the same package, vary by service area.  (*Id.*)  And even within particular service areas, subscribers are not charged uniform amounts for the same package because of the various promotions and discounts Cablevision offers.  (¶ 26.)

Damages cannot be uniform for the additional reason that the precise days of subscribers' monthly billing period vary from subscriber to subscriber.  (¶ 23.)  Plaintiffs contend that Cablevision was obligated to provide the Fox Channels (and therefore obligated to provide a credit for their absence) because the subscriber received the channels at the time she paid her bill for the Fox Withdrawal period and therefore expected to continue to receive them.[14]  (*See* Plfs.' Br. at 13.)  Thus, subscribers who paid prior to the Fox Withdrawal, but whose billing

---

[13] ███████████████████████████████████████████████████████████████████████████████

[14]   Plaintiffs actually assert that they "pre-pay" for cable service (Plfs.' Br. at 13), but provide no evidence that that is the case.  (*See generally* Plfs.' 56.1.)  Subscribers are billed in advance for their services.  (*See* ¶ 22.)  Some subscribers paid for the period of the Fox Withdrawal prior to the Fox Withdrawal, but many did not.  (¶ 1.)

period ended during the Fox Withdrawal, could have had no expectation of receiving the Fox Channels during the next billing period.  That is, if any credit is owed, it would be only for the portion of the Fox Withdrawal that falls within the billing period for which the subscriber paid while still receiving the Fox Channels.  That amount will not be uniform across subscribers.

Similarly, some subscribers continued to receive some of the Fox Channels' programming during the Fox Withdrawal, while others never received that programming at all. For example, some Connecticut subscribers never had access to three of the Fox Channels; others could watch Broadcast Station programming on Fox's Hartford affiliates (which were not included in the Fox Withdrawal).  (¶¶ 4, 47.)  Plaintiffs do not explain why these subscribers would be owed the same credit as all other subscribers.

In sum, neither the law nor the facts support Plaintiffs' request for a ruling that "each subscriber of a package is entitled to a pro rata credit in the same amount as every other subscriber of that same package."  Plaintiffs' Motion should be denied.

## CONCLUSION

For the foregoing reasons, Cablevision respectfully requests that Plaintiffs' Motion for Partial Summary Judgment be denied.

Dated: January 31, 2013
      New York, New York

WILLKIE FARR & GALLAGHER LLP

     /s/ Thomas H. Golden
Thomas H. Golden (tgolden@willkie.com)
Norman P. Ostrove
787 Seventh Avenue
New York, New York  10019
Phone:  (212) 728-8000
Fax:  (212) 728-8111

*Attorneys for Defendants Cablevision Systems Corporation and CSC Holdings, LLC*

8742920

25