**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re Cablevision Consumer Litigation** | Case No. 10-cv-04992(JS)(AKT) |
| This Document Relates To: | |
| All Actions | ECF Case |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STRIKE TESTIMONY AND REPORT OF ELIZABETH LOSINSKI AND TO PRECLUDE DEFENDANTS FROM RELYING ON UNTIMELY DISCOVERY**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................ 1

BACKGROUND ............................................................................................ 3

    I.    The Claims And Procedural History ................................................ 3

    II.   Ms. Losinski's Experience As Cablevision Policy Advocate ................. 5

    III.  The Contents Of Ms. Losinski's Report ........................................ 7

        A.  Overview of Report ........................................................... 7

        B.  The Opinions ................................................................... 8

LEGAL ARGUMENT ................................................................................... 9

    I.    The Expert Report Of Elizabeth Losinski Should Be Stricken And
        Ms. Losinski Should Be Precluded From Offering Expert Testimony ... 9

        A.  Standard For Admissibility of Expert Testimony .............................. 9

        B.  Opinion #1 Is Not Admissible .................................................... 11

        C.  Opinion #2 And Opinion #3 Are Not Admissible ............................. 14

        D.  Opinion #4 And Opinion #5 Are Not Admissible ............................. 18

        E.  The Other Material In the Expert Report Should Be Stricken And
            Ms. Losinski Should Not Be Permitted To Testify In This Case ....... 20

    II.   Defendants Should Be Precluded From Presenting Elizabeth Losinski
        As A Fact Witness And From Relying On Untimely Discovery
        Including Her Attached Exhibits ................................................. 21

        A.  Standard For Remedy Of Evidence Preclusion Under Rule 37(c) .... 21

        B.  Rule 37(c) Standard Is Met As To Ms. Losinski, The New
            Documents Submitted As Exhibits, and The July 2014 Bates-
            Stamped Production .......................................................... 22

        C.  Four-Factor Test Weighs In Favor Of Preclusion ............................ 23

CONCLUSION ............................................................................................ 25

## TABLE OF AUTHORITIES

**CASES**

*Advanced Analytics, Inc. v. Citigroup Global Markets, Inc.*, 2014 WL 1243685 (S.D.N.Y. May 7, 2014) ...................................................................................................................................... 22

*Amorgianos v. Nat'l Railroad Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) ........................... 10

*Bronx Sav. Bank v. Weigandt*, 1 N.Y.2d 545 (1956) .................................................................... 12

*Brown v. China Integrated Energy Inc.*, No. 2:11-cv-02559-BRO-PLA (Aug. 4, 2014) ....... 10, 20

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) .................................... 9, 11

*Delehanty v. KLI, Inc.*, 663 F.Supp.2d 127 (E.D.N.Y. 2009) ....................................................... 10

*Design Strategy, Inc. v. Davis*, 469 F.3d 284 (2d Cir. 2006) ................................................. 21, 22

*Donnelly v. Ford Motor Co.*, 80 F.Supp.2d 45 (E.D.N.Y. 1999) ........................................... 10, 12

*Feliciano v. County of Suffolk*, No. 04-CV-5321(JS)(AKT), 2009 WL 290469 (E.D.N.Y. Feb. 4, 2009) ....................................................................................................................................... 10

*Hartford Acc. v. Indem. Co. v. Wesolowski*, 33 N.Y.2d 169 (1973) ............................................ 12

*In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) ......................... 16, 18

*Int'l v. Multifoods Corp. v. Comm'l Union Ins. Co*, 98 F.Supp.2d 498 (S.D.N.Y. 2000) ........... 12

*Jacobson v. Sassower*, 66 N.Y.2d 991 (1985) .............................................................................. 12

*Kogut v. County of Nassau*, 894 F. Supp.2d 230 (E.D.N.Y. 2012) .............................................. 20

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) ......................................................... 10

*Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D. 50 (E.D.N.Y. 2012) ................................................... 17

*Morgenstern v. County of Nassau*, No. 04-cv-0058(JS)(ARL), 2008 WL 4449335 (E.D.N.Y. Sept. 29, 2008) ........................................................................................................................ 21

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) ........................................................... 13

*Patterson v. Balsamico*, 440 F.3d 104 (2d Cir. 2006) ................................................................ 22

*Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76 (2d Cir. 1997) .......................................................... 20

*TNT USA Inv. V. DHL Express (USA), Inc.,* No. 09-CV-0481(JS)(ARL), 2012 WL 601452 (E.D.N.Y. Feb. 23, 2012) .................................................................................................. 12, 14

**RULES**

Fed. R. Evid. 702 ............................................................................................................................. 9

Fed. R. Evid. 401 ........................................................................................................................... 10

Fed. R. Evid. 403 ................................................................................................................. 10, 11, 16

Fed. R. Civ. Proc. 26(a), 26(e) ...................................................................................................... 21

Fed. R. Civ. Proc. 37(c) ........................................................................................................... 21, 22

Fed. R. Civ. Proc. 16(b)(4) ............................................................................................................ 22

**REGULATIONS**

16 N.Y.C.R.R.§ 890.80(b) ............................................................................................................... 8

16 N.Y.C.R.R.§ 890.80(c)(4) ........................................................................................................... 8

16 N.Y.C.R.R.§ 890.80(c)(5) ........................................................................................................... 8

16 N.Y.C.R.R. § 890.80(a)(3)(i) ...................................................................................................... 8

C.G.S.A. § 16-331k ......................................................................................................................... 8

N.J.A.C. 14:18-3.17(b) ................................................................................................................... 8

Plaintiffs in this breach of contract action against Cablevision Systems Corporation and CSC Holdings, LLC (collectively, "Cablevision") respectfully move to strike Cablevision's Expert Report of Elizabeth Losinski and to preclude her as a fact or expert witness, and to preclude Cablevision from relying on untimely discovery.

## INTRODUCTION

This case asserts a breach of contract claim on behalf of a class of Cablevision subscribers.  There is no dispute about what is the governing contract; nor is there a dispute that for a two-week period in October 2010, Cablevision knew that it did not deliver the Fox channels programming listed in its channel lineup.  Now, four years into the case and a year after fact discovery has closed, Cablevision has identified its long-time employee Elizabeth Losinski as a fact witness and also as an "expert."  This disclosure, served on July 18, 2014, was (i) included in supplemental initial disclosures; (ii) sent with 138 pages of new documents; and (iii) sent with an amended interrogatory response (the "July 2014 discovery").  By this motion, plaintiffs seek to foreclose Cablevision from relying on Ms. Losinski as an expert or fact witness, and to preclude it from using documents and "expert exhibits," that were not produced during fact discovery.[1]

Cablevision's attempt to sandbag plaintiffs with belated disclosure of Ms. Losinski is impermissible.  Cablevision has never before indicated that Losinski, a 27-year Cablevision veteran, was "knowledgeable;" would be used to support its defenses; or was otherwise

---

[1] This motion does not seek to strike four other newly-identified witnesses, because those individuals were identified during discovery and have been deposed.  Nor does this motion seek to strike the amended interrogatory response, which increases Cablevision's recurring cable subscriber fees for Oct. 2010. While that amendment impacts the aggregate damage in the case, and Cablevision has long been on notice of that aggregate amount, the amendment does not unduly prejudice plaintiffs under the present circumstances.  References to "Shahmoon Decl. Ex. __" herein are to the Exhibits attached to the Declaration of Carol S. Shahmoon in Support of Motion to Strike Testimony and Report of Elizabeth Losinski and to Preclude Defendants From Relying On Untimely Discovery.

significant.  Losinski's appearance "out of the woodwork" reflects a "trial by ambush" strategy, because Cablevision earlier identified and defended the deposition of a different employee in the same Government and Public Affairs Dept. at Cablevision.  That employee, Lee Schroeder, was Losinski's boss. Cablevision is unhappy with that testimony, in which Schroeder, contrary to these expert opinions, indicated that there was not a change in lineup.  Ms. Schroeder also could not explain (or recall) her own emails showing that her department informed public officials that Cablevision would pay credits for the missing channels.  With fact discovery closed for over a year, and a lack of favorable testimony, Cablevision now wants to introduce a new witness to spin a different version of the facts to support their fanciful reading of their contract. The discovery rules, however, prevent this type of strategy, at this late stage.

In an effort to sneak in Ms. Losinski, Cablevision designates Losinski both as a new fact witness and tries to shroud her testimony in the guise of "expert opinions."  But Ms. Losinski's expert report falls far short of the standards of admissibility.  Her only "specialized knowledge" as a lifetime employee is about how *Cablevision runs its own business*; and her "special experience" was as an advocate of Cablevision's interests before public officials.  Her work *did not* cover subscriber notifications, the contract, or programming lineups or changes, the subject matters of her report.  Regulations were not her expertise either; they were the responsibility of Cablevision's legal team.

The content of the report adds nothing to help resolve the contract interpretation issues in the case, and instead confusingly diverts the fact-finder to "regulatory schemes" "Cablevision's practices" instead of the actual contract words.  The smattering of regulation discussed in the report is irrelevant, because it is the contract language that controls in this breach of contract case.  Ms. Losinski's assessment that her employer complied with selected portions of selected

regulations does not overcome Cablevision's hurdle – Paragraph 17 of the contract permits lineup changes only "in accordance with applicable law." Cablevision has never asserted (nor can it assert) that it changed its lineup *in accordance with applicable law*, because it never did. Ms. Losinski's theories are, therefore, irrelevant, confusing and prejudicial.

Also, Cablevision cannot use this "expert" report to introduce documents, as "exhibits," that were not properly disclosed in discovery. Those exhibits, with the report, should be stricken. The same result should apply to the new 138 pages newly produced.

Accordingly, plaintiffs' motions to strike the Losinski expert report, exhibits, and any expert or fact testimony, and to strike the new 138 pages should be granted.[2]

## BACKGROUND

### I.    The Claims And Procedural History

This class action was filed in October 2010, asserting breach of contract and other claims against Cablevision due to a two-week interruption in Fox programming (WNYW; WWOR; WTXF; Fox Business Network; Nat Geo Wild; and Fox Deportes; together, the "Fox Channels"), included in subscriber packages. Cablevision filed a motion to dismiss, which was denied as to breach of contract for the credit due to customers as a result of the interruption. The dispute revolves around whether the governing contract section is, as Cablevision contends, Paragraph 17[3] (change in lineup), or as plaintiffs contend, Paragraph 4[4] (interruption). *See Dkt. No. 117*.

---

[2] Currently, the discovery cut-off for the completion of expert depositions is on or about Sept. 30, 2014. The parties are attempting to schedule the depositions of Plaintiffs' experts the week of Sept. 15, 2014, and Defendant's experts the week of Sept. 22, 2014. Plaintiffs respectfully seek to stay the deposition of Ms. Losinski pending the outcome of this motion.

[3] Para. 17: "All programming, program services, program packages, number of channels, channel allocations, broadcast channels, interactive services, e-mail, data offerings and other Services are subject to change in accordance with applicable law." *Shahmoon Decl. Ex. 2.*

Fact discovery closed on February 15, 2013.  [*Dkt No. 87, 88*]  During fact discovery, Cablevision served its initial disclosures, responded to three sets of discovery requests, and produced over 354,000 pages.  Thirteen current and former employees were identified in the disclosures and discovery responses.[5]  Plaintiffs deposed five of them and sought an extension of fact discovery to depose a sixth employee, which was denied.[6]

Towards the close of discovery, plaintiffs filed a class certification motion [*Dkt. No. 65*] and a motion for partial summary judgment [*Dkt. No. 80*].  At that time, the Court was presented with a question about "damages."  While plaintiffs' asserted that class members were entitled to a "pro rata" refund of monthly charges as calculated based on a daily pro ration, Cablevision asserted an "expectation" damage theory.  The parties stipulated, and the Court permitted, a stay of expert discovery (but not fact discovery) until the Court ruled on the pending motions.  [*Dkt. No. 104; and docket entry dated April 22, 2013*]  In a March 31, 2014 order, the Court granted class certification, based on the "pro rata credit" theory.[7]  [*Dkt. No. 108*].  This set in motion the expert discovery phase of the litigation.  A May 6, 2014 "Final Scheduling Order," [*Dkt. No. 111*] set deadlines, including that of July 7, 2014 (extended to July 18 at Cablevision's request) for initial expert reports.  *See* docket entry May 29, 2014, ruling on [*Dkt. No. 115*].

---

[4] Para. 4: "In any event, if there is a known program or service interruption in excess of 24 consecutive hours (or in excess of such lesser time period pursuant to state law), which a pro-rata credit relating to such failure or interruption or, at its discretion, in lieu of the credit provide alternative programming during any program interruption. Cablevision shall not be liable for any incidental or consequential damages."  *Shahmoon Decl. Ex. 2.*

[5] They were identified in the initial disclosures, *Shahmoon Decl. Ex. 4*, (identifying Gary Schanman, Cablevision Sr. V.P., Video and Advanced Advertising; Jonathan Hargis, Cablevision Exec. V.P., Marketing and Advertising; Thomas Montemagno, Cablevision Sr. V.P., Programming Acquisition); in interrogatory response regarding internal discussions about paying a pro rata credit for the interruption, *Shahmoon Decl. Ex. 6, at Interrogatory Resp. No. 10* (identifying John Bickham; Catherine Bohigian; Jim Maiella; Kathleen Mayo; Lisa Rosenblum; Tom Rutledge; Lee Schroeder; Charlie Schueler); in interrogatory response revealing persons who assisted with the responses, *Shahmoon Decl. Ex. 6, at Interrogatory Resp. No. 16* (identifying Bradley Feldman; Peter Capozzi).

[6] Cablevision opposed plaintiffs' request. [*Dkt. Nos. 96, 98; docket entry dated Apr. 29, 2013*].

[7] The parties conferred on the appropriate language for the class notice, which was ultimately approved by the Court, and the parties continue to work on the mechanics of distribution.

4

To the complete surprise of plaintiffs, and without seeking leave to reopen fact discovery, Cablevision delivered the July 2014 discovery and for the first time identified Ms. Losinski as a fact witness, when it delivered her expert report.  It is puzzling that Losinski could be designated not only as knowledgeable, but also as an expert, when she appears on a handful of the 354,000+ documents and when her supervisor, Lee Schroeder, deposed earlier in the case, had little knowledge about the subjects on which Ms. Losinski purports to offer expert opinions.  Ms. Schroeder indicated that no one in her department played any role in subscriber notification, subscriber contracts, programming disputes or programming lineups, and that her department had no special expertise on regulatory notices and deferred entirely to legal counsel.[8]

## II.   Ms. Losinski's Experience As Cablevision Policy Advocate

For the bulk of her career and for the last 27 years, Elizabeth Losinski has worked for one employer – Cablevision.  She has always worked on cable policy, political affairs and regulatory affairs.  From 1998-2014, Losinski was Vice President – Cable Policy and Political Ethics, and "responsible for Company's political activity, including managing the political action committees, compliance with lobbying and gift rules; political advertising and other corporate political activity," as well as "franchise relations with the City of New York." *Shahmoon Decl. Ex. 1 (Curriculum Vitae at Exhibit A of report).*  For ten years before that, she had responsibility to "manage the company's government relations."  Upon retiring from Cablevision in early 2014, Ms. Losinski immediately resumed many of her same functions as a "consultant."[9]

During the period at issue, Ms. Losinski (and six other employees) reported to Ms. Lee Schroeder, Sr. V.P. of Government and Public Affairs.  That department was not responsible for

---

[8] *See generally Shahmoon Decl. Ex. 3 (Schroeder Dep.) at T18:14-28:22.*
[9] Her current functions are: "with respect to the development of the history of Cablevision and advisor on compliance with laws and regulations governing corporate political activity, including lobbying, gift rules and campaign finance as well as general advisor on cable policy issues*." See Shahmoon Decl. Ex. 1 (Curriculum Vitae at Exhibit A of report).*

"compliance." *Shahmoon Decl. Ex. 3 (Schroeder Dep.), at T11:10-11.*  Instead, it functioned as an advocacy group that sought to build relationships with politicians and regulators.[10]  Among the departmental goals in 2010 was to "communicate successfully the company's position at the time when it would be necessary." *Id. at T33:20-23.*  The department performed "outreach" to legislators.[11]  During the Fox incident, the role of department employees "would be to, to the extent necessary, communicate with public officials regarding – in respect to inquiries in a situation like that." *Id. at T13:2-8.*[12]  The purpose would be to gain support from public officials for Cablevision.[13]  For example, there were inquiries from public officials about whether Cablevision would be crediting its customers, and for a period of time, these employees were telling officials that credits would be paid for the interruption period.[14]

 At times, the department would be responsible for sending notifications or letters to regulators.  But the department was not responsible for knowing the legal requirements as to notice *timing, triggers, or content*; those judgments were made by legal counsel.[15]  Furthermore,

---

[10] "Government affairs does the company's relationship with government officials at the federal, state and local level." *Shahmoon Decl. Ex. 3 (Schroeder Dep.), at T8:16-18.*

[11] "[W]ithin the government affairs realm, you aim to build relationships with the people who represent the areas that you serve or who are in leadership." *Shahmoon Decl. Ex. 3 (Schroeder Dep.), at T37:3-13.*

[12] In connection with figuring out how to respond to those inquiries, the employees in this group "would be looking for guidance from counsel and others on what would be said in that situation." *Shahmoon Decl. Ex. 3 (Schroeder Dep.), at T32:4-10.*

[13] "[C]ampaign would involve us asking them to write a letter probably in support of our position." *Shahmoon Decl. Ex. 3 (Schroeder Dep.), at T87:23-88:17.*

[14] *Shahmoon Decl. Ex. 3 (Schroeder Dep.), at T79-86.*

[15] *See, e.g., Shahmoon Decl. Ex. 3 (Schroeder Dep.), at T19:5 – 22:6* ("I'm generally aware that there are notification requirements attendant to a situation like this. But any specifics about what those are I get from in-house counsel with respect to a certain situation."); *T28:20-22* ("We seek guidance from in-house counsel on whether or not – whatever instance is being presented would require notice."); *T27:4-10* (trigger in giving notice "would have been involving in-house counsel's advice on when the notice would have needed to be done"); *T67:10-14* ("I'm generally aware that there are regulatory notices attached to channel modifications. I don't know – I rely on in-house counsel to advise on what specifically those are in the different instances."); *T45:21-24* ("someone from my group would likely sign the letter, but the letter would have been vetted with in-house counsel"); *T46:15-16* (if a regulatory notice issue arises, "we would seek counsel on that"); *T47:7-8* ("The determination on whether or not notice was necessary is not our decision"); *T72:10-12* ("my group would be providing the regulatory notice only. But on the advice

the department had *no responsibility* for knowing about, advising on, or executing subscriber notifications.[16]  Nor was it responsible for interacting with customers.  *Id. at T39:11-17*.  Furthermore, it was not involved with:  (1) drafting Cablevision's Terms of Service (*id. at T 110:22-111:8*); (2) the Fox dispute or the negotiations;  (*id. at T111:14-18; T12:16-22*); (3) pricing cable packages for sale to customers; or (4) channel lineup changes.  (*id. at T111:19-112:1*)

### III.    The Contents Of Ms. Losinski's Report

#### A.  Overview Of Report

The report contains five sections: (I) Summary of Expert Opinions; (II) Expert Experience And Qualifications; (III) Facts, Bases And Reasons In Support Of Expert Opinions; (IV) Expert Findings, (V) Conclusion And Opinions.  Section III has five parts, consisting of a narrative of cable industry background; Cablevision's business and practices; the Cablevision-News. Corp. dispute; and regulatory schemes and remedies.

The report introduces a term that is not in the contract, "programming blackout," and asserts that it is a "term of art."  It also introduces another supposed term of art, "network change," and then equates the two.  Then it discusses "disruption of service," as another "term of art" to be interpreted as a loss of service "for which a subscriber pays a separate price," due to a "force majeure" event, and which represents a certain unspecified proportion of channels.  None of the terms of art are supported by citations to industry or other evidence of the usage or limitations asserted.

---

of counsel"); *T74:6-25* (with respect to timeline for regulatory notice on rate adjustments, "we rely on counsel").

[16] *Shahmoon Decl. Ex. 3 (Schroeder Dep.), at T22:25-23:7* ("I'm generally aware of notification requirements for customers, but I'm not aware of the specific requirements that exist…I don't have specific knowledge of who in the company does that [implements customer notifications]"); *T61:11-20* (does not know which department or person "would be in charge of customer notifications that are done pursuant to some regulatory issue;" and not aware of "general bill messaging department").

The report then asserts that certain regulations "in general" require subscribers to be notified of a lineup change and provide an opportunity to downgrade or terminate without charge.  It contends that there are certain circumstances under which regulations require credits to subscribers.  The report does not address the contractual provision that Cablevision has asserted governs here – *i.e.*, whether there was a programming change in accordance with applicable law, however, and ignores many of the rules about the timing, form, distribution method, and contents of subscriber and regulator notices, necessary to make a change in accordance with applicable law.[17]  The report introduces a number of exhibits, never before produced in response to plaintiffs' specific discovery requests for all notices provided to customers, and then asserts that these are "examples" of on screen "messages" purportedly on subscriber TV screens during the interruption. The report concludes with the five opinions below.

**B.  The Opinions**

1.  "[T]he unavailability of the Fox Channels on Cablevision's cable system from Oct. 16 to Oct. 30, 2010, due to the contract dispute between New Corp. and Cablevision was a 'programming blackout,' which is a kind of 'network change,' as those terms of art are used in the cable industry. As discussed above, the other terms of art found in paragraph 17 of Cablevision's Terms of Service also could be used to describe the change to the availability of the Fox Channels on Cablevision from Oct. 16-30, 2010. But none of the terms of art found in paragraph 4 of the Terms of Service would be used to describe this change to the availability of the Fox Channels."

2.  "[I]n general, in the event of a 'programming blackout,' the applicable regulations in the areas where Cablevision operates require cable companies only to give subscribers notice of the change and to afford them an opportunity to downgrade or terminate service free of charge."

---

[17] *See, e.g.*, 16 N.Y.C.R.R. § 890.80(a)(3)(i); § 890.80(c)(4); § 890.80(b); § 890.80(c)(5) (30 days advance written notice to regulators on customer bill/mailing <u>and</u> on-screen); N.J.A.C. 14:18-3.17(b) (30 day advance notice); C.G.S.A. § 16-331k (30 day advance notice).  Cablevision has never asserted that it complied with these rules, and in fact did not comply with them.

3.  "[I]n connection with the 'programming blackout' of the Fox Channels, Cablevision gave subscribers notice of the change and afforded them an opportunity to downgrade or terminate service free of charge, which was consistent with its longstanding practice as informed by the regulatory framework."

4.  "[A] 'disruption of service' is a commonly understood term of art in the cable industry, which refers to a loss of cable service for which a subscriber pays a separate price, resulting from a technical failure or extraordinary *force majeure* type of event that affects the operation of the cable system."

5.  "[O]ther than in limited circumstances, not applicable here, the across-the-board credits requested by Plaintiffs are required under applicable regulations only for certain 'disruptions of service.'  The 'programming blackout' of the Fox Channels was not a 'disruption of service.'  The unavailability of the Fox Channels did not constitute a loss of cable service for which a subscriber pays a separate price, as the Fox Channels represented only a small fraction of the total number of channels contained in the service tiers from which they were unavailable.  Similarly, the unavailability of the Fox Channels was <u>not</u> caused by a technical failure or extraordinary event that affected the operation of Cablevision's cable system.  It resulted from the contract dispute between Cablevision and News Corp., in which Cablevision made a business decision to refuse to accede to News Corp.'s demands for fees and contract terms that it deemed to be unacceptable, and in which News Corp. made a business decision to refuse to permit Cablevision to carry the Fox Channels during the dispute."

## LEGAL ARGUMENT

I.  **The Expert Report Of Elizabeth Losinski Should be Stricken And Ms. Losinski Should Be Precluded From Offering Expert Testimony**

   A.  **Standard For Admissibility Of Expert Testimony**

Rule 702 of the Federal Rules of Evidence sets forth the required conditions for

testimony offered by a witness "who is qualified as an expert" to be admissible:

(a)  expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b)  testimony is based on sufficient facts or data;
(c)  testimony is the product of reliable principles and methods; and
(d)  expert has reliably applied the principles and methods to the facts of the case.

Rule 702 was amended to reflect the principles of the leading Supreme Court cases,

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v.*

*Carmichael*, 526 U.S. 137 (1999) (extending the *Daubert* principles beyond "scientific"

testimony to all expert testimony).  The *Daubert* standard requires the district court to perform a

"gatekeeping" function under Rule 702 to ensure that the expert testimony is both reliable and

relevant.  *Amorgianos v. Nat'l Railroad Passenger Corp*., 303 F.3d 256, 265 (2d Cir. 2002). On

relevance, the inquiry is whether the proffered testimony "ha[s] any tendency to make the

existence of any fact that is of consequence to the determination of the action more probable or

less probable than it would be without the evidence."  *Id*. (citations omitted).  *See also* Fed. R.

Evid. 401.

In addition, the expert must employ the "same level of intellectual rigor that characterizes

the practice of an expert in the relevant field." *Amorgianos,* 303 F.3d at 266. An expert's

conclusions must be "supported by good grounds for each step in the analysis, [which] means

that *any* step that renders the analysis unreliable under the *Daubert factors renders the expert's

testimony inadmissible*." *Id*. at 267 (citations omitted) (emphasis in original).  Opinion evidence

is not admissible if the opinion "is connected to existing data only by the *ipse dixit* of the

expert."  *Donnelly v. Ford Motor Co*., 80 F.Supp.2d 45, 48 (E.D.N.Y. 1999) (citations omitted);

*see also Feliciano v. County of Suffolk*, No. 04-CV-5321(JS)(AKT), 2009 WL 290469, at *2

(E.D.N.Y. Feb. 4, 2009) (expert opinion is inadmissible when data, methodology, or studies are

"simply inadequate to support the conclusions reached") (citations omitted); *Delehanty v. KLI,

Inc*., 663 F.Supp.2d 127, 133 (E.D.N.Y. 2009) (inadmissible when there is "nothing at all to

establish the basis of his opinion"); *Brown v. China Integrated Energy Inc*., No. 2:11-cv-02559-

BRO-PLA, at p. 5 (Aug. 4, 2014) (burden of proof of admissibility is on proponent of expert).

Expert testimony is also subject to Rule 403 of the Federal Rules of Evidence. Evidence

may be excluded "if its probative value is substantially outweighed by a danger of…unfair

prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

### B.  Opinion #1 Is Not Admissible

Opinion #1, which introduces the term "programming blackout," and equates it with the term "network change," fails the *Daubert* test on a number of grounds.

First, the opinion is irrelevant, prejudicial and confusing.  Cablevision's contract liability depends on whether the missing Fox channels constituted a "program or service interruption" (under Paragraph 4) or a programming "change in accordance with applicable law" (under Paragraph 17).  Neither Paragraph 4 nor Paragraph 17 contains the term "programming blackout."  Cablevision wrote this contract; if it meant to use different words, it could have done so.  Cablevision's flexibility to write a form contract to favor its own interest is, for the most part, unrestricted.  Now, having created its form contract, it cannot succeed in its effort to have the Court to rewrite it.  Moreover, after this litigation was filed, Cablevision actually exercised its unilateral power to rewrite the contract – by rewriting it.  The contract amendments made Cablevision's "theoretical" paragraph 17 offered in this report into a reality.[18]

---

[18] New paragraph 17 is arguably illusory, because it promises no particular programming in its packages: "Subscriber acknowledges and agrees that it has no right to receive, and Cablevision has no obligation to provide, any particular programming service or channel as part of Cablevision's Service and that Subscriber is not entering into this agreement or purchasing Cablevision's Service in reliance on an expectation or promise (explicit or implicit) that any particular programming service or set of programming services shall be included as part of Cablevision's Service.  Notwithstanding anything to the contrary herein, and for the avoidance of doubt, in the event particular programming becomes unavailable, either on a temporary or permanent basis, due to a dispute between Cablevision and a third party programmer, Cablevision shall not be liable for compensation, damages (including compensatory, direct, indirect, incidental, special, punitive or consequential losses or damages), credits or refunds of fees for the missing or omitted programming.  Subscriber's sole recourse in such an event shall be termination of the Service in accordance with the terms of Section 14 [requiring 7 days advance notice].  The provisions of this paragraph shall not apply to programming to which a Subscriber subscribes on an a la cart basis (i.e. channels that are not part of a package or tier); provided, however, that in that event Subscriber shall only be entitled to a pro rata credit of amounts pre-paid for the specific programming to which Subscriber subscribes on an a la carte basis."

Second, the opinion is not based on sufficient facts or data, as it provides no basis or citation to support the definition of the supposed terms of art "programming blackout" or "network change."  *See Donnelly v. Ford Motor Co.*, 80 F.Supp.2d 45, 51 (E.D.N.Y. 1999) (rejecting expert opinion under Rule 702, because "it is devoid of any explanation of the reasoning or methodology by which he reaches it").  Moreover, by introducing "programming blackout" as a "term of art," through its employee, Cablevision is reversing course, from its prior position (including testimony from that employee's own supervisor), in which it repeatedly objects to the characterization "Fox Blackout," as vague, ambiguous and/or inapplicable.[19]  And even if Cablevision could now embrace the terminology, "programming blackout," the opinion still does not help Cablevision's defense.  This opinion ignores the phrase "program interruption" – the actual contract words contained in paragraph 4.  So at best the new terminology could serve only as evidence of a contract "ambiguity."  But, as a legal matter, a contract drafter cannot create an "ambiguity," based on "extrinsic evidence" – its own employee's opinion – that introduces language not present in its own form contract.[20]

Third, even if, despite Cablevision's assertions to the contrary, a "programming blackout" were a relevant term of art, Ms. Losinski employs no methodology or principle to

---

[19] *See Shahmoon Decl. Ex. 10 (Defs. Resp. and Objs. To Plffs.' Third Set of Interrogatories And Accompanying Request For Prod. Of Documents)*, at *Interrogatory Resp. No. 1* ("Cablevision objects to the undefined term 'Fox Blackout' as vague and ambiguous."); *Schroeder Dep, T11:16-12:5* (in response to description of event as "Fox blackout," Lee Schroeder stated "It is not my characterization."); *Answer [Dkt. No. 55], at ¶ 14*, (Cablevision "denies that it engaged in a 'blackout of the Fox Channels'").

[20] *Int'l v. Multifoods Corp. v. Comm'l Union Ins. Co*, 98 F.Supp.2d 498, 503 (S.D.N.Y. 2000) (court will not consider "custom and usage to create ambiguity where none exists in the plain language of the agreement); *TNT USA Inv. V. DHL Express (USA), Inc.,* No. 09-CV-0481(JS)(ARL), 2012 WL 601452, at *6 (E.D.N.Y. Feb. 23, 2012) (consumer contract is construed based on "reasonable person" interpretation); *Bronx Sav. Bank v. Weigandt*, 1 N.Y.2d 545,553 (1956) ("placing a legal conclusion on the words in this policy does not change their meaning or the manner in which they might reasonably be construed by an average person who would purchase such a policy"); *Hartford Acc. v. Indem. Co. v. Wesolowski,* 33 N.Y.2d 169, 173 (1973) (form insurance contract construed based on "what the average person anticipates"); *Jacobson v. Sassower*, 66 N.Y.2d 991, 993 (1985) (construed against the drafter).

support her leap of logic that a "programming blackout" is also a "network change."[21]  The

purported reasoning, as set forth below, is improper "ipse dixit" logic:

> A "network change" is a term of art in the cable industry used to refer to a change
> in the mix of networks that cable operators offer subscribers on a particular service
> tier.  A "network change" can refer to the addition or removal of a network from a
> service tier, a change of network from one tier to another, or the substitution of one
> network for another.  <u>A network change can also result from a contract dispute
> between a cable operator and a programmer, such as, for example, when a
> programmer refuses to enter into a license agreement to allow the cable operator to
> offer a network, or when a programmer insists on license fees or other contract
> terms that the cable operator finds unacceptable.</u>  As noted, the term "programming
> blackout" is a term of art used in the cable industry to describe a network change
> resulting from such a contract dispute.  The unavailability of the Fox Channels from
> October 16 to 30, 2010, is an example of a "network change."  More specifically, it
> is a "programming blackout," which is a type of "network change (emphasis
> added).

The obvious gap in the reasoning is compounded by the perverse conclusion, which

contradicts Cablevision's consistent evidence showing that the "blackout" was not a lineup

change.[22]  Moreover, Ms. Losinski's own exhibits D and E[23] show that all of the six Fox

channels *remained in the channel lineup and package listings* during the interruption period; and

thus there was no lineup change deleting those channels.

The report's illogical leap equating a "blackout" with a "change" is inconsistent with

standard meanings of "blackout" listed in the dictionary, which in various forms refers to a

---

[21] *Nimely v. City of New York*, 414 F.3d 381, 399 (2d Cir. 2005) ("Such a leap is the essence of
unverifiable subjectivity, amounting to the sort of *ipse dixit* connection between methodology and
conclusion that the district court has a duty to exclude under Rule 702"); *id.* at 396 (reliability requires
"sufficiently rigorous analytical connection between that methodology and the expert's conclusions").

[22] *Shahmoon Decl. Ex. 3 (Schroeder Dep.), at T69:4-15* (Q: Was the channel deleted would you say? A:
The channel wasn't available to our customers. I wouldn't characterize it as deleted or not." Q: Would
you say that Cablevision changed its lineup on October 16, 2010? A: No. I mean I wouldn't characterize –
no.); *Shahmoon Decl. Ex. 11 (Montemagno Dep.), at T98:23-99:3* (Q: Did you understand the Fox
blackout to be a channel lineup change? A: Not in my opinion); *T60:25-61:4* (referring to the incident as
"the temporary blackout").

[23] Although not "bates-stamped," these documents appear to be among the channel lineups produced in
discovery.

temporary (voluntary or involuntary) disruption, and not a permanent change.[24]  Presumably, this

is why Cablevision has all along objected to the term "blackout."  Ms. Losinski cites to no

examples of Cablevision's use of this "term of art" or its meaning, or its use in the industry or

among the general public.  The missing logic in the report cannot be cured simply by Ms.

Losinski's bald assertion that these are all "terms of art," which amounts to nothing more than --

"because I said so."  Further, it matters little whether "programming blackout" is a term of art

used in the cable industry; what matters is what the contract words mean to a reasonable

subscriber.[25]

      Fourth, Ms. Losinski has no expertise in the subject areas of this opinion.  Her

department was not involved with programming; channel lineups; editorial and business

decisions of Cablevision; or disputes between programmers and Cablevision.  The role of her

department was limited to sending letters to regulators, based on legal advice, and to advocating

to public officials to advance Cablevision's best interests.[26]

## C.  Opinion #2 And Opinion #3 Are Not Admissible

      Opinion #2, which asserts "in general" that "applicable regulations" require notice of a

change and an opportunity to downgrade/terminate free of charge; and Opinion #3, which asserts

that Cablevision gave that notice, do not satisfy *Daubert*.

      First, these opinions are irrelevant, prejudicial and confusing. The only relevant question

under contract paragraph 17 is whether Cablevision changed its lineup "in accordance with

applicable law."  That question cannot be addressed in this "expert" opinion about the

---

[24] Per Merriam-Webster online, "blackout" means, among other things, a period of darkness caused by electrical failure; sudden and temporary loss of consciousness; a period when lights are kept off or are hidden from view to guard against enemy airplane.

[25] *TNT USA, Inc.*, 2012 WL 601452, at *5 ("mere assertion by one party that contract language means something other than what it clearly says is not sufficient to raise a triable issue of fact").

[26] *Shahmoon Decl. Ex. 3 (Schroeder Dep.), at T18:14-28:22.*

Cablevision's "longstanding practices" or the "regulatory framework," because Cablevision has never asserted in any of its court filings or discovery responses that it made a change <u>in accordance with applicable law</u>.  That failure is no accident as the issue was squarely presented to Cablevision, but it could not in good faith make the important assertion.[27]

    <u>Second</u>, the caveats and generalizations render Opinions #2 and #3 confusing and prejudicial.  While Opinion #2 broadly appears to be an opinion about legal requirements under regulations (improper, in part, because it is not appropriate for an expert to give a legal opinion), and Opinion #3 appears to be an opinion about regulatory "compliance," a closer look at the wording of these opinions makes it clear that they are meant to throw the fact-finder off course and evade the relevant question.

    Opinion #2 is limited to what "applicable regulations" require -- "<u>in general.</u>"[28] Opinion #2 ignores many "applicable regulations" that relate to channel deletions.  Those other regulations address:  *form and method* of subscriber notice delivery (written mailed notice as well as on-screen); the *timing* of subscriber and regulator notice (30-days in advance and for 30 days); *contents* of notice (informing subscriber of upcoming programming lineup change); and *other requirements* (notice that subscribers may be entitled to credits for prior 6 months charges

---

[27] In response to plaintiffs' motion for summary judgment, raising this critical issue, defendants filed an opposition brief and a Rule 56.1 statement of fact. [*Dkt. Nos. 92, 93*] Nowhere in those documents does Cablevision assert it changed the lineup in accordance with applicable law.  Plaintiffs' reply, filed on March 1, 2013, again put the question front and center, at p.4 & n.4. [*Dkt. No. 99*] On February 5, 2013, plaintiffs served interrogatories and document requests on the same question.  Defendants' response on March 7, 2013 still did not assert that Cablevision changed its lineup in accordance with applicable law. *See generally Shahmoon Decl. Ex. 10 (Defs. Resp. and Objs. To Plffs.' Third Set of Interrogatories And Accompanying Request For Prod. Of Documents).*  Nor did Cablevision make that assertion in its supplemental letter in further support of its opposition, dated June 28, 2013. [*Dkt. No. 105*]

[28] Notably, the "applicable regulations" cited here do not address the term "programming blackout" anywhere.  So again, the methodology here is confusing, rendering the opinion unhelpful and inadmissible.

for certain lineup changes).  Cablevision did not comply with all the requirements relevant to

deleting the Fox Channels, so it did not change the lineup in accordance with applicable law.

Opinion #3 is narrowly-tailored to be consistent with the "in general" caveat of "Opinion

#2, which addresses some, but not all, applicable regulations.  While Opinion #3, at first blush,

appears to be about "regulatory compliance," it is actually nothing more than a restatement of

Cablevision's assertion that it gave notice and afforded an opportunity to downgrade/terminate,

per its "longstanding practice as informed by the regulatory framework."  An opinion about

Cablevision's longstanding practice, whether or not it is "informed by the regulatory

framework," is not relevant to this case, and is confusing and prejudicial.  A practice that is

"informed" by regulations is not necessarily in compliance with applicable law.  Thus, Opinions

#2 and #3, are not relevant to this contract dispute, because they say nothing more than

Cablevision in general complied with some regulations.  *In re Rezulin Prods. Liability Litig.*, 309

F. Supp. 2d 531, 544-45 (S.D.N.Y. 2004) (expert testimony addressing an irrelevant question is

not admissible, and further confuses and prejudices jury under Fed. R. Evid. 403).   These

opinions will confuse the fact-finder, because they are not relevant to the contract words.

Third, these opinions are not based on sufficient facts or data in the record or generally

relied upon by experts.  The methodology presented in support of these opinions is the discussion

in report section III.C., citing to purported Cablevision sample "messages" in report exhibits F,

G, and H[29] and a "schedule" in report exhibit I. These documents were never produced in

---

[29] Ms. Losinski asserts that these items are regulatory "notifications" meant to inform subscribers that *all six* Fox Channels have been *permanently deleted* from the lineup, but the text does not notify customers of a lineup change as required by law, and is instead a public relations message:  "News Corp [sic] is demanding more for FOX 5 than we pay for ABC, NBC, CBS and Univision combined! FOX has pulled Fox 5 and My9 from Cablevision."  This message states the obvious that the channels are not on the screens; it does not indicate that the missing channels are a permanent lineup change rather than an interruption.  This failure to indicate a specific lineup change, 30 days in advance in writing, is probably

discovery in response to direct requests before fact discovery cutoff, and thus, they are improper.[30]   Similarly, report exhibits K and L, purportedly "listing network changes for 2009 and 2010," were never produced and, as exhibit L is dated July 18, 2014, they appear to be newly-created self-serving documents.  Moreover, even if these documents were permissible evidence, the "message" does not indicate that channels have been deleted from the lineup, rather than interrupted.  Ms. Losinski's department within Cablevision had no connection to customer messaging about Fox, and thus it is unclear how she would have knowledge about those matters.[31]   Furthermore, these exhibits do not address the relevant applicable regulations about timing, method and content of subscriber notices, or the basic fact that Cablevision has never asserted that it changed its lineup in accordance with law.[32]

Fourth, Ms. Losinski has no special expertise in the subject areas of these two opinions. While she speaks extensively here (personally and as an "expert") about her knowledge of the rules governing subscriber notifications and Cablevision's practices, she is not an expert in either. Ms. Schroeder indicated that subscriber notice was not covered by her department or its

---

no accident; true advance notice of a change would likely have caused Cablevision to lose more subscribers.

[30] *See Shahmoon Decl. Ex. 10 (Defs. Resp. and Objs. To Plffs.' Third Set of Interrogatories And Accompanying Request For Prod. Of Documents)* (in response to requests about subscriber and regulatory notice, defendants listed certain documents and also incorporated by reference documents produced in an earlier interrogatory response (*Shahmoon Decl. Ex. 6*); 42 pages of documents were identified, none of which includes Losinski's exhibits F-I).  *See Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D. 50, 70-71 (E.D.N.Y. 2012) (excluding expert exhibits containing documents not produced in discovery).

[31] *Shahmoon Decl. Ex. 3 (Schroeder Dep.), at T39:11-17* (A: "to the extent we put together messaging it would be relating to communications with government officials"; Q: Were you also working on messaging to customers? A: No.").

[32] Two months before the interruption, Cablevision employees began "contingency planning" regarding Fox, and an email was circulated among them to discuss topics, which included a deadline of Thursday, Sept. 16 to make "30-day notification deadline." The email was circulated to Schroeder, but Losinski was not on that email or listed as responsible for any assigned tasks (*e.g.*, notification and bill messaging or "customer advance notifications").  Ms. Schroeder recalled nothing about this planning or what deadlines were applicable and indicated she had no expertise about regulatory requirements.  *See Shahmoon Decl. Ex. 3 (Schroeder Dep.), at T18:14-28:22.*  Cablevision apparently decided to ignore the Sept. 16 deadline, and never notated bills with notice.

employees, and she didn't even know who at Cablevision would know about the subject. Furthermore, Ms. Schroeder was emphatic that departmental knowledge about regulatory requirements and implementation came from legal counsel and that her department was not responsible for "compliance."[33]  *In re Rezulin*, 309 F.Supp.2d at 549 (experts cannot describe or interpret regulations or comment on compliance when they have no expertise or first hand knowledge).

### D.  Opinion #4 And Opinion #5 Are Not Admissible

Opinion #4, which introduces the term "disruption of service"; and Opinion #5, which asserts that certain regulations require credits for "disruption of service," and that those regulations do not require credits in this case, are inadmissible.

<u>First</u>, these opinions are irrelevant, prejudicial and confusing.  They purport to address certain regulatory rules about requirements for "credits," which vary from state to state.  But this is a contract case  -  not a regulatory enforcement action.  Thus, the opinions are irrelevant and will confuse the fact-finder.

<u>Second</u>, the report makes an illogical leap that a "disruption of service," is a "term of art" understood to include four conditions: (i) *when there is a loss of service; (ii) "for which a subscriber pays a separate price;" (iii) resulting from "technical or extraordinary force majeure" events; and (iv) affecting more than "two or three channels out of 35" or representing more than "a small fraction of the total number of channels in the service tiers."*  There is absolutely no support or citation for this theory, which is not cured by interposing the phrase "term of art."  Regardless, an industry term of art is not relevant to a contract dispute with a customer.

---

[33] *Shahmoon Decl. Ex. 3 (Schroeder Dep.), at T11:10-11; see generally id. at T8:16-28:22.*

Moreover, even if "industry insiders" would understand the words "disruption of service" to include the four conditions, the opinion does not address the actual contract words at issue -- "program or service interruption."  Those words cannot be limited to "technical force majeure events," because the contract states that, in the case of a "program interruption," Cablevision can, at its sole option, provide "alternative programming" in lieu of credits.  Moreover, during the interruption, consistent with the option in the contract, Cablevision considered, and rejected, the idea of providing subscribers with alternative programming. *Shahmoon Decl. Ex. 6, at No. 9*. The contract treats that business decision as an election to provide credits to subscribers instead.

Furthermore, it is unclear what Ms. Losinski means by "pays a separate price" in Opinion #4.  Subscribers are limited to whatever packages/channels Cablevision sells, at the prices and in the manner offered in Cablevision's "rates and packages."  As the report asserts, Cablevision has wide latitude to create the tiers or packages, and customers oblige, even if they would prefer to purchase less than all the channels in any package.  Accordingly, Cablevision subscribers always pay a "separate price" for their services -- whatever price Cablevision charges.

The report asserts that if only some channels are affected, Cablevision is off the hook for credits.  This arbitrary theory, with no support, actually raises more questions than it answers: *How many channels is enough?  Does it matter if the interrupted channels are "commercially critical" to the package or "must see"?*[34]  Ultimately, Cablevision could have set a "de minimis" exception in its contract. If it wanted to sell the channels separately, it could have done so.  But its employee cannot now import such a limitation into it – one that Cablevision could have written in the first place.

---

[34] Cablevision has admitted that to retain and obtain customers, it needed the Fox broadcast networks in its lineups, because they were "commercially critical programming."  Compl., *Cablevision Sys. Corp. v. Viacom Int'l, Inc.*, 13 Civ. 1278, ¶ 30 [Dkt. 25] (July 16, 2013) (difficult to obtain/retain subscribers without Fox).  It has also admitted that the interrupted programming, was "must –see" television, such as the major league baseball championships.

19

Moreover, a "force majeure" theory of "disruptions" has no bearing on paragraph 4, which specifically excludes *force majeure* events from the realm of liability.[35]  The logical conclusion of this report – that Cablevision is liable for credits for a blameless "force majeure" event, but cannot be liable when it *knowingly* interrupts the programming because of a "business decision" to increase its profits – is illogical, confusing and prejudicial.

Third, Ms. Losinski is not an expert on credits for customers or the customer contract. *See generally Shahmoon Decl. Ex. 3 (Schroeder Dep.), at T18:14-28:22.*

**E.  The Other Material In the Expert Report Should Be Stricken And Ms. Losinski Should Not Be Permitted To Testify In The Case**

Apart from the five opinions, the rest of the report offers a factual narrative and provides no helpful expertise on the questions in this case.  Ms. Losinski was not timely identified as a fact witness, and as explained below, for that reason, she should be excluded as a fact witness. Furthermore, as discussed above, she has no expertise that would be relevant to this case, because her role at Cablevision is primarily to advocate for Cablevision before public officials. She has no expertise and was not involved with any of the facts at issue in this case or the subscriber contract.  And she has no personal knowledge about onscreen "messages" that Cablevision purportedly executed, because her department was not responsible for subscriber notification.  *Kogut v. County of Nassau*, 894 F.Supp.2d 230, 245 (E.D.N.Y. 2012) ("testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702"); *Brown, supra*, at p. 9 (expert "must have expertise in the matters on which he will opine"). Furthermore, it is not appropriate for a company employee to serve as an expert about "industry practice."  *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997).

---

[35] Oddly, Cablevision continues to assert in its Answer that the Fox interruption was a *force majeure* event, which pursuant to Ms. Losinski's theory, would be creditable.  However, this Court has already ruled that when a promisor fails to deliver due to a foreseen circumstance, such as a dispute with its vendor, it cannot claim a force majeure excuse, under contract paragraph 4.

Accordingly, the entire expert report should be stricken and Ms. Losinski should not be permitted to testify on facts or as an expert in this case.

## II.   Defendants Should Be Precluded From Presenting Elizabeth Losinski As A Fact Witness And From Relying On Untimely Discovery Including Her Attached Exhibits

### A.   Standard For Remedy Of Evidence Preclusion Under Rule 37(c)

Rule 37(c) of the Federal Rules of Civil Procedure provides that: "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." The purpose of the rule "is to prevent the practice of 'sandbagging' an adversary with new evidence." *Morgenstern v. County of Nassau*, No. 04-cv-0058(JS)(ARL), 2008 WL 4449335, at *1 (E.D.N.Y. Sept. 29, 2008) (citations omitted).  Rule 37(c) permits other less "drastic" sanctions, in lieu of or in addition to preclusion, at the discretion of the trial court, but if the Rule 37(c) standard is met, a sanction is mandatory.  *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 298 (2d Cir. 2006).

The court may decide that, despite a party's "failure to adhere to the letter of the discovery rules," the failure to disclose a witness was harmless if the other party was "sufficiently aware of the existence and relevance of the persons in question so that [that party is] not being subject to trial by ambush." *Morgenstern*, 2008 WL 4449335, at *2 (party "should have been on notice" that newly disclosed individual was a potential witness) (citations omitted). By contrast, the court may preclude a new witness, "whose identity [the party] may not even have been aware of, and who did not play any role in the parties' discovery process." *Id*. at *3.

Review of a district court's exercise of discretion in choosing preclusion as a sanction requires a consideration of the following four *Patterson* factors: "(1) the party's explanation for

21

the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness[es]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Design*, 469 F.3d at 296 (*citing Patterson v. Balsamico*, 440 F.3d 104 (2d Cir. 2006)).  Although the district court may, in choosing sanctions, consider whether a party acted in bad faith, the rule does not require a showing of bad faith or flagrant disregard of the rules in order to exclude evidence. *Design Strategy,* 469 F.3d at 296.

## B. Rule 37(c) Standard Is Met As To Ms. Losinski, The New Documents Submitted As Exhibits, and The July 2014 Bates-Stamped Production

This motion seeks preclusion of (1) Ms. Losinski as a fact witness; (2) the items contained in exhibits to her report that were not previously produced; and (3) the additional 138 pages of discovery, bates numbered CSC0035404-541, delivered on July 18, 2014.  There is no question that these items are late.  More than a year has passed since the fact discovery cutoff on February 15, 2013; plaintiffs' expert reports have already been produced; and plaintiffs' partial motion for summary judgment and class certification motions were filed more than a year ago.[36]

There was no hint of these items earlier in the case, and Cablevision has no excuse for the delay.  Moreover, the delay is a "trial by ambush" strategy, in which Cablevision has "dug up" an employee, subordinate to other witnesses who have already been deposed, to tell a new and different story from the one that Cablevision articulated through its witnesses during fact discovery.  While technically the new supplemental disclosure adds four other employee-witnesses to the three employees on Cablevision's original list, those individuals had been

---

[36] Amended Case Management And Scheduling Order [Dkt. No. 88], dated Jan. 15, 2013, p. 3 ("**The deadlines in this order will be enforced, and will be modified only upon a timely showing of good cause.")** (emphasis in original);  Fed. R. Civ. Proc. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent); *Advanced Analytics, Inc. v. Citigroup Global Market*s, Inc., 2014 WL 1243685, at \*14 (S.D.N.Y. May 7, 2014) (discovery will not be reopened to accommodate untimely disclosure).

deposed during fact discovery.  Thus, plaintiffs are not seeking to preclude them and arbitrarily undermine Cablevision's defense.  But, unlike those other individuals, Ms. Losinski's appearance is sudden, not reasonably anticipated, and prejudicial, as the case is well into expert discovery.

Ms. Losinski's report tries to "back-door" new documents to support her assertions about regulatory compliance and subscriber notification.  Her documentary "examples" and "schedules" to prove "compliance" with legal notification rules do not correspond with the documents Cablevision earlier produced in response to a broad discovery request about regulatory and subscriber notification.  And the report attaches "exhibits" pertaining to events in 2009 and 2010 that have been newly-fashioned to create a self-serving narrative.

Just as the identification of Ms. Losinski and her new documents are untimely, so too are the 138 new pages.  These pages appear to pertain to Cablevision's costs and other industry information about programming costs.  They are too late and were never disclosed before fact discovery cutoff.  Moreover, they are not included among the types of documents that Cablevision identified in its initial disclosures.  These included documents concerning:  (1) the Terms of Service: (2) advertisements, public statements, marketing materials; (3) subscriber viewing patterns and habits; (4) payments by plaintiffs to Cablevision for cable services; and (5) the expiration of retransmission consent agreement with News Corp.  Cablevision has no excuse for not producing these documents earlier, and its delay is not harmless, because fact discovery is closed and expert discovery well underway.

### C.  Four-Factor Test Weighs In Favor Of Preclusion

The first factor, the non-compliant party's explanation, weighs in favor of preclusion. Cablevision has no excuse for waiting to identify Losinski or provide the documents.  It has

known about her all along, and now apparently dissatisfied with the testimony of the witnesses that it did identify during fact discovery, is trying to redirect its case with a new story from a new witness.

The second factor, the importance of the testimony of the precluded witnesses, also weighs in favor of preclusion. Cablevision already identified a total of seven other employees, including Losinski's boss.  It is difficult to believe that Losinski would be more familiar with the facts and issues in the case than her immediate supervisor.

The third factor, prejudice to plaintiffs in having to prepare for the new testimony and evidence, also weighs in favor of preclusion.  Fact discovery is closed; plaintiffs have already spent time and money on two expert reports and putting together their case.  Reopening fact discovery would be costly. Losinski's name appears on only a handful of the 354,000+ emails produced, and thus, to prepare for the discovery of the wide ranging factual assertions made by Losinski, plaintiffs would need to serve additional document requests to obtain any documents relating to Losinski's knowledge of the facts of the case before deposing her.  Also, it is unfair for plaintiffs to have to address the "new story" being spun, which contradicts many of Cablevision's old positions.  Nor should the tactic of trying to introduce Ms. Losinski through the expert process be rewarded.  Further, the new documents would require a reopening of discovery.

The fourth factor, the possibility of a continuance, weighs in favor of preclusion.  This case has been pending for four years.  This Court, thus, has been expeditious in setting the upcoming schedule, which requires proposed joint pre-trial orders to be filed by November 4, 2014.  Upending discovery in order to reopen fact discovery at this late date is not reasonable or fair.

24

Accordingly, Ms. Losinski should be precluded as a fact witness, and her new exhibits should be precluded.  Additionally, Cablevision should be precluded from relying on its new documents, which are late.

## CONCLUSION

For all of the reasons set forth above, Plaintiffs' motion should be granted in its entirety.

Dated: August 8, 2014

SHAHMOON & ELLISEN LLP

By:   /s/ Carol S. Shahmoon
Carol S. Shahmoon
cshahmoon@sandelaw.com
370 Lexington Avenue, 24th Floor
New York, NY 10017
Tel. (646) 820-5490
Fax (917) 591-3064

LAW OFFICE OF TODD J. KROUNER

By:   /s/ Todd J. Krouner
Todd J. Krouner
tkrouner@krounerlaw.com
93 North Greeley Avenue
Chappaqua, NY 10514
Tel. (914) 238-5800
Fax (914) 238-5820

STONE BONNER & ROCCO LLP

By:   /s/ Ralph M. Stone
Ralph M. Stone
rstone@lawssb.com
145 West 45th Street, Suite 701
New York, NY 10036
Tel. (212) 239-4340
Fax (212) 239-4310

*Co-Lead Counsel for Plaintiffs*