**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re Cablevision Consumer Litigation** | Case No. 10-cv-04992(JS)(AKT) |
| This Document Relates To: | |
| All Actions | ECF Case |

**PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' CROSS-MOTION TO STRIKE AND REPLY IN FURTHER SUPPORT OF PLAINTIFFS' MOTION TO STRIKE**

## TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................................ 1

**BACKGROUND** ................................................................................................................. 3
   **I.**   **The Pro Rata Credit Due Under Paragraph 4 Is Not A New Theory And Evidence In Support Of The Calculation Derives Entirely From Cablevision** ....................................... 3

   **II.**   **Cablevision's Request For Plaintiffs To Produce A Computation** ............................... 4

   **III.**   **Cablevision Discloses A New Witness And Documents After Plaintiffs Delivered Their Expert Reports And After Fact Discovery Cut-Off** .......................................................... 6
      A.   The New Documents Were Responsive To Earlier Requests ........................................ 7
      B.   Losinski Is Added To The Witness List In The Guise Of An Expert While Cablevision Has Seven Other Senior Employee Witnesses ........................................................................... 9

   **IV.**   **Cablevision's Threatened Cross-Motion In Response To Plaintiffs' Objections** ................. 10

**LEGAL ARGUMENT** ...................................................................................................... 11
   **I.**   **Cablevision's Cross Motion Is Meritless And Not A Defense For Cablevision's Discovery Violations** .................................................................................................................. 11
      A.   Cablevision's Objection To Plaintiffs' Disclosures, Which Was Raised Only As A Retaliatory Response To Plaintiffs' Motion, Is Untimely And Waived .................................. 11
      B.   Rule 37(c) Is Preclusion Not Warranted On The Merits ............................................. 12
         1.   Plaintiffs Did Not Violate Rule 26(e) As All Of The Information In Their Disclosures Was Made Known During The Discovery Process ...................................................................... 12
         2.   Even If There Were A Rule 26(e) Failure On The Part Of Plaintiffs, Rule 37(c) Is Not Applicable, Because Any Such Failure Was Harmless ................................................................ 13
         3.   Even If Rule 37(c) Were Applicable, Preclusion Is Not Appropriate, Under The Four-Factor *Patterson* Test ................................................................................................................. 14

   **II.**   **Cablevision Has No Excuse For Any Of Its Discovery Violations** ............................. 15
      A.   The New Documents Should Have Been Produced In Response To Prior Requests ............... 15
      B.   New Fact Depositions Are Not Permitted At This Stage And Do Not "Cure" The Prejudice And Undue Burden Resulting From Cablevision's Discovery Violations ..................................... 16

   **III.**   **Losinski Should Be Precluded As An Employee Fact-Expert Witness** ........................ 18
      A.   Losinski's Work for Cablevision Does Not Qualify Her As An Expert On The Issues Covered By Her Report ...................................................................................................... 18
      B.   Losinki's Report Is Confusing To The Fact-Finder And Prejudicial ............................. 19
         1.   Report Addresses Regulations Rather Than Actual Contract Terms ............................... 19
         2.   Contract Principles Preclude The Evidence Offered By Losinski ................................. 21
         3.   Cablevision Cannot Rely On Paragraph 17 If It Cannot Assert That It Removed The Fox Channels "In Accordance With Applicable Law" ....................................................................... 23

**CONCLUSION** ................................................................................................................. 25

## TABLE OF AUTHORITIES

**CASES**

*Alamia v. Nationwide Mut. Ins. Co.*, 495 F.Supp. 2d 362 (S.D.N.Y. 2007) .......................... 22, 25

*Broder v. Cablevision Sys. Corp.*, 418 F.3d 187 (2d Cir. 2005) ................................................. 24

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ...................................... 25

*Donnelly v. Ford Motor Co.*, 80 F.Supp.2d 45 (E.D.N.Y. 1999) ................................................ 20

*Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F.Supp. 987 (S.D.N.Y. 1968) ..................... 22

*Fabozzi v. Lexington Ins. Co.*, 601 F.3d 88 (2d Cir. 2010) ........................................................ 22

*FCCD Ltd. v. State Street Bank and Trust Co.*, No. 10 Civ. 1632, 2011 WL 519228 (S.D.N.Y. Feb. 15, 2011) .......................................................................................................................... 23

*Feliciano v. County of Suffolk*, No. 04-CV-532 (JS)(AKT), 2009 WL 290469 (E.D.N.Y. Feb. 4, 2009) ................................................................................................................................ 20

*Gutman v. Klein*, No. 03 Civ. 1570, 2011 WL 683939 (E.D.N.Y. Feb. 16, 2011) ..................... 12

*Law Debenture Trust Co. of NY v. Maverick Tube Corp.*, 595 F.3d 458 (2d Cir. 2010) ....... 22, 23

*Outley v. City of New York*, 837 F.2d 587 (2d Cir. 1988) ........................................................... 14

*Pall Corp. v. 3M Purification, Inc.*, 279 F.R.D. 209 (E.D.N.Y. 2011) ...................................... 14

*Patterson v. Balsamic*, 440 F.3d 104 (2d Cir. 2006) ................................................................. 14

*Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59 (2d Cir. 2000) ................................................. 22

*Rienzi & Sons, Inc. v. N. Puglisi & F. Industria Paste*, No. 08-CV-2540, 2011 WL 1239867 (E.D.N.Y. Mar. 30, 2011) ............................................................................................................. 15

*Schwan-Stabilo Cosmetics GMBH & Co. v. PacificLink Int'l Corp.*, 401 F.3d 28 (2d Cir. 2005). .................................................................................................................................................. 13

*See Morgenstern v. County of Nassau*, 04-CV-0058, 2008 WL 4449335 (E.D.N.Y. Sept. 29, 2008) ............................................................................................................................................. 17

**RULES**

Fed. R. Evid. 302 ......................................................................................................................... 21

Fed. R. Evid. 702 ......................................................................................................................... 21

Fed. R. Civ. Proc. 26(e) ......................................................................................................... 12, 13

Fed. R. Civ. Proc. 37(c) ......................................................................................................... 12, 14

**REGULATIONS**

16 N.Y.C.R.R. § 890.80 ............................................................................................................... 24

C.G.S.A. § 16-331k ...................................................................................................................... 24

N.J.A.C. 14:18-3-17(b) ................................................................................................................ 24

Plaintiffs submit this Reply and Opposition in response to Defendants' Opposition and Cross-Motion [Dkt. 130-131]. This consolidated memorandum serves as both (1) a reply in further support of Plaintiffs' August 8, 2014 motion to strike Cablevision's Expert Report of Elizabeth Losinski and to preclude her as a witness, to preclude Cablevision from relying on untimely discovery, and (2) an opposition to Defendants' Cross Motion to Strike damages.

## INTRODUCTION

Fact discovery cut-off in this case was February 15, 2013. Initial expert reports were exchanged on July 18, 2014. On that date, Cablevision produced documents never produced before, and it supplemented its initial disclosures to identify its recently retired employee turned consultant – Elizabeth Losinski – as a new knowledgeable fact witness. At the same time, Cablevision delivered Losinski's expert report purporting to describe the facts as Cablevision now would like them to be seen. The delivery of this new evidence came after plaintiffs, at great expense, delivered their expert reports based on the discovery produced by Cablevision during the now closed discovery period. There is a word for this tactic. It is called "sandbagging."

With regard to the new documents that should be precluded, the critical facts are these: Cablevision could have produced these documents long before it did; all of the documents are covered by prior discovery requests, but were not timely produced and Cablevision asserted that they were irrelevant; Cablevision's own experts rely on these documents, but plaintiffs' experts had no similar opportunity; and no fact witnesses have been questioned about the documents because they were produced long after the discovery cut-off.

These new documents include 17 pages that set forth programming costs, revenue and subscriber numbers. They were not produced with any supporting data or information about how they were created and or whom. Plaintiffs could never explore the accuracy or meaning of these

new documents without related information, and plaintiffs have not had the opportunity to test this information at deposition.  Without deposing the witnesses with knowledge of how they were created and the information contained in them, plaintiffs are unable to determine the appropriateness of Orszag's reliance on them. With so few documents delivered so late, Cablevision clearly selected them to tell its new story.  It is too late to reopen discovery to permit plaintiffs a fair opportunity to explore the new evidence. Cablevision used this new evidence for months to enable its experts to prepare reports, but did not give plaintiffs the same opportunity.

With regard to Losinski, the purported expert and newly-identified fact witness: she is not genuinely experienced in the areas of her report; she uses no methodology or support for her opinions; and her opinions are irrelevant, prejudicial and confusing.  While Cablevision offers her to testify about "custom and usage," that type of evidence is not admissible by a contract drafter to vary the contract's explicit terms, when the non-drafter cannot be expected to understand the purportedly specialized terms.  Losinski's report opines as to terms that are not in the contract, and ignores key terms that are in the contract.  Because neither she nor Cablevision asserts that Cablevision changed its lineups "in accordance with applicable law," her report is utterly irrelevant.  And her report is at odds with the facts and the testimony of the many other employee-witnesses that it had identified during discovery. And even Cablevision admits that some of the exhibits that are cited in her report were not timely produced.

In concocting an excuse to justify its sandbagging strategy, Cablevision attempts to tie its late fact discovery to plaintiffs' damage disclosures.  This is highly misleading and wrong.  First, Losinski does not even address damages.  Second, Cablevision omits an important fact: in May 2014, it demanded plaintiffs to provide the damage computation that they are objecting to now, and plaintiffs complied (without objection from Cablevision).  More importantly, those

computations merely provided quantification for the same and sole damage analysis that plaintiffs have always described from the start of the case. Plaintiffs' analysis was not new or surprising.  Cablevision was aware of the 'pro rata credit' theory for years, and its own repeated briefings to this court have complained about it as a "windfall."  A pro rata credit is the express remedy – and the sole remedy - in its contract. Cablevision suffered no prejudice, because the disclosures identified only Cablevision's own evidence, and they were delivered in time for expert disclosure.  Cablevision did not move to reopen discovery in May 2014.  Instead it waited to deliver the new discovery with its expert reports in July 2014.

For the reasons set forth below, plaintiffs motion to strike Losinski and preclude her from testifying and to preclude Cablevision from relying on its new documents should be granted, and Cablevision's cross-motion should be denied.[1]

## BACKGROUND

**I.   The Pro Rata Credit Due Under Paragraph 4 Is Not A New Theory And Evidence In Support Of The Calculation Derives Entirely From Cablevision**

Cablevision's key assertion is that it learned something new in May 2014 that excuses its violation of the discovery rules.  But there is nothing surprising about plaintiffs' breach of contract claim or the pro rata credit remedy expressly due under the contract.  Cablevision has long understood that the pro rata credit sought by plaintiffs is a simple refund of charges.  *See Def. Mot. To Dismiss* [Dkt. No. 34-1], at p. 1 ("Plaintiffs demand a refund of subscription fees as a result of the Fox Withdrawal based on allegations of breach of contract").  And Cablevision

---

[1] References to "Shahmoon Decl. Ex. __" herein are to the Exhibits 1- 11 attached to the Declaration of Carol S. Shahmoon filed on August 19, 2019 [Dkt. No. 127-1 – 127-5] as supplemented by Exhibits 12 – 21 filed herewith. References to "Def. Br." are to the Consolidated Memorandum of Law In Opposition to Plaintiffs' Motion to Strike and in Support of Defendants' Cross-Motion to Strike Plaintiffs' Belated Damages Contentions, filed on Aug. 25, 2014 [Dkt. 131].  References to "Genser Decl. Ex. __" are to the exhibits filed by Cablevision on Aug. 25, 2014 attached to the Declaration of Andrew M. Genser.

has long known that paragraph 4's broad limitation of liability clause precludes incidental and consequential damages, and thus, *plaintiffs cannot claim anything other than pro-rata refunds*.

Cablevision has credited customers under paragraph 4 in the past, in the form of a refund based on the same daily pro-ration of monthly package charges that plaintiffs seek.[2]  Cablevision has never calculated that credit based on usage or subjective or "market" value of any channel. As Cablevision itself explained, "no part of Cablevision's revenue can be specifically attributed to individual non-premium channel or channels, including the Fox Channels."  *Shahmoon Decl. Ex. 7, Resp. # 12, 14*.  The pro rata credit was expressed by plaintiffs in their class certification and summary judgment motions, filed during discovery. [Dkt. 80, 81, 99, 66, 101]; *see, e.g., Pl. Mem. Summ. J., at p. 14* ("straightforward reversal of charges for the period 'pro rated' based on the number of days Cablevision did not deliver complete packages").[3]

## II.   Cablevision's Request For Plaintiffs To Produce A Computation

Even though Cablevision was well aware of plaintiffs' pro rata credit theory of recovery, on May 21, 2014, Cablevision requested "that Plaintiffs' supplement their Rule 26(a) disclosures by June 4, 2014, with full responses setting forth Plaintiffs' computation with respect to each category of damages claimed, and identifying the documents or other evidentiary material on which such calculations are based."  *Shahmoon Decl. Ex. 12*. The next day, plaintiffs responded that each subscriber seeks a pro rata credit for each day of the interruption "equaling 1/30th of that subscriber's monthly cable bill, in accordance with Paragraph 4 of the Terms of Service."

---

[2] *Shahmoon Decl. Ex. 8, at Resp. ## 8, 9* (identifying same method for calculating pro-rata credit under paragraph 4 as pro-rata charges for partial month service under paragraph 1).  Deposition testimony also confirmed this method.

[3] *Order on Class Cert. (Mar. 31, 2014)* [Dkt. No. 108], at p. 35 ("The measure of damages for this alleged breach is straightforward:  Cablevision subscribers would be entitled to a uniform 'pro rata' refund of that portion of their monthly subscriber fees attributable to the absence of the Fox Channels.").

*Shahmoon Decl. Ex. 13.*[4]   This method reflected an individual, readily-calculable refund that permits each subscriber to recover no more than his or her prorated refund based on a *daily* rate of actual monthly packages fees (*e.g.*, $17; $55; $79), charged to that subscriber for the interruption period.

Subject to that theory of damage, which accounts for each individual's specific charge, plaintiffs' disclosure also estimated Cablevision's aggregate liability to the entire class.  To reach that result, plaintiffs relied entirely upon Cablevision's interrogatory response that the aggregate amount of recurring cable revenues it collected in October 2010 was ███████, resulting in $86.7 million of aggregate liability to the entire class.  The pro-rata credit computation does not depend on Cablevision's aggregate revenues, but rather on individual package pricing, and thus, that aggregation number does not change the underlying theory or make it surprising.[5]

Plaintiffs had not earlier updated their disclosures because everything in them was previously made known. Moreover, the claim was to enforce the sole remedy expressed in Cablevision's contract based on its own package pricing.[6]  Cablevision raised no contemporaneous objection to their timeliness or content.  Nor did Cablevision indicate a need to supplement its own discovery.  Counsel for both sides had already discussed the theory and aggregate numbers, including in early May at the discovery conference, at which Cablevision

---

[4] Plaintiffs cited a list of evidence sourced entirely from Cablevision: the terms of service; Cablevision's discovery responses; its publicly-filed SEC Form 10-K; depositions of its employees; its complaint in *Cablevision Sys. Corp. v. Viacom Int'l, Inc.*, C.A. No. 13 civ 1278 (S.D.N.Y. July 16, 2013); documents showing Cablevision's usual daily pro ration method for credits; and its channel lineup showing the package pricing for each tier.

[5] Accordingly, although Cablevision recently revised its aggregate revenue numbers upwards, (*Shahmoon Decl. Ex. 5*) that evidence doesn't change plaintiffs' already disclosed methodology. Although plaintiffs have been given no explanation for the adjustment, plaintiffs have no basis to conclude that the revision is not a good faith correction of an error in an earlier response. In any event, the aggregate is simply a total of the specific package refunds, which is at the heart of plaintiff's methodology.

[6] *Order on Class Cert. (Mar. 31, 2014)* [Dkt. No. 108], at pp. 34- 35.

stated it would be a windfall.  [Dkt. 111] ("plaintiffs assert they are entitled to a pro rata credit on their monthly bill. ... Defendant's counsel takes the position that this results in a windfall").[7]

There is no windfall when consumers get no more than what they paid for services they did not receive, in accordance with an express remedy that precludes any other recovery.  The aggregate numbers show no windfall; if plaintiffs were paid for their actual losses, including expectation and remediation costs, the aggregate damage caused by Cablevision's breach would easily be double (*e.g.*, $155 million based on at least a $50 charge to purchase and install an antenna to receive some of the missing channels).[8]

## III.   Cablevision Discloses A New Witness And Documents After Plaintiffs Delivered Their Expert Reports And After Fact Discovery Cut-Off

Two months after plaintiffs complied with Cablevision's request, on the July 18, 2014 deadline for exchange of expert reports, Cablevision surprised plaintiffs with new discovery. This included new witnesses (Losinski and four others) and documents used in the expert report of Cablevision's economic expert, Mr. Orszag.  Obviously, these documents were provided to Orszag long before they were given to plaintiffs.

Between the May conference and the July report exchange, Cablevision was silent about its new discovery.  In the interim, Cablevision made two motions to the Court.  On May 28, 2014, it sought to extend the expert report deadline [Dkt. No. 115], which was consented to and granted.  Then, *two days* before the reports were due, Cablevision sought a schedule revision to require plaintiffs to produce their reports in July 2014, while Cablevision would not serve its reports until September 2014.  [Dkt. No. 120]  This request was rightly denied.  *Order dated July*

---

[7] Plaintiffs repeatedly requested that Cablevision provide information (including at depositions) on how it priced or valued each network separately, and was repeatedly informed that such subscriber pricing for individual channels was not possible.  *Shahmoon Decl. Ex. 7 [Dkt. 127-5], Resp. ## 12, 14; Shahmoon Decl. Ex. 6 [Dkt. 127-4], Resp. # 13*; *Feldman Decl. In Opp. to Class Cert [Dkt. No 90-6], at ¶ 3.*
[8] *Feldman Decl. In Opp. To Class Cert. [Dkt. No 90-6], at ¶ 5* (subscribers can use an antenna).

*17, 2014.*  Cablevision did not at either time complain about being surprised by plaintiffs' disclosures.  Nor did it indicate that it planned to add a fact witness or to produce documents or otherwise reopen fact discovery.[9]  Meanwhile, plaintiff hired experts to produce reports that would properly reflect the fact discovery that was timely delivered, and which had already proceeded through summary judgment and class certification motions, without Cablevision's belated evidence.

Cablevision believes that the discovery deadlines should apply to plaintiffs, but not to it.  Previously, plaintiffs sought a short extension of the discovery deadline to depose either Rocky Boler or Robert Sullivan, Cablevision employees that were identified as responsible for dealing with customers and customer credits.  [Dkt. 96].  Cablevision adamantly objected to permitting that deposition, on the grounds that it could not be meaningful and Cablevision would suffer "undue burden and expense."  [Dkt. 98]  Now, in a complete about-face, Cablevision's asserts that it will *defend* its case based on information <u>from Ms. Losinski, a never-before disclosed employee in government affairs,</u> who will testify on the same topic plaintiffs inquired about in 2013-- the "customary relief given to subscribers."  *Shahmoon Decl. Ex. 5.*

### A.  The New Documents Were Responsive To Earlier Requests

The documents that plaintiffs seek to preclude in their motion fall into two categories:

(1)     138 pages of new documents (relied upon by defense expert Orszag), including 17 documents (*Shahmoon Decl. Ex. 17*) that consist of internally-created evidence of revenues, subscribers, and programming costs;

---

[9] In an effort to excuse itself, Cablevision reverts to a vague statement made at the May 5, 2014 discovery status conference that it "may need some additional fact discovery." [Dkt. No. 111].  It conveniently ignores the follow-up events, such as when Cablevision demanded and promptly received new damage disclosures.  *Shahmoon Decl. Ex. 12.*  Thereafter, Cablevision <u>never sought additional fact discovery</u> from plaintiffs.  Plaintiffs had no basis to object at the discovery conference, since they had no idea what "additional fact discovery" Cablevision needed.  Plaintiffs could not predict that Cablevision intended to disclose a new obscure witness and selectively produce documents (of unknown origin) that were responsive to earlier requests and that Cablevision had earlier deemed irrelevant.  Nor did plaintiffs expect new factual disclosures to arrive upon the exchange of expert reports.

(2)    Several documents (purporting to relate to subscriber "notice") that are exhibits
to the report of Cablevision employee/liability expert Losinski.

It is impossible to tell when any of these documents were created, who created them, what
is the underlying data, the methodology behind them, or what other related documents on the
same topics were not produced.  They were not produced in native spreadsheet form and were
produced without metadata in violation of the Stipulation and Order Regarding Electronic
Discovery, dated Apr. 29, 2011 [Dkt. No. 44-2].[10]  Plaintiffs had no opportunity to test the
information through depositions and follow-up requests, because fact discovery is closed.

Cablevision does not dispute that 138 bates-stamped pages were not previously produced.
Nor can it credibly dispute that they were covered by extensive discovery requests on the same
subjects.[11]  Similarly, Cablevision admits without explanation that many of the Losinski exhibits

---

[10] Cablevision has not asserted that the new information was provided in connection with its duty to
supplement or correct earlier disclosures.  It cannot now purport to be doing that, because it clearly hasn't
provided all the back-up data or other information to support these documents.  Also, as these documents
were never included in their initial or even recently-amended disclosures, plaintiffs had no way during
discovery to know that they were important to the defense.

[11] Doc. Req. # 12: All documents concerning the total revenue received by Cablevision from customers in
New York, Connecticut, or New Jersey relating to the purpose of cable television services from
Cablevision that included one or more of the Fox Channels and the proportion of such revenue that was
attributable to the Fox Channels in 2010.  *Shahmoon Decl. Ex. 7*

Doc. Req. # 13: All documents concerning the amounts paid by Cablevision to News Corp. for the right
to transmit or retransmit the Fox Channels between 2008 and the present.  *Shahmoon Decl. Ex. 7.*

Doc. Req. # 14:  All documents concerning the amount of Cablevision's revenue in dollars or as a
percentage of total revenue that is attributable to, attributed to or believed or suggested to be attributable
to Cablevision's provision of the Fox Channels to its subscribers between 2008 and the present.
*Shahmoon Decl. Ex. 7.*

Doc. Req. #  1:  Documents sufficient to identify all New York, Connecticut, New Jersey and
Pennsylvania cable television service customers along with the service plan or package purchased, for the
period October 16, 2010 through October 30, 2010.  *Shahmoon Decl. Ex. 9.*

Doc. Req. # 13:  All documents concerning amounts paid to programming providers who are affiliated
with Cablevision, including affiliation through shared management, ownership and/or board member(s),
with respect to each of Cablevision's cable television plan(s) and/or package(s) in effect from January 1,
2010 through December 31, 2011.  *Shahmoon Decl. Ex. 9.*

Doc. Req. # 14:  All documents concerning amounts paid to programming providers who are not
affiliated with Cablevision, with respect to each of Cablevision's cable television plan(s) and/or
package(s) in effect from January 1, 2010 through December 31, 2011.  *Shahmoon Decl. Ex. 9.*

were not produced previously either.  *See Def. Br. at p. 23, n. 60.*  The new Losinski exhibits,

which purport to relate to customer "notice," were covered by very targeted requests seeking

every regulatory or subscriber notice and any support for the contention that Cablevision

changed its lineup in accordance with applicable law.[12]  The new Losinski exhibits were not

cited in Cablevision's responses or in opposition to summary judgment.[13]  Given this history,

Cablevision cannot be permitted to produce new documents so late.

### B. Losinski Is Added To The Witness List In The Guise Of An Expert While Cablevision Has Seven Other Senior Employee Witnesses

Losinski was never before identified as a witness with knowledge, and her name appears

on less than 10 of 354,000 documents produced (including an employee list and on generic

emails cc'd to numerous others). *Shahmoon Decl. Exs 19, 20; Genser Decl. Ex. 10.*[14]

---

Doc. Req. # 15:  All documents concerning amounts paid by Cablevision in aggregate for each cable television plan or packaged offered to Cablevision subscribers in the year 2010.  *Shahmoon Decl. Ex. 9.*

[12] Interrog. #1: Identify each and every notification to regulators or subscribers, including but not limited to 16 N.Y.C.R.R. section 890.80; C.G.S.A. section 16-331k; N.J.A.C. 14:18-3.17; 47 C.F.R. section 76.1603(b), in respect of the Fox Blackout, and for each such notification, describe the manner in which it was conveyed.  *Shahmoon Decl. Ex. 10.*

Interrog. #2:  Indicate whether Cablevision contends that at some point in 2010, Cablevision changed its line-up by deleting the Fox Channels in accordance with applicable law, and if so, indicate the basis of such contention, the timing of such deletion, and the steps Cablevision took to accomplish it.  *Shahmoon Decl. Ex. 10.*

Doc. Req. # 1: All documents identified in Interrogatory #1.  *Shahmoon Decl. Ex. 10.*

Doc Req. #19: All documents concerning notice or notices by Cablevision of any network change, and/or channel line-up or programming change, including but not limited to any such notices included with or printed on the regular billing statements of Cablevision subscribers in New York, Connecticut, or New Jersey.  *Shahmoon Decl. Ex. 7 see also id. at* Req. Nos. 7; 8; 18; 20, 21.

[13] The identified documents included the following list:  CSC00000940; 984; 155333-35; 17061-61; 186056-57; 186414-20; 23660-63; 353735-36; 353737-38; 353739-40; 353741-41; 353745; 353748-49; 353750. Cablevision further referred to documents in its opposition to summary judgment, which included, CSC00017063, 936-38; 155146-47; 15687-88; 918; 936-38; 155146-47; 353737.

[14] Apart from the above documents cited in the text, Losinski's name could be found on two other multi-tabbed spreadsheets (not filed herewith), and her name appears only in one place, as compared to numerous other employees listed there.  Cablevision can hardly say that Losinski was adequately identified.  Even the single substantive document in the file (*Genser Decl. Ex. 10*) is not appended to the Losinski report and was never before identified as a notice. It appears to be letter that refers to "bill messages" from Cablevision, but no bill messages were ever sent.  As Cablevision didn't identify this document in its discovery responses, it is unclear if this letter was ever sent.  It is hardly significant, given all others letters that Cablevision did identify in their discovery responses and opposition papers.

Cablevision identified thirteen other senior employees earlier in the case.  Four were listed on its initial disclosures, and three were added along with Ms. Losinski in July.  All seven know as much as Losinski about the industry and more about the facts.[15]  Cablevision, thus, does not need to add a new witness at this late date, but needs one to tell a new story at a time when plaintiffs are not in a position to test that new story through contemporaneous documents or witnesses.

To avoid her lateness as a fact witness, Cablevision calls Losinski an "expert."  Losinski offers opinions on newly-identified "terms of art" -- "programming blackout"; and "network change" – that are not the contract words in dispute.  Although not a practicing lawyer, she also purports to give a legal opinion that regulations do not require credits, which is confusing, and not basis to show that credits were not due under the contract. She does not address Cablevision's inability to assert that it removed the Fox channels in accordance with law.  Also, her report is not responsive to plaintiffs' damage disclosures, which is the pro rata credit.

## IV.   Cablevision's Threatened Cross-Motion In Response To Plaintiffs' Objections

By letter dated July 29, 2014, plaintiffs' counsel sought to "meet and confer" on the issues raised in this motion.  Cablevision's July 30, 2014 response threatened a cross motion: "should plaintiffs elect to press their misguided objection to Defendants' supplemental disclosures and discovery, Defendants would move to strike Plaintiffs' Amended Rule 26 Disclosure …Were we to succeed on that position, plaintiffs would be precluded altogether from putting on a damages case or offering damages evidence." *Shahmoon Decl. Ex. 14.*  In an

---

[15] *Shahmoon Decl. Ex. 4* (Gary Schanman, Sr. V.P. Video and Advanced Marketing; Jonathan Hargis, Executive V.P. Marketing and Advertising; Thomas Montemagno, Sr. V.P., Programming Acquisition); *Shahmoon Decl. Ex. 5* (Bradley Feldman, V.P. Video Product Management; James Maiella, former V.P. Media Relations; Lee Schroeder, Sr. V.P. Gov't and Pub. Affairs; Thomas Rutledge, former COO). Bradley Feldman has been at Cablevision for 15 years; Ms. Schroeder (Losinski's boss) has seven reports and has been at Cablevision over 15 years and before that worked at the Ohio Public Service Commission, among other jobs in government; Mr. Montemagno spent his entire 25-year career at Cablevision; and Mr. Rutledge was Cablevision's CFO for 7 years (with industry experience from 1977 to the present).

August 1, 2014 letter, plaintiffs reminded Cablevision that their disclosures were provided at Cablevision's insistence, and contained theories long ago disclosed based on Cablevision's own statements. *Shahmoon Decl. Ex. 15*. After the parties conferred, plaintiffs' filed their motion to strike on August 8, 2014 [Dkt. 125]. Cablevision opposed and cross-moved on August 25, 2014. [Dkt. 130, 131] This memorandum serves as both a reply and opposition to that cross-motion.

## LEGAL ARGUMENT

### I. Cablevision's Cross Motion Is Meritless And Not A Defense For Cablevision's Discovery Violations

#### A. Cablevision's Objection To Plaintiffs' Disclosures, Which Was Raised Only As A Retaliatory Response To Plaintiffs' Motion, Is Untimely And Waived

Cablevision seeks to rewrite history, by feigning complete surprise about disclosures that were delivered by plaintiffs more than three months ago. But those computations were based ***entirely on Cablevision's own evidence*** and simply reiterated plaintiffs' long-cited pro rata credit theory based on the explicit words of Cablevision's own form contract. *Shahmoon Decl. Ex 13*. Cablevision asked for, received and accepted, without objection, plaintiffs' responsive disclosures, which were served within Cablevision's deadline. Thus, Cablevision suffered no harm, and there is no basis for preclusion. The first time plaintiffs ever heard Cablevision complain about its damage disclosures was nearly two months later, more than a week after expert reports were exchanged, and only in response to plaintiffs' timely objections to Cablevision's prejudicial new discovery.

Cablevision indicates that its motion to strike is based "on the very same grounds" as plaintiffs' motion. That is false. First, Cablevision requested plaintiffs' supplemental disclosures. Plaintiffs made no such request. Second, to the extent that Cablevision claims such

disclosure is a necessary response to plaintiffs' supplemental disclosure, prior counsel did not, the disclosure is untimely, and, in fact, it does not correlate to plaintiffs' supplemental disclosure.

If Cablevision's new facts (Losinski and the new documents) are indeed relevant to the pro rata credit, then Cablevision should have disclosed them in its Rule 26(a) disclosures and should have produced them before the fact discovery cut-off date.  As Cablevision understood in May 2014, expert disclosure would be dependent on fact discovery, and plaintiffs' expert reports would be based on their fairly disclosed damages theory.  *Shahmoon Decl. Ex. 12*.  Cablevision had ample time to deal with plaintiffs' damage disclosures, if it was truly surprised, by timely objecting or seeking leave of Court, without in turn prejudicing plaintiffs.  By appearing twice before the Court to seek relief, and saying nothing about any issue with plaintiffs' disclosures or any need for new evidence that it had already given to its experts, Cablevision cannot now move to strike plaintiffs' damages computation.[16]

## B. Rule 37(c) Is Preclusion Not Warranted On The Merits

### 1. Plaintiffs Did Not Violate Rule 26(e) As All Of The Information In Their Disclosures Was Made Known During The Discovery Process

Even if Cablevision's preclusion motion were timely, it has no merit because it is not a violation of Rule 26(e) if the information had "been made known to the other parties during the discovery process or in writing."  Cablevision understood from the very start that the claim was for a breach of paragraph 4 and that subscribers were seeking the only available remedy - pro rata refunds.  *See generally Def. Mot. To Dismiss* [Dkt. No. 34-1] (objecting to plaintiffs' claim for refunds). Moreover, Cablevision is the source of all the evidence it seeks to wipe away.  It is hard to fathom that a party could be surprised by its own admissions about how it charges its customers and how it calculates pro rata refunds in the course of running its business.  Rather

---

[16] *Cf. Gutman v. Klein*, No. 03 Civ. 1570, 2011 WL 683939, at *3 (E.D.N.Y. Feb. 16, 2011) (motion to vacate default judgment denied because of delay in filing motion).

than being responsive to plaintiffs' disclosures, in actuality the new evidence is Cablevision's

attempt to offer different facts than those it offered before the discovery cut-off, and by this

motion ***it seeks to strike its own admissions***.

While Cablevision's new counsel feigns surprise at the pro-rata credit theory, calling it a

"windfall," they fail to mention that prior counsel had been disputing plaintiffs' allegedly

"windfall" damages theory for years.[17]   The "windfall" defense, however, lacks merit.   Refunds

given to customers who pre-pay for services that they do not receive, cannot be a windfall,

especially when those customers are precluded by a *form* contract from *getting any other*

*remedy*, and when the breaching party had other options (such as alternative programming) to

avoid having to provide credits.[18]   The pro rata credit/damage theory is based on basic contract

principles that "alternative contracts" will be enforced as written, and in particular, that the

measure of damages is the "sum of money promised" (without regard to windfall).  *Schwan-*

*Stabilo Cosmetics GMBH & Co. v. PacificLink Int'l Corp.*, 401 F.3d 28, 34 (2d Cir. 2005).

### 2.   Even If There Were A Rule 26(e) Failure On the Part Of Plaintiffs, Rule 37(c) Is Not Applicable, Because Any Such Failure Was Harmless

---

[17] *See, e.g.*, *Def. Opp. Mot. Summ J. at pp. 22-23* ("plaintiffs' proposal for uniform credits would provide <u>windfall</u> recoveries"; "plaintiffs have not established that damages should be based on a credit rather than the lack of alternative programming"; it would be a "windfall recovery" to provide daily refunds of package pricing, because some subscribers watched the other available channels in the package during the interruption); *Def. Opp. Class Cert., at pp. 18-19* ("if a particular subscriber simply did not care about, and was not in any way aggrieved by, the Fox Withdrawal, it would give that subscriber an impermissible <u>windfall</u> to provide him with a credit, making him better off than he would have been absent the Fox Withdrawal").  Cablevision reiterated its "windfall" point of view at the discovery hearing, when the parties had specific conversations about the methodology and evidence. [Dkt. 111]

[18] While it may be expensive for Cablevision, the contractual remedy of a pro-rata credit is not a windfall for plaintiffs.  Indeed, compared to "expectation" damages, pro-rata credits are quite reasonable.  For example, assuming a minimum of approximately \$50 per subscriber to by HDTV antennas in order to view some but not all the channels, this damages would be approximately \$155 million in the aggregate. *Feldman Decl. In Opp. To Class Cert. [Dkt. No 90-6], at ¶ 5* (subscribers can use an antenna to view broadcast channels).  Being deprived of the right to receive expectation damage was particularly harmful to consumers, because, as Cablevision admitted, the interrupted programming, such as the World Series league championships and NFL football, was "must see" viewing.

Rule 37(c) permits preclusion as a remedy for a Rule 26(e) violation, unless the discovery "failure" is harmless. Even Plaintiffs' supplemental disclosures were served pursuant to Cablevision's explicit request, which was two months before expert reports were due, and most importantly they contained nothing new. Thus, Cablevision suffered no prejudice.[19] Moreover, Cablevision was the source of all the evidence disclosed, and required no further discovery from plaintiffs to respond. Cablevision never explains why it failed to seek to reopen discovery or timely share that new information with plaintiffs before expert reports were exchanged. And it never explains why that information was not timely produced in response to earlier requests or ever *in Cablevision's own disclosures*.

### 3. Even If Rule 37(c) Were Applicable, Preclusion Is Not Appropriate, Under The Four-Factor *Patterson* Test

Rule 37(c) preclusion requires a consideration of four factors set forth in *Patterson v. Balsamic*, 440 F.3d 104 (2d Cir. 2006): (1) the explanation for the discovery failure; (2) the importance of the precluded evidence; (3) prejudice suffered by opposing party in having to address the new evidence; and (4) possibility of continuance. Plaintiffs in good faith saw no need to update their disclosures, as the information was already made known in discovery and the source of it was entirely Cablevision. Therefore, this first factor weighs against preclusion. The second factor also weighs against preclusion, because it would be very damaging to plaintiffs' case if they were precluded from obtaining the only relief permitted under the contract's express language.[20] Finally, the third and fourth factors weigh against preclusion. Cablevision was not prejudiced when it sought and obtained plaintiffs' disclosures well in

---

[19] *Pall Corp. v. 3M Purification, Inc.*, 279 F.R.D. 209, 213 (E.D.N.Y. 2011) (no preclusion because failed to identify an prejudice suffered as a result of late production).

[20] *Outley v. City of New York*, 837 F.2d 587, 590 (2d Cir. 1988) ("rules of discovery were not designed to encourage procedural gamesmanship, with lawyers seizing upon mistakes made by their counterparts in order to gain some advantage").

advance of the expert deadline and those disclosures required no fact discovery from plaintiffs. There is thus no need for a continuance. Accordingly, even if plaintiffs' supplemental computation was untimely (which it was not), preclusion of plaintiffs' damages or evidence is not an appropriate remedy.[21]

## II.   Cablevision Has No Excuse For Any Of Its Discovery Violations

### A.   The New Documents Should Have Been Produced In Response To Prior Requests

Cablevision argues that its new documents, still not reflected as in its amended disclosures documents on which it intends to rely (*see Shahmoon Decl. Exs. 4 and 5*) are critical to its defense. But the problem, as to both sets of documents (the ones relied on by Orszag and Losinski, respectively) is that they were the subject of plaintiffs' earlier discovery requests,[22] and were not timely produced in over three years of pre-expert litigation.[23] Moreover, the "pro rata credit" has always been the express language of the contract, yet Cablevision always insisted that the documents it now has produced "were not reasonably calculated to lead to the discovery of admissible evidence" and not relevant. *See Shahmoon Decl. Exs. 7, 9, 10.*

Cablevision's new counsel seeks a new strategy, leaving Cablevision to scramble for new facts to support it. But fact discovery is closed. Cablevision does not get a second chance to re-

---

[21] *Rienzi & Sons, Inc. v. N. Puglisi & F. Industria Paste*, No. 08-CV-2540, 2011 WL 1239867, at*5 (E.D.N.Y. Mar. 30, 2011) (permitting supplemental damage disclosure, because all underlying documents were provided).

[22] Cablevision admits that Losinski is "a potential fact witness on the following subjects, all of which had been previously the subject of discovery." *Def. Br. at 6; Def. Br. at 24, n.63*. Yet it doesn't explain why she wasn't identified earlier, given plaintiffs focus on the very areas she seeks to address and given that her boss indicated a complete lack of expertise in those areas. It also doesn't explain why it never provided the documents purportedly relating to subscriber "notice," in response to numerous requests. Thus, Cablevision's admissions prove that plaintiffs are prejudiced by having to deal with a new witness who is relying on new and different evidence, when the opportunity for plaintiffs to take follow-up fact discovery is long since over.

[23] While admitting that 17 of the pages of its new 138-page bates-stamped production are internal documents, Cablevision defends itself as to the other 121 pages, asserting that those documents were created by a third party. Of course, it is unclear where those 121 pages came from, but if they were in Cablevision's possession, custody or control, they were also required to be produced in response to plaintiffs' requests.

tell an old story.  Even if Cablevision were indeed surprised, that does not permit it to present new evidence in an effort *to undermine its own evidence* with information previously deemed to be irrelevant.  Regardless of the merits of Cablevision's purported surprise, Cablevision provides no excuse why its "new information" was not delivered at the start of expert discovery or why it took no action to avoid prejudice to plaintiffs.  Accordingly, Cablevision has no excuse for its extremely late and prejudicial disclosures, and preclusion is warranted.

**B.  New Fact Depositions Are Not Permitted At This Stage And Do Not "Cure" The Prejudice And Undue Burden Resulting From Cablevision's Discovery Violations**

The prejudice to plaintiffs cannot be "cured," as Cablevision suggests, by forcing quick depositions.  First, Cablevision never explains how a deposition of its purportedly independent expert Mr. Orszag can produce any relevant fact evidence about the 17 documents that Cablevision indicates were internally-produced. *Shahmoon Decl. Ex. 17.* Orszag is not competent to testify as to the origins of those documents.  They concern highly confidential internal business information.  Orszag cannot provide relevant testimony about the underlying data that formed the basis of those internal business documents (compiling programming costs, subscribers, revenues and packages).  Nor can he attest to every individual involved in creating them, the surrounding circumstances and timing, or the underlying methodology.  Nor do plaintiffs have every document on these issues.  Cablevision specifically cherry-picked them to support its defense.

As to Losinski, Cablevision's effort to sweep her into this case by calling her an expert (by virtue of 27-year employment as a government and policy affairs advocate at Cablevision) is a sandbagging effort to allow her to introduce new facts and new documents after the discovery cut-off.  She was a subordinate employee, with no obvious connection to the facts of the case

(appearing on only 10 contemporaneous documents, mostly as a "cc" out of 354,000),[24] and it is

unfair to permit her to tell a story about topics (based on new documents) that, according to her

own supervisor, Lee Schroder, were not the coverage areas of her department.[25]  Schroeder

indicated that legal analysis of regulations was the exclusive coverage area of legal counsel, and

that her department had no connection to subscriber notices, interactions or credits.  *See also*

*Shahmoon Decl. Ex. 21 (assorted documents showing a number of Cablevision employees – not*

*including Losinski - involved in Fox issue with respect to 30-day advance notice deadline, and*

*subscriber credits)*.  In fact, those areas are covered by Cablevision employees that were

precluded from testifying by Cablevision, when it opposed plaintiffs' requests to do so.

Cablevision's reason for objecting was that: "testimony on this peripheral issue would impose

undue burden and expense on Cablevision." [Dkt. Nos. 98] For the same reasons that

Cablevision opposed plaintiffs' request for an employee deposition one month after the close of

fact discovery, plaintiffs oppose the undue expense, burden and prejudice of taking another

employee fact deposition with no supporting evidence of her connection to the case.

     Second, with virtually no contemporaneous documents connecting Losinski to any

relevant facts, plaintiffs cannot test the origins of her supposed knowledge.  If fact discovery

were reopened, the response and objection process would create needless and expensive delay

---

[24]  There is no way plaintiffs could have anticipated Losinski as a new witness.  *See Shahmoon Decl. Ex. 21 (showing no involvement of Losinski in subscriber credit or notice).  See Morgenstern v. County of Nassau*, 04-CV-0058, 2008 WL 4449335, at *4 (E.D.N.Y. Sept. 29, 2008) (precluding affidavits from individuals not playing a role in discovery process).

[25]  Schroeder was implicated in emails suggesting that Cablevision would tell public officials that Cablevision would be giving customers credits for the Fox issue, even though Cablevision refused to give out credits to customers.  *Shahmoon Decl. Ex. 3 at T32:4-10; Shahmoon Decl. Ex. 16 (Maiella Dep.), at T86:17-87:24*.  She also revealed herself not to have any expertise on analyzing regulations, especially those involving notice to regulators or subscribers.  *Shahmoon Decl. Ex. 3 at T18:14-28:22; T11:10-11; T19:5-22:6*.  She also indicated that Cablevision did not change the lineup to remove the Fox channels in Oct. 2010; and she objected to the word "blackout" (*Shahmoon Decl. Ex. at T11:16-12:5*) – the very word that Losinski now insists as a purported expert is a commonly understood industry "term of art."

that Cablevision could have avoided by timely identifying Losinski.  Even the documents

included in the report show no connection between Losinski and the facts; they were not timely

produced when requested; and they were likely created by others at Cablevision (they relate to

subscriber notifications and programming additions and deletions, neither of which are covered

by Losinski's Government and Public Affairs Dept.).  Dealing with these exhibits would require

further fact discovery to determine the origins of the new documents, which were not produced

in accordance with the electronic discovery stipulation [Dkt. 44-2] in native form with all

metadata.[26]  And plaintiffs' expert reports were based on the facts in evidence as of May 2014.

Cablevision has no basis to ask for special treatment or to argue that Losinski or its new

documents are critical.  Her experience at Cablevision does not qualify her as an expert on the

matters to be covered by the reports.  It has other witnesses, and it had a chance to deliver those

documents when plaintiffs asked for them long before discovery cut-off.  Cablevision should not

be rewarded for violating the discovery rules, which results in prejudice and undue burden and

expense on plaintiffs.

## III.   Losinski Should Be Precluded As An Employee Fact-Expert Witness

### A.  Losinski's Work for Cablevision Does Not Qualify Her As An Expert On The Issues Covered By Her Report

While Losinski is apparently a veteran employee at Cablevision, neither Cablevison nor

its attorneys believed she had the knowledge or experience to be identified as a fact witness in

---

[26] Losinski will presumably seek to introduce facts in accordance with her report that Cablevision has an unwritten practice to treat loss of half the channels as an effective loss of the entire tier for regulatory purposes.  But Losinski does not work in the customer service department and that rule appears nowhere in Cablevision's documents.  It is prejudicial to plaintiffs to permit Losinski to testify about this, when her duties at Cablevision did not cover matters of subscriber credits. *See Shahmoon Decl. Ex. 21 (showing no involvement of Losinski in subscriber credit or notice)*.  Moreover, that evidence was never turned over in response to directed discovery requests, and thus must be precluded now, where plaintiffs are prejudiced in meeting the testimony.  This is the first time that plaintiffs have ever heard of this rule despite numerous requests about the calculation of the pro rata credit, in each and every circumstance.  Regardless, the contract has no language limiting credits to cases of interruptions of half the channels.

four years of discovery in his case.  *Shahmoon Decl. Ex 19, 20; Genser Decl. Ex. 10 (*handful of documents with her name on them).  It is obvious from the record, however, that her coverage areas did not include dealing with customers;[27] drafting or interpreting Cablevision's Terms of Service; drafting or sending out subscriber notices; interpreting the notification requirements (to regulators or subscribers) pursuant to applicable regulations;[28] dealing with or providing credits subscribers; creating or setting pricing for subscriber packages; or dealing with disputes with programmers.[29]  Yet these are the very subjects about which she now purports to be an industry expert.  Losinski's supervisor, Lee Schroeder, described at deposition the parameters of her department's work, which was primarily limited to lobbying regulators to advocate for Cablevision's position.[30]  Schroeder asserted that her department did not deal with subscribers, and that she did not know who was in charge of subscriber notification.[31]  Schroeder was certain, however, that only legal counsel – and not her department – was responsible for approving the content of letters to regulators and interpreting regulatory requirements about notice.[32]

## B.  Losinki's Report Is Confusing To The Fact-Finder And Prejudicial

### 1.  Report Addresses Regulations Rather Than Actual Contract Terms

The Losinski report is confusing to the fact-finder.  It is focused primarily on whether Cablevision was required by any specific regulation to give credits to customers when the Fox

---

[27] Losinski was in the government affairs group, not in the customer service group.  The individuals in that latter group identified at deposition included: Rocky Boler, Snr. VP of Customer Service; Kathleen Mayo, head of customer service; Sean McKenzie and Corrine Grimes-Bair in customer communication, *Shahmoon Decl. Ex. 16.*
[28] *Shahmoon Decl. Ex. 3 at TT19:5-22:6.*
[29] *See generally Plaintiffs' Mem. In Supp. Of Mot. To Strike (Aug. 19, 2014) [Dkt. 127], at pp. 5-7.*
[30] *Shahmoon Decl. Ex. 3 at T33:20-23; T8:16-18.*
[31] *Shahmoon Decl. Ex. 3 at T22:25-23:7; T61:11-20.*
[32] *Shahmoon Decl. Ex. 3, at T19:5-22:6; T28:20-22;T67:14; T45:21-24; T46:15-16; T47:7-8; T72:10-12*

Channels were interrupted.  But this is a contract case – not a regulatory enforcement action.[33] Here the only question is whether plaintiffs are entitled to a pro rata credit for a program or service interruption, when Cablevision did not exercise its option to provide alternative programming. Losinski's report refers to words not mentioned in the contract – such as "programming blackout" and "network change" – while ignoring the specific contract terms "program or service interruption."  She provides absolutely no methodology or back-up for her conclusions (other than self-professed expertise), yet she baldy concludes that (i) the Fox incident was a "programming blackout;" (ii) which equals a "network change;" (iii) both "programming blackout" and "network change" are like the terms listed in paragraph 17 (those two terms are not listed anywhere in the contract); and (iv) therefore paragraph 17 applies.

Losinski's complete lack of methodology is stark when considering her opinion that the word "disruption" in the cable industry "refers to a loss of cable service for which a subscriber pays a separate price, resulting from a technical failure or extraordinary *force majeure* type of event that affects the operation of the cable system." *Shahmoon Decl. Ex. 1, at p.1.*  Apart from the opinion's irrelevance (relevant phrase is "program or service interruption"), a more fundamental problem is that Losinski appears to have dreamed up this definition, which has no supporting evidence and *contradicts Cablevision's internal documents.*[34]  In customer service emails in connection with the Fox issue, Cablevision used the word "disruption," to describe interruptions in channels occurring as a result of contract-related disputes with programmers, such as the Fox incident.  *See Shahmoon Decl. Ex. 18* (using the term "disruption" five times to

---

[33] In fact, customers have not been successful in seeking a private right of action to enforce regulatory requirements – those are issues for regulators.  *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187 (2d Cir. 2005).  Ms. Losinski's job is primarily focused on gaining good relationships with the regulators in charge of Cablevision's business.

[34] *Donnelly v. Ford Motor Co.*, 80 F.Supp.2d 45, 48 (E.D.N.Y. 1999); *Feliciano v. County of Suffolk*, No. 04-CV-532 (JS)(AKT), 2009 WL 290469, at *2 (E.D.N.Y. Feb. 4, 2009).

refer to contract-related programming dispute); *Shahmoon Decl. Ex. 19* (email copied to Losinski referring to package changes as "programing change," but loss of Fox channels as "disruption").

Cablevision argues that "temporariness" is not the hallmark of an interruption, and that changes are temporary, "*as in when day 'changes' to night and then night 'changes' back to day again*".  That philosophical insight adds little value: every interruption necessarily involves that same type of metaphysical change (*i.e.*, when television screens go blank, that is nothing more than a "change" from the television shows that were there before).  And this theory is irrelevant, because Cablevision does not assert that it changed its lineup in accordance with applicable law. Losinski's complete absence of any showing of methodology or analysis, industry usage, references or sources, or any logic in her report, as well as the lack of connection to the contract language, and the prejudicial nature of testimony that "regulations don't require credits," makes the report and any related testimony confusing, unhelpful, unfounded and prejudicial.[35]  Fed. R. Evid. 302, Fed. R. Evid. 702.

### 2.   Contract Principles Preclude The Evidence Offered By Losinski

Cablevision is unconvincing when it argues that contract principles support the admissibility of the Losinski report.  As Cablevision points out, this is not a case requiring "complex" expert testimony (*Def. Br. at 13*).  It is a consumer contract, and consumers cannot be held to an industry standard that only Cablevision's internal employee-industry "expert" can understand.  None of Cablevision's numerous cases support the notion that a drafter in a non-

---

[35] Even if it were helpful for Losinski to provide definitions for words **that are not in the contract**, she has not provided a shred of evidence or reasoning to support her notion that those words do indeed have the meanings she ascribes to them let alone that those meanings were known to the subscribers.  "A custom, in order to become part of a contract, must be so far established an so far known to the parties, that it must be supposed that their contract was made in reference to it.  For this purpose, the custom must be established, and not casual, *uniform and not varying, general and not personal*, and known to the parties."  *Law Debenture Trust Co. of NY v. Maverick Tube Corp*., 595 F.3d 458, 466 (2d Cir. 2010) (emphasis in original).

negotiated consumer contract can introduce the subjective belief of its own long-term employee

as extrinsic evidence to support that party's reading of the contract.  These cases offer principles

that negate rather than support Cablevision's argument:

- First, any potential contract ambiguity in paragraph 4 must arise from the four corners of the contract, not from extrinsic evidence.[36]  Thus, Losinski's opinion that paragraph 4 is limited to "force majeure" issues cannot be offered to vary the express language (in which the only force majeure clause serves to **preclude** paragraph 4 liability rather as a **predicate for liability**).  Nor can it be offered to discuss "programming blackout" and "network change," which are nowhere in the contract.

- Second, as Cablevision's cases reiterate, form contracts are strongly construed against the drafter, and a court will not add words into the contract to help the drafter.[37]  (In this case, of course, Cablevision has since revised its paragraph 17 to include the language that Ms. Losinski attempts to read into the contract, but is not there.)[38]

- Third, custom and usage evidence does not consist of one party's "subjective belief" as to the meaning of the contract words, whether that evidence comes in from that party's long-time employee, its attorney or otherwise.[39]

---

[36] *Law Debenture Trust Co. of NY v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) ("[e]vidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing"); *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F.Supp. 987, 994 (S.D.N.Y. 1968) ("effect of admitting such testimony in the absence of some showing of ambiguity would be to permit a party to substitute his view of his obligations for those clearly stated"). Not only is the evidence not admissible for Cablevision to find an ambiguity, it certainly can't help Cablevision argue, after it lost its motion to dismiss, that the four corners of the contract is to be read in its favor **unambiguously**.

[37] *Alamia v. Nationwide Mut. Ins. Co.*, 495 F.Supp. 2d 362, 367 (S.D.N.Y. 2007) ("to enforce an exclusion, "insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case and that its interpretation of the exclusion is the only construction that [could] fairly be placed thereon"); *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 68 (2d Cir. 2000) ("in cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it, and favorably to a party who had no voice in the selection of its language."); *Fabozzi v. Lexington Ins. Co.*, 601 F.3d 88, 93 (2d Cir. 2010) ("where an insurer has drafted the policy, as here, 'any ambiguity in [the] … policy should be resolved in favor of the insured.'") (citations omitted).

[38] The new paragraph 17 indicates that "in the event particular programming becomes unavailable, either on a temporary or permanent basis, due to a dispute between Cablevision and a third party programmer, Cablevision shall not be liable for compensation, damages (including compensatory, direct, indirect, incidental, special, punitive or consequential losses or damages), credits or refunds of fees for the missing or omitted programming."

[39] *Law Debenture Trust Co. of NY v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) ("proof of custom and usage does not mean proof of the parties' subjective intent"); *Eskimo Pie Corp. v. Whitelawn*

- <u>Fourth</u>, custom and usage is relevant only if it is "so well-settled, so uniformly acted upon, and so long continued as to raise a fair presumption that it was known to both contracting parties and that they contracted in reference thereto."  *Law Debenture Trust Co. of NY v. Maverick Tube Corp.*, 595 F.3d 458, 466-67 (2d Cir. 2010) (citations omitted).  That type of evidence "is considered, as needed, to show what *the parties'* specialized language is 'fair[ly] presume[ed]' to have meant."  *Id.* (emphasis added).  Thus, industry language not presumed to be known by consumers does not permit Cablevision to incorporate "terms of art" into its form contract in order to deprive a consumer of its right to receive the complete package of channels purchased. For example, the word "disruption," is understood by customers to include even a loss of a channel due to a cable company dispute with its programmer, such as the Fox incident.[40]  Moreover, the relevant language here is "program or service interruption," which is not "specialized" and not discussed in Losinski's report anywhere.[41]

Accordingly, contract principles do not permit Cablevision to put forth its employee to offer its own subjective views of the contract, based not on any commonly understood meaning of the contract terms in order to vary explicit contract terms to favor Cablevision's reading in the context of a non-negotiated consumer contract.

### 3.  Cablevision Cannot Rely On Paragraph 17 If It Cannot Assert That It Removed The Fox Channels "In Accordance With Applicable Law"

The Losinski report is also confusing because it does not address the critical language in paragraph 17, which permits program package changes "in accordance with applicable law." Cablevision seeks to convince the court that it can avoid paragraph 4 liability by arguing that it

---

*Dairies, Inc.*, 284 F.Supp. 987, 992 (S.D.N.Y. 1968) ("testimony or other proof as to the subjective intent of the parties" is not admissible).

[40] *See Shahmoon Decl. Ex. 18* (using the term "disruption" five times to refer to contract-related programming dispute); *Shahmoon Decl. Ex. 19* (an email copied to Losinski referring to package changes as "programing change," but loss of Fox channels as "disruption").

[41] Cablevision cites an example in which "specialized language" comes into play in the context of a complex senior-subordinated loan structure, wherein at a certain trigger point (based on a complex "Control Appraisal Period" formula, listed in the contract) the senior lender gets control over the loan servicing, because the subordinated lender no longer has "skin in the game," because the collateral has dropped significantly in value. *FCCD Ltd. v. State Street Bank and Trust Co.*, No. 10 Civ. 1632, 2011 WL 519228, at *7-8 (S.D.N.Y. Feb. 15, 2011) (industry experts may be helpful to determine loss allocation between senior and subordinated lenders, based on custom and usage of negotiated inter-creditor agreements).

made a paragraph 17 "change."  Yet Cablevision wants the Court to ignore the contract language requiring that any such changes to be made "in accordance with applicable law."  Cablevision's opposition brief provides no explanation of why Cablevision should not be held to the clear standard that it wrote into its contract.[42]

Cablevision knows full well that paragraph 17 requires program package changes to be made "in accordance with applicable law."  Its brief is peppered with a Second Circuit case that interpreted that language -- *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187 (2d Cir. 2005). *Broder* dealt with an analogous provision to paragraph 17 in Cablevision's contract, stating: "rates … are subject to change in accordance with applicable law."  The Second Circuit concluded that the language was unambiguous, and precludes Cablevision from changing its rates, ***except in accordance with applicable law***.  *Id*. at 199 (Cablevision cannot change "the customer's rates except in accordance with applicable law").  Like the *Broder* contract, paragraph 17 precluded Cablevision from removing the Fox channels from its packages except ***in accordance with applicable law***.  Because Cablevision made no program change in accordance with applicable law, it cannot rely on paragraph 17.[43]

---

[42] Cablevision admits that Ms. Losinski's report does not address paragraph 17's requirement that any change that Cablevision makes to the program packages must be made "in accordance with applicable law."  *Def. Br. at 17* (offers no opinion on that question); *id*. at 20 (arguing that plaintiffs' critique is "based on the flawed premise" that in order for opinion to establish paragraph 17 applicability, Cablevision must make program package changes "in accordance with applicable law").  Cablevision wrongly asserts that plaintiffs do not "cite a single regulation" on that issue, when in fact plaintiffs have cited those regulations at footnote 17 of plaintiffs' opening brief.  Those regulations are 16 N.Y.C.R.R. § 890.80; N.J.A.C. 14:18-3-17(b); C.G.S.A. § 16-331k, and those regulations have been repeatedly cited throughout the litigation to demonstrate the falsity of the paragraph 17 defense.

[43] To delete the Fox Channels from its lineup in accordance with applicable law, Cablevision was required to give 30 day advance written notice by bill messages; 30 day advance notice to regulators; and 30 days of on-screen messages.  Cablevision did not do those things.  The most Cablevision asserts is that it posted advertisements on its screens stating that – "News Corp is demanding more for Fox 5 than we pay for ABC, NBC, CBS and Univision combined! Fox has pulled Fox 5 and My9…" Those statements do not comply with all the notice requirements, let alone the "on screen" notice.  If Cablevision wanted to change the lineup and avoid being liable for an interruption, then it certainly had the resources and knowledge to comply with all the terms of paragraph 17.  The likely reason for not formally eliminating

*Broder* makes clear that consumers have no private right of action to enforce regulations, and are limited to enforce only Cablevision's contract obligations.  In *Broder*, the consumer tried to argue that, even though there was ***no change*** in Cablevision's rates, it could use the "applicable law" language to incorporate the ***entirety*** of the regulatory framework (and not just the "applicable law" dealing with ***changes*** in subscriber rates).  Ms. Losinski is using the same line of reasoning as that rejected by the Second Circuit.  Ms. Losinski cannot assert (in the "negative") that no regulations would require credits in this circumstance, and thus, that Cablevision cannot be held to its own contract requirement for providing credits when that contract clause ***contains no regulatory limit on Cablevision's obligation to pay credits***.

The Losinski report is merely an effort by Cablevision to rewrite the facts.  This strategy is a blatant abuse of the expert report process and one that highlights the serious deficiencies in the way Cablevision proceeded prior to and after the discovery cut-off.  The Losinski report is at odds with the facts as they unfolded in discovery and as they existed at Cablevision as evidenced by the documents and testimony provided in discovery.  Under the circumstances, it is inherently unreliable as expert material, and far too late as a merits production.

Thus, Cablevision should be precluded from introducing Losinski as an employee-fact-expert witness, both on the basis of Rule 37(c) and on *Daubert*[44] grounds.

## CONCLUSION

For all of the reasons set forth above, Plaintiffs' motion should be granted in its entirety, and Cablevision's cross-motion should be denied.

Dated: September 4, 2014

---

the Fox channels from its packages was that that programming was commercially critical.  It could not retain subscribers if it gave timely (30 advance written) notice that those channels would be completely gone.

[44] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

SHAHMOON & ELLISEN LLP

By:___/s/ Carol S. Shahmoon____
Carol S. Shahmoon
cshahmoon@sandelaw.com
370 Lexington Avenue, 24th Floor
New York, NY 10017
Tel. (646) 820-5490
Fax (917) 591-3064

LAW OFFICE OF TODD J. KROUNER

By:___/s/ Todd J. Krouner____
Todd J. Krouner
tkrouner@krounerlaw.com
93 North Greeley Avenue
Chappaqua, NY 10514
Tel. (914) 238-5800
Fax (914) 238-5820

STONE BONNER & ROCCO LLP

By:___/s/ Ralph M. Stone___
Ralph M. Stone
rstone@lawssb.com
145 West 45th Street, Suite 701
New York, NY 10036
Tel. (212) 239-4340
Fax (212) 239-4310

*Co-Lead Counsel for Plaintiffs*

26

**CERTIFICATE OF SERVICE**

I, Carol S. Shahmoon, certify that a true and correct copy of Plaintiffs' Consolidated

Opposition to Defendants' Cross-Motion To Strike And Reply In Further Support of Plaintiffs'

Motion To Strike, and the declaration of Carol S. Shahmoon and related exhibits in support, have

been served via ECF to the below-listed attorney for Defendants on September 4, 2014 in

accordance with the requirements of the Federal Rules of Civil Procedure:

Joseph Serino, Jr.
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022

/s/ Carol S. Shahmoon
Carol S. Shahmoon
