UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
THEODORE PEARLMAN, MARC TELL,
JULIA GALLO, DOROTHY RABSEY,
and JOHN AZZARELLA individually
and on behalf of all others
similarly situated,

                Plaintiffs,

                                 <u>MEMORANDUM & ORDER</u>
      -against-                10-CV-4992(JS)(GRB)

CABLEVISION SYSTEMS CORPORATION,

                Defendant.
----------------------------------X
APPEARANCES
For Plaintiffs:     Carol S. Shahmoon, Esq.
                Shahmoon & Elisen LLP
                370 Lexington Avenue, 24th Floor
                New York, NY 10017

                Todd J. Krouner, Esq.
                Scott Jaller Koplik, Esq.
                Law Offices of Todd J. Krouner
                93 North Greeley Avenue
                Chappaqua, NY 10514

                Ralph M. Stone, Esq.
                Stone Bonner & Rocco LLP
                145 West 45th Street, Suite 701
                New York, NY 10036

For Defendants:    Thomas H. Golden, Esq.
                Wilkie Farr & Gallagher
                787 Seventh Avenue
                New York, NY 10019

SEYBERT, District Judge:

        Pending before the Court are the following motions: (1)

plaintiffs Theodore Pearlman and Marc Tell's (collectively,

"Plaintiffs") motion to strike the testimony and report of

Elizabeth Losinski ("Losinski") and to preclude defendant Cablevision Systems Corporation ("Cablevision") from relying on discovery produced on July 18, 2014 (Docket Entry 125)[1]; and (2) Cablevision's cross motion to strike Plaintiffs' damages disclosure (Docket Entry 131).[2] For the reasons set forth below, Plaintiffs' motion is GRANTED IN PART and DENIED IN PART and Cablevision's cross motion is DENIED.

BACKGROUND

I.    Factual and Procedural Background

The Court assumes familiarity with the background of this case, which is set forth in the Memorandum and Order dated March 31, 2014. In re Cablevision Consumer Litig., No. 10-CV-4992, 2014 WL 1330546 (E.D.N.Y. Mar. 31, 2014). Plaintiffs, who were Cablevision subscribers, commenced this class action based on Cablevision's failure to provide certain television programming during a two-week period in 2010. Cablevision, 2014 WL 1330546, at *1.

---

[1] Plaintiffs requested that their motion be filed under seal and filed a redacted memorandum of law and exhibits. (Docket Entries 124 and 125.) Plaintiffs later refiled their memorandum of law and exhibits 1-11 to remove redactions. (Docket Entry 127.) For ease of reference, the Court will cite to the memorandum of law and exhibits filed at Docket Entry 127.

[2] While Cablevision stated in the body of its memorandum of law that it was cross moving to strike Plaintiffs' damages disclosure, Cablevision did not file a separate Notice of Cross Motion. Nevertheless, the Court will treat Cablevision's opposition to Plaintiffs' motion as a cross motion.

Briefly, on October 16, 2010, Cablevision's retransmission agreement with News Corp., Fox Cable Network Services' ("Fox") parent company, expired. Cablevision, 2014 WL 1330546, at *1. As a result, Cablevision lost its right to broadcast the following Fox cable channels: WNYN, WWOR, WTXF, Fox Business Network, National Geographic Wild, and Fox Deportes (collectively, the "Fox Channels"). Id. The Fox Channels were unavailable for two weeks until October 30, 2010, at which time Cablevision and News Corp. reached a new transmission agreement allowing Cablevision to resume broadcasting the Fox Channels. Id. Cablevision did not provide a credit or alternative programming to its subscribers during the two-week period that they were without the Fox Channels. Id. at *2.

Pursuant to Cablevision's Terms of Service, a standard form agreement that governed the contractual relationship between Cablevision and its subscribers during the relevant time period, Cablevision's subscribers were billed "monthly in advance for services to be received." Cablevision, 2014 WL 1330546, at *2. This litigation has focused on paragraphs four and seventeen of the Terms of Service. Id. at *3. Paragraph four of the Terms of Service ("Paragraph Four") provides:

> Disruption of Service: In no event shall Cablevision be liable for any failure or interruption of program transmissions or service resulting in part or entirely from circumstances beyond Cablevision's reasonable

3

control.  Subject to applicable law, credit
will be given for qualifying outages.  In any
event, if there is a known program or service
interruption in excess of 24 consecutive hours
(or in excess of such lesser time period
pursuant to state law), Cablevision, upon
prompt notification of such failure or
interruption from Subscriber, will either
provide Subscriber with a pro-rata credit
relating to such failure or interruption or,
at its discretion, in lieu of the credit
provide alternative programming during any
program interruption.  Cablevision shall not
be liable for any incidental or consequential
damages.

Id.  Paragraph seventeen of the Terms of Service ("Paragraph
Seventeen") provides: "Programming: All programming, program
services, program packages, number of channels, channel
allocations, broadcast channels, interactive services, e-mail,
data offerings and other Services are subject to change in
accordance with applicable law."  Id.

On March 28, 2012, the Court dismissed all of Plaintiffs'
claims except for its breach of contract claim.  Cablevision, 2014
WL 1330546 at *4.  See also In re Cablevision Consumer Litig., 864
F. Supp. 2d 258 (E.D.N.Y. 2012).  With respect to their breach of
contract claim, Plaintiffs argue that the two week period where
the Fox Channels were unavailable constitutes a "program or service
interruption" pursuant to Paragraph Four and that Cablevision
breached Paragraph Four when it did not provide subscribers with
a pro rata credit or alternative programming.  Cablevision, 2014
WL 1330546, at *3.  Cablevision has taken the position that "it is

4

not liable for breach of contract because Paragraph 17 relieves it of the obligation to provide any particular programming and Paragraph 4 only applies to interruptions caused by a mechanical or technical problem." Id.

The Court, inter alia, granted Plaintiffs' motion for class certification in its Memorandum and Order dated March 31, 2014 (the "Certification Order"). Cablevision, 2014 WL 1330546, at *5. The Certification Order notes, with respect to Plaintiffs' theories of liability and damages, that "[t]he measure of damages for this alleged breach is straightforward: Cablevision subscribers would be entitled to a uniform 'pro rata' refund of that portion of their monthly subscriber fees attributable to the absence of the Fox Channels." Id. at *13 (emphasis in original).

II. Discovery

Plaintiffs' Initial Rule 26(a) Disclosure dated March 28, 2011 did not provide the computation of each category of claimed damages and stated, in relevant part: "Plaintiffs are currently in the process of preparing a computation of damages and will, upon completion, provide a damage estimate to Defendants." (Def.'s Br., Docket Entry 131, at 3; Def.'s Decl., Ex. 1, Docket Entry 131-2, at 6.) Cablevision provided initial disclosures on April 14, 2011 and "identified three company witnesses (and the Plaintiffs) as persons with discoverable information." (Def.'s Br. at 3; Def.'s Decl., Docket Entry 131-3, Ex. 2, at 2.)

During discovery, Cablevision produced over 354,000 pages in response to discovery requests. (Pls.' Br., Docket Entry 127, at 4.) Cablevision's disclosures and discovery responses identified thirteen current and former employees, five of which were deposed by Plaintiffs. Id. The Court's Amended Case Management and Scheduling Order imposed a deadline of February 15, 2013 for the completion of fact discovery. (See Am. Sch. Order, Docket Entry 88.)

At a May 5, 2014 conference before Magistrate Judge A. Kathleen Tomlinson, Cablevision "stated that the plaintiffs have not articulated a damages theory and depending on what that theory is, counsel may need some additional fact discovery." (May 5, 2014 Min. Order, Docket Entry 111, ¶ 1.) The Court reminded Plaintiffs of their obligation to supplement their initial disclosures and that damages categories and calculations were requested in those disclosures. (Id.) Plaintiffs alleged that "they are entitled to pro rata credit on their monthly bill" with the definition of the pro rata credit to be determined by the Court. (Id.) Defendant took the position that a pro rata credit would result in a "windfall" to Plaintiffs. (Id.)

Plaintiffs' Amendment to Rule 26 Initial Disclosure dated May 22, 2014 states that they are seeking the following categories of damages: (1) monetary damages in the form of pro rata credits; (2) pre-judgment and post-judgment interest as

permitted by law; and (3) attorney's fees and costs. (Amendment to Pls.' Rule 26 Initial Disclosure, Docket Entry 131-9, at 1.) With respect to a pro rata credit, Plaintiffs allege that "for each day of the programming or service interruption, each subscriber was entitled to a pro rata credit equaling 1/30th of that subscriber's monthly cable bill in accordance with Paragraph 4 of the Terms of Service." (Id.)

By Electronic Order dated May 29, 2014, Judge Tomlinson granted Cablevision's request to extend the deadline for the service of expert reports to July 18, 2014. On July 18, 2015, Cablevision served the reports of two experts, Elizabeth Losinski and Jonathan Orszag. (Def.'s Br., at 3.)

III. Cablevision's July 18, 2014 Disclosures

On July 18, 2014, Cablevision served the following documents: (1) the expert report of Losinski (the "Losinski Report"), (2) the expert report of Jonathan Orzag, (3) a supplemental document production consisting of approximately 137 pages (the "Supplemental Document Production"), (4) Cablevision's First Supplemental Rule 26(a)(1) Disclosure Statement (the "Supplemental Disclosure"), and (5) Cablevision's Second Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories. (Def.'s Decl., Docket Entry 131-8, Ex. 7.) Cablevision avers that the documents contained in the Supplemental Document Production all concerned the computation of alleged

damages, as did its supplemental interrogatory response. (Def.'s Br. at 5-6.) Cablevision's Supplemental Disclosure identified five additional potential fact witnesses; Plaintiffs had previously deposed four of these individuals and the fifth individual was Losinski, who was separately disclosed as an expert witness. (Def.'s Br. at 6.)

A. The Losinski Report

The Losinski Report details Losinski's twenty-seven year employment in the cable television industry. (Losinski Report, Pls.' Decl., Docket Entry 127-2, Ex. 1 at 4.) Losinski began working at Cablevision in 1987 as its Director of Regulatory Affairs and held the position of Vice President of Cable Policy and Political Ethics from 1998 until her retirement on January 31, 2014. (Losinski Report at 4.) Since February 1, 2014, Losinski has provided consulting services to Cablevision as an independent contractor. (Losinski Report at 4.) Losinski is admitted to the Minnesota Bar but has "been a non-practicing member for many years." (Losinski Report at 4-5.)

While at Cablevision, Losinski was responsible for matters involving the Federal Communications Commission ("FCC"), state regulatory authorities, and local franchise authorities that included obtaining approvals and licenses for Cablevision to operate from local franchise authorities. (Losinski Report at 5.) Losinski has been involved in regulatory compliance and decisions

regarding Cablevision's response to its subscribers with respect to: (1) other contract disputes that Cablevision has had with broadcast stations or cable television networks, and (2) weather problems resulting in a disruption of Cablevision's ability to transmit certain networks or its entire cable service. (Losinski Report at 5-6.) Losinski has reviewed drafts of Cablevision's terms of service to ensure regulatory compliance. (Losinski Report at 6.) Losinski avers that she has "specialized knowledge of [ ] the industry customs and practices and terms of art related to cable operator terms of service relevant to this case." (Losinski Report at 6-7.)

Losinski's duties at Cablevision "have not regularly involved giving expert testimony" and she has not testified at a deposition or as an expert witness at trial during the previous four years. (Losinski Report at 4, 7.) However, Losinski has testified before or given speeches and presentations to the FCC, New York Public Service Commission, Connecticut Public Utilities Regulatory Agency, Massachusetts Cable Commission, and she has "testified before . . . major municipalities on issues before the cable industry." (Losinski Report at 7.)

    1.  <u>Terms of Art</u>

The Losinski Report defines certain terms that Losinski alleges are industry "terms of art." In her discussion of negotiations between cable operators and programmers, Losinski

defines a "programming blackout" as a situation when a network is unavailable because a license agreement has not been reached between a cable operator and a programmer. (Losinski Report at 13.) Losinski avers, "Cable operators, including Cablevision, widely publicize the fact that they retain the editorial discretion to make changes to the mix of networks offered on their cable systems to their subscribers. Paragraph 17 of Cablevision's Terms of Service here is one such example." (Losinski Report at 13-14.) When discussing the subject contract dispute between Cablevision and News Corp., Losinski characterizes the unavailability of the Fox Channels as a "programming blackout." (Losinski Report at 18.) Parenthetically, Losinski states that she has "personal familiarity with the contract dispute between Cablevision and News Corp. based on [her] work for Cablevision." (Losinski Report at 16.)

In her discussion of the difference between editorial changes and disruptions of service, Losinski alleges, "[a] 'network change' is a term of art in the cable industry used to refer to a change to the mix of networks that cable operators offer subscribers on a particular service tier." (Losinski Report at 19.) Losinski further alleges that a "network change" can result from a cable operator's editorial judgment as well as a contract dispute between a cable operator and a programmer and states that "[t]he unavailability of the Fox Channels from October 16 to 30,

2010, is an example of a 'network change.'  More specifically, it is a 'programming blackout,' which is a type of 'network change.'" (Losinski Report at 19.)

Losinski also alleges that changes to channel offerings that result from editorial or business decisions are also referred to in the industry as "changes to 'programming,' 'program services,' 'program packages,' 'number of channels,' 'channel allocations,' and/or 'broadcast channels.'"  (Losinski Report at 20.)  Losinski specifically notes that all of these terms appear in Paragraph 17 and none of them appear in Paragraph 4.  (Losinski Report at 20.)

Losinski defines "disruption of service" as a cable industry term of art that references a "loss of cable service for which a subscriber pays a separate price, resulting from technical failures or extraordinary force majeure type of events that affect the operation of the cable system."  (Losinski Report at 20.) Losinski expressly states that the term "disruption of service" would not be used in the industry to describe a programming blackout, and that "[t]he unavailability of the Fox Channels from October 16 to 30, 2010 was not a 'disruption of service.'" (Losinski Report at 20 (emphasis in original).)  Once again, Losinski notes that the industry terms that reference a "disruption of service" all appear in Paragraph 4, while none of the

"disruption of service" terms are used in Paragraph 17. (Losinski Report at 21.)

### 2. Remedies for Service Disruptions

The Losinski Report summarizes the New York, New Jersey, and Connecticut regulations that provide for a credit for certain "disruptions of service." (Losinski Report at 25-28.) Losinski notes that "Cablevision's longstanding practice . . . is to offer and provide subscribers across-the-board credits only for 'disruptions of service' . . . and not for 'programming blackouts' or other 'network changes.'" (Losinski Report at 27.) Losinski also states that Paragraph 4 references the criteria that appear in the summarized state regulations, while Paragraph 17 does not reference such criteria. (Losinski Report at 27-28.)

### 3. Conclusions

The Losinski Report reaches five separate conclusions, all of which are expressed as Losinski's "opinion": (1) the unavailability of the Fox Channels from October 16 to 30, 2010 was a "programming blackout" and none of the terms of art found in Paragraph 4 would be used to describe this occurrence; (2) in the event of a "programming blackout," applicable state regulations only require cable companies to provide subscribers with notice of the change of service and an opportunity to downgrade or terminate their service, free of charge; (3) Cablevision provided subscribers notice of the change of service and an opportunity to

downgrade or terminate service in connection with the unavailability of the Fox Channels; (4) a "disruption of service" is a term of art that refers to a loss of service for which a subscriber pays a separate price that results from a technical failure or <u>force</u> <u>majeure</u> event; and (5) the credits requested by Plaintiffs are only required for certain "disruptions of service" and "[t]he 'programming blackout' of the Fox Channels was not a 'disruption of service.'" (Losinski Report 28-29.)

B. <u>Losinski's Disclosure as a Fact Witness</u>

Cablevision's Supplemental Disclosure lists Losinski as a person "likely to have discoverable information that Cablevision may use to support its claims and defenses" and indicates that the subject matter of her discoverable information is as follows:

> The contract dispute between Cablevision and News Corp.; the Terms of Service used by Cablevision; Cablevision's interactions with cable regulatory authorities; various types of disruptions to cable TV service; various types of changes to the mix of networks offered by Cablevision; and the customary relief given to subscribers in different cases involving such disruptions and changes, respectively.

(Def.'s Decl., Ex. 11, Docket Entry 131-12.) Cablevision alleges that Losinski's testimony will serve as a response to what they characterize as "Plaintiffs' belatedly disclosed windfall damages claim." (Def.'s Br. at 6.)

C.  Cablevision's Supplemental Document Production

Cablevision alleges that Orszag relies on the Supplemental Document Production in his expert report.  (Def.'s Br. at 6.)  Cablevision also avers that only seventeen pages of the Supplemental Document Production originate from Cablevision's files and the "vast majority" of these documents "came from a third-party industry consulting company and were produced to Plaintiffs merely as a courtesy."  (Def.'s Br. at 6.)

IV.  Stay of Losinski Deposition

By letter dated September 3, 2014, Plaintiffs requested a stay of Losinski's deposition pending the resolution of their motion to strike her testimony.  (Docket Entry 133.)  Cablevision opposed this request.  (Docket Entry 136.)  On September 22, 2014 Judge Tomlinson granted Plaintiffs' motion to stay Losinski's deposition until their motion to strike is determined.  (Docket Entry 141.)

DISCUSSION

I.  Losinski's Expert Testimony

The admission of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the

> trier of fact to understand the evidence or to
> determine a fact in issue;
> (b) the testimony is based on sufficient facts
> or data;
> (c) the testimony is the product of reliable
> principles and methods; and
> (d) the expert has reliably applied the
> principles and methods to the facts of the
> case.

FED. R. EVID. 702. The party seeking the admission of the expert testimony bears the burden of demonstrating its admissibility pursuant to the framework set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), by a preponderance of the evidence. Hollman v. Taser Int'l Inc., 928 F. Supp. 2d 657, 666 (E.D.N.Y. 2013). Nevertheless, the district court is the final "gatekeeper" and must ensure that the testimony or evidence admitted is relevant and reliable. Id. (internal quotation marks and citations omitted).

A. Qualifications of an Expert

Rule 702 requires that an expert be "qualified as an expert by knowledge, skill, experience, training, or education." FED. R. EVID. 702. In analyzing an expert's qualifications, the court should: (1) examine the background of the witness to determine if he or she possesses any of the qualifications set forth in Rule 702; and (2) compare the witness' education or area of expertise with the subject matter of the proffered expert

testimony.  Washington v. Kellwood Co., --- F. Supp. 3d ----, 2015 WL 2258098, at *6-7 (S.D.N.Y. 2015).

It is imperative that a court consider the entirety of the witness' background when determining the witness' qualifications for expert testimony.  Smith v. Herman Miller, Inc., No. 03-CV-5358, 2005 WL 2076570, at *2 (E.D.N.Y. Aug. 26, 2005).  Expert qualification is appropriate on the sole basis of "practical experience" and a formal degree is not required.  Argonaut Ins. Co. v. Samsung Heavy Indus. Co. Ltd., 929 F. Supp. 2d 159, 172 (N.D.N.Y. 2013).  Accord In re Fosamax Products Liab. Litig., 645 F. Supp. 2d 164, 172 (S.D.N.Y. 2009) (Noting that expert qualification is "viewed liberally" and may be founded in "a broad range of knowledge, skills, and training.") (internal quotation marks and citation omitted).  Disputes regarding the strength of an expert's credentials speak to the weight of the testimony, not its admissibility.  McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1044 (2d Cir. 1995).

The Court is not persuaded by Plaintiffs' argument that Losinski is not qualified to be an expert because her knowledge is limited to "how Cablevision runs its own business" and her work at Cablevision did not include "the subject matters of her report." (Pl.'s Br. at 2.)  Losinski's credentials meet the liberal expert qualification standard.  As set forth more fully above, Losinski held high level positions at Cablevision for nearly thirty years

and possesses specific knowledge of the cable television industry as well as experience in assisting with contract disputes and disruptions of service. (See Losinski Report at 5-6.) Losinski has also reviewed drafts of Cablevision's Terms of Service. Id. The fact that Losinki's department at Cablevision dealt primarily with lobbying and did not deal with subscribers does not refute Losinski's description of her work experience. (See Pls.' Reply Br., Docket Entry 139, at 19.) Moreover, as noted by Cablevision, Losinski clearly has expertise in the general field of cable television and, accordingly, the Court should not exclude her testimony on the sole basis that she "lacks expertise in the specialized areas that are not directly pertinent." In re Zyprexa Prods. Liab. Litig., 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007). (See also Def.'s Br. at 11, n.28.)

B. Reliability of Expert Testimony

In determining the reliability of an expert's analysis, the court should rigorously examine "the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand," bearing in mind that an expert's opinion will not be per se inadmissible based on a negligible flaw in reasoning or slight adjustment to a reliable method. Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002). Indeed, evidence should only be excluded where the expert's flaw is

significant enough that there is an absence of "good grounds" for the expert's conclusions.  Id. (internal quotation marks and citation omitted).  However, "[e]xpert testimony must rest on 'more than subjective belief or unsupported speculation.'"  Washington, 2015 WL 2258098, at *9 (quoting Daubert, 509 U.S. at 599, 113 S. Ct. at 2800) (collecting cases).

While the Supreme Court has identified factors that district courts may consider with respect to reliability, those factors "'are neither mandatory nor exclusive,' particularly when the expert's qualifications are based primarily on his or her training and experience."  Ebbert v. Nassau County, No. 05-CV-5445, 2008 WL 8086382, at *6 (E.D.N.Y. Sept. 29, 2008) (quoting Canino v. HRP, Inc., 105 F. Supp. 2d 21, 29 (N.D.N.Y. 2000)).

Plaintiffs argue that Losinski does not provide sufficient methodology for her conclusions and improperly relies on ipse dixit logic. (Pls.' Br. at 12-13.)  However, as noted by Cablevision, Losinski is testifying based on her experience, not a scientific method. (Def.'s Br. at 13.)  The Court finds that Plaintiffs' reliability argument speaks more to the weight of the evidence than its admissibility.  See Arista Records LLC v. Lime Group LLC, No. 06-CV-5936, 2011 WL 1674796, at *7 (S.D.N.Y. May 2, 2011) (Noting that arguments respecting underlying data and assumptions speak to the expert testimony's weight, not admissibility.).

C. <u>Relevance of Expert Testimony</u>

Expert testimony must adhere to Federal Rule of Evidence 403, which provides for the exclusion of relevant evidence "'if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'" <u>Washington</u>, 2015 WL 2258098, at *9 (quoting Fᴇᴅ. R. Eᴠɪᴅ. 403). The relevance standard is liberal and the decision to exclude expert testimony based on relevance is within the trial court's discretion. <u>In re Zyprexa</u>, 489 F. Supp. 2d at 283. However, doubts regarding the usefulness of an expert's testimony "should generally be resolved in favor of admissibility." <u>Lappe v. Amer. Honda Motor Co., Inc.</u>, 857 F. Supp. 222, 226 (N.D.N.Y. 1994), <u>aff'd sub. nom. Lappe v. Honda Motor Co. Ltd. of Japan</u>, 101 F.3d 682 (2d Cir. 1996) (internal quotation marks and citation omitted).

The witness's testimony will be admissible where it assists the trier of fact. <u>Keenan v. Mine Safety Appliance Co.</u>, No. 03-CV-0710, 2006 WL 2546551, at *2 (E.D.N.Y. Aug. 31, 2006). This requirement "can be expressed as a question of 'fit'--'whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" <u>In re Fosamax</u>, 645 F. Supp. 2d at 173 (quoting <u>Daubert</u>, 509 U.S. at 591, 113 S. Ct. at 2796).

Expert testimony is not useful if it merely "'usurps[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.'" In re Fosamax, 645 F. Supp. 2d at 173 (quoting U.S. v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994) (alteration in original). Indeed, this Circuit has held that testimony that states a legal conclusion must be excluded. Duncan, 42 F.3d 97, 101 (2d Cir. 1994) (citations omitted). See also Hygh v. Jacobs, 961 F.2d 359, 364 (2d Cir. 1992) ("Whereas an expert may be uniquely qualified by experience to assist the trier of fact, he is not qualified to compete with the judge in the function of instructing the jury."); U.S. v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991) (noting that while the expert may opine as to issues of fact, he or she may not give testimony setting forth legal conclusions based on those facts).

The Losinski Report's discussion of industry custom, practice, and terminology is relevant to the subject breach of contract claim. Indeed, in Broder v. Cablevision Systems Corp., 418 F.3d 187 (2d. Cir. 2005), an unrelated class action against Cablevision in which plaintiff asserted breach of contract claims, the Second Circuit discussed contract ambiguity and noted the general rule that a contract term is ambiguous where it could suggest multiple meanings when objectively considered by a "reasonably intelligent person who has examined the context of the

entire integrated agreement and . . . is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'"  Broder, 418 F.3d at 197 (quoting World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co., 345 F.3d 154, 184 (2d Cir. 2003)) (ellipsis in original).

However, Losinski impermissibly crosses the boundary from opinion to legal conclusion.  As set forth below, the Losinski Report is reminiscent of the expert testimony at issue in Marx & Co., Inc. v. Diners' Club Inc., 550 F.2d 505 (2d Cir. 1977).  In Marx, an action alleging violations of the Securities Exchange Act of 1934, the security regulations expert did not limit his testimony to customs and practices and instead "testified not so much as to common practice as to what was necessary 'to fulfill the covenant' (of the contract)."  Marx, 550 F.2d at 509 (alteration in original).  The Second Circuit held that the district court erred in permitting the expert witness to provide his opinion with respect to the parties' legal obligations pursuant to the contract.  Id. at 508.  See also Levinson v. Westport Nat'l Bank, No. 09-CV-0269, 2013 WL 3280013, at *4 (D. Conn. Jun. 27, 2013) ("[A]n expert may not interpret a contract for the jury, nor may an expert testify about the meaning of legal terms.") (internal citations omitted).

Defendant's argument that "Ms. Losinski conscientiously avoids offering opinions on ultimate legal issues," and "she does

not offer a legal opinion on whether Cablevision's notices in fact complied with law or regulation," obscures the issue at hand. (Def.'s Br. at 17.)  Defendant is correct that Losinski does not offer conclusions as to whether Cablevision's notices complied with applicable laws or regulations.  However, Losinski essentially interprets the Terms of Service and speaks to what was necessary for Cablevision to "fulfill the covenant of the contract."  See Marx, 550 F.2d at 509 (internal quotation marks omitted).

### 1.  Opinions One, Two and Three

When read together, Losinski's first, second, and third opinions allege that: (a) the subject unavailability of the Fox Channels was a "programming blackout"; (b) the terms of art in Paragraph 17 could be used to describe this "programming blackout"; (c) the terms of art in Paragraph 4 could not be used to describe this "programming blackout"; (d) in the event of a "programming blackout", applicable regulations only require cable companies to provide subscribers with notice of the change of service and an opportunity to downgrade or terminate, free of charge; and (e) with respect to the subject incident, Cablevision did, in fact, provide its subscribers with notice or an opportunity to downgrade or terminate, free of charge, as is consistent with its "longstanding practice as informed by the regulatory framework." (Losinski Report at 28-29.)

The sole issue in this case is whether Cablevision breached the Terms of Service. By defining the subject incident as a "programming blackout", indicating which provisions of the Terms of Service would and would not apply to a "programming blackout", and employing a line of reasoning that results in Cablevision only being required to provide notice and an opportunity to downgrade or terminate service, Losinski is telling the fact-finder what result to reach, not aiding the fact-finder in reaching a conclusion. See U.S. v. Duncan, 42 F.3d at 101. While Losinski is careful in her wording, opinions one, two, and three, when read together, constitute Losinski's interpretation of the contract rather than testimony regarding industry customs and practices.

Moreover, Losinski's assertion that the terms of art in Paragraph Four could not be used to describe a "programming blackout" but the terms of art in Paragraph Seventeen could be used to describe a "programming blackout" is confusing and somewhat misleading as the phrase "programming blackout" does not appear anywhere in Paragraph Seventeen.

2. Opinions Four and Five

When read together, Losinski's fourth and fifth opinions allege that: (a) a "disruption of service" is a term of art that refers to a loss of service for which a subscriber pays a separate price that results from a technical failure or force majeure event;

(b) the "programming blackout" of the Fox Channels did not constitute a "disruption of service"; and (c) the credits requested by Plaintiffs are only available for certain "disruptions of service." (Losinski Report 28-29.) Again, Losinski is veering away from custom and practice and asserting the legal conclusion--that Plaintiffs are not entitled to any pro rata credits.

### 3. State Regulations

The Losinski Report also contains a summary of New York, New Jersey, and Connecticut state regulations concerning so-called "disruptions of service" as well as a chart analyzing the components of each state's regulations. (Losinski Report at 25-28.) Losinski's citation to and analysis of state regulation is not permissible. See, e.g., Ebbert, 2008 WL 8086382, at *13 ("The Court draws the parties' attention to the . . . portions of [the expert's] [r]eports which reflect citation to law and cases as well as legal conclusions which are impermissible.").

### D. Lay Matters

Expert testimony must not merely address "lay matters" that the jury is capable of understanding without assistance. Ho Myung Moolsan, Co. Ltd. v. Manitou Mineral Water, Inc., No. 07-CV-7483, 2010 WL 4892646, at *5 (S.D.N.Y. Dec. 2, 2010), aff'd, 501 F. App'x 85 (2d Cir. 2012). Accord U.S. v. Mejia, 545 F.3d 179, 194 (2d Cir. 2008) ("Testimony is properly characterized as 'expert' only if it concerns matters that the average juror is not

capable of understanding on his or her own."). Cf. Levinson, 2013 WL 3280013, at *4 ("[A]n expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence.). But see In re Zyprexa, 489 F. Supp. 2d at 283 (expert testimony is "freely admitted" where it substantially helps the average individual understand the case "even if it simply explains the record.").

The Losinski Report contains a section providing an "overview of Cablevision's business" as well as a recitation of the purported facts concerning Cablevision's contract dispute with News Corp. (Losinski Report at 14-19.) These sections do not constitute "expert" testimony as they contain factual narratives that the trier of fact is capable of understanding without assistance.

E. Expert-Employee Exception

While Cablevision argues that Losinski falls under the "expert-employee" exception to Federal Rule of Civil Procedure 26(a)(2)(B) (and thus has no obligation to submit an expert report) the Court disagrees. (Def.'s Br. at 11.) Rule 26(a)(2)(B) provides that expert disclosures must include a written report, prepared and signed by the expert witness, "if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." FED. R. CIV. P. 26(a)(2)(B). See Bank

of China, N.Y. Branch v. NBM LLC, 359 F.3d 171, 177 n.13 (2d Cir. 2004). The parties have not proffered any evidence to suggest that Losinski regularly provides expert testimony and, indeed, the Losinski Report specifically states that Losinski has not provided expert testimony at a deposition or trial during the past four years. (Losinski Report at 7.) However, Losinski also states: "I have been asked to provide expert testimony in this matter and am being compensated for this work at the rate of $350 per hour." (Losinski Report at 4.) Additionally, Losinski is presently an independent contractor providing consulting services to Cablevision and, accordingly, is not technically an "employee." (Losinski Report at 4.) Thus, Losinski has been retained or specially employed to provide expert testimony and the expert report requirement of Rule 26(a)(2)(B) applies to Losinski.

F. Conclusion

The branch of Plaintiffs' motion seeking to strike the Losinski Report is GRANTED based on the Court's finding that the Losinski Report asserts legal conclusions. Based on the Court's ruling, Plaintiffs' request that Cablevision be precluded from relying on the exhibits to the Losinski Report that were purportedly not previously produced is MOOT. (Pls.' Br. at 22-23.)

Although courts within the Second Circuit routinely strike portions of an expert's report and retain others, see

Ebbert, 2008 WL 8086382 at *13, Losinski's statements amounting to contract interpretation are also found in the body of the Losinski Report. (See, e.g., Losinski Report at 20 (stating that terms relating to changes in channel offerings resulting from editorial or business decisions all appear in Paragraph Seventeen but do not appear in Paragraph Four and alleging that the subject unavailability of the Fox Channels was not a "disruption of service").) Furthermore, as previously noted, the Losinski Report also contains sections that constitute "lay matters" rather than expert testimony as well as a legal analysis of state regulations. Accordingly, it would be futile for the Court to attempt to parse out the admissible portions of the Losinski Report and the Court declines to engage in such an exercise.

## II.  Preclusion

Federal Rule of Civil Procedure 26(a) requires that parties provide, inter alia, the contact information for "each individual likely to have discoverable information--along with the subjects of that information--that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." FED. R. CIV. P. 26(a)(1)(A)(i). Rule 26(e) requires that the parties timely supplement their disclosures or responses upon discovering that any disclosure or response was materially incomplete or inaccurate and the information was not otherwise

provided during discovery or in writing. FED. R. CIV. P. 26(e)(1)(A).

Additionally, Rule 37(c) provides, in relevant part: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." FED R. CIV. P. 37(c)(1). Rule 37(c) is applicable to a party's "untimely production of documents and information required to be produced.'" Lee Valley Tools, Ltd. v. Indus. Blade Co., 288 F.R.D. 254, 260 (W.D.N.Y. 2013) (quoting Lodge v. United Homes, LLC, 787 F. Supp. 2d 247, 258 (E.D.N.Y. 2011).

"The purpose of Rule 37(c)(1) is to prevent the practice of 'sandbagging' an adversary with new evidence." Morganstern v. County of Nassau, No. 04-CV-0058, 2008 WL 4449335, at *1 (E.D.N.Y. Sept. 29, 2008) (internal quotation marks and citations omitted). The imposition of sanctions pursuant to Rule 37(c)(1) remains in the trial court's discretion and the dilatory party bears the burden of establishing "justification or harmlessness." Peterson v. Pan Am Railways, Inc., No. 12-CV-1857, 2015 WL 2451227, at *2 (N.D.N.Y. May 21, 2015). Nevertheless, "[p]reclusion of evidence is generally a disfavored action." American Stock Exch., LLC v. Mopex, Inc., 215 F.R.D. 87, 93 (S.D.N.Y. 2002).

In determining whether testimony should be excluded, the Court considers: (1) the dilatory party's explanation for the failure to adhere to the disclosure requirement; (2) the importance of the precluded witness' testimony; (3) prejudice to the movant resulting from the need to prepare to respond to the new testimony; and (4) whether a continuance is possible. <u>Patterson v. Balsamico</u>, 440 F.3d 104, 117 (2d Cir. 2006) (internal quotation marks and citation omitted). These factors should also be considered by the Court in determining whether to exclude late produced evidence. <u>See</u> <u>Lodge</u>, 787 F. Supp. 2d at 259.

A. <u>Losinski Fact Witness Testimony</u>

Plaintiffs allege that "Ms. Losinski's appearance is sudden, not reasonably anticipated, and prejudicial, as the case is well into expert discovery." (Pl.'s Br. at 23.) With respect to the <u>Patterson</u> factors, Plaintiffs argue: (1) Cablevision has no excuse for delaying in identifying Losinski since it has "known about her all along" and is simply trying to "redirect its case with a new story from a new witness"; (2) Losinski's testimony is unimportant given the seven other employees (including Losinski's boss) identified by Cablevision as fact witnesses; (3) Plaintiffs would be prejudiced by Losinski's testimony as reopening discovery to serve additional document requests would be costly; and (4) this case has been pending for four years and it would be

unreasonable to reopen discovery at this late date. (Pl.'s Br. at 23-24.)

Cablevision counters that: (1) Losinski was disclosed as a fact witness in response to Plaintiffs' disclosure of their damages theory on May 22, 2014; (2) Cablevision advised Plaintiffs at the May 2014 conference that they may require supplemental discovery to respond to Plaintiffs' damages theory; and (3) "the subject matters for which Ms. Losinski has been disclosed as a fact witness all relate to responding to Plaintiffs' damages theory." (Def.'s Br. at 22.)

The Court will review each <u>Patterson</u> factor individually:

### 1. The Party's Explanation for Non-Compliance

Cablevision's explanation for its failure to disclose Losinski as a fact witness during discovery—-that Cablevision's disclosure of Losinski was made in connection with its defense of Plaintiffs' belated disclosures of its damages contentions—-is unavailing. (<u>See</u> Def.'s Br. at 22.) Losinski avers in her report that she has "personal familiarity with the contract dispute between Cablevision and News Corp. based on [her] work for Cablevision" and Cablevision does not dispute that Losinski was a subordinate of Lee Schroeder, who was deposed in this action. (Losinski Report at 16; Pl.'s Br. at 5-6.) It strains the imagination that Losinski's knowledge of this matter was unknown

to Cablevision until early 2014.  Moreover, the subject matter of Losinski's discoverable information as set forth in Cablevision's Supplemental Disclosure is not limited to the issue of Plaintiffs' damages theory and includes areas such as "the contract dispute between Cablevision and News Corp." and "the Terms of Service used by Cablevision."  (See Def.'s Decl., Ex. 11.)

  2.  The Importance of the Testimony

Based on Cablevision's disclosure of multiple employee-fact witnesses, including Losinski's superior, it appears unlikely that Losinski's testimony is distinct from that of her former Cablevision colleagues.

  3.  Prejudice

The Court finds that Plaintiffs would be prejudiced were Losinski permitted to testify as a fact witness.  Discovery has been closed since February 2013 and Plaintiffs have not had the opportunity to depose Losinski or engage in fact discovery with respect to Losinski.  Additionally, there has been no showing that Plaintiffs should have been "on notice" of Losinski's relevant knowledge of this matter as her name only appeared on "a handful" of documents in Cablevision's over 350,000 page document production.  (Pls.' Br. at 5.)  Cf. Wright v. Aargo Sec. Servs. Inc., 99-CV-9115, 2001 WL 1035139, at *2-3 (S.D.N.Y. Sept. 7, 2001) (denying preclusion of witnesses where "the identities of the [ ] witnesses ha[d] been made known to plaintiff during the discovery

process in satisfaction of Rule 26(e)(2), despite defendant's failure to respond fully to plaintiff's interrogatories in a timely fashion. . . .")

### 4. Possibility of a Continuance

No trial date has been set, and continuance of discovery would likely be needed for supplemental fact discovery and a deposition of Losinski.

As set forth above, an exception to Rule 37(c)(1) exists where the non-movant's failure to disclose the witness is "substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). The Court finds no evidence of a substantial justification for Cablevision's failure to disclose Losinski as a fact witness and, as set forth above, the Court is not persuaded by Cablevision's "explanation" for its delay. Similarly, the Court finds that the failure to disclose Losinski is not "harmless" based on the prejudice that would inure to Plaintiffs if they were to proceed to trial without a deposition or discovery with respect to a fact witness. See Amer. Stock Exchange, 215 F.R.D. at 93 (Non-compliance with Rule 37(c) is "harmless" where the party entitled to the disclosure is not prejudiced.)

Although the Court is mindful that preclusion is not favored, it is warranted with respect to the testimony of Losinski as a fact witness. Accordingly, the branch of Plaintiffs' motion

seeking to preclude Losinski's testimony as a fact witness is GRANTED.

B. <u>Supplemental Document Production</u>

Plaintiffs similarly allege that the Supplemental Document Production, which "pertain[s] to Cablevision's costs and other industry information about programming costs," should be precluded because it was not disclosed prior to the close of fact discovery and "[it was] not included among the types of documents that Cablevision identified in its initial disclosures." (Pls.' Br. at 23.) Plaintiffs argue that the Supplemental Document Production was the subject of earlier discovery requests and that Cablevision is merely attempting to "undermine its own evidence with information previously deemed to be irrelevant." (Pls.' Reply Br., at 15-16 (emphasis omitted).)

Cablevision maintains that its Supplemental Document Production was made in response to Plaintiffs' allegedly belated damages theory and notes that it "advised Plaintiffs at the May 5, 2014 conference that supplemental fact discovery might be required to respond to Plaintiffs' damages—-and, apparently recognizing that this proposition was correct, Plaintiffs did not object." (Def.'s Br. at 22.) Additionally, the Supplemental Document Production was allegedly relied upon by Cablevision's damages expert, Jonathan Orszag and "all but 17 pages of these documents

are not even Cablevision documents, and Cablevision had no prior duty to produce them."[3]  (Def.'s Br. at 22, n.59.)

The Court acknowledges that it has not been privy to the entirety of the Supplemental Document Production as only a portion of this production was included as an exhibit to Plaintiffs' motion and filed under seal.  (Pls.' Reply Decl., Ex. 17, Docket Entry 134-4.)  Plaintiffs allege that these documents concern "costs and other industry information about programming costs," and Defendant characterizes the Supplemental Document Production as documents "concerning the computation of alleged damages."  (Pls.' Br. at 23; Def.'s Br. at 5.)  In any event, the Court finds that this information should have been produced in response to Plaintiffs' discovery demands.  (Pls.' Br. at 23; Pls.' Discovery Demands, Pls.' Decl., Ex. 7, Docket Entry 127.)  Although Cablevision alleges that the lion's share of the Supplemental Document Production was prepared by a third-party and provided to Plaintiffs as a "courtesy," Cablevision clearly obtained possession of those documents and accordingly had an obligation to timely disclose them to Plaintiffs.  See FED. R. CIV. P. 26(a)(1)(A)(ii) ("[A] party must . . . provide to the other parties . . . (ii) a copy—-or a description by category and location—-of all documents, electronically stored information, and tangible things that the

---

[3] Orszag's expert testimony is the subject of a motion to exclude that is currently <u>sub judice</u>.  (<u>See</u> Docket Entry 164.)

disclosing party has in its possession, custody, or control and may use to support its claims or defenses . . . .") The fact that Orszag, Cablevision's damages expert, allegedly relied upon the Supplemental Document Production does not excuse Cablevision's obligation to timely produce of those documents. (Def.'s Br. at 6.)

Nevertheless, the Court finds that any violation of Rule 26(e) was harmless and, accordingly, preclusion pursuant to Rule 37 is not appropriate. To the extent that Orszag relies upon the Supplemental Document Production, disclosure was made prior to his expert deposition. Plaintiffs have not made a showing of prejudice sufficient to warrant the extreme sanction of preclusion with respect to the Supplemental Document Production and that branch of Plaintiffs' motion is DENIED without prejudice to renewal at trial.

III. Cross Motion to Strike Plaintiffs' Damages Disclosure

Cablevision's memorandum of law in opposition to Plaintiffs' motion asserts that "[i]n the alternative, Cablevision thus cross-moves to strike Plaintiffs' belated damages disclosure, and to preclude evidence thereof." (Def.'s Br. at 2.) Cablevision has essentially taken the position that "what is good for the goose, is good for the gander" in arguing that if it is precluded from utilizing evidence disclosed after the close of discovery, Plaintiffs should similarly be precluded from relying

on a damages theory disclosed after fact discovery concluded. (Def.'s Br. at 25.)

Plaintiffs characterize Cablevision's cross motion as a "retaliatory response" to Plaintiffs' motion based on the two months between disclosure and Cablevision's first objection to Plaintiffs' damages theory. (Pls.' Reply Br. at 11.) Plaintiffs note that its damages disclosure was submitted in response to a request by Cablevision and that "Cablevision understood from the very start that the claim was for a breach of paragraph 4 and that subscribers were seeking the only available remedy--pro rata refunds." (Pls.' Reply Br. at 12.)

The Court finds that Plaintiffs violated Rule 26(e) by failing to timely supplement their initial disclosure, which did not contain a computation of damages. (See Def.'s Decl., Ex. 1, Docket Entry 131-2, at 6.) However, Plaintiffs' violation was harmless based on the lack of prejudice to Cablevision. The Certification Order (dated March 31, 2014) expressly held, with respect to Plaintiffs' damages theory, that "[t]he measure of damages for this alleged breach is straightforward: Cablevision subscribers would be entitled to a uniform 'pro rata' refund of that portion of their monthly subscriber fees attributable to the absence of the Fox Channels." Cablevision, 2014 WL 1330546 at *13. Additionally, in its opposition to Plaintiffs' motion for summary judgment dated January 31, 2013, Cablevision states

"Plaintiffs also fail to establish that the [Terms of Service] mandate 'a pro rata credit in the same amount as every other subscriber of that same package.' Plaintiffs absurdly suggest that they are entitled to a <u>full</u> <u>refund</u> of their monthly package fee for the two weeks of the Fox Withdrawal . . . ." (Def.'s Opp. Mot. Summ. J., Docket Entry 92-1, at 2 (emphasis in original).) While Cablevision did not receive a computation of damages until May 2014, it has clearly been on notice of Plaintiffs' damages theory for some time.

Moreover, Cablevision received Plaintiffs' damages disclosure well in advance of trial and even in advance of expert witness depositions. Accordingly, Cablevision's cross motion to strike Plaintiffs' damages disclosure is DENIED without prejudice to renewal at trial.

<u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' motion to strike the testimony and report of Elizabeth Losinski and to preclude Cablevision from relying on untimely discovery is GRANTED IN PART and DENIED IN PART. Losinski's expert report is striken and she will be precluded from testifying as a fact or expert witness at trial. The branch of Plaintiffs' motion seeking preclusion of the documents annexed to the Losinski Report is accordingly MOOT. Plaintiffs' request to preclude Cablevision from relying on the

Supplemental Document Production is DENIED without prejudice to renewal at trial.

Cablevision's cross motion to strike Plaintiffs' damages disclosure is DENIED without prejudice to renewal at trial.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     December __8__, 2015
           Central Islip, New York