UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
THEODORE PEARLMAN, MARC TELL, JULIA
GALLO, DOROTHY RABSEY, and JOHN
AZZARELLA, individually and on behalf
of all others similarly situated,

                                Plaintiffs,

         -against-

CABLEVISION SYSTEMS CORPORATION,

                                Defendant.
----------------------------------------X

**FILED**
**CLERK**

12/28/2015 12:44 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

MEMORANDUM & ORDER
10-CV-4992(JS)(GRB)

APPEARANCES

For Plaintiffs:      Carol S. Shahmoon, Esq.
                          Shahmoon & Elisen LLP
                          370 Lexington Avenue, 24th Floor
                          New York, NY 10017

                          Todd J. Krouner, Esq.
                          Scott Jaller Koplik, Esq.
                          Law Offices of Todd J. Krouner
                          93 North Greeley Avenue
                          Chappaqua, NY 10514

                          Ralph M. Stone, Esq.
                          Stone Bonner & Rocco LLP
                          145 West 45th Street, Suite 701
                          New York, NY 10036

For Defendants:     Thomas H. Golden, Esq.
                          Wilkie Farr & Gallagher
                          787 Seventh Avenue
                          New York, NY 10019

SEYBERT, District Judge:

        Pending before the Court are the following motions:

(1) plaintiffs Theodore Pearlman and Marc Tell's (collectively,

"Plaintiffs") motion to exclude the opinions of Jonathan Orszag

("Orszag"), the damages expert for defendant Cablevision Systems

Corporation ("Cablevision") (Docket Entry 164), and (2) Cablevision's motion to exclude the opinions of Plaintiffs' experts, Todd Buchholz ("Buchholz") and Larry Gerbrandt ("Gerbrandt") (Docket Entry 144). For the reasons set forth below, Plaintiffs' motion is DENIED and Cablevision's motion is GRANTED IN PART and DENIED IN PART.

Preliminarily, the Court is troubled that the parties have filed memoranda of law and exhibits in conjunction with their pending motions that are redacted in their entirety. (See Docket Entries 144, 150, 155, 164, 167, 169.) Although the Court granted the parties' respective requests to electronically file documents under seal, it is not permissible for the parties to file memoranda of law and exhibits--particularly, the expert reports at issue-- that are totally redacted rather than redacted only with respect to the portions of the documents that are confidential. See 1199 SEIU Pension Fund ex. rel. Kennedy v. E. Niagra Hosp., Inc., No. 13-CV-0323, 2013 WL 5531361, at *1 (W.D.N.Y. Oct. 4, 2013) (noting that the right of public access to judicial records dictates that courts should only permit "'truly confidential'" portions of documents to be filed under seal and that "'[t]he presumption of access is at its strongest when the document in question, as here, has been submitted as a basis for judicial decision making.'") (quoting Cornelius v. Indep. Health Ass'n, Inc., 912 F. Supp. 2d 26, 29 (W.D.N.Y. 2012)).

2

Accordingly, the parties are directed to re-file any documents that were entirely redacted and filed under Docket Entries 144, 150, 155, 164, 167, and 169 to reflect the redaction of only the confidential portions of these documents within thirty (30) days of the date of this Memorandum and Order. In the interest of clarity, the Court considers memoranda of law that only contain introductory pages or a table of authorities to be entirely redacted for the purposes of this Memorandum and Order. The Court will unseal the entire docket entry if the relevant party fails to re-file appropriately redacted documents in accordance with the directives set forth above.

BACKGROUND[1]

I.    Factual and Procedural Background

The Court assumes familiarity with the background of this case, which is set forth in the Memorandum and Order dated March 31, 2014. See In re Cablevision Consumer Litig., No. 10-CV-4992, 2014 WL 1330546 (E.D.N.Y. Mar. 31, 2014). Plaintiffs, who were Cablevision subscribers, commenced this class action based on Cablevision's failure to provide certain television programming during a two-week period in 2010. Id. at *1.

---

[1] In light of the parties' total redaction of numerous documents, including memoranda of law, the Court will refer to the docket entries containing the parties' sealed submissions. The Court has not included any information that it deems confidential in this Memorandum and Order.

Briefly, on October 16, 2010, Cablevision's retransmission agreement with News Corp., Fox Cable Network Services' ("Fox") parent company, expired. Cablevision, 2014 WL 1330546, at *1. As a result, Cablevision lost its right to broadcast the following Fox cable channels: WNYN, WWOR, WTXF, Fox Business Network, National Geographic Wild, and Fox Deportes (collectively, the "Fox Channels"). Id. The Fox Channels were unavailable for two weeks until October 30, 2010, at which time Cablevision and News Corp. reached a new transmission agreement allowing Cablevision to resume broadcasting the Fox Channels. Id. Cablevision did not provide a credit or alternative program to its subscribers during the two-week period that they were without the Fox Channels. Id. at *2.

Pursuant to Cablevision's Terms of Service, a standard form agreement that governed the contractual relationship between Cablevision and its subscribers during the relevant time period, Cablevision's subscribers were billed "monthly in advance for services to be received." Cablevision, 2014 WL 1330546, at *2. This litigation has focused on paragraphs four and seventeen of the Terms of Service. Id. at *3. Paragraph four of the Terms of Service ("Paragraph Four") provides:

> Disruption of Service: In no event shall Cablevision be liable for any failure or interruption of program transmissions or service resulting in part or entirely from circumstances beyond Cablevision's reasonable

4

> control.  Subject to applicable law, credit
> will be given for qualifying outages.  In any
> event, if there is a known program or service
> interruption in excess of 24 consecutive hours
> (or in excess of such lesser time period
> pursuant to state law), Cablevision, upon
> prompt notification of such failure or
> interruption from Subscriber, will either
> provide Subscriber with a pro-rata credit
> relating to such failure or interruption or,
> at its discretion, in lieu of the credit
> provide alternative programming during any
> program interruption.  Cablevision shall not
> be liable for any incidental or consequential
> damages.

Id.  Paragraph seventeen of the Terms of Service ("Paragraph Seventeen") provides: "Programming: All programming, program services, program packages, number of channels, channel allocations, broadcast channels, interactive services, e-mail, data offerings and other Services are subject to change in accordance with applicable law."  Id.

On March 28, 2012, the Court dismissed all of Plaintiffs' claims except for its breach of contract claim.  On March 31, 2014, the Court, inter alia, granted Plaintiffs' motion for class certification (the "Certification Order").  Cablevision, 2014 WL 1330546, at *5.  The Certification Order notes, with respect to Plaintiffs' theories of liability and damages, that "[t]he measure of damages for this alleged breach is straightforward: Cablevision subscribers would be entitled to a uniform 'pro rata' refund of that portion of their monthly subscriber fees attributable to the absence of the Fox Channels."  Id. at *13 (emphasis in original).

5

II.  <u>Orszag Report</u>

The Expert Report of Cablevision's damages expert, Jonathan Orszag, dated July 18, 2014 (the "Orszag Report") annexes a curriculum vitae detailing Orszag's experience, which includes his tenure as an Economic Policy Advisor to the Clinton Administration and Assistant to the Secretary and Director of the Office and Policy and Strategic Planning at the U.S. Department of Commerce.  (Orszag Report, Docket Entry 163-2, at 15.)[2] Additionally, Orszag has served as a consultant to a number of Multichannel Video Programming Distributors and has testified before the Federal Communications Commission ("FCC") and numerous federal and state courts.  (Orszag Report ¶ 4, and at 23-26.) Orszag is currently a Senior Managing Director at Compass Lexecon, an economic consulting firm.  (Orszag Report at 16.)

The Orszag Report sets forth a calculation of damages for Cablevision's alleged breach of the Terms of Service.  Orszag initially calculates Cablevision's October 2010 net revenue for distributed video services (the "Net Revenue").  (Orszag Report at 7, ¶ 16.)  Next, Orszag calculates a "'pro rata' percentage based on the Fox Channels' share of the total number of channels carried on each service tier" (the "Pro Rata Percentage").  The Pro Rata

---

[2] The Court will utilize the Electronic Case Filing pagination for the Orszag Report.

Percentage varies across service tiers.  (Orszag Report at 7-8, ¶¶ 16-17.)

Orszag determines the Pro Rata Percentage by applying an "attribution percentage" that is the product of two factors: (a) the share of the service tier accounted for by the Fox Channels ("Factor 1") and (b) "the temporal share of October 2010 accounted for by the non-carriage period" ("Factor 2").  (Orszag Report at 8, ¶ 18.)  As the Fox Channels were unavailable for fifteen days in October 2010, Factor 2 is 15/31 in all calculations.  (Orszag Report at 8, ¶ 19.)  Thus, the "attribution percentage" is determined by multiplying Factor 1 by 15/31 (Factor 2).

Orszag considers two approaches in determining Factor 1. Pursuant to Orszag's first approach ("Approach 1"), Factor 1 is "the Fox Channels' share of the total number of channels carried on the tier."  (Orszag Report at 8.)  Factor 1 is multiplied by the Net Revenue and then multiplied by Factor 2 (15/31).  (Orszag Report at 9.)  In calculating Factor 1, Orszag makes a "small adjustment" to account for the subscribers in Hamilton, New Jersey that lost one additional channel as well as the subscribers in New Haven and Litchfield, Connecticut that did not lose two Fox Channels.  (Orszag Report at 9, n.13.)

Pursuant to Orszag's second approach ("Approach 2"), Factor 1 consists of the Fox Channels' share of each service tier's total programming expenditure.  (Orszag Report at 10-11, ¶ 27.)

Orszag defines a "programming expenditure" as "the sum of license fees that a [Multichannel Video Programming Distributor] pays for the right to carry networks on the tier." (Orszag Report at 9, ¶ 24.) Approach 2 calculates damages by "multiplying total revenues in each tier by the Fox Channels' share of the total programming expenditure on the tier (Factor 1) and then multiplying by 15/31 (Factor 2)." (Orszag Report at 10-11, ¶27.)

III. Buchholz Report

Buchholz's expert report on damages (the "Buchholz Report") contains a biographical statement detailing his experience. (Buchholz Report, Ex. B, Docket Entry 143-1, at 11-12.) Buchholz served as a White House director of economic policy and has contributed "commentaries on political economy, financial markets, and business" to news publications and major television networks. (Buchholz Report, Ex. B.) Buchholz holds advanced degrees in economics and law from Cambridge University and Harvard University and served as a Fellow at Cambridge. (Buchholz Report, Ex. B.)

The Buchholz Report calculates the pro rata credit due subscribers based on three scenarios. (Buchholz Report, Docket Entry 143, at 1-2.) The first scenario contemplates a pro rata credit consisting of a refund of the subscribers' cable bill charges that accrued during the time that the Fox Channels were unavailable ("Scenario 1"). (Buchholz Report at 2.) Buchholz

8

notes that: (a) Cablevision does not provide subscribers with the choice of opting out of the Fox Channels, thus, "retransmitting the Fox Broadcast Channels constituted a <u>necessary</u> condition for inducing households to subscribe to Cablevision," and (b) Cablevision has alleged that it cannot identify the value of the Fox Channels on an "a la carte" basis. (Buchholz Report at 2 (emphasis in original).)

Buchholz's second scenario examines the six tiers of subscription services and equalizes the refund for the subscribers in the highest tiers with those in a lower "iO" tier[3] ("Scenario 2"). (Buchholz Report at 3.) Specifically, subscribers who purchased more expensive packages that include more channels but do not contain any additional Fox Channels are "capped" at the refund for the "Family Cable + iO" tier. (Buchholz Report at 4.)

Under the third scenario, Buchholz provides a preliminary estimate of the cost to access the Fox Channels during the period of unavailability utilizing "alternative technology" ("Scenario 3"). (Buchholz Report at 4.) Scenario 3 provides an estimate of the cost of a television antenna, delivery charges,

---

[3] Some of the Fox Channels (specifically, WNYW [Fox 5], WTXF, and WWOR) were included in the lowest tiers of service, while others were only included in the higher service tiers. While all subscribers purchased packages containing WNYW, WTXF and WWOR, some subscribers purchased higher service tiers that contained additional Fox Channels. (Buchholz Report at 1.)

and the cost of a hiring handyman in New York City to install the television antenna. (Buchholz Report at 4-5.)

Buchholz concludes that Scenario 1 "has the virtues of simplicity and equity because during the Blackout period subscribers did not receive the packages that they subscribed to and paid for." (Buchholz Report at 5.)[4]

IV. Gerbrandt Report

The Expert Report of Larry Gerbrandt (the "Gerbrandt Report") contains a curriculum vitae stating that Gerbrandt has experience as a media and entertainment executive, research analyst, valuation expert, and consultant. (Gerbrandt Report, Docket Entry 143-3, Ex. A at 26.) Gerbrandt has been an expert witness and consultant on more than eighty-five cases pertaining to media, entertainment, and intellectual property issues. Gerbrandt is currently the Managing Director of Janas Consulting, a firm that "provides management consulting, turnaround and restructuring advisory services to mid-market companies." (Gerbrandt Report, Ex. A at 27.)

The Gerbrandt Report expressly states that Gerbrant was asked to proffer an opinion as to "whether, based on industry standards, customs and practices . . . Cablevision subscribers

---

[4] As noted in the Orszag Report, Scenario 1 calculates damages based on thirty days in October rather than thirty-one. (Orszag Report at 11.) This appears to be an inadvertent error.

were entitled to a pro rata credit when Cablevision failed to distribute and retransmit the Fox Channels for the [period of unavailability], and if so, what is the appropriate method of calculating that pro rata credit for each subscriber . . . ." (Gerbrandt Report at 4, ¶ 8.)  Gerbrandt expressly concludes that the unavailability of the Fox Channels constituted a "material interruption in the programming service" for which subscribers are entitled to a pro rata credit amounting to "a return of the monthly fees charged to subscribers for their programming service as pro rated based on 1/30th of the monthly amount for each day of the interruption."  (Gerbrandt Report at 5, ¶ 10.)  The Gerbrandt Report also provides a narrative with respect to the history of cable television, the 1992 Cable Act, and the "continued dominance" of broadcast networks.  (Gerbrandt Report at 5-10.)

Gerbrandt states that it is his opinion that Paragraph Seventeen is "intended to give Cablevision the flexibility to make changes in the way it operates on a permanent going-forward basis . . . not temporary service interruptions arising from contract disputes with a vendor.  Therefore, the temporary program interruption of the Fox Channels that Cablevision caused is appropriately covered under [Paragraph Four]."  (Gerbrandt Report at 13, ¶ 25.)  Gerbrandt further avers that the actions taken by Cablevision during the time period when the Fox Channels were unavailable is "consistent with a temporary program interruption."

(Gerbrandt Report at 13, ¶ 26.)   Gerbrandt also cites various examples of programming changes that he alleges would be covered by Paragraph Seventeen.

V.   Orzag Rebuttal

         Orszag prepared a Rebuttal Report dated September 11, 2014 ("Orszag's Rebuttal") with respect to the opinions of Plaintiffs' experts, Buchholz and Gerbrandt.   (Orszag Rebuttal, Pls.' Motion, Ex. R, Docket Entry 163-11.)   Orszag's Rebuttal alleges, inter alia, that evidence that there was not a substantial reduction in total viewership hours for all available networks during the period where the Fox Channels were unavailable contradicts Buchholz's position that there was "no value" to Cablevision's programming in the absence of the Fox Channels. (Orszag Rebuttal at ¶¶ 7-8.)   Additionally, Cablevision's video subscribership did not significantly change in October 2010. (Orzag Rebuttal at ¶ 9.)

VI.   Motion to Exclude Orszag

      A.   Plaintiffs' Motion

         In their motion to exclude Orszag's opinions, Plaintiffs argue that the Orszag Report is not relevant because it "seeks to overlay a vague allocation principle onto the pro rata credit by attempting to 'value' something that cablevision insisted could not be valued and by applying a second divisibility factor to the

temporal proration of price."[5]   (Pls.' Orszag Br., Docket Entry
163-12, at 9.)   Plaintiffs contend that the pro rata credit remedy
set forth in the Terms of Service is a pro rated refund of the
monthly fee during the period of unavailability.  (Pls.' Orszag
Br. at 11.)

     With respect to reliability, Plaintiffs argue that
Orszag is attempting to determine how important the Fox Channels
are to subscribers, which is subjective, individualized, and does
not reliably translate into a dollar amount.  (Pls.' Orszag Br. at
13-15.)   Additionally, Plaintiffs aver that Orszag's two
approaches to determining Factor 1 are founded in unsupported
assumptions.  (Pls.' Orszag Br. at 15.)  With respect to Approach
1, in which Factor 1 consists of the number of Fox Channels divided
by the total number of channels in each tier, the underlying
assumption is that subscribers equally value every channel in a
Cablevision package.  (Pls.' Orszag Br. at 15-16.)   Plaintiffs
argue that this method deems Cablevision's pricing methodology
irrelevant and provides no basis for Orszag's "'value assumption'"
that subscribers attribute the same interest value to the Fox

---

[5] Plaintiffs allege that "[w]hen asked about the 'proportion of
[its] revenue that was attributable to the Fox Channels in
2010,' Cablevision stated that 'no part of Cablevision's revenue
can be specifically attributed to the individual non-premium
channel or channels, including the Fox Channels."  (Pls.' Orszag
Br. at 4 (emphasis omitted).)

Channels that they do to all of the other channels in their package. (Pls.' Orszag Br. at 16.)

With respect to Approach 2, in which Factor 1 is determined by multiplying Cablevision's total revenue in each tier by the Fox Channels' share of the license fees for each tier, Plaintiffs allege that "there is no correlation between what Cablevision pays for programming and how valuable it is to subscribers" and that prior to November 2010, Cablevision paid nothing for Fox 5, which was a "commercially critical" channel. (Pls.' Orszag Br. at 10-11, 17.)   In that regard, Plaintiffs further argue that Orszag failed to measure the high intensity of Fox 5 (which broadcasted the New York Yankees playoff games and the National Football League) and that Orszag's focus on Cablevision's profits interest is misplaced. (Pls.' Orszag Br. at 18.)   Additionally, Plaintiffs maintain that as a result of programming "bundle[s]," programmers, at times, fix lower license fees in exchange for alternative "values" like the promotion of new networks or broad distribution to obtain advertising placement. (Pls.' Orszag Br. at 20.)

Plaintiffs allege that Orszag errs in treating the entire class of subscribers as an "average," which "misallocates injury from those more injured to those less injured." (Pls.' Orszag Br. at 21.)   Instead of excluding the individuals who did not experience any service interruption, Orszag "weights" their

14

non-injury and "spreads it among the class." (Pls.' Orszag Br. at 22.) Parenthetically, Plaintiffs also argue: (1) Orszag relied on irrelevant facts, and (2) the foundational materials for the Orszag Report should be excluded for the reasons set forth in Plaintiffs' separate motion to strike (Docket Entry 125). (Pls.' Orszag Br. at 23.)

Finally, Plaintiffs assert that Orszag's Rebuttal is flawed based on his reliance on the unfounded assumption that a subscriber derives value from watching a channel when a more popular channel is unavailable. (Pls.' Orszag Br. at 24.) Orszag's Rebuttal also relies on the similarly unsupported assumption that subscribers must terminate Cablevision's services to establish that they care about the programming. (Pls.' Orszag Br. at 25.)

B. Cablevision's Opposition

With respect to relevance, Cablevision counters that Orszag's calculations are consistent with the Certification Order's ruling that Plaintiffs' damages are "that portion of [Cablevision subscribers'] monthly subscriber fees attributable to the absence of the Fox Channels." (Def.'s Orszag Br., Docket Entry 166-1, at 8 (internal quotation marks omitted).) Cablevision argues that the appropriate measure of damages in a breach of contract case is not, as Plaintiffs allege, "the value of the allegedly promised performance, ignoring actual performance."

15

(Def.'s Orszag Br. at 10.)  To the extent that Plaintiffs argue that Orszag's opinion is inconsistent with Cablevision's prior statements that it cannot attribute its revenues to individual channels, Cablevision maintains that it never asserted that an economic expert would be unable to undertake such a calculation. (Def.'s Orszag Br. at 12-13.)

With respect to reliability, Cablevision characterizes Orszag's method as "hedonic pricing" and avers that this method has been consistently approved as appropriate in cases where the plaintiff seeks damages for part of a good, service, or tract of land.  (Def.'s Orszag Br. at 14.)  Cablevision avers that Approach 1 is "based on the well-founded assumption that the Fox Channels are representative (in terms of their average value) of the channels in the package as a whole . . . given that the Fox Channels include a mix of channels similar to the mix that makes up the package as a whole."  (Def.'s Orszag Br. at 15.)  Approach 2 is founded in "sound economic principles" that establish that cable providers will often be willing to pay more for a channel that attracts subscribers and thus, programming fees for specific channels "generally correspond to the value that subscribers (in the aggregate) place on those channels."  (Def.'s Orszag Br. at 16.)

Cablevision argues that Plaintiffs are inconsistent in criticizing Orszag for failing to calculate a fair market price

for the Fox Channels while agreeing that fair market price is not an appropriate method of determining the pro rata credit. (Def.'s Orszag Br. at 18.)  Cablevision also alleges that contrary to Plaintiffs' position, Orszag did not consider "subjective subscriber interests." (Def.'s Orszag Br. at 19.)

VII. <u>Motion to Exclude Buchholz and Gerbrandt</u>

Cablevision filed a motion to exclude the expert opinions of Buchholz and Gerbrandt. (Docket Entry 143). Cablevision argues that Buchholz and Gerbrandt have rejected the Court's damages framework by calculating damages that constitute a refund for the entire loss of service even though the majority of channels remained available. (Def.'s Buchholz Br., Docket Entry 143-9, at 7.) Indeed, Cablevision alleges that Plaintiffs' damages theory will result in an "impermissible windfall." (Def.'s Buchholz Reply Br., Docket Entry 154, at 5.) Cablevision further avers that Buchholz confirmed at his deposition that his report does not attempt to calculate the portion of Cablevision's monthly subscriber fees attributable to the absence of the Fox Channels. (Def.'s Buchholz Br. at 9.)

Cablevision alleges that Gerbrandt is not qualified to offer an opinion on damages as he has no formal training or education in the calculation of economic damages. (Def.'s Buchholz Br. at 11.) Gerbrandt agreed at his deposition that he is "the cable industry expert" in this matter while Buchholz is the

"damages expert."   (Def.'s Buchholz Br. at 11, n.20 (internal quotation marks omitted).)   Although Gerbrandt allegedly agreed that he was not providing an expert opinion with respect to economic damages in this case, Cablevision seeks to exclude Gerbrandt's conclusion that the appropriate pro rata credit is a refund for each day that the Fox Channels were unavailable. (Def.'s Buchholz Br. at 11.)

Cablevision argues that the balance of Gerbrandt's Report constitutes an impermissible interpretation of the contract and testimony on ultimate legal conclusions.   (Def.'s Buchholz Br. at 12-18.)   Specifically, Gerbrandt asserts that "Paragraph 4 and not Paragraph 17 applies to the Fox Blackout in this case; that Cablevision breached Paragraph 4; and that Cablevision is thus liable for a pro rata credit."   (Def.'s Buchholz Br. at 12.) Cablevision notes that Gerbrandt testified at his deposition that in opining that the unavailable of the Fox Channels was covered by Paragraph Four, he was "giving [his] interpretation of the Terms of Service that Cablevision uses in this case[.]"   (Def.'s Buchholz Br. at 14 (internal quotation marks omitted).)

Plaintiffs oppose Cablevision's motion and, with respect to their damages theory, allege that the Terms of Service constitutes an "alternative contract" and, accordingly, "there is no basis to permit the breaching party to attempt to measure 'lost value' to the promisee (i.e., the difference between what was

delivered and what should have been delivered), or to inquire whether (and how much) the promisee suffered 'injury' . . . ." (Pls.' Buchholz Br., Docket Entry 151, at 8 (alterations in original).)   Plaintiffs note that Cablevision's former Chief Operating Officer testified at his deposition that Cablevision "had nothing to offer in regard to a metric for separating out the Fox Channels from the bundle." (Pls.' Buchholz Br. at 14.)

Plaintiffs allege that Gerbrandt does not provide an economic calculation of damages or a quantification of the Plaintiffs' claimed refunds and, accordingly, there is no basis for exclusion based on his qualifications. (Pls.' Buchholz Br. at 19-20.)   Plaintiffs note that "Gerbrandt has consistently been approved as an expert on cable industry issues." (Pls.' Buchholz Br. at 18.)   Plaintiffs maintain that the Gerbrandt Report "does not contain a single legal argument or principle, and it does not usurp the role of the fact-finder," but merely sets forth a framework that informs what Cablevision asserts to be the factual issues in this case. (Pls.' Buchholz Br. at 23.)

DISCUSSION

I.   <u>Legal Standard</u>

The admission of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by
> knowledge, skill, experience, training, or

19

> education may testify in the form of an
> opinion or otherwise if:
>
> (a) the expert's scientific, technical, or
> other specialized knowledge will help the
> trier of fact to understand the evidence or to
> determine a fact in issue;
>
> (b) the testimony is based on sufficient facts
> or data
>
> (c) the testimony is the product of reliable
> principles and methods; and
>
> (d) the expert has reliably applied the
> principles and methods to the facts of the
> case.

FED. R. EVID. 702.  The party seeking the admission of the expert testimony bears the burden of demonstrating its admissibility pursuant to the framework set forth in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), by a preponderance of the evidence.  Hollman v. Taser Int'l Inc., 928 F. Supp. 2d 657, 666 (E.D.N.Y. 2013).  Nevertheless, the district court is the final "gatekeeper" and must ensure that the testimony or evidence admitted is relevant and reliable.  Id. (internal quotation marks and citation omitted).

    A.  Qualifications of an Expert

       Rule 702 requires that an expert be "qualified as an expert by knowledge, skill, experience, training, or education." FED. R. EVID. 702.  In analyzing an expert's qualifications, the court should: (1) examine the background of the witness to determine if he or she possesses any of the qualifications set

forth in Rule 702; and (2) compare the witness' education or area of expertise with the subject matter of the proffered expert testimony. <u>Washington v. Kellwood Co.</u>, --- F. Supp. 3d ----, 2015 WL 2258098, at *6-7 (S.D.N.Y. 2015).

It is imperative that a court consider the entirety of the witness' background when determining the witness' qualifications for expert testimony. <u>Smith v. Herman Miller, Inc.</u>, No. 03-CV-5358, 2005 WL 2076570, at *3 (E.D.N.Y. Aug. 26, 2005) (internal quotation marks and citation omitted.) Expert qualification is appropriate on the sole basis of "practical experience" and a formal degree is not required. <u>Argonaut Ins. Co. v. Samsung Heavy Indus. Co. Ltd.</u>, 929 F. Supp. 2d 159, 172 (N.D.N.Y. 2013). <u>Accord</u> <u>In re Fosamax Prods. Liab. Litig.</u>, 645 F. Supp. 2d 164, 172 (S.D.N.Y. 2009) (noting that expert qualification is "viewed liberally" and may be founded in "a broad range of knowledge, skills, and training.") (internal quotation marks and citation omitted). Disputes regarding the strength of an expert's credentials speak to the weight of the testimony, not its admissibility. <u>McCullock v. H.B. Fuller Co.</u>, 61 F.3d 1038, 1044 (2d Cir. 1995).

B.  <u>Relevance of Expert Testimony</u>

Expert testimony must also adhere to Federal Rule of Evidence 403, which provides for the exclusion of relevant evidence "'if its probative value is substantially outweighed by a danger

of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'" Washington, 2015 WL 2258098, at *9 (quoting FED. R. EVID. 403).  The relevance standard is liberal and the decision to exclude expert testimony based on relevance is within the trial court's discretion.  In re Zyprexa Prods. Liab. Litig., 489 F. Supp. 2d 230, 283 (E.D.N.Y. 2007). However, "[d]oubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility." Lappe v. Amer. Honda Motor Co., 857 F. Supp. 222, 226 (N.D.N.Y. 1994), aff'd, sub. Nom. Appe v. Honda Motor Co. Ltd of Japan, 101 F.3d 682 (2d Cir. 1996) (internal quotation marks and citation omitted).

Expert witness testimony will be admissible where it assists the trier of fact.  Keenan v. Mine Safety Appliance Co., No. 03-CV-0710, 2006 WL 2546551, at *2 (E.D.N.Y. Aug. 31, 2006). This requirement "can be expressed as a question of 'fit'-- 'whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'"  In re Fosamax, 645 F. Supp. 2d at 173 (quoting Daubert, 509 U.S. at 591, 113 S. Ct. at 2796).

C.   Reliability of Expert Testimony

In determining the reliability of an expert's analysis, the court should rigorously examine "the facts on which the expert

relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand," bearing in mind that an expert's opinion will not be per se inadmissible based on a negligible flaw in reasoning or slight adjustment to a reliable method. Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002). Indeed, evidence should only be excluded where the expert's flaw is significant enough that there is an absence of "good grounds" for the expert's conclusions. Id. (internal quotation marks and citation omitted). However, "[e]xpert testimony must rest on 'more than subjective belief or unsupported speculation.'" Washington, 2015 WL 2258098, at *9 (quoting Daubert, 509 U.S. at 599, 113 S. Ct. at 2800) (collecting cases).

While the Supreme Court has identified factors that district courts may consider with respect to reliability, those factors "are neither mandatory nor exclusive, particularly when the expert's qualifications are based primarily on his or her training and experience." Amorgianos, 303 F.3d at 266; Ebbert v. Nassau County, No. 05-CV-5445, 2008 WL 8086382, at *6 (E.D.N.Y. Sept. 29, 2008) (internal quotation marks and citation omitted).

## II. Orszag

### A. Qualifications

Plaintiffs do not assert any objections to Orszag's expert opinion based on qualifications and the Court finds that

Orszag's education and background qualifies him to testify as a damages expert in this matter.

    B.   <u>Relevance</u>

        The Court finds that Orszag's opinion is relevant and will assist the trier of fact. <u>See</u> <u>Keenan</u>, 2006 WL 2546551, at *2. Although the parties have differing interpretations of both the Terms of Service and the Certification Order's oft-quoted summary of Plaintiffs' damages theory, this divergence of opinion does not translate to the Orszag Report being devoid of relevance. The Certification Order's holding that the Terms of Service do not provide for a pro rata credit based on "individual subscriber preferences or usage" does not conflict with Orszag's two approaches to determining "Factor 1." <u>See</u> <u>Cablevision</u>, 2014 WL 1330546, at *13. Orszag's two approaches provide for uniform credits that do not consider subjective values. Approach 1 calculates Factor 1 by determining the Fox Channels' share of the total number of channels on each tier. (Orszag Report at 8, ¶ 21.) Approach 2 calculates Factor 1 by multiplying each tier's total revenue by the Fox Channels' share of the total sum of license fees on each tier. (Orszag Report at 9, ¶ 24.) Plaintiffs' argument that the Terms of Service only provides for a "'pro rata credit' of the amounts actually paid by a subscriber" sets forth an issue to be determined at trial and does not foreclose Orszag's damages theory. (Pls.' Orszag Br. at 8.)

The Court is equally unpersuaded by Plaintiffs' reliance on Cablevision's prior testimony that "no part of Cablevision's revenue can be specifically attributed to individual non-premium channel or channels, including the Fox Channels." (Pls.' Orszag Br. at 4, n.4. (internal quotation marks and citation omitted).) As noted by Orszag at his deposition, Cablevision's executives are not economists and the fact that Cablevision indicated that it could not, on its own, allocate specific revenue to the Fox Channels does not speak to the relevance of Cablevision's damages theory.

C.   <u>Reliability</u>

Plaintiffs' arguments with respect to the reliability of Orszag's opinion speaks more to the weight of the evidence than admissibility.   <u>See</u>, <u>e.g.</u>, <u>Washington</u>, 2015 WL 2258098, at *8 (Suggestions of unfounded assumptions "'go to the weight, not the admissibility of the testimony.'") (quoting <u>Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC</u>, 571 F.3d 206, 214 (2d Cir. 2009)); <u>Marmol v. Biro Mfg. Co.</u>, No. 93-CV-2659, 1997 WL 88854, at *4 (E.D.N.Y. Feb. 24, 1997) (Disputes with respect to credentials, methodology, or the absence of textual authority speak to the weight of the expert testimony, not its admissibility.)   Specifically, Plaintiffs argue: (1) Orszag inappropriately converts subscriber viewing into an average without sufficient support; (2) Orszag's two approaches to Factor

1 rely on unsupported, inaccurate assumptions; and (3) Orszag's damages calculations treat the entire class as an average thereby misallocating injury from the more injured subscribers to the less injured subscribers.  (See generally Pls.' Orszag Br. at 13-23.) The Court finds that Orszag's opinions contain a "reasonable modicum of reliability" and the objections cited by Plaintiffs will be better addressed by cross examination rather than exclusion.  See Rondout Valley Cent. Sch. Dist. v. Coneco Corp., 321 F. Supp. 2d 469, 478-79 (N.D.N.Y. 2004).

Accordingly, Plaintiffs' motion to exclude the Orszag's opinions is DENIED WITHOUT PREJUDICE to renewal at trial.

III. Buchholz

    A.   Qualifications

Cablevision does not assert any objections to Buchholz's expert opinion based on qualifications and the Court finds that Buchholz's education and background qualifies him to testify as a damages expert in this matter.

    B.   Relevance

Cablevision argues that Buchholz's opinion should be excluded because this Court has "already determined" that pro rata damages should be calculated "by determining the portion of the monthly fee attributable to the Fox Channels" and Buchholz's opinion erroneously asserts that the pro rata credit should be determined by calculating the entire subscription fee for the days

26

that the Fox Channels were unavailable.  (Defs.' Buchholz Br. at 6-7.)  The Court disagrees.

Like their relevance arguments regarding Orszag's opinions, the parties' arguments regarding the relevance of Buchholz's opinion are grounded in their differing interpretations of the Terms of Service and the Certification Order's characterization of Plaintiffs' damages theory.  As set forth above, the Certification Order states that Plaintiffs' damages theory is that subscribers should be awarded "a uniform 'pro rata' refund of that portion of their monthly subscriber fees attributable to the absence of the Fox Channels." Cablevision, 2014 WL 1330546, at *13.  The Certification Order does not delineate the method to determine the pro rata credit, nor does it foreclose Plaintiffs from arguing at trial that their pro rata credit should consist of their entire subscriber fee for the days that the Fox Channels were unavailable.  The Court finds that Buchholz's opinion is sufficiently related to the facts of the case to assist the trier of fact.  See In re Fosamax, 645 F. Supp. 2d at 174.

C.  Reliability

Cablevision does not proffer any arguments with respect to the reliability of Buchholz's opinions.  The Court's review of the Buchholz Report indicates that any objections to reliability

27

are more appropriate for cross examination than exclusion.  See
Rondout Valley, 321 F. Supp. 2d at 478-79.

Accordingly, Cablevision's motion to exclude Buchholz's
opinions is DENIED WITHOUT PREJUDICE to renewal at trial.

IV.   Gerbrandt

A.    Qualifications

Cablevision alleges that Gerbrandt is not qualified to
testify as a damages expert in this matter but lodges no objections
to Gerbrandt's qualifications to testify as an expert on the cable
industry.  (See Def.'s Buchholz Br. at 11.)  As Plaintiffs allege
that the Gerbrandt Report does not contain any calculation or
assessment of damages and Gerbrandt himself alleges that he is the
"cable industry expert," it appears that Gerbrandt is not being
offered as a damages expert in this matter, and the issue of his
qualifications to testify as a damages expert is moot.  The Court
finds that Gerbrandt's media and entertainment industry experience
is sufficient for qualification as an expert on the cable industry.

B.    Relevance

Cablevision argues that the Gerbrandt Report contains an
impermissible interpretation of the Terms of Service and testimony
on ultimate legal conclusions.  (Def.'s Buchholz Br. at 12-18.)
The Court agrees.

It is well settled that expert testimony must be excluded
where it "states a legal conclusion."  U.S. v. Duncan, 42 F.3d 97,

28

101 (2d Cir. 1994) (citations omitted).  Accord U.S. v. Bilzerian,
926 F.2d 1285, 1294-95 (2d Cir. 1991) (Noting that while an expert
may opine as to issues of fact, he or she may not give testimony
setting forth legal conclusions based on those facts.).  Indeed,
expert witness testimony should not be permitted where the expert
testifies to what is "necessary 'to fulfill the covenant' (of the
contract)."  Marx & Co. v. Diners' Club, Inc., 550 F.2d 505, 509
(2d Cir. 1977).  See, e.g., Levinson v. Westport Nat'l Bank, No.
09-CV-0269, 2013 WL 3280013, at *4 (D. Conn. Jun. 27, 2013) ("[A]n
expert may not interpret a contract for the jury, nor may an expert
testify about the meaning of legal terms.") (citations omitted);
Breezy Point Co-Op., Inc. v. Cigna Prop. and Cas. Co., 868 F. Supp.
33, 36 (E.D.N.Y. 1994) (noting that an expert is barred from
proffering an opinion with respect to the parties' legal
obligations pursuant to a contract).

　　　　The Gerbrandt Report impermissibly crosses the boundary
from opinion to legal conclusion.  While couched as an "opinion,"
Gerbrandt sets forth the express legal conclusion that "[Paragraph
Seventeen] is clearly intended to give Cablevision the flexibility
to make changes in the way it operates on a permanent going-forward
basis . . . [t]herefore, the temporary program interruption of the
Fox Channels that Cablevision caused is appropriately covered
under [Paragraph Four]."  (Gerbrandt Report at 13, ¶ 25.)
Gerbrandt also cites "examples" that constitute "the kinds of

changes to channels, programming and channel lineups that are covered by the language in [Paragraph Seventeen] of the i0 Terms of Service." (Gerbrandt Report at 14, ¶ 31.) Gerbrandt provides an extended discussion of the applicability of Paragraph Four to this action and concludes that Cablevision failed to satisfy the "threshold requirements" set forth in Paragraph Four that would have obviated the need to provide subscribers with a pro rata credit for program interruptions. (Gerbrandt Report at 17-20.)

As set forth above, a key issue in this breach of contract action is whether the unavailability of the Fox Channels falls under the purview of Paragraph Four or Paragraph Seventeen of the Terms of Service. By asserting that the unavailability of the Fox Channels falls under Paragraph Four, providing examples of the types of situations that fall under Paragraph Seventeen, and expressly stating that Cablevision did not satisfy Paragraph Four's "threshold requirements," Gerbrandt is interpreting the subject contract rather than opining on industry custom and practice. See Levinson, 2013 WL 3280013, at *4 (an expert may not engage in contract interpretation or testify regarding the meaning of legal terms).

Gerbrandt also states that "there was a material interruption in the programming service, and each subscriber was due a pro rata credit, which amounts to a return of the monthly fees charged to subscribers for their programming service as pro

rated based on 1/30th of the monthly amount for each day of the interruption." (Gerbrandt Report at 5, ¶ 10.) In addition to constituting a legal conclusion, Gerbrandt's previously noted statement sets forth an opinion on damages notwithstanding his role as Plaintiffs' cable industry expert. (See Pls.' Buchholz Br. at 18.)

Furthermore, Gerbrandt's narrative with respect to the history of cable television and the 1992 Cable Act (Gerbrandt Report at 5, ¶ 11) constitute "lay matters" that the trier of fact is capable of understanding without expert assistance. See Ho Myung Moolsan, Co. Ltd. v. Manitou Mineral Water, Inc., No. 07-CV-7483, 2010 WL 4892646, at *5 (S.D.N.Y. Dec. 2, 2010), aff'd, 501 F. App'x 85 (2d Cir. 2012). See also U.S. v. Mejia, 545 F.3d 179, 194 (2d Cir. 2008) (noting that testimony is only considered to be "expert" where it pertains to matters that an average juror cannot understand on his or her own).

Accordingly, the branch of Cablevision's motion seeking to exclude Gerbrandt's expert opinion is GRANTED based on the Court's finding that the Gerbrandt Report asserts legal conclusions. It is not necessary for the Court to reach the issue of the Gerbrandt Report's reliability in light of the exclusion of Gerbrandt's opinion on relevance grounds. Although courts within the Second Circuit routinely strike portions of an expert's report and retain others, see, e.g., Ebbert v. Nassau County, No. 05-CV-

5445, 2008 WL 8086382 (E.D.N.Y. Sept. 29, 2008), it would be futile for the Court to attempt to parse out the admissible portions of the Gerbrandt Report and the Court declines to engage in such an exercise.

<u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' motion to exclude Orszag's opinions is DENIED WITHOUT PREJUDICE to renewal at trial, and Cablevision's motion to exclude the opinions of Buchholz and Gerbrandt is GRANTED IN PART and DENIED IN PART WITHOUT PREJUDICE to renewal at trial. The opinion of Plaintiffs' expert, Larry Gerbrandt, is excluded and he will be precluded from testifying at trial.

The parties are further ORDERED to re-file any documents that were entirely redacted and filed under Docket Entries 144, 150, 155, 164, 167, and 169 to reflect the redaction of only the confidential portions of these documents within thirty (30) days of the date of this Memorandum and Order. The Court will unseal the entire docket entry if the relevant party fails to re-file appropriately redacted documents in accordance with the directives set forth above.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:    December __28__, 2015
          Central Islip, New York

32