**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re Cablevision Consumer Litigation** | Master File No. |
| | 10-cv-4992 (JS) (AKT) |
| ------------------------------------------------------- | |
| | ECF CASE |
| This Document Relates to: | |
| All Actions | |

**DEFENDANTS' LOCAL RULE 56.1 STATEMENT**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendants Cablevision Systems Corporation and CSC Holdings, LLC (collectively, "Cablevision"), by and through their undersigned counsel, Kirkland & Ellis LLP, respectfully submit the following statement in Support of Defendants' Motion for Summary Judgment.

**I.      Cablevision's Business and the Applicable Terms of Service**

1.      Cablevision provides, among other things, "video programming and video-related services, and interactive television services" to subscribers.  (Pls.' Ex. E ¶ 2.)[1]  During the period at issue here, Cablevision had approximately 3 million subscribers in New York, New Jersey, Connecticut, and Pennsylvania.  (Ex. 18 (Montemagno Tr.) at 43-44.)[2]

2.      Cablevision subscribers are billed a monthly subscriber fee in advance for services to be received in the upcoming month.  (*See* Ex. 19 (TOS) ¶ 1; Ex. 3 (Jan. 17, 2013 Decl. of Bradley Feldman in Supp. of Cablevision's Opp. to Pls.' Mot. for Class Cert. ("Feldman Class Cert. Opp. Decl.")) ¶ 3.)

3.      Together with Cablevision's General Terms and Conditions of Service (as noted, the "General Terms"), Cablevision's Terms of Service ("TOS") govern the relationship between

---

[1] References to "Pls.' Ex. __" are to exhibits in Plaintiffs' Local Rule 56.1 Statement of Material Facts in Support of Motion for Partial Summary Judgment.

[2] References to "Ex. __" are to exhibits to the February 16, 2016 Declaration of Andrew M. Genser in Support of Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment and in Support of Defendants' Motion for Summary Judgment, attached hereto.

Cablevision and its subscribers. (*See* Ex. 9 (CSC00353996) ¶ 17); Ex. 19 (TOS) ¶ 35.) The General Terms appear on Cablevision's website and on the back of the work order that each subscriber signs when Cablevision installs their cable service. (Ex. 17 (February 16, 2016 Declaration of Brad Feldman in Support of Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment and in Support of Defendants' Motion for Summary Judgment ("Feldman SJ Decl.") ¶ 3.) The General Terms incorporate the TOS by reference. (Ex. 9 (CSC00353996) ¶ 17).)

4.      The TOS allows a subscriber to terminate her subscription at any time on seven days' notice. (Ex. 19 (TOS) ¶ 14.) Notwithstanding the seven-day notice provision, Cablevision's practice is to allow subscribers to terminate their services immediately upon oral or written notice for any reason, without further obligation or penalty, and to refund the subscriber for whatever portion of the month remains after cancelation or downgrade for which the subscriber has prepaid. (Ex. 20 (Jan. 31, 2013 Decl. of Bradley Feldman in Supp. of Cablevision's Opp. To Pls.' Mot. For Partial Summary Judgment ("Feldman SJ Opp. Decl.")) ¶ 3.)

5.      Cablevision offers its subscribers various levels of cable packages, with more expensive packages containing a broader offering of channels. (Ex. 21 (Rates & Packages (Port Chester) at CSC00000797 (Aug. 11, 2010), listing channels included in each package at the time; Ex. 8 (Rates & Packages (Freehold/Lakewood/Jackson) at CSC00000097 (Apr. 14, 2009), same.)

6.      All of Cablevision's cable packages offer subscribers many channels beyond those that were subject to the Programming Blackout of the Six Fox Channels[3] at issue here. In

---

[3]  WTXF a/k/a Fox 29, WNYW a/k/a Fox 5, or WWOR a/k/a the My9 Channel are referred to as the "Three Fox Broadcast Stations." The Fox Business Network, National Geographic Wild, and Fox Deportes are referred to as the

October 2010, Cablevision's least expensive package, "Basic," contained approximately 37 channels, not including music, interactive, pay-per-view, or on-demand channels. Cablevision was required to carry some of these channels by federal law.  (*See* Pls.' Ex. G at CSC00000797; 47 U.S.C. § 534; 47 C.F.R. § 76.55.)  Prior to (and after) the Programming Blackout of the Six Fox Channels, one or more of the Three Fox Broadcast Stations were included in the "Basic" package, depending on the region where service was provided.   Prior to the Programming Blackout of the Six Fox Channels, WTXF (a /k/a Fox 29) was only available to Cablevision subscribers in certain regions of southern New Jersey, and neither WNYW nor WWOR was available in the Litchfield region of Connecticut.  (Ex. 10 at 2.))

7.     Because the Three Fox Broadcast Stations transmit their signals over the public airwaves, at all relevant times, Cablevision subscribers could use an antenna to view the Three Fox Broadcast Stations for free, without using Cablevision's services.  (Ex. 3 ¶ 5.)

8.     Cablevision's "Family" package contained the Basic package plus an additional approximately 57 such channels, for a total of 94 channels, not including music, interactive, pay-per-view, or on-demand channels.   (*See* Ex. 22 (Exhibit 1 to July 18, 2014 Expert Report of Jonathan Orszag ("Orszag Rep.")) at 1; Ex. 23 (Cablevision's Rates and Packages) at CSC00000540-631); Ex. 24 (Cablevision's Rates and Packages) at CSC00000768-879; *see also id.* at CSC00000788-89.)

9.     Cablevision's "iO" package contained approximately 45 channels (not including music, interactive, pay-per-view, or on-demand channels) in addition to those in Basic and Family, and could be purchased with either the Basic or the Family package (*e.g.*, "Basic + iO"

---

"Three Fox Cable Channels." Together, the Three Fox Broadcast Stations and the Three Fox Cable Channels are referred to as the "Six Fox Channels."  The "Fox Programming Blackout Period" refers to the period from October 16, 2010 through October 30, 2010.  The "Programming Blackout of the Six Fox Channels" refers to the loss of the Six Fox Channels on Cablevision's network during the Fox Programming Blackout Period.

or "Family + iO").  (*See* Ex. 22 (Exhibit 1 to Orszag Rep.) at 1; Ex. 23 (Cablevision's Rates and Packages) at CSC00000540-631); Ex. 24 (Cablevision's Rates and Packages) at CSC00000768-879; *see also id.* at CSC00000788-89.)  Prior to (and after) the Programming Blackout of the Six Fox Channels, Fox Deportes (Spanish language sports programming), National Geographic Wild (nature programming), and Fox Business (business news) (*i.e.*, the Three Fox Cable Channels) were included in Cablevision's "iO" package (as well as in the "iO Silver" and the "iO Gold" packages).  (Ex. 3 ¶ 4; Pls.' Ex. G.)  Plaintiff Vincent Pezzuti subscribed to the Family + iO package.  (Ex. 7 (Pezzuti Dep.) at 37:12-38:13.)

10.  Cablevision's "iO Silver" package contained the Family package plus 74 additional channels, for a total of approximately 168 channels, not including music, interactive, pay-per-view, or on-demand channels.  (*See* Ex. 22 (Exhibit 1 to Orszag Rep.) at 1; Ex. 23 (Cablevision's Rates and Packages) at CSC00000540-631); Ex. 24 (Cablevision's Rates and Packages) at CSC00000768-879; *see also id.* at CSC00000788-89.).)  Plaintiffs Arthur Finkel, Theodore Pearlman, and Eric Bohm subscribed to the iO Silver package.  (Ex. 4 (Finkel Dep.) at 82:5-24; Ex. 25 (Pearlman Dep.) at 36:9-24; Ex. 6 (Bohm Dep.) at 34:3-6.)

11.  Cablevision's most expensive package, "iO Gold," contained the iO Silver package plus an additional 26 channels, for a total of approximately 194 channels, not including music, interactive, pay-per-view, or on-demand channels.  (*See* Ex. 22 (Exhibit 1 to Orszag Rep.) at 1); Pls.' Ex. G at CSC00000797; Ex. 8 at CSC00000097; Ex. 24 (Cablevision's Rates and Packages) at CSC00000788-89.)  Plaintiff John Brett subscribed to the iO Gold package.  (Ex. 26 (Brett Dep.) at 18:24-19:3; 58:7-22.)

12.  With the exception of certain premium *a la carte* channels not involved in the Programming Blackout of the Six Fox Channels, Cablevision's subscribers do not order specific

channels, and are not charged amounts specifically for any particular channel in a package.  (*See* Ex. 21 (Rates & Packages (Port Chester)) at CSC00000797; Ex. 8 (Rates & Packages (Freehold/Lakewood/Jackson)) at CSC00000097.)

13.     Plaintiffs Eric Bohm, John Brett, Arthur Finkel, Theodore Pearlman, Vincent Pezzuti, and Stanley Somer ("Moving Plaintiffs") did not subscribe to—and did not pay Cablevision for—individual channels rather than a package of services.  Instead, they subscribed to—and paid for—various different packages of services, each of which contains numerous channels.  (*Compare* Ex. 1 at P-AF-000005 (subscribed to "iO Silver") *with* Ex. 2 at P-VP-000002 (subscribed to "Family Cable w/iO"); *see also* Ex. 3 ¶ 3.)

14.     Plaintiffs did not pay for some or all of the Six Fox Channels on a channel-by-channel basis.  Subscribers pay for packages, and the specific channels that are included in each package are "subject to change or discontinuance at any time."  (Pls.' Ex. G at CSC00000796; *see also* Pls.' Ex. E ¶ 17 ("All programming, program services, program packages, number of channels, channel allocations, broadcast channels, interactive services, e-mail, data offerings and other Services are subject to change in accordance with applicable law.").)

15.     The price for the Basic package, as well as the precise mix of channels offered in that package, vary according to service area.  (*See* Ex. 27 at P-TG-000003 (Basic at $11.89); Ex. 5 at P-EB-000001 (Basic at $14.56); Pls.' Ex. G at CSC00000797; Ex. 8 at CSC00000097.) In addition, because of the various promotions and discounts that Cablevision offers, subscribers to the same service package—even in the same service area—may and do pay different rates. (*Compare* Ex. 2 at P-VP-000003-4 (showing discount for Family w/iO package) *with* Pls.' Ex. 8 at CSC00000097 (showing the base prices for packages).)

16.     Cablevision regularly offers promotions, discounts and other accommodations to subscribers, including those who threaten to terminate their service, to entice them to maintain their Cablevision service. (Ex. 20 (Feldman SJ Opp. Declaration) ¶ 4; Ex. 7 at 41; Pls. Ex. B at 7-8.)

17.     The precise days in a monthly billing period vary from subscriber to subscriber. For example, plaintiff Bohm's October/November 2010 bill covered the period from October 8, 2010 to November 7, 2010 (*see* Ex. 5 at P-EB-000001), Finkel's bill covered the period from October 1, 2010 to October 31, 2010 (*see* Ex. 1 at P-AF-000005), Pearlman's bill covered the period from October 8, 2010 to November 7, 2010 (*see* Ex. 28 at P-TP-000003), Siegel's bill covered the period from October 16, 2010 to November 15, 2010 (*see* Ex. 29 at P-MS-000003), and Gerson's bill covered the period from October 22, 2010 to November 21, 2010 (*see* Ex. 27 at P-TG-000003).

18.     Each person listed in Paragraph 1 of Plaintiffs' Local Rule 56.1 Statement of Material Facts in Support of their Motion for Partial Summary Judgment ("Pls.' SOF") did not pay his bill for Cablevision cable television services covering the period from October 16, 2010 through October 30, 2010 prior to the Fox Programming Blackout Period.  Arthur Finkel, Eric Bohm, and Vincent Pezzuti each paid for Cablevision cable television services covering the Fox Programming Blackout Period during or after the Fox Programming Blackout Period. Specifically, Finkel paid his Cablevision bill for the period of October 1, 2010 to October 31, 2010 on or about October 19, 2010. (*See* Ex. 1 at P- AF-000004-5 (period of 10/1/2010-10/31/2010 paid on 10/19/2010); Ex. 4 at 84-86.)  Bohm paid his Cablevision bill for the period of October 8, 2010 to November 7, 2010 on November 3, 2010.  (Ex. 5 at P-EB-000001, 3 (period of 10/8/2010-11/7/2010 paid on 11/3/2010); Ex. 6 at 71.)  Pezzuti paid his Cablevision

bill for the period of October 15, 2010 to November 14, 2010 on October 20, 2010.  (Ex. 2 at P-VP-000003 (period of 10/15/2010-11/14/2010 paid on 10/20/2010); Ex. 7 at 83-84.)

## II. Cablevision Has Business and Editorial Discretion Over the Programming That It Includes In its Packages, and Cablevision Adds and Removes Channels From Its Lineups Without Providing Subscribers With Subscriber Credits

19.    Cablevision makes programming changes for any number of reasons, including that certain networks have recently become available or are no longer available, or that agreements with providers may permit or mandate reposition or re-tiering, or they expire and are pending renegotiation.  (*See* Ex. 20 (Feldman SJ Opp. Decl.) ¶¶ 5-7; Ex. 30 (2010 New Video Content & Enhancements) at CSC00236195-96 (describing recent channel additions).) Cablevision adds and removes channels from its package lineups, and repositions channels among its various packages in the ordinary course of its business.  (*See* Ex. 20 (Feldman SJ Opp. Decl.) ¶¶ 5-7.)

20.    Cablevision does not charge subscribers an additional fee when it adds a channel to a lineup, nor does it charge a reduced fee or provide subscriber credits when a channel is removed from a lineup.  (Ex. 3 (Feldman Class Cert. Opp. Decl.) ¶ 8.)  Rather, Cablevision typically determines the rates it charges subscribers for its various packages on a yearly basis and does not change those rates directly in response to each change in its channel lineups, whether that change is an addition or deletion of a channel.  (*Id.*)

21.    Similarly, Cablevision does not pay credits or provide alternative programming to subscribers in instances in which networks fail, merge with other networks, re-launch with a new focus, or are re-branded with significantly changed program schedules.  Nor does Cablevision pay a credit or provide alternative programming to subscribers when networks change their program schedules, such as by cancelling low-rated shows and replacing them with new ones, or when very popular shows, such as "Mad Men," end their runs.  Cablevision does not pay credits

7

to subscribers or provide alternative programming when it repositions channels among its various packages, nor does Cablevision pay credits to subscribers or provide alternative programming when it adds or removes channels from its lineups, including when a channel is lost (either temporarily or permanently) due to a contract dispute with a programmer.  (Ex. 17 (Feldman SJ Decl.) ¶ 4.)

22.     By way of example, in April 2010, Cablevision added the National Geographic Wild channel to its iO packages.  (Ex. 3 (Feldman Class Cert. Opp. Decl.) ¶ 9.)  Cablevision did not charge subscribers an extra fee for this channel.  (*Id.*)  More recently, in August 2012 Cablevision added the NFL Network to its iO channel lineups; the fees for those lineups remained the same.  (*Id.*)  And for a period of time, Cablevision's channel lineup included The Wedding Central channel.  (*Id.* ¶ 10.)  That channel was deleted from Cablevision's lineup in July 2011.  (*Id.*)  Cablevision did not reduce subscriber fees, issue a pro rata credit, or offer alternative programming at the time the Wedding Central Channel was removed.  (*Id.*)

23.     Plaintiffs have conceded that the "in accordance with applicable law" language contained in Paragraph 17 of the Terms of Service does ***not*** mean that Cablevision is relieved of providing particular content ***only*** in the event of a change in applicable law.  Rather, Plaintiffs have taken the position—through the testimony of expert witnesses they have sponsored and in their legal briefs filed with the Court—that this "in accordance with applicable law" language refers to complying with legal notice requirements to subscribers and regulators, and it does not limit the reasons why Cablevision may make a change to its mix of channels.  (Ex. 31 (Buchholz Dep.) at 128:19-129:3, 129:19-130:2; Ex. 32 (Gerbrandt Dep.) at 141:3-18; 142:25-143:6; Dkt. 125 (Pls.' Mem. in Supp. of Mot. to Strike Testimony and Report of E. Losinski and to Preclude

Defs. from Relying on Untimely Discovery) at 15-16; Dkt. 135 (Pls.' Cons. Opp. to Def.'s Cross-Mot. To Strike and Reply In Further Support of Pls.'s Mot. To Strike) at 24 n. 43).)

### III.    The Moving Plaintiffs' Prior Course of Dealing With Cablevision Concerning Programming Blackouts

24.    There were at least two occasions in 2010, before Cablevision's dispute with News Corp., in which certain channels were removed from Cablevision's lineup due to contract disputes with programmers.  In neither instance did Cablevision provide a pro-rata credit or offer alternative programming to subscribers.  (*See* Ex. 20 (Feldman SJ Opp. Decl.) ¶¶ 6-7.)

25.    First, on January 1, 2010, the Food Network and HGTV (the "Scripps Channels") were removed due to the expiration of Cablevision's contract with Scripps Networks Interactive, Inc. (the "Scripps Programming Blackout").  A new agreement was subsequently reached, and the Scripps Channels were added back to Cablevision's channel lineup on January 21, 2010.  In connection with the Scripps Programming Blackout, Cablevision did not issue a pro rata credit to its customers for any portion of their monthly fee, or provide alternative programming.  (Ex. 20 (Feldman SJ Opp. Decl.) ¶ 6.)

26.    Similarly, on March 6, 2010, the programming contract between Cablevision and The Walt Disney Co. expired, so that Cablevision no longer had the contractual right to carry WABC-TV. Consequently, WABC-TV was removed from Cablevision's lineups on March 6, 2010 (the "ABC Programming Blackout").  The following day, on March 7, 2010, Cablevision and Disney reached agreement on a new contract, and WABC-TV was added back to Cablevision's lineup.  (Ex. 20 (Feldman SJ Opp. Decl.) ¶ 7.)

27.    As was the case with the Scripps Programming Blackout, Cablevision did not issue a pro rata credit to its customers for any portion of their monthly fee, or provide alternative

programming, in connection with the ABC Programming Blackout.  (Ex. 20 (Feldman SJ Opp. Decl.) ¶ 7.)

28.    The General Terms and the Terms of Service that were in effect during the Programming Blackout of the Six Fox Channels were also in effect during the Scripps Programming Blackout and the ABC Programming Blackout.  (Ex. 17  (Feldman SJ Decl.) ¶ 5.)

29.     The Moving Plaintiffs were each Cablevision subscribers during the Scripps Programming Blackout and the ABC Programming Blackout.  (*See* Ex. 6 (Bohm Dep.) at 6:10-18, 32:7-11; Ex. 4 (Finkel Dep.) at 7:14-8:21; 88:4-7; Ex. 25 (Pearlman Dep.) at 38:22-39:5, 89:13-19; Ex. 26 (Brett Dep.) at 18:15-18; 52:14-19; Ex. 7 (Pezzuti Dep.) at 7:21-24; 27:20-24; 99:17-21; Ex. 33 (Somer Dep.) at 24:9-11; 37:11-18.)

30.    Cablevision has no record that any of the Moving Plaintiffs called to complain or demand a pro rata credit or alternative programming with respect to either the Scripps or the ABC Programming Blackout.  (Ex. 17  (Feldman SJ Decl.) ¶ 6. )

31.    No regulator ever suggested to Cablevision or demanded that Cablevision issue subscriber credits because of the Scripps or ABC Programming Blackouts.  (Ex. 17  (Feldman SJ Decl.) ¶ 9. )

**IV.    Industry Practice Regarding Programming Blackouts**

32.    Thomas Rutledge, who was Cablevision's Chief Operating Officer from 2004 or 2005 until December 2011 and was the Chief Operating Officer during the Programming Blackout of the Six Fox Channels, testified that in his experience at Cablevision, he could not recall "any circumstances to [his] knowledge where credits or rebates were paid to Cablevision customers due to a loss of a particular program or network like the Fox content in October 2010."  (Ex. 34 (Rutledge Dep.) at 9:18-10:7; 109:13-22; *see also id.* at 109:21-22 ("I have no recollection of programming, which changes all the time, having an impact on credits.").)

33.     Mr. Rutledge also agreed that "apart from [his] personal experience as an executive among Time Warner, Cablevision, or Charter, just in terms of being informed about [the cable] industry, on a historic basis," he was also not "aware of any circumstance where the cable provider, such as Cablevision, provided any rebate or credit to its customers because of a loss of programming content under circumstances such as those involved in October 2010 between Cablevision and News Corp."  (Ex. 34 (Rutledge Dep.) at 110:6-15.)

34.     Plaintiffs' damages expert, Mr. Buchholz, agreed that he is not "aware of any actual situation in the . . . MVPD  [Multichannel Video Programming Distributor] industry -- where the MVPD gave a refund or credit to its customers of a hundred million dollars," or "a refund or credit to its customers of $10 million."  (Ex. 31 (Buchholz Dep.) at 149:8-17.)

35.     Likewise, Plaintiffs' purported industry expert, Mr. Gerbrandt could not identify a single instance where "a cable operator provided credit to subscribers because of a blackout resulting from a contract dispute with the operator and a programmer."  (Ex. 32 (Gerbrandt Dep.) at 55:15-20.)

## V.     Disruptions of Service

36.     From time to time, equipment malfunctions, technical problems, accidents, storms, power failures and other similar events may result in the loss of Cablevision's technical ability to transmit signals through the cable system for one or more channels to one or more subscribers.  In 2010, Cablevision would not have necessarily known that such a disruption of service had occurred unless and until a subscriber notified Cablevision of the problem. Cablevision sometimes has the technical means to provide alternate programming to affected subscribers on such occasions.  (Ex. 17  (Feldman SJ Decl.) ¶ 7.)

37.     Cablevision routinely issues credits to its subscribers when power outages, storms, equipment failures, accidents and other similar events affecting the equipment that

supports its cable network result in interruptions of service or programming to subscribers, provided that certain conditions, such as the duration of the interruption, and customer notification to Cablevision, are met.  For example, in 2010 there were thousands of instances when Cablevision issued such outage credits to subscribers who qualified for such credits. (Ex. 17 (Feldman SJ Decl.) ¶ 8; *see also* Ex. 35 (Feldman Dep.) at 112:8-22; Ex. 18 (Montemagno Dep.) at 125:18-126:6.)

## VI.    The Contract Dispute with News Corporation

38.    At various times, Fox and Cablevision entered into license agreements that allowed Cablevision to include the Six Fox Channels in its programming packages.  (Ex. 18 (Montemagno Dep.) at 90-92.)

39.    In October 2009, as the end of the term for such a license agreement approached, Cablevision and Fox sought to negotiate a renewal of those retransmission rights, but disagreed publicly over the increased fees Fox was demanding from Cablevision in exchange for the right to continue to include the Fox Channels in its various packages.  (*See*, *e.g.*, Ex. 34 (Rutledge Dep.) at 28:15-22, 29:14-30:13; Ex. 11 at CSC00017062-64; *see* Exs. 36, 37, 38 (Oct. 17, 2010 On-Air Messages from Cablevision to Subscribers).)

40.    During the period from September 20, 2010 to October 15, 2010, Fox ran advertisements warning Cablevision's subscribers that they might lose the Six Fox Channels if Cablevision did not acquiesce to Fox's terms.  (*See* Ex. 38.)  In addition, during that period, local media reported, and Cablevision publicly discussed, the possibility that News Corp. would not permit Cablevision to retransmit or deliver the Fox Channels upon the expiration of their retransmission agreement. (*See, e.g.*, Ex. 12 (Oct. 13, 2010 Cablevision Advertisements About Fox Negotiations) at CSC00000936-38; Ex. 13 (Oct. 12, 2010 E-mail from Cablevision to Subscribers) at CSC00186056-57; Ex. 15 (Oct. 12, 2010 Cablevision "Fox Newspapers traffic

12

instructions") at CSC00155146-48; Ex. 16 (Oct. 14, 2010 E-mail from Cablevision to New York Post) at CSC00015687-88.)

41.     On several occasions, Cablevision advised its subscribers in advance of the Programming Blackout of the Six Fox Channels of the possibility that Fox's position might result in the removal of the Six Fox Channels from its packages.  (Pls.' Ex. B at 7-8; *see* Ex. 12 at CSC00000936-38; Ex. 13 at CSC00186056-57; Ex. 14 at CSC00000918 (radio ad produced to Plaintiffs in native format); Ex. 15 at CSC00155146-47; Ex. 16 at CSC00015687-88.) Cablevision also provided state regulators advance notice of this possibility on several occasions (Ex. 39 at CSC00353735; Ex. 40 at CSC00353739; Ex. 41 at CSC00353741.)

42.     On October 15, 2010 at 11:59 p.m., the 2009 license agreement between Fox and Cablevision expired.  As a result, as of October 16, 2010, at 12:00 a.m., Fox denied Cablevision the right to retransmit the Fox Broadcast Networks and elected not to deliver to Cablevision the signals for the Fox Cable TV Networks.  (Ex. 20 (Feldman SJ Opp. Decl.) ¶ 2; Ex. 18 (Montemagno Dep.) at 20:25-21:12, 122:21-123:4.[4])   Following removal of the Six Fox Channels, Cablevision notified subscribers and regulators that the Six Fox Channels were no longer available. (*See* Pls.' Ex. F; 2AC ¶¶ 7, 23;   Ex. 42 at CSC00353748; Ex. 43 at CSC00353737.)

43.     Certain of Cablevision's subscribers were able to view Fox programming on WTIC–Hartford and MyTV9–New Haven during the loss of the Six Fox Channels on Cablevision's network during the Fox Programming Blackout Period.  (*See* Ex. 11 at CSC00017063.)

---

[4] However, subscribers in certain regional areas continued to receive the Fox Broadcast Stations on regional sister stations owned by News Corp.  (*See, e.g.*, Ex. 37 (Oct. 17, 2010 On-Air Message from Cablevision to Connecticut Subscribers) at CSC00017063; Ex. 38 (Oct. 17, 2010 On-Air Message from Cablevision to New Jersey Subscribers) at CSC00017064.)

44.     In the absence of a mutually acceptable agreement with News Corp., Cablevision did not have the ability to unilaterally retransmit or distribute any of the Six Fox Channels.  In fact, in the absence of a license agreement between them, News Corp. exercised its right under federal law to deny Cablevision the right to retransmit the Three Fox Broadcast Stations, so that it would have been unlawful for Cablevision to have continued retransmitting those channels; and News. Corp. elected not to deliver to Cablevision the signals of the Three Fox Cable Channels, making it impossible for Cablevision to distribute those channels.  (Pls.' Ex. B at 12-13.)

45.     Paragraph 4 of the Terms of Service did not require the provision of pro-rata credit to subscribers because of the Programming Blackout of the Six Fox Channels.  Rather, the Terms of Service, as well as the General Terms, make clear that no such credit was due.  For example, Paragraph 17 of the Terms of Service provides that all programming is subject to change.  (*See* Pls.' Ex. G at CSC00000796; *see also* Pls.' Ex. E ¶ 4.)

46.     Paragraph 4 of the Terms of Service states that a pro-rata credit will be provided only "if there is a known program or service interruption in excess of 24 consecutive hours (or in excess of such lesser time period pursuant to state law)," only "upon prompt notification of such failure or interruption from Subscriber," and only if Cablevision elects to provide a credit rather than alternative programming.  (*See* Pls.' Ex. E ¶ 4.)  As the references to a "known" program or service interruption and the requirement for "prompt notification . . . from Subscriber" (among other things) make clear, Paragraph 4 is addressed to loss or interruption of program or service due to physical problems with the equipment that supports Cablevision's cable system.  Unlike the loss of a channel due to a contract dispute—of which Cablevision would always necessarily be aware—in 2010, Cablevision would not always have been aware when physical problems

with its equipment resulted in an interruption of program or service.  (Ex. 17 (Feldman SJ Decl.) ¶ 2.)

47.     On October 30, 2010, Cablevision and News Corp. agreed to a mutually acceptable transmission consent agreement, which gave Cablevision consent to retransmit WNYW, WWOR and WTXF, and provide Fox Business Networks, National Geographic Wild, and Fox Deportes.  (Ex. 17 (Feldman SJ Decl.) ¶ 11.)

48.     The Six Fox Channels were the only channels affected by the Programming Blackout of the Six Fox Channels, and Cablevision continued to provide the regular network programming for all other channels (including all other major broadcast networks and other highly popular channels, such as ESPN and Discovery) in its packages during that time.  (Ex. 17 (Feldman SJ Decl.) ¶ 12.)

49.     The channels that Cablevision continued to provide during the Programming Blackout of the Six Fox Channels included ABC, NBC, CBS, and ESPN, which plaintiffs' damages expert, Mr. Buchholz contended are "critical to attracting and retaining customers." (Ex. 31 (Buchholz Dep.) at 52:23-53:1; 53:2-5.)

50.     None of Moving Plaintiffs contacted Cablevision to complain about the removal of the Fox Channels.  (Ex. 44 at 3-4; Ex. 4 at 72-73; Ex. 25 at 58-59.)  Pezzuti testified that his wife contacted Cablevision regarding the Fox Withdrawal and inquired about a credit.  (Ex. 7 at 84-87.)  In addition, none of the Moving Plaintiffs canceled, or sought to cancel, his or her subscription at any point during the period September 20, 2010 to October 30, 2010.  (Ex. 6 at 6, 32; Ex. 4 at 88; Ex. 25 at 38-39, 89; Ex. 26 at 52; Ex. 7 at 99; Ex. 33 at 24.)  Rather, Plaintiffs continued to watch television through their Cablevision subscriptions during the Fox Withdrawal.  (*See*, *e.g.*, Ex. 6 at 85; Ex. 26 at 30-31, 56; Ex. 4 at 97; Ex. 25 at 102; Ex. 7 at 110.)

51.     No regulator ever suggested to Cablevision or demanded that Cablevision issue subscriber credits because of the Programming Blackout of the Six Fox Channels.  (Ex. 17 (Feldman SJ Decl.) ¶ 10.)

52.     The overwhelming majority of Cablevision subscribers elected to continue service despite the Programming Blackout of the Six Fox Channels, and they continued to pay their monthly fees for their cable TV service.  (Ex. 45 (Sept. 11, 2014 Rebuttal Expert Report of Jonathan Orszag ("Orszag Rebuttal Report") ¶¶ 8-9; Ex. 46 (CSC00354413).)   The small percentage of subscribers who canceled their subscriptions were not charged fees or penalty and were entitled to a refund of any unused prepaid amounts, consistent with standard policies and practices applicable to any customer terminating service.  (Ex. 20 (Feldman SJ Opp. Decl.) ¶¶ 3, 7.)

53.     Subscribers' levels of viewership of cable TV on Cablevision did not materially change during the Programming Blackout of the Six Fox Channels.  (*See* Ex. 45 (Orszag Rebuttal Report) ¶¶ 8-9.)   In fact, Cablevision subscribers viewed an aggregate of 187 million hours of television on Cablevision during the first week of the Programming Blackout of the Six Fox Channels, and an aggregate of 183 million hours of television during the second week. (Ex. 31 (Buchholz Dep.) at 98:10-16; Ex. 45, Orszag Rebuttal Report at 5, Table 1 (showing weekly viewership by hours based on a 1% sampling of Cablevision's viewership data).)   The aggregate weekly viewership data for October 11, 2010 to November 21, 2010 shows that there was no substantial change in total viewership hours from the week before the Programming Blackout of the Six Fox Channels, to the two weeks during the Programming Blackout, to the three weeks after the Programming Blackout.  (Ex. 45, Orszag Rebuttal Report ¶¶ 8-9; *id.* at 5, Table 1.)

Dated:   February 16, 2016

                                       */s/ Andrew M. Genser*

                                      Joseph Serino, Jr., P.C.
                                      Andrew M. Genser
                                      Jonathan F. Putnam
                                      KIRKLAND & ELLIS LLP
                                      601 Lexington Avenue
                                      New York, New York 10022
                                      Telephone:     (212) 446-4800
                                      Facsimile:     (212) 446-4900
                                      joseph.serino@kirkland.com
                                      agenser@kirkland.com
                                      jputnam@kirkland.com

                                      *Attorneys for Defendants Cablevision Systems*
                                      *Corporation and CSC Holdings, LLC*