**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

**In re Cablevision Consumer Litigation**

-----------------------------------------------------------

This Document Relates to:
All Actions

Master File No.
10-cv-4992 (JS) (AKT)

ECF CASE

**MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

KE 41518994.2

## TABLE OF CONTENTS

**Page**

INTRODUCTION.................................................................................................................1

PROCEDURAL BACKGROUND .......................................................................................2

FACTUAL BACKGROUND ...............................................................................................3

I.  CABLEVISION'S BUSINESS AND THE APPLICABLE TERMS OF
    SERVICE.................................................................................................................3

II.  UNDER PARAGRAPH 17, CABLEVISION ROUTINELY ADDS AND
     REMOVES CHANNELS WITHOUT PROVIDING CREDITS TO
     SUBSCRIBERS.......................................................................................................4

III.  PLAINTIFFS' PRIOR COURSE OF DEALING WITH CABLEVISION ON
      PROGRAMMING BLACKOUTS. ........................................................................5

IV.  DISRUPTIONS OF CABLE SERVICE DUE TO TECHNICAL ISSUES.................6

V.  THE CONTRACT DISPUTE WITH FOX. ............................................................7

SUMMARY JUDGMENT STANDARD .............................................................................7

ARGUMENT .......................................................................................................................8

I.  CABLEVISION'S READING IS THE ONLY WAY TO RECONCILE
    PARAGRAPHS 4 AND 17. ....................................................................................9

   A.  Cablevision's Interpretation Harmonizes Paragraphs 4 and 17, and It
       Leaves No Provisions Superfluous. ...........................................................9

   B.  Plaintiffs' Contrary Arguments All Run Afoul of Paragraph 17. .........................11

      1.  Plaintiffs' Invented Distinction Between Permanent and
          Temporary Programming Changes Has No Basis in Paragraph 17
          and Leads to An Absurd Result. ..............................................................11

      2.  Plaintiffs' Argument That Cablevision Promised Specific Channel
          Packages Is Wrong and Would Render Paragraph 17 Superfluous. ..........13

      3.  Plaintiffs' Argument that Cablevision Did Not Remove The Fox
          Channels in Accordance with Applicable Law Under Paragraph 17
          Is Unavailing. ..........................................................................................14

KE 41518994.2

## TABLE OF CONTENTS (CONT'D)

**Page**

II.  THE PLAIN LANGUAGE OF PARAGRAPH 4 MAKES CLEAR THAT IT
APPLIES ONLY TO TECHNICAL OUTAGES AND NOT TO A
PROGRAMMING CHANGE SUCH AS THE FOX BLACKOUT ............................15

III. OTHER EVIDENCE PROPERLY BEFORE THE COURT CONFIRMS
THAT PLAINTIFFS' CONTRACT INTERPRETATION MUST BE
REJECTED AND THAT CABLEVISION'S IS CORRECT. ....................................21

   A.  The Parties' Prior Dealing Further Confirms Cablevision's Interpretation...........21

   B.  Industry Custom Evidence Further Supports Cablevision's Interpretation. ..........22

IV.  CABLEVISION'S INTERPRETATION GIVES MEANING TO ALL
CONTRACT TERMS AND DOES NOT RENDER THE TOS ILLUSORY.............22

V.   THE FACTUAL RECORD AND THE COURT'S ADMISSION OF
COMPETING EXPERT OPINIONS ON DAMAGES REQUIRE DENIAL
OF THE SUMMARY JUDGMENT MOTION REGARDING DAMAGES.............24

CONCLUSION ..................................................................................................................25

KE 41518994.2

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Analisa Salon, Ltd. v. Elide Props., LLC*,
    818 N.Y.S.2d 130 (2d Dept. 2006) ........................................................................16

*Atlas Partners, LLC v. STMicroelectronics, Intern. N.V.*,
    2015 WL 4940126 (S.D.N.Y. Aug. 10, 2015) .......................................................12

*Auscape Int'l v. Nat'l Geographic Soc.*,
    282 Fed. Appx. 890 (2d Cir. 2008) .......................................................................21

*Basset v. Elec. Arts*,
    93 F. Supp. 3d 95 (E.D.N.Y. 2015) .......................................................................24

*Broder v. Cablevision Sys. Corp.*,
    418 F.3d 187 (2d Cir. 2005) .........................................................................8, 10, 20

*Cole v. Macklowe*,
    953 N.Y.S.2d 21 (1st Dep't 2012) ...........................................................................2

*Hammer v. Cablevision of Boston, Inc.*,
    849 N.Y.S.2d 749 (Just. Ct. N.Y. 2007) ..................................................10, 13, 14

*Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*,
    252 F.3d 608 (2d Cir. 2001) ..................................................................................20

*In re Bridge Constr. Servs. of Fla., Inc.*,
    39 F. Supp. 3d 373, 394 (S.D.N.Y. 2014) ...............................................................8

*In re Cablevision Consumer Litig.*,
    2014 WL 1330546 (E.D.N.Y. Mar. 31, 2014) ........................................................3

*In re Cablevision Consumer Litig.*,
    864 F. Supp. 2d 258 (E.D.N.Y. 2012) ............................................................ *passim*

*Kinstler v. First Reliance Standard Life Ins. Co.*,
    1997 WL 401813 (S.D.N.Y. July 16, 1997) ...........................................................8

*Lebowitz v. Dow Jones & Co.*,
    508 F. App'x 83 (2d Cir. 2013) .............................................................................24

*Lebowitz v. Dow Jones & Co.*,
    847 F. Supp. 2d 599 (S.D.N.Y. 2012) ...................................................................24

iii

*N.Y. Marine and Gen. Ins. Co. v. Lafarge N. Am., Inc.*,
   599 F.3d 102 (2d Cir. 2010)................................................................21

*Parker v. Booker*,
   822 N.Y.S.2d 156 (2d Dept. 2006) ...................................................11

*Pearlman v. Cablevision Sys. Corp.*,
   2015 WL 8481879 (E.D.N.Y. Dec. 8, 2015) .....................................20

*Pearlman v. Cablevision Sys. Corp.*,
   2015 WL 9462104 (E.D.N.Y. Dec. 28, 2015) ..........................9, 16, 25

*Royal Bank of Canada v. Mahrle*,
   818 F. Supp. 60 (S.D.N.Y. 1993) .......................................................7

*Seiden Assocs., Inc. v. ANC Holdings, Inc.*,
   959 F.2d 425 (2d Cir. 1992)...............................................................21

*Sykel Enters., Inc. v. Local 819*,
   1996 WL 1088210 (E.D.N.Y. Oct. 22, 1996) .....................................8

*Topps Co., Inc. v. Cadbury Stani S.A.I.C.*,
   526 F.3d 63 (2d Cir. 2008)............................................................8, 21

*Travellers Int'l AG v. Trans World Airlines, Inc.*,
   722 F. Supp. 1087 (S.D.N.Y. 1989)..................................................22

*United Fire & Cas. Co. v. Arkwright Mut. Ins. Co.*,
   53 F. Supp. 2d 632 (S.D.N.Y. 1999)................................................21

*Valle v. ATM Nat'l, LLC*,
   2015 WL 413449 (S.D.N.Y. Jan. 30, 2015) ......................................24

*Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*,
   775 N.Y.S.2d 765 (N.Y. App. 2004) ................................................11

*Wells Luck Co., Inc. v. F.C. Gerlach & Co., Inc.*,
   421 F. Supp. 2d 533 (E.D.N.Y. 2005) ..............................................21

**Statutes and Rules**

16 N.Y.C.R.R. § 890.61.....................................................................6

16 N.Y.C.R.R. § 890.65(a) ................................................................6

16 N.Y.C.R.R. §890.80(a)(3)(i).......................................................15

Conn. Gen. Stat. Ann. § 16-331k.....................................................15

KE 41518994.2

Conn. Gen. Stat. Ann. § 16-331w ........................................................................................6

Conn. Agencies Regs. § 16-333e-1 ......................................................................................6

Conn. Agencies Regs. § 16-333e(c) .....................................................................................6

Fed. R. Civ. P. 56(c) ............................................................................................................7

N.J. Admin. Code § 14:18-3.5(a)-(b) ..............................................................................6, 19

**Other Authorities**

http://www.merriam-webster.com/dictionary/outage ...........................................................17

http://www.oxforddictionaries.com/us/definition/american_english/outage .........................17

http://www.oxforddictionaries.com/us/definition/american_english/service .........................17

http://www.oxforddictionaries.com/us/definition/american_english/transmission ................17

## INTRODUCTION[1]

Plaintiffs seek summary judgment on their sole remaining count, a claim for breach of contract. Plaintiffs contend that the approximately two weeks in 2010 during which Cablevision did not provide certain Fox channels due to a contract dispute with Fox were a "program or service interruption" under Paragraph 4 of the Terms of Service ("TOS") and therefore Cablevision owes credits to subscribers pursuant to Paragraph 4, which credits purportedly can be calculated as a matter of law on summary judgment. (Mot. at 1.) Plaintiffs are wrong.

***First***, Plaintiffs' argument is foreclosed by the canons of contract construction that require courts to give meaning to all contract terms and to avoid rendering any term meaningless, because the only way to reconcile Paragraphs 4 and 17 of the TOS is to find that Paragraph 4 obligates Cablevision to provide credit only for certain outages and service disruptions of a technical nature, and that Paragraph 17 grants Cablevision the right to change the programming it offers subscribers without having to pay credits. That right would be rendered meaningless under Plaintiffs' expansive interpretation of Paragraph 4. Rejection of Plaintiffs' contract interpretation is also compelled by the contract construction rules that require courts to avoid interpretations that would produce absurd results (as Plaintiffs' construction leads to an outcome which even they admit is absurd—an outcome where subscribers would receive free cable service any time even one channel became temporarily unavailable for as long as that unavailability lasted, but subscribers would receive nothing where Cablevision elected to remove multiple channels permanently).

---

[1] Unless otherwise noted, all emphasis has been added, and all citations, ellipses, alterations, and quotation marks have been omitted. As used herein, "SOF" refers to Defendants' Local Rule 56.1 Statement in Support of Motion for Summary Judgment filed herewith. References to "Ex. __" are to exhibits to the February 16, 2016 Declaration of Andrew M. Genser in Support of Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment, filed herewith.

KE 41518994.2

**Second,** rejection of Plaintiffs' reading is also compelled by the plain language of Paragraph 4, which uses terminology throughout that refers to the loss of service of a technical nature, and which makes sense only if the obligation to pay credits is limited to certain qualifying technical service disruptions.  In contrast, Cablevision's interpretation reconciles all contract terms and does not render the contract illusory.

**Third**, rejection of Plaintiffs' reading of the Terms of Service is compelled by other evidence properly before the Court, such as the parties' prior course of dealing (which includes two prior programming blackouts involving the named Plaintiffs and the same TOS, where credits were neither sought nor paid).

**Finally,** in arguing that "each subscriber of a [cable] package is entitled to [the same] pro rata credit" amounts (Mot. at 13), Plaintiffs ignore both the record evidence showing that subscribers paid different amounts for the same packages, and the fact that this Court has already admitted competing expert testimony on damages from Plaintiffs and Defendants.  Either fact raises a triable question requiring denial of Plaintiffs' summary judgment motion as to damages.

## PROCEDURAL BACKGROUND

Plaintiffs filed this class action on October 29, 2010, following a two-week period in October 2010 during which Cablevision was unable to provide a handful of Fox Channels[2] ("Blackout of the Six Fox Channels" or "Fox Blackout") between the time when its license to do so expired, and when Cablevision and Fox were able to reach a new agreement.  (Dkt. 1.)  After the Court consolidated this action with several others (Dkt. 25), Cablevision moved to dismiss.  (Dkt. 34.)  On March 28, 2012, the Court dismissed five of Plaintiffs' six counts, leaving only their breach of contract claim.  *In re Cablevision Consumer Litig.*, 864 F. Supp. 2d 258, 263, 269

---

[2] By "Fox Channels" or "Six Fox Channels," Cablevision refers to three Fox broadcast channels (WNYW, WWOR, and WTXF) and three Fox cable channels (Fox Business Network, National Geographic Wild, and Fox Deportes).

(E.D.N.Y. 2012).   Plaintiffs contend that Cablevision breached Paragraph 4 of the Terms of Service ("TOS") by not paying pro rata credits in connection with the Fox Blackout.  *See In re Cablevision Consumer Litig.*, 2014 WL 1330546, at *3 (E.D.N.Y. Mar. 31, 2014).  The TOS are clear, however, that Paragraph 4 does not apply to the Fox Blackout, which was not a service disruption or outage.   Rather, it was a programming change contemplated and permitted by Paragraph 17, for which no credits are due.

In ruling on the motion to dismiss, the Court noted the importance of reconciling Paragraph 4 with Paragraph 17 and noted there were two possible ways to do so.  *See* 864 F. Supp. 2d at 263.  Under the first, Paragraph 4 would require Cablevision to pay pro rata credits in the event of a change of programming as occurred in this case (as Plaintiffs argue), but then Paragraph 17 would ***have*** to mean that Cablevision could make changes to its programming only when it was ***required*** to do so by a change in applicable law.   Under the second, Paragraph 4 would apply only to technical "outages" (as Cablevision argues), and Paragraph 17 would mean that Cablevision is free to change its programming for any reason, subject to any restrictions that exist in applicable law.  *See id.*[3]

## FACTUAL BACKGROUND

### I.   Cablevision's Business and the Applicable Terms of Service.

Cablevision provides video programming and video-related services to subscribers. (SOF ¶ 10.)  The relationship between Cablevision and its subscribers is governed by the TOS. (*Id.* ¶ 12.)   Under the TOS, Cablevision agrees to "provid[e] video programming and video-

---

[3] As set forth in more detail below, the uncontroverted evidence adduced since that motion to dismiss decision makes clear that the "first approach" cannot be correct. Indeed, Plaintiffs have now admitted as much, acknowledging that the "in accordance with applicable law" language in Paragraph 17 does not mean that Cablevision may only change its programming upon a change in applicable law; rather, it means that ***if*** Cablevision elects to change its programming, it must ***effectuate*** that change in accordance with any applicable law.  (*See* SOF ¶ 29; Dkt. 186 at 2) (acknowledging that Paragraph 17 "permits Cablevision to change its program packages only if done 'in accordance with applicable law.'").

related services[.]"  (*Id.* ¶ 10; Genser Decl., Ex. 19 ¶ 2.)  Cablevision does ***not***, however, promise to provide subscribers with any particular channels—including any of the Six Fox Channels. (*See generally id.*)  Subscribers also do not order any specific channels (with the exception of certain premium *a la carte* channels not at issue here), and they are not charged amounts specifically for any particular channel in a package.  (*Id.* ¶ 21.)  If subscribers do not like the video programming and video-related services that Cablevision chooses to provide to them, they retain at all times the right to cancel their service from Cablevision and incur no further charges. (*Id.* ¶ 13.)

## II.   Under Paragraph 17, Cablevision Routinely Adds and Removes Channels Without Providing Credits to Subscribers.

Consistent with the basic arrangement where Cablevision provides video programming but does not promise to provide specific channels, Paragraph 17 of the TOS states:  "***All programming***, program services, program packages, number of channels, channel allocations, broadcast channels, interactive services, e-mail, data offerings and other Services are ***subject to change*** in accordance with applicable law."  (Ex. 9 ¶ 17.)  Contrary to Plaintiffs' repeated misstatement of the contract (Mot. at 1, 11-12), Paragraph 17 has no reference to a "channel line-up" and does not require Cablevision to deliver any particular version of a "channel line-up." The reference to changes being made in accordance with applicable law refers to certain state laws and regulations, which (as addressed *infra*) require notice to subscribers when channels are removed, but do not require credits.  Cablevision thus does not promise to deliver any specific channels, and retains the right to make programming changes for any reason whatsoever— including that certain networks have recently become unavailable or for other reasons. (SOF ¶ 25.)  Cablevision does not increase subscriber fees when a new channel is added; does not reduce fees or provide credits when a channel is removed or its programming content

4

changes; and does not provide credit when networks change their program schedules. (*Id.* ¶ 26-27.) Nor does Cablevision pay credits or provide alternative programming when (as here) a channel's programming is no longer available, whether temporarily or permanently, due to a contract dispute with a programmer. (*Id.* ¶¶ 27-28.) Tellingly, no regulator ever suggested that Cablevision issue subscriber credits because of the Fox Blackout (or any other blackout). (*Id.* ¶ 53.) And neither the experts sponsored by Plaintiffs nor Cablevision's former Chief Operating Officer could identify a single instance in which a cable provider gave credits due to a blackout resulting from a contract dispute with a programmer, as Plaintiffs seek here. (*Id.* ¶¶ 38-41.)

### III.   Plaintiffs' Prior Course of Dealing With Cablevision on Programming Blackouts.

There were at least two occasions in 2010 before Cablevision's dispute with Fox where Cablevision was unable to provide certain channels due to contract disputes with programmers; and in neither instance did Cablevision provide credits or alternative programming. (*Id.* ¶¶ 30-33.) Specifically, beginning on January 1, 2010, Cablevision stopped providing the Food Network and HGTV channels because Cablevision's programming agreement with Scripps Network Interactive, Inc. expired. (*Id.* ¶ 31.) It was not until January 21, 2010, that a new agreement was reached and these channels were restored. (*Id.*) Similarly, on March 6, 2010, Cablevision stopped providing WABC-TV because Cablevision's programming agreement with The Walt Disney Co. expired. (*Id.* ¶ 32.) Cablevision and Disney reached agreement on a new contract the next day, and WABC-TV was then re-added. (*Id.*) Cablevision did not issue a pro rata credit or provide alternative programming to subscribers with respect to either blackout. (*Id.* ¶ 33.) The named Plaintiffs in this case were Cablevision subscribers during both blackouts; the relevant TOS were the same; and none complained or demanded a credit under Paragraph 4 or otherwise. (*Id.* ¶¶ 34-36.)

## IV.      Disruptions of Cable Service Due to Technical Issues.

From time to time, equipment malfunctions, technical problems, accidents, storms, power failures and other similar events may result in the loss of Cablevision's technical ability to transmit signals through the cable system for one or more channels to one or more subscribers. (SOF ¶ 42.)  In 2010, Cablevision would not have necessarily known that such a disruption of service had occurred unless and until a subscriber notified Cablevision of the problem.  (*Id.*)  Certain state laws and regulations require cable programmers to pay subscriber credits for technical service disruptions in the event that programmers do not restore service within certain time periods set by those laws.[4]  Every time Paragraph 4 of the TOS refers to subscriber credits, it also refers to state law,[5] which provides for subscriber credit only for service disruptions and outages of a technical nature (and not for programming changes).  In 2010, there were thousands of instances when Cablevision issued credits for service disruptions and outages from technical issues (such as power outages, storms, equipment failures, etc.) to subscribers who qualified for them, and no instances when it issued credits for a programming change.  (*See* SOF ¶ 43.)  Depending on the nature of the disruption, Cablevision may have the technical ability to provide alternate programming to affected subscribers on such occasions.  (SOF ¶ 42.)

---

[4] For example, New York law requires cable television companies to "provide credit to subscribers affected by any service outage in excess of four continuous hours," 16 N.Y.C.R.R. § 890.65(a), with "service outage" defined as "a loss of picture or sound on all basic channels or on all channels provided on any other service tier or on one or more premium channels occurring during normal operating conditions which is not caused by the subscriber's television receiver or the subscriber."  16 N.Y.C.R.R. § 890.61.  New Jersey law requires credits in two instances:  (1) in the event of an "outage" lasting six or more hours, unless restoration of service was not possible within those six hours due to "factors beyond the reasonable control of the company," N.J. Admin. Code § 14:18-3.5(a)-(b), with "outage" defined as "the total loss of audio or visual portion of any level of cable television service for which the cable television company imposes a separate charge *and which affects the cable television company's distribution plant*" (*id.* ¶ 14:18-1.2); or where a customer is without all cable television service for at least 24 hours and the loss of service is not the result of an "outage."  *Id.* ¶ 14:18-3.5(d).  Connecticut law likewise requires credits in two instances:  (1) if cable service during a month falls below system reliability standards due to "qualifying outages" (defined as a "total loss of CATV service on all channels") that meet certain timing and duration requirements, Conn. Agencies Regs. §§ 16-333e(c), 16-333e-1; or (2) if subscribers "experience[] a service outage for more than twenty-four continuous hours."  Conn. Gen. Stat. Ann. § 16-331w.

[5] For example, Paragraph 4 provides for credits "[s]ubject to applicable law" and for interruptions "in excess of 24 consecutive hours (or in *excess of such lesser time period pursuant to state law*)."  (Ex. 19 ¶ 4.)

## V.      The Contract Dispute with Fox.

Prior to this dispute, Fox and Cablevision had entered into license agreements that allowed Cablevision to provide the Six Fox Channels to its subscribers.  (*Id.* ¶ 44.)  As the end of the term of one such agreement was approaching in October 2010, Cablevision's and Fox's negotiations reached an impasse due to Fox's exorbitant fee demands.  (*Id.* ¶ 45.)  Both Fox and Cablevision ran ads that notified subscribers of the potential loss of the Six Fox Channels; and Cablevision also notified regulators.  (*Id.* ¶¶ 46-47.)  The Fox license agreement expired at midnight on October 15, 2010, and, as a result, Cablevision could no longer provide the Six Fox Channels' programming to its subscribers.  (*Id.* ¶ 48.)  Cablevision notified subscribers and regulators alike that the Fox Channels were no longer available.  (*Id.*)  On October 30, 2010, Cablevision and Fox reached an agreement for a new license agreement, following which Cablevision resumed providing the Six Fox Channels' programming.  (*Id.* ¶ 49.)  Only the Six Fox Channels were affected by the Fox Blackout, and Cablevision continued to provide cable service, including scores of other channels during that time.  (*Id.* ¶¶ 50-51.) Subscribers' viewership of Cablevision's cable service did not materially change during the Fox Blackout.  Cablevision subscribers collectively viewed over ***360 million hours*** of Cablevision's cable TV service during the Fox Blackout (all of which they would get for free under Plaintiffs' theory of this case).  (*Id.* ¶ 55.)  No regulator ever suggested or demanded that Cablevision issue subscriber credits because of the Fox Blackout, and although some canceled service, the vast majority of Cablevision subscribers elected to continue their service despite the Fox Blackout. (*Id.* ¶¶ 53-54.)

## <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is appropriate when there are "no genuine issues as to any material facts . . . and the moving party is entitled to judgment as a matter of law"  (Fed. R. Civ. P. 56(c)),

and, in contract actions, only "where the language of the contract is unambiguous." *Royal Bank of Canada v. Mahrle*, 818 F. Supp. 60, 62 (S.D.N.Y. 1993).[6]   In making this assessment, the court must determine whether the terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 197 (2d Cir. 2005).[7]   Importantly, when "the party moving for summary judgment also bears the burden of persuasion at trial" (as Plaintiffs do here), "the party's initial summary judgment burden is ***higher*** in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable factfinder would be free to disbelieve it."[8]

## ARGUMENT

Plaintiffs base their entire case on four words of Paragraph 4—"program or service interruption"—taken out of context, and disregard the rest of Paragraph 4, not to mention the TOS as a whole.[9]   Contrary to Plaintiffs' arguments, the TOS, read as a whole, and as confirmed by the parties' prior course of dealing and industry custom and practice—all of which may properly be considered on this motion—show that Paragraph 4 is unambiguous and applies only

---

[6] *See also Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008) (summary judgment may be granted "***only*** when the contractual language on which the moving party's case' rests is found to be wholly unambiguous and to convey a definite meaning").

[7] Relying on decades old cases, Plaintiffs misstate the legal standard as requiring the Court to read the contract based on the "understanding of an average person." (Mot. at 8.)   The correct legal standard, however, is as articulated by the Second Circuit in *Broder*, above.

[8] *In re Bridge Constr. Servs. of Fla., Inc.*, 39 F. Supp. 3d 373, 394 (S.D.N.Y. 2014); *accord Sykel Enters., Inc. v. Local 819*, 1996 WL 1088210, at *2 (E.D.N.Y. Oct. 22, 1996); *Kinstler v. First Reliance Standard Life Ins. Co.*, 1997 WL 401813, at *4 (S.D.N.Y. July 16, 1997).

[9] Plaintiffs also contend that Cablevision breached the TOS when it did not "transmit the ***full package***" of programming to subscribers (Mot. at 1)—even though nothing in the TOS requires Cablevision to deliver particular programming, and to the contrary, the plain terms of Paragraph 17 state that "[a]ll programming . . . [is] subject to change in accordance with applicable law." (SOF ¶ 4.)

to disruptions of service and outages from technical problems, and not to programming changes such as the Fox Blackout. In other words, the Fox Blackout is not covered by Paragraph 4 and Cablevision did not breach Paragraph 4 by not paying subscriber credits because of it.  Finally, summary judgment on damages is generally frowned upon, but is entirely inappropriate here given the Court's prior expert rulings and the factual record in this case.  In fact, as the Court knows, Cablevision intends to cross-move for summary judgment of no liability because the TOS unambiguously forecloses Plaintiffs' claim.

I.      **Cablevision's Reading Is the Only Way To Reconcile Paragraphs 4 and 17.**

As this Court has noted, "a *key issue* in this breach of contract action is whether the unavailability of the Fox Channels falls under the purview of Paragraph Four or Paragraph Seventeen[.]" *Pearlman v. Cablevision Sys. Corp.*, 2015 WL 9462104 (E.D.N.Y. Dec. 28, 2015) at *11.  Yet Plaintiffs make no meaningful attempt to grapple with Paragraph 17, as they mention it only twice in their motion (Mot. at 11-12) and offer no real explanation as to why it would not apply.  Their silence is a tacit admission that the interpretation they seek to foist on the Court does not reconcile the two paragraphs.   By contrast, Cablevision's interpretation provides the *only* reasonable way to reconcile these provisions.

A.      **Cablevision's Interpretation Harmonizes Paragraphs 4 and 17, and It Leaves No Provisions Superfluous.**

Paragraph 17 of the TOS states:   "All programming, program services, program packages, number of channels, channel allocations, broadcast channels, interactive services, e-mail, data offerings and other Services are subject to change in accordance with applicable law." (Ex. 9 ¶ 17.)   The plain meaning of this language is that Cablevision does not promise subscribers any particular channels or programming.  Instead, "[a]ll programming . . . [is] subject to change[.]"  In ruling on Cablevision's motion to dismiss, the Court observed that there are two conceivable ways of reconciling Paragraph 4 with Paragraph 17.  (*See supra* at 3.)  It is now

9

clear that the reconciliation that depends on construing the phrase "in accordance with applicable law" to mean that Cablevision is relieved of providing particular content *only* in the event of a change in applicable law is indefensible.  Indeed, Plaintiffs have since conceded that Paragraph 17 "permits Cablevision to change its program packages" as long as the change is made 'in accordance with applicable law.'" (SOF ¶ 29; Dkt. 186 at 2.)

This concession is not surprising because the Second Circuit in *Broder v. Cablevision Systems Corp.*, 418 F.3d 187 (2d Cir. 2005) has already ruled that the phrase "subject to change in accordance with applicable law" in Cablevision's TOS does not limit Cablevision to making changes only when required to do so by law.  *Id.* at 197.  Instead, *Broder* held that this exact phrase (in a paragraph concerning changes to Cablevision's rates) means that Cablevision can make a change for any reason so long as it does so within the constraints of applicable law.[10] The *Broder* Court's reading applies equally here:  Paragraph 17 "protect[s] Cablevision against the argument that its [programming] could not change even where change was otherwise permitted by law," and it "provide[s] that [Cablevision's programming is] subject to change in accordance with applicable law and not otherwise."  *See id.*  Consistent with *Broder*, another New York court interpreted another similar Cablevision TOS provision—which authorized "Cablevision to change its programming and pricing in accordance with applicable law"—to mean that Cablevision is free to add or remove channels, and that it has *not* promised its subscribers any particular channel line-up.[11] These cases, as well Plaintiffs' concession of this

---

[10] *See id.* (interpreting this language to "protect Cablevision against the argument that its rates could not change even where change was otherwise permitted by law," and as "provid[ing] that rates were subject to change in accordance applicable law and not otherwise.").

[11] *See Hammer v. Cablevision of Boston, Inc.*, 849 N.Y.S.2d 749, 750-51 (Just. Ct. N.Y. 2007) (dismissing breach of contract, fraud, and other claims arising from Cablevision's removal of a Turner Classic Movies channel from its "basic 'analog' service" and moving it to a new digital service that required "a substantial additional monthly fee," and holding that under the TOS, Cablevision "had the contractual right to jettison TMC from its basic analog package under existing law.").

point, eliminate the first way of reconciling Paragraphs 4 and 17, leaving Cablevision's interpretation that Paragraph 4 is limited to technical outages as the only viable interpretation.

### B.   Plaintiffs' Contrary Arguments All Run Afoul of Paragraph 17.

Plaintiffs float a hodge-podge of arguments in support of their contract interpretation, all of which fail to reconcile Paragraphs 4 and 17, and must be rejected.

#### 1.   Plaintiffs' Invented Distinction Between Permanent and Temporary Programming Changes Has No Basis in Paragraph 17 and Leads to An Absurd Result.

Plaintiffs suggest that there is yet a third way to reconcile Paragraphs 4 and 17—in which Paragraph 17 allows Cablevision **permanently** to remove channels from its line-up, but that a **temporary** change (such as what they say happened here) falls under Paragraph 4 and exposes Cablevision to financial penalty.[12]  That argument must be rejected.

***First***, nothing in Paragraph 17 supports Plaintiffs' purported temporary-versus-permanent distinction.  To the contrary, its plain language places **no** temporal restrictions on Cablevision's right to change its programming and instead says simply that all programming is "subject to change[.]"  (Ex. 9 ¶ 17.)  There is no way to adopt Plaintiffs' construction without adding a temporal qualifier that is nowhere found in the contract—but courts are not free to rewrite a contract in this manner.[13]  In addition, by its plain language, Paragraph 17 is not limited to formal, permanent changes to the channel "line-up" as Plaintiffs argue.  Rather, it gives Cablevision the broad right to change "[a]ll programming."  (*Id.*)  Thus, Plaintiffs' argument that Cablevision did not formally "remove the Fox Channels from its packages" (Mot. at 3) is irrelevant, because even if Cablevision did not do so, the removal of the Fox programming at

---

[12] S*ee, e.g.*, Mot. at 12 (arguing that "Cablevision never changed [the October 2010] lineup to remove the Fox Channels.").

[13] *Parker v. Booker*, 822 N.Y.S.2d 156, 603 (2d Dept. 2006); *see also Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*, 775 N.Y.S.2d 765, 768 (N.Y. App. 2004)

issue here was, at a minimum, a change to the "programming" available on Cablevision, and thus fell squarely within the broad ambit of Paragraph 17.

**Second**, Plaintiffs' construction should be rejected because it produces a patently absurd result.[14]  Plaintiffs' interpretation posits that Cablevision gave itself the greater power to remove channels permanently (without triggering any pro rata credit obligations), yet denied itself the lesser power to remove those same channels on a temporary basis—at least not without exposing itself to tremendous financial liability (here, under Plaintiffs' view, a staggering $86.7 million).[15] Put otherwise, in Plaintiffs' view, subscribers would be owed nothing if Cablevision permanently removed all Fox Channels due to an irresolvable contract dispute with Fox, but because Cablevision was able to negotiate a resolution and restore the Fox Channels, it must pay a credit north of $80 million.   No reasonable subscriber would believe that Cablevision intended Paragraph 17 to require this absurd result, because there is no logical reason why Cablevision would do so.   Significantly, in their pre-motion opposition letter, Plaintiffs conceded that the result of their interpretation is absurd:   Plaintiffs' only answer is to suggest that the absurd outcome is Cablevision's own fault because it does not sell channels on an *a la carte* basis.[16] That is nonsensical, because, *inter alia*, the absurd result can and should be avoided by rejecting Plaintiffs' unsupported contract interpretation.   The admittedly absurd and unreasonable result of

---

[14] *See, e.g.*, *Atlas Partners, LLC v. STMicroelectronics, Intern. N.V.*, 2015 WL 4940126, at *5 (S.D.N.Y. Aug. 10, 2015); *Cole v. Macklowe*, 953 N.Y.S.2d 21, 23 (1st Dep't 2012) ("a contract should not be interpreted to produce an absurd result [or] one that is commercially unreasonable.").

[15] In addition, Plaintiffs' interpretation also means that Cablevision can be held hostage by programmers, who would know that they  have the unilateral ability to trigger enormous costs of an across-the-board subscriber credit simply by effecting a temporary programming blackout of a single channel (for example, by making unreasonable demand payments or otherwise refusing to extend a programming contract).  Finally, Plaintiffs' interpretation would mean that any subscriber who experienced the temporary programming blackout of **one** channel would not owe Cablevision anything for all of the channels that subscriber **did** receive.  This is commercially unreasonable and cannot be what the TOS means.

[16] Dkt. 186 at 3 ("Cablevision's 'absurd' result is the product of its decision to require subscribers to buy tier-based packages of numerous channels rather than channels a la carte.").

Plaintiffs' reading of Paragraph 17 betrays the weakness of their position, and confirms that their motion must be denied.

### 2.   Plaintiffs' Argument That Cablevision Promised Specific Channel Packages Is Wrong and Would Render Paragraph 17 Superfluous.

Plaintiffs also argue that "Cablevision sells specific bundled packages of channels as contained in a channel line-up," and that the October 2010 line-up "listed the Fox Channels." (Mot. at 11-12.)  This is wrong.  There is *no* provision in the TOS that requires Cablevision to provide any particular channel line-up, and this argument is foreclosed by Paragraph 17, which plainly states that "[a]ll programming . . . [is] subject to change[.]"  (Ex. 9 ¶ 17.)  For Plaintiffs' argument to be correct, Paragraph 17 would have to be superfluous.   But as this Court already said, "[i]t it settled that contracts should be interpreted in a way that avoids making any of their provisions superfluous."  *Cablevision*, 864 F. Supp. 2d at 263.   In an ironic twist, Plaintiffs' resort to extrinsic evidence in the form of Cablevision's channel line-up sheets to support this argument.[17]  Not only does that highlight that their argument is untethered to the TOS, even if such extrinsic evidence could be properly considered (which it cannot), the channel line-up sheets themselves make clear that all listed offerings are subject to change.[18]

Contrary to Plaintiffs' argument, the TOS are clear that Cablevision agrees to "provid[e] video programming and video-related services" (SOF ¶ 10) and does not promise to provide subscribers with any particular channels or group of channels, which is consistent with Paragraph 17.  This is why Cablevision routinely makes programming changes for any number of reasons without affecting subscriber fees or issuing credits.  (*Id.* ¶¶ 25-26.)  For example, Cablevision

---

[17] This is particularly so because Plaintiffs elsewhere chide Cablevision for purportedly "ask[ing] the Court to look outside the four corners of the contract." (Mot. at 10.)

[18] Shahmoon Aff., Ex. G (CSC000000796-797 at 796) ("***The listed programs, packages***, services, number of channels, content, format, rates and other aspects of Cablevision's service ***are its current offerings and are subject to change or discontinuance at any time*** in accordance with applicable law.").

13

added the National Geographic Wild channel to iO packages in April 2010, added the NFL Network to iO packages in August 2012, and removed the Wedding Central channel in July 2011, all without changing the subscriber fees.[19]   Plaintiffs' argument that Cablevision specifically promised to provide the Six Fox Channels is a fiction and provides no support for Plaintiffs' breach of contract claim.  *See Hammer*, 849 N.Y.S.2d at 729-30 (dismissing breach of contract and other claims arising from Cablevision's removal of TMC channel, and holding that "Plaintiff received everything he paid for" even though it was "not everything he had hoped for.").[20]

### 3.     Plaintiffs' Argument that Cablevision Did Not Remove The Fox Channels in Accordance with Applicable Law Under Paragraph 17 Is Unavailing.

Plaintiffs also argue that in removing the Fox Channels on October 16, 2010, Cablevision somehow did not do so "in accordance with applicable law," as required by Paragraph 17, and therefore owes credits under Paragraph 4.  (Mot. at 12 & n.9.)  Specifically, Plaintiffs contend that such a change would require "a 30-day advance notice to subscribers and regulators of a channel deletion" under the applicable regulations.  (Mot. at 12 & n.9.)  First, in making this argument, Plaintiffs concede that the Fox Blackout in fact ***would have been a*** "programming change" under Paragraph 17 but for the supposed fact that it failed to comply with applicable notice requirements.  The problem with Plaintiffs' argument is that, even if Cablevision failed to comply with applicable notice requirements (which it did not, see *infra* n.21), there is no basis to conclude that the Fox Blackout becomes subject to the credit requirement of Paragraph 4—

---

[19] *See* SOF ¶ 28.

[20] Plaintiffs' argument that it is somehow "illogical to suggest that subscribers who have paid the highest tier package for a channel package at the highest tier has not bought anything specific" (Mot. at 12) is also wrong.  The same TOS govern all subscribers, so there is no basis for Plaintiffs' attempted distinction between subscribers who bought the highest tier package and those who have not.  Moreover, as noted, Paragraph 2 obligates Cablevision to "provid[e] video programming" (Ex. 19 ¶ 2), not particular channels, and Paragraph 17 gives Cablevision the right to change its programming.  *See Hammer*, 849 N.Y.S.2d at 729.  If a subscriber is unhappy with Cablevision's programming he can cancel his service at any time without penalty.  (SOF ¶ 13.)

which is an entirely separate provision.  Nothing in the TOS suggests a mechanism whereby a programming change that was made without the proper regulatory notice under Paragraph 17 somehow becomes a "program or service interruption" under Paragraph 4, for which subscriber credits might be required.  To be sure, if Cablevision made a programming change but did so in manner that failed to comply with applicable notice requirements under Paragraph 17, Cablevision could conceivably be fined by a regulator for failing to make the required notice, or subscribers might try to bring a breach of contract action alleging a breach of ***Paragraph 17*'s** "applicable law" provision.  But that is ***not*** the case Plaintiffs filed, nor the damages they have sought.  Instead, they have based their case exclusively on an alleged breach of Paragraph 4, and indeed they contend that "TOS ¶ 17 is irrelevant[.]"  (Mot. at 2.)

Moreover, Plaintiffs' contention that Cablevision did not comply with the law in relation to the Fox Blackout is flat wrong, and is based on an egregious misreading of the regulations they cite.[21]  Accordingly, the argument that Cablevision owes credits under Paragraph 4 because it did not comply with legal notice requirements under Paragraph 17 is not only wrong as a matter of law, but concedes that Paragraph 17, and not Paragraph 4, applies here.

## II.   The Plain Language of Paragraph 4 Makes Clear that It Applies Only to Technical Outages and Not to a Programming Change Such as the Fox Blackout.

Plaintiffs offer little more than their own say-so in support of their contract interpretation: they focus myopically on the phrase "program or service interruption" in Paragraph 4 taken out

---

[21]  For instance, 16 N.Y.C.R.R. §890.80(a)(3)(i) requires a 30-day advance notice "if such change is ***within the control*** of the cable television company."  And C.G.S.A. §16-331k similarly requires a 30-day notice of "any ***planned*** programming or rate changes[.]"  But here, negotiations between Cablevision and Fox continued up until October 15, 2010.  It was unclear until the very last day (let alone 30 days in advance) whether Cablevision and Fox would reach a new agreement; the removal of the Fox channels certainly was not ***planned*** over thirty days in advance; and it was also not within Cablevision's sole control, since bi-lateral negotiations were ongoing.  (*See* SOF ¶¶ 45-46.)  In any event, as those negotiations continued, Cablevision did provide notice to subscribers as well as regulators of the possibility that Fox's position might result in the removal of the six Fox Channels from Cablevision's packages; and Cablevision also provided notice of removal after the negotiations were unsuccessful and the Fox Blackout began.  (*See id.* ¶¶ 46-47.)  We are unaware of any regulatory finding that Cablevision failed to comply with the law in this regard.

of context, and insist that by its plain English meaning, it embraces the Fox Blackout, and that this is how "[a] reasonable subscriber" would understand it.  (Mot. at 9.)  Plaintiffs' failure of proof is particularly notable given their burden in moving for summary judgment, and because the Court previously noted that the applicable TOS provisions are open to two competing interpretations.[22]  As noted, Plaintiffs also all but ignore Paragraph 17, even though the Court has already recognized that whether or not it applies is a "***key issue***."[23]  Plaintiffs' approach violates the basic tenet of contract interpretation that the contract "must be read as a whole in order to determine its purpose and intent," and "single clauses cannot be construed by taking them out of their context and giving them an interpretation apart from the contract of which they are a part." *Analisa Salon, Ltd. v. Elide Props., LLC*, 818 N.Y.S.2d 130, 131 (2d Dept. 2006).  Read as a whole, Paragraph 4 is clear on its face that it is limited to loss of service and outages arising from technical problems.  Paragraph 4—titled "Disruption of Service"—states:

> **Disruption of Service:**  In no event shall Cablevision be liable for any failure or interruption of program transmissions or service resulting in part or entirely from circumstances beyond Cablevision's reasonable control.  Subject to applicable law, credit will be given for qualifying outages.  In any event, if there is a known program or service interruption in excess of 24 consecutive hours (or in excess of such lesser time period pursuant to state law), Cablevision, upon prompt notification of such failure or interruption from Subscriber, will either provide Subscriber with a pro-rata credit relating to such failure or interruption or, at its discretion, in lieu of the credit provide alternative programming during any program interruption.  Cablevision shall not be liable for any incidental or consequential damages.

(Ex. 19 ¶ 4.)  Paragraph 4 uses terminology that refers to the technical ability of Cablevision to transmit cable signals throughout—referring, for instance, to "disruption of ***service***," "interruption of program ***transmissions***," and "***outages***."   The dictionary defines each of these

---

[22] *See Cablevision*, 864 F. Supp. 2d at 263 n.3 (acknowledging that "Paragraphs 4 and 17 may also be reconciled in the way Cablevision suggests.").  As detailed in Section I, however, the undisputed facts adduced since the Court's motion to dismiss decision show that there is in fact only one reasonable way to interpret these provisions.

[23] *Pearlman*, 2015 WL 9462104, at *11.

words in technical and/or mechanical terms. *See* Oxford English Dictionary (defining "service" as, *inter alia*, "the use that can be made of a machine"; defining "transmission" as, *inter alia*, "[t]he action or process of transmitting something or the state of being transmitted" and defining "outage" as "a period when a power supply or other service is not available or when equipment is closed down.").[24]  Given all these references to the technical aspect of signal transmission, a reasonable subscriber reading Paragraph 4 would understand that the credit provision applies only to technical problems and disruptions, and ***not*** to programming changes such as occur as a result of a contract dispute with a programmer.

In addition, the structure of Paragraph 4 shows that the phrase "failure or interruption of program," on which Plaintiffs rely, is a shorthand reference back to the plainly technical terms "interruption of program ***transmissions*** or ***service***" and "***outage***" used earlier in Paragraph 4. For example, in the opening sentence, Paragraph 4 refers to the "failure or interruption of program ***transmissions*** or ***service***."  The sentence that immediately follows uses the term "outage" as a synonym for that phrase, further reinforcing its technical nature.  That is, when Paragraph 4 says that "credit will be given for qualifying outages," "qualifying outages" are plainly a type of a "failure or interruption of program transmissions or service."  The rest of Paragraph 4 uses "program or service interruption" as a shorthand reference to the prior, longer phrase "failure or interruption of program transmissions or service."  This is reinforced in the third sentence—that begins with "[i]n any event," which is plainly a continuation of the discussion of instances when Cablevision may be held liable for failures or interruptions of

---

[24]    *Available at* http://www.oxforddictionaries.com/us/definition/american_english/service; http://www.oxforddictionaries.com/us/definition/american_english/outage;                                    and http://www.oxforddictionaries.com/us/definition/american_english/transmission (all last visited on May 4, 2016); *see also* Merriam-Webster, http://www.merriam-webster.com/dictionary/outage ("outage" is "a failure or interruption in use or functioning" or "a period of interruption especially of electric current"); http://www.merriam-webster.com/dictionary/transmission ("transmission" is "the act or process of sending electrical signals to a radio, television, computer, etc." or "something (such as a message or broadcast) that is transmitted to a radio, television, etc.").

"program **transmissions or service.**"   The reference in the third sentence to "**such** failure or interruption" likewise can only be a shorthand reference back to the longer definition that appears at the start of Paragraph 4.  And the reference in the third sentence to a "**known** program or service interruption" only makes sense if, again, it refers back to "failure or interruption of program transmissions or service" in the opening sentence of Paragraph 4.

Other parts of Paragraph 4 further confirm that credits are due only for certain technical disruptions, and that a reasonable subscriber reading this paragraph would understand it as such. The first sentence of Paragraph 4 states that Cablevision will not be liable for failure of service "resulting in part or entirely from circumstances beyond Cablevision's reasonable control."  This is a *force majeure* provision (as Plaintiffs concede (Mot. at 16)) which relates to events outside human control, such as storms and floods, which are only relevant because of their potential to disrupt or impact Cablevision's equipment, further confirming that the entire paragraph is addressing subscriber remedies for technical loss of service.   Similarly, the requirement that subscribers provide "prompt notification [to Cablevision] of such failure or interruption" before a credit may be due makes sense only if those failures or interruptions are due to physical problems with equipment that supports Cablevision's cable systems.   Unlike the loss of a channel due to a contract dispute—of which Cablevision would always necessarily be aware—in 2010, Cablevision would not always have been aware when physical problems with its equipment resulted in an interruption of program or service, which is precisely why Paragraph 4 has this notice requirement.  (SOF ¶ 42.)  So, too, the reference to a "**known** program or service interruption" only makes sense in the context of technical problems.  This reference would be nonsensical if Paragraph 4 applied to programming changes as occurred here, since those changes will necessarily always be "known" to Cablevision even without subscriber notice.

Cablevision's interpretation is further buttressed by the fact that whenever Paragraph 4 mentions credits, it also expressly refers to the background state law, which requires operators to provide credits for technical outages but not for programming changes. For instance, Paragraph 4 states that "*subject to applicable law*" credits will be given for "*qualifying* outages." Paragraph 4 thus explicitly refers to applicable law to define when an outage will be a "qualifying" outage for which credits will be paid. This only makes sense if it is understood to refer to the state law rules that require cable operators to pay subscriber credits for certain outages of a technical nature when the operator fails to restore service within a defined period of time. For example, in New York, a qualifying outage is defined as one involving the technical loss of an entire tier of service for in excess of four consecutive hours, and in New Jersey and Connecticut, it is a similar loss of service that lasts in excess of six consecutive hours.[25] In addition to the "qualifying outages" reference, Paragraph 4's language that Cablevision shall not be liable for disruptions "resulting in part or entirely from circumstances beyond Cablevision's reasonable control" likewise tracks language from these regulations.[26]

Paragraph 4 also provides that "[i]n any event" credits will be given for known interruptions in excess of "24 hours" or "in excess of such other time period *pursuant to state law*" if the customer notifies Cablevision of the problem. Again, this reference to state law makes sense only if Paragraph 4 is limited to technical problems, because state law provides for credits when technical problems lead to the loss of service for in excess of 24 hours.[27] The "24 hours" reference in Paragraph 4 plainly derives from and refers to these state law provisions

---

[25] *See supra*, n.4.

[26] *See* N.J. Admin. Code § 14:18-3.5(a)-(b) (requiring credits in the event, among other things, of an "outage" lasting six or more hours, unless restoration of service was not possible due to "factors beyond the reasonable control of the company").

[27] In fact, both New Jersey and Connecticut provide for subscriber credits in the event of a loss of an entire tier of service for in excess of 24 hours. *See supra* n. 4.

concerning technical outages.  Those regulations ***do not*** require companies to issue credits for changes to programming (*see* n.4), and there is no reason to read such a requirement into the TOS.[28]

Recognizing that Paragraph 4's references to these state laws and regulations are fatal to their "interpretation," Plaintiffs seek to exclude them from the Court's consideration, arguing that in pointing to state regulations, "Cablevision asks the Court to look outside the four corners of the contract" (Mot. at 10.)  This is plainly incorrect, because Paragraph 4 specifically refers to state law and regulations by referencing "applicable law" and "state law" in connection with the provision of credits, so looking to state law does not go beyond the contract; rather doing so is necessary to properly interpret Paragraph 4 by its own terms.  In addition, as this Court has already recognized, state law, regulations, and other industry evidence are properly considered in interpreting a disputed contractual provision.[29]

Cablevision raised all of these points in its March 16, 2016 pre-motion letter.  (Dkt. 184.)  Yet in their motion, Plaintiffs do not dispute that this terminology in Paragraph 4 refers to technical issues.  Indeed, Plaintiffs offer no response to this argument at all beyond asserting that "[t]he word 'technical' is nowhere found in [Paragraph 4]."  (Mot. at 10.)  That is undisputed and irrelevant.  The dispositive point is that the actual language in Paragraph 4 can only be understood as referring to various kinds of technical issues with transmission of signals to Cablevision subscribers.  Indeed, no reasonable subscriber would believe Paragraph 4 was

---

[28] Contrary to Plaintiffs' suggestion (Mot. at 10), Paragraph 4's grant of discretion to Cablevision to provide alternative programming in lieu of subscriber credits is completely consistent with the fact that Paragraph 4 is limited to outages of a technical nature and not programming changes.  This is because if a technical outage affected a single tier of service (such as the channels providing premium HBO programming), Cablevision may have had the technical ability to provide alternative programming to affected subscribers over other channels.  (*See* SOF ¶ 42-43.)

[29] *See Pearlman v. Cablevision Sys. Corp.*, 2015 WL 8481879, at *8 (E.D.N.Y. Dec. 8, 2015) (citing *Broder* and noting that Cablevision industry expert's "discussion of industry custom, practice, and terminology is relevant to the subject breach of contract claim."); *see also Broder*, 418 F.3d at 197; *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 617-18 (2d Cir. 2001).

intended to cover the Fox Blackout, which did not involve the disruption, failure, or interruption of cable service or program transmissions. To the contrary, Plaintiffs continued to enjoy Cablevision's cable TV service throughout the Fox Blackout, and continued to receive the scores of channels that were available other than the Six Fox Channels. (SOF ¶ 50.) There was no "failure or interruption" of Cablevision's program transmissions during that time; rather, it is undisputed that at all relevant times, Cablevision had the technical ability to transmit cable service, and in fact did so. (*See* SOF ¶¶ 50-55.) As such, the unavailability of the Six Fox Channels was a "change" in "programming" that falls under Paragraph 17.[30]

## III. Other Evidence Properly Before The Court Confirms That Plaintiffs' Contract Interpretation Must Be Rejected and that Cablevision's Is Correct.

### A. The Parties' Prior Dealing Further Confirms Cablevision's Interpretation.

Courts regularly look to evidence of the parties' course of dealing to help construe contract terms, even where (as here) those terms are clear, because the "parties' course of performance of a contract is relevant to understanding the contract even if the contract is unambiguous."[31] Indeed, "[t]he practical interpretation of a contract by the parties, manifested by their conduct subsequent to the formation for any considerable length of time before it becomes a subject of controversy, is entitled to *great, if not controlling weight* in the

---

[30] Plaintiffs also misapprehend Cablevision's argument by asserting that "even if Cablevision could articulate a basis for adding an unstated 'technical' limit into Paragraph 4, that would not be enough for it to avoid paying credits, because ambiguous contracts are to be construed against the drafter." (Mot. at 11.) To be clear, Paragraph 4 is *not* ambiguous as a matter of law, and Plaintiffs attempt to create ambiguity merely by offering an alternative interpretation does not change that result because "[t]he language of a contract is not made ambiguous simply because the parties urge different interpretations." *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992). To the contrary, its plain language unambiguously precludes the interpretation that Plaintiffs urge. And even if the TOS were ambiguous, that would mean that Plaintiffs are not entitled to summary judgment in any event. *See Topps Co., Inc.*, 526 F. 3d at 68.

[31] *United Fire & Cas. Co. v. Arkwright Mut. Ins. Co.*, 53 F. Supp. 2d 632, 640 (S.D.N.Y. 1999); *see also Auscape Int'l v. Nat'l Geographic Soc.*, 282 Fed. Appx. 890, 891 (2d Cir. 2008) ("There is no requirement that an agreement be ambiguous before evidence of a course of dealing can be shown."); *Wells Luck Co., Inc. v. F.C. Gerlach & Co., Inc.*, 421 F. Supp. 2d 533, 540 (E.D.N.Y. 2005) ("Unless otherwise agreed, a course of dealing between the parties gives meaning to or supplements or qualifies their agreement."); *N.Y. Marine and Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 119 (2d Cir. 2010) ("There is no surer way to find out the intent of the parties to a contract than to see what they have done.").

construction of the contract."[32]  There were two other occasions in 2010 alone when Cablevision did not provide certain channels due to expiration of programming agreements; in neither case did Cablevision provide credits to subscribers, and the named Plaintiffs (who were Cablevision subscribers at that time) did not call Cablevision to complain or demand credit or alternative programming.  (*See* SOF ¶¶ 31-36.)  Conversely, Cablevision in the past has issued credits or offered alternate programming for disruptions of a technical nature which are covered under Paragraph 4—and in fact issued such outage credits ***thousands*** of times in 2010 alone.  (SOF ¶¶ 42-43.)  Thus, the undisputed course of dealing refutes Plaintiffs' interpretation of Paragraph 4 and confirms Cablevision's reading.

### B.    Industry Custom Evidence Further Supports Cablevision's Interpretation.

Industry custom evidence is relevant in construing unambiguous contract language.  *See supra* n.29.  Here, the undisputed industry custom evidence is that neither Cablevision nor other cable operators issue credits for programming changes such as occurred in this case.  *See supra* at 4-5.  Moreover, no industry regulators ever asked Cablevision to issue subscriber credits either for the two pre-Fox programming blackouts in 2010 nor the Fox Blackout at issue here.  (SOF ¶¶ 37, 53.)  The TOS must be interpreted against this industry custom and practice, all of which refutes Plaintiffs' interpretation, and supports Cablevision's.

### IV.   Cablevision's Interpretation Gives Meaning to All Contract Terms and Does Not Render the TOS Illusory.

Plaintiffs heavily rely on the order on Cablevision's motion to dismiss, where the Court noted that under Cablevision's interpretation, "it has not really promised to provide anything and the contract is arguably illusory," because "[t]aken to its logical conclusion, Cablevision's position that it was not required to provide particular channels would mean that it was not

---

[32]  *Travellers Int'l AG v. Trans World Airlines, Inc.*, 722 F. Supp. 1087, 1102 (S.D.N.Y. 1989).

obligated to provide any channels[.]"  (Mot. at 12; *Cablevision*, 864 F. Supp. 2d at 263.)  But the Court also said in that same order that "[t]o be sure, Paragraphs 4 and 17 may also be reconciled in the way Cablevision suggests."  *Id.* at 263 n.4.  Plaintiffs ignore this altogether.

Interpreting Paragraph 17 to mean what it says—that Cablevision has the right to change its programming—does not render Paragraph 4 meaningless as Plaintiffs suggest (*see* Mot. at 2), because Paragraph 4 *still* obligates Cablevision to provide credit for qualifying service disruptions that it fails to remedy within time periods as defined by applicable law.  Indeed, that Cablevision's reading gives full effect to Paragraph 4 is demonstrated by the fact that Cablevision routinely issues credits when power outages, storms, equipment failure, accidents, and other similar events result in interruptions of service or program transmissions (provided that certain conditions such as disruption duration and customer notification are met)—and in 2010 alone, there were thousands of instances when Cablevision issued such outage credits to qualifying subscribers.  (SOF ¶ 43.)

Nor does Cablevision's interpretation of Paragraph 17 make the TOS illusory, for multiple reasons.  First, Cablevision is obligated by the TOS to "provid[e] video programming" to its subscribers.  (Ex. 19 ¶ 2.)  Cablevision could not simply stop providing all programming without implicating this separate contractual obligation.  And, if a given subscriber determines that she does not want to continue to receive the particular programming offered by Cablevision at the price at which it is offered, she retains at all times the ability to cancel her Cablevision service without any further financial obligation and a refund of any prepaid amounts.  (SOF ¶ 13.)

Moreover, the mere fact that Paragraph 17 gives Cablevision discretion to change programming does not make the TOS illusory.  To the contrary, it is well-settled that "[u]nder

New York law, a contract is ***not*** illusory merely because its terms give discretion to one party to the contract," because "every contract encompasses the implied duty of good faith and fair dealing." *Lebowitz v. Dow Jones & Co.*, 508 F. App'x 83, 84 (2d Cir. 2013); *see also Lebowitz v. Dow Jones & Co.*, 847 F. Supp. 2d 599, 604 (S.D.N.Y. 2012) (rejecting plaintiffs' argument that a subscriber agreement that "expressly permit[ted] Dow Jones to discontinue or change services . . . or their availability at any time . . . render[ed] it meaningless.").[33]

## V.     The Factual Record and The Court's Admission of Competing Expert Opinions on Damages Require Denial of the Summary Judgment Motion Regarding Damages.

In moving for summary judgment, Plaintiffs also seek a ruling "that each subscriber of a package is entitled to a pro rata credit in the same amount as every other subscriber of that same package," because Cablevision purportedly "charges subscribers a uniform amount within each plan of service."  (Mot. at 13.)  The incontrovertible evidence that subscribers paid different amounts for the same service (SOF ¶¶ 22-23) raises a material issue of fact that precludes summary judgment as to damages.  Moreover, this Court has already ruled that the competing expert damages testimony offered by the parties' respective damages experts, who employ very different calculations and methodologies, may be admitted, and has already ruled that "Plaintiffs' argument that the Terms of Service only provides for a 'pro rata credit' of the amounts actually paid by a subscriber' ***sets forth an issue to be determined at trial***[.]"[34]  These competing damages opinions necessarily mean that, even if liability could be resolved in Plaintiffs' favor on summary judgment—which it cannot, as demonstrated above—disputed fact issues exist with regard to damages.

---

[33] *See also, e.g.*, *Basset v. Electronic Arts*, 93 F. Supp. 3d 95, 106 (E.D.N.Y. 2015) (adopting magistrate judge's recommendation and ruling that the "provision was not invalid as illusory simply because EA had the unilateral right to modify the agreement.").

[34] *See Pearlman*, 2015 WL 9462104, at *9, *12.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' summary judgment motion.

Dated:   May 6, 2016

 */s/ Andrew M. Genser*

Joseph Serino, Jr., P.C.
Andrew M. Genser
Jonathan F. Putnam
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
joseph.serino@kirkland.com
agenser@kirkland.com
jputnam@kirkland.com

*Attorneys for Defendants Cablevision Systems
Corporation and CSC Holdings, LLC*

KE 41518994.2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 6, 2016, I served a true and correct copy of the foregoing on

counsel of record listed below via ECF:

Carol S. Shahmoon
CSS Legal Group PLLC
1010 Northern Blvd., Suite 208
Great Neck, NY  11021
cshahmoon@csslegalgroup.com

Todd J. Krouner
LAW OFFICE OF TODD J. KROUNER
93 North Greeley Avenue
Chappaque, NY  10514
tkrouner@krounerlaw.com

Ralph M. Stone
STONE BONNER & ROCCO LLP
145 West 45th Street, Suite 701
New York, New York  10036
rstone@lawssb.com

 */s/ Andrew M. Genser*
Andrew M. Genser

26

KE 41518994.2