UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re Cablevision Consumer Litigation**<br><br>--------------------------------------------------------<br><br>This Document Relates to:<br>All Actions | Master File No.<br>10-cv-4992 (JS) (AKT)<br><br>ECF CASE |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

KE 41955108.6

**TABLE OF CONTENTS**

**INTRODUCTION**......................................................................................................................1

**PROCEDURAL BACKGROUND** ..........................................................................................3

**FACTUAL BACKGROUND**..................................................................................................3

**SUMMARY JUDGMENT STANDARD** ................................................................................4

**ARGUMENT**............................................................................................................................5

**I.     CABLEVISION DID NOT BREACH PARAGRAPH 4 OF THE TOS.**......................5

**II.    PARAGRAPH 17 UNAMBIGUOUSLY COVERS THE FOX
         PROGRAMMING BLACKOUT.** ..................................................................................9

**III.   THE FACT THAT PLAINTIFFS' ALTERNATIVE INTERPRETATION
         CANNOT BE CORRECT FURTHER DEMONSTRATES THAT
         CABLEVISION'S INTERPRETATION MUST BE CORRECT.**..............................12

**CONCLUSION** ......................................................................................................................13

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Broder v. Cablevision Systems Corp.*,
   418 F.3d 187 (2d Cir. 2005)......................................................................................4, 9, 10, 11

*Hammer v. Cablevision of Boston, Inc.*,
   849 N.Y.S.2d 749 (Just. Ct. N.Y. 2007) ...........................................................................11, 12

*In re Cablevision Consumer Litig.*,
   864 F. Supp. 2d 258 (E.D.N.Y. 2012) ................................................................................9, 10

*In re Omnicom Group, Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010)......................................................................................................5

*Lebowitz v. Dow Jones & Co.*,
   508 F. App'x 83 (2d Cir. 2013) ........................................................................................10, 11

*Pearlman v. Cablevision Sys. Corp.*,
   2015 WL 9462104 (E.D.N.Y. Dec. 28, 2015) ........................................................................13

*Rothenberg v. Lincoln Farm Camp, Inc.*,
   755 F.2d 1017 (2d Cir. 1985)....................................................................................................9

*Why v. Nassau Health Care Corp.*,
   969 F. Supp. 2d 248 (E.D.N.Y. 2013) .....................................................................................4

# INTRODUCTION[1]

Cablevision hereby seeks a ruling on summary judgment dismissing with prejudice Plaintiffs' sole remaining claim for breach of contract in this case. Plaintiffs' contract claim tries to force a square peg into a round hole in the hopes of achieving an unwarranted pay day, but it is now clear that this effort is futile. The "square peg" is the fact that, due to a dispute with Fox over the terms of a license renewal, Cablevision was unable to provide six Fox Channels to its subscribers for a two-week period in October 2010. The "round hole" is Paragraph 4 of the Terms of Service ("TOS"), which addresses subscriber remedies for disruptions of service resulting from technical problems with the cable system. On the undisputed facts, it is now clear that the Fox programming blackout does not fit into Paragraph 4. Indeed, the parties agree that it was not a disruption resulting from a technical problem with the cable system.

In contrast, the "square peg" of the Fox programming blackout fits easily and comfortably into the "square hole" of Paragraph 17 of the TOS, which broadly provides that "[a]ll programming, program services, program packages, number of channels, channel allocations, broadcast channels, interactive services, e-mail, data offerings and other Services are subject to change in accordance with applicable law." That is exactly what the Fox programming blackout was—a change to the programming that was available on Cablevision's service for a two-week period under Paragraph 17. And the parties agree that no credits are due for a Paragraph 17 event. Consequently, the Fox programming blackout did not trigger any obligation on Cablevision to pay credits under Paragraph 4, and Cablevision did not breach the TOS by not doing so, as Plaintiffs allege.

---

[1] Unless otherwise noted, all emphasis has been added, and all citations, ellipses, alterations, and quotation marks have been omitted. As used herein, "SOF" refers to Defendants' Local Rule 56.1 Statement in Support of Motion for Summary Judgment filed herewith. References to "Ex. __" are to exhibits to the February 16, 2016 Declaration of Andrew M. Genser in Support of Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment, filed herewith.

1

As shown below, Cablevision's reading of Paragraph 4 is compelled by the plain language of Paragraph 4 read as a whole; the parties' prior course of dealing; and the evidence of industry custom and practice in this case. It is also compelled by the fact that it is the only reading that gives reasonable, effective meaning to both Paragraph 4 and Paragraph 17 and to all other contract terms. Indeed, it is now clear that of the two readings that the Court identified in its ruling on Cablevision's motion to dismiss as being plausible ways to reconcile these two paragraphs, only Cablevision's can be correct. And, under clear Second Circuit precedent, Cablevision's reading does not render the TOS illusory.

Cablevision's reading is also confirmed because the only alternative proposed by Plaintiffs is not only entirely untethered to the actual contract language, it is absurd and cannot be correct. Plaintiffs offer a tortured argument that Paragraph 4 provides for credits for *temporary* programming blackouts (despite the fact that Paragraph 4 says nothing of the sort) and that Paragraph 17 allows Cablevision to change its programming only by *permanently* deleting channels from its "channel line-up" (again despite the fact that Paragraph 17 says nothing of the sort). Not only does this argument fly in the face of the plain language of Paragraphs 4 and 17, it leads to a patently absurd result, in which a reasonable subscriber would have to believe that, for no discernible reason, Cablevision unilaterally decided to give itself the greater power to permanently delete channels without incurring any credit obligation, but denied itself the lesser power of making temporary changes on a cost-free basis. It should come as no surprise that in the service of this nonsensical reading of the TOS, Plaintiffs urge the Court to ignore Paragraph 17 and to make no effort to reconcile Paragraphs 4 and 17, in violation of settled rules of contract construction. That Plaintiffs take such extreme and unsupportable positions only highlights the failure of their contract argument. Cablevision's motion should be granted.

## PROCEDURAL BACKGROUND

The procedural background to this motion is set forth in Cablevision's Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment (the "Opposition Brief" or "Opp. Br.") at 2-3.  Cablevision is mindful of the Court's instruction that Defendants' summary judgment brief should "consist[] of arguments not previously raised in opposition to plaintiffs' motion." (Dkt. 200.) To comply with that directive and to preserve the record and its summary judgment arguments, Cablevision hereby incorporates by reference all of the points and arguments made in its Opposition Brief and, even though Cablevision does not repeat and may not refer to all of them in the body of this memorandum, it hereby makes all of those arguments and points in support of this motion for summary judgment.

The only additional procedural point we note here is that Cablevision is making this motion at its first opportunity, consistent with the Court's required pre-motion process.[2]

## FACTUAL BACKGROUND

The factual background for Cablevision's motion is set forth in its Opposition Brief at 3-4, and in Cablevision's Rule 56.1 Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment, submitted herewith.  There are, however, a handful of uncontested facts that are particularly material to this motion.

<u>First</u>, the unavailability of six Fox Channels for two weeks in this case (the "Programming Blackout of the Six Fox Channels" or the "Fox Programming Blackout") resulted from a carriage dispute between Cablevision and Fox, and not a service outage or problem with programming transmissions.  (SOF ¶¶ 42, 47.)  <u>Second</u>, the governing contract at

---

[2] The Court's rules required Cablevision to first serve its Rule 56.1 Statement of Undisputed Material Facts, submit a pre-motion letter, and participate in a pre-motion conference (Seybert, J. Individual Rules § IV.F) before it could make a summary judgment motion, which is why Cablevision was unable to cross-move when it submitted its opposition to Plaintiffs' renewal of their prior motion for partial summary judgment.

3

issue is the TOS, a true and correct copy of which is attached as Exhibit 19 to the Declaration of Andrew M. Genser in Support of Cablevision's Motion for Summary Judgment.  (SOF ¶ 3, Ex. 19 (TOS).)   <u>Third</u>, Plaintiffs agree that Paragraph 17 permits Cablevision to change programming at any time for any reason (in accordance with applicable law), and does not limit it to making changes only when required to do so by changes in the law**.**  (SOF ¶ 23; Dkt. 186 at 2 (citing *Broder v. Cablevision Sys. Corp.,* 418 F.3d 187 (2d Cir. 2005).)  <u>Fourth</u>, in prior programming blackouts due to carriage disputes, at a time when these same Plaintiffs were Cablevision subscribers under the same TOS, Cablevision did not pay credits or otherwise treat those occurrences as Paragraph 4 events, and Plaintiffs did not seek or claim such credits.  (*Id.* ¶¶ 24-30.)  <u>Fifth</u>, Cablevision has provided thousands of Paragraph 4 credits when storms, power failures and equipment problems result in service outages, although at the time, in 2010, it would not have always known when such outages occur, and Cablevision sometimes has the technical ability to provide alternative programming during such outages.  (*Id.* ¶¶ 36-37.)  <u>Sixth</u>, the witness testimony in this case is uncontroverted that there is no industry precedent for a cable operator providing credits due to a programming blackout, and that no regulator has ever required Cablevision (or any other cable operator) to do so.  (*Id.* ¶¶ 31-35, 51.)

## SUMMARY JUDGMENT STANDARD

The legal standard applicable to this summary judgment motion is set forth in Cablevision's Opposition Brief at 7-8.  In addition, to defeat Cablevision's summary judgment motion, Plaintiffs "must present more than a scintilla of evidence or some metaphysical doubt as to the material facts."  *Why v. Nassau Health Care Corp.*, 969 F. Supp. 2d 248, 253 (E.D.N.Y. 2013).  That is, they must present "evidence . . . such that a reasonable jury could return a verdict for [Plaintiffs]."  *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010).

4

# ARGUMENT

## I.     Cablevision Did Not Breach Paragraph 4 of the TOS.

The plain language of Paragraph 4, read as a whole, confirms that it is limited to disruptions of cable service of a technical nature (in other words, outages as that term is used both in common parlance and in state cable regulations), and that it did not apply to the Fox Programing Blackout.  Accordingly, Cablevision had no obligation to pay credits under it.  The wording of Paragraph 4 is undisputed, and provides that:

> **Disruption of Service:**  In no event shall Cablevision be liable for any failure or interruption of program transmissions or service resulting in part or entirely from circumstances beyond Cablevision's reasonable control.  Subject to applicable law, credit will be given for qualifying outages.  In any event, if there is a known program or service interruption in excess of 24 consecutive hours (or in excess of such lesser time period pursuant to state law), Cablevision, upon prompt notification of such failure or interruption from Subscriber, will either provide Subscriber with a pro-rata credit relating to such failure or interruption or, at its discretion, in lieu of the credit provide alternative programming during any program interruption.  Cablevision shall not be liable for any incidental or consequential damages.

(Ex. 19 ¶ 4.)  The first two sentences provide that: "**Disruption of <u>Service</u>:**  In no event shall Cablevision be liable for any failure or interruption of program <u>transmissions</u> or <u>service</u> resulting in part or entirely from circumstances beyond Cablevision's reasonable control.  Subject to applicable law, credit will be given for qualifying <u>outages</u>" (emphases added).  The dictionary definition of the words "service," "transmissions" and "outages" that appear in the first two sentences all have a technical, mechanical connotation, and their use, in the context of these two sentences, makes clear that these sentences refer to disruptions that affect Cablevision's technical ability to transmit cable signal, and that they do not embrace a programming change resulting from a contract dispute (or other business decision), such as the Fox Blackout. (*See also* Opp. Br. at 16-17.)  This is reinforced by the fact that the word "outages" in the second sentence is used as a synonym for the term "failure or interruption of program transmissions or service" in the first

5

sentence. The word "outage" is commonly used (in both ordinary parlance and in state regulations in the cable industry) to refer to the loss of service due to an impairment of a transmission system. (*See also id.*) Read together, the first sentence establishes a general principle that Cablevision will not pay credits for technical service disruptions that are beyond its reasonable control, while the second sentence confirms that, nonetheless, Cablevision will pay credits for technical service disruptions that are "*qualifying* outages" under applicable law.[3]

The third sentence of Paragraph 4—the round hole into which Plaintiffs try to force their square peg—provides that:

> In any event, if there is a known program or service interruption in excess of 24 consecutive hours (or in excess of such lesser time period pursuant to state law), Cablevision, upon prompt notification of such failure or interruption from Subscriber, will either provide Subscriber with a pro-rata credit relating to such failure or interruption or, at its discretion, in lieu of the credit provide alternative programming during any program interruption.

(Ex. 19 ¶ 4.) Read in the context of Paragraph 4 as a whole, this sentence can be read only as referring to technical disruptions of the cable service and not programming changes as occurred during the Fox Programming Blackout. <u>First</u>, read in context, this sentence plainly continues the discussion of the different circumstances in which Cablevision will pay credits for technical service disruptions that was begun in the first two sentences, and defines another circumstance when credits may be paid, namely when the disruption is "known" to Cablevision and lasts "in excess of 24 consecutive hours (or in excess of such lesser time period pursuant to state law"). It is clear that the phrase "program or service interruption" in the third sentence is used synonymously with the prior phrases "failure or interruption of program transmissions or

---

[3] Although there are some variations between the laws in New York and New Jersey, where Cablevision operates, both define qualifying outages for which a cable operator must pay credits as a loss of all channels in a tier of service for a defined minimum period of time (six hours in New Jersey and four hours in New York) that was within the reasonable ability of the operator to repair. (*See* Opp. Br. at 6 & n.4.) Connecticut uses a similar definition. *See id.*

6

service" and "outage" in the first two sentences of Paragraph 4, and is referring to the same thing: a disruption of service of a technical nature. It is not introducing an entirely new category of event, such as a programming change due to a contract dispute. (*See also* Opp. Br. at 15-16.)[4]

Second, this reading is also supported by common sense. It stands to reason that Paragraph 4, captioned "Disruption of Service," addresses one issue throughout: the various circumstances in which a technical disruption of service (*i.e.,* a service outage) will give rise to subscriber remedies such as a credit. It makes no sense at all to suppose that Paragraph 4 would be mixing up very different issues like disruptions from technical problems affecting the cable system, on the one hand, and programming changes that arise from carriage disputes or other business reasons, as occurred in this case, on the other. A reasonable subscriber[5] would (and should) understand that these two classes of events involve different underlying causes (*i.e.*, storms, power outages and equipment failures, on the one hand, and business decisions and negotiations with programmers, on the other); have very different implications for Cablevision and subscribers (*i.e.*, the need for subscribers to notify Cablevision of the service disruption so Cablevision can make system repairs, on the one hand, and Cablevision's need to have editorial discretion over its content, on the other hand), and are subject to very different regulatory regimes (*i.e.,* regulations that require operators to pay credits for outages, on the one hand, and to provide subscribers with notice for certain programming changes, on the other). A reasonable subscriber would likewise expect and understand that Cablevision's approach to subscriber remedies for those two classes of events would be very different, given their different natures,

---

[4] The portion of the third sentence that permits Cablevision, in its discretion, to provide alternative programming in lieu of credits is fully consistent with and reinforces this plain language reading, because Cablevision may have the technical ability to provide alternate programming in the event of a technical service disruption—as, for example, if the HBO premium service tier experienced such a disruption, Cablevision might be able to activate Showtime for affected subscribers until HBO service was repaired. (SOF ¶ 36, Ex. 17 ¶ 7.)

[5] In this context, a reasonable subscriber means "a reasonably intelligent person who has examined the context of the entire integrated agreement and is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *See Broder*, 418 F.3d at 197 (ellipsis omitted).

7

and would not be lumped together and treated the same way in one short paragraph. When that reasonable subscriber reads Paragraph 17, which provides that "[a]ll programming … is subject to change in accordance with applicable law" (Ex. 19 ¶ 17), that subscriber would understand that the TOS does in fact deal with service outages and programming changes separately, with the former addressed by Paragraph 4 and the latter by Paragraph 17.

<u>Finally</u>, Cablevision's reading is compelled by other aspects of Paragraph 4. For example, the very sentence of Paragraph 4 on which Plaintiffs rely states that only "known" interruptions are eligible for a credit and requires the subscriber to notify Cablevision of the problem to receive a credit. These knowledge and notification requirements show that Paragraph 4 was drafted to address service disruptions of a technical nature, given that at the time such problems, *e.g.*, a fallen tree severing a cable line, would not necessarily be "known" by Cablevision unless it was notified by a subscriber, whereas Cablevision would always know of programming changes. Similarly, Paragraph 4's multiple references to state laws requiring credit for service disruptions *of a technical nature* (such as the reference to "qualifying outages" and to an "interruption in excess of 24 consecutive hours (or in excess of such lesser time period pursuant to state law)"), show conclusively that Cablevision's interpretation is correct and foreclose Plaintiffs' interpretation. (*See also* Opp. Br. at 19-20.) In addition, the prior course of dealing between the parties (in which Cablevision did not pay credits for prior programming blackouts involving the same Plaintiffs and the same TOS, but did pay them for technical service disruptions) and industry custom (in which the testimony is uncontroverted that cable operators do not pay credits for programming blackouts, nor do regulators expect them to do so)—both of which are properly consulted in construing an unambiguous agreement—also show conclusively that Paragraph 4 does not cover the Fox Programming Blackout. (*See* Opp. Br. at 21-22.)

8

## II. Paragraph 17 Unambiguously Covers the Fox Programming Blackout.

When construing an unambiguous contract, a court should take care to give effect to the entire contract and to avoid an interpretation that would render superfluous any part of the parties' agreement. *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985); *In re Cablevision Consumer Litig.*, 864 F. Supp. 2d 258, 263 (E.D.N.Y. 2012). Here, Paragraph 17 makes clear that Cablevision did not owe subscriber credits due to the Fox Programming Blackout and, accordingly, did not breach Paragraph 4 by failing to pay such credits.

Paragraph 17 of the TOS expressly informs subscribers that "[a]ll programming, program services, program packages, number of channels, channel allocations, broadcast channels, interactive services, e-mail, data offerings and other Services are subject to change in accordance with applicable law." (Ex. 19 ¶ 17.) This is the TOS provision that deals with the Fox Programming Blackout, not Paragraph 4, because the Fox Programming Blackout was at minimum a "change" in "programming," "program services," "program packages," and/or "number of channels." (*See also* Opp. Br. at 11-12.)

At one point in this case, there was a question as to whether the phrase "in accordance with applicable law" in Paragraph 17 meant that Cablevision could only make programming changes when changes to the law required it to do so. *See In re Cablevision*, 864 F. Supp. 2d at 263. There is no longer any question about this, because Plaintiffs have since conceded that Cablevision is free to make any change described in Paragraph 17, as long as it complies with applicable regulations concerning subscriber notice. (SOF ¶ 23; Dkt. 186 at 2 (citing *Broder*, 418 F.3d at 187).) And the case law is in accord, as the Second Circuit has ruled that the phrase "subject to change in accordance with applicable law" in Cablevision's TOS does not limit Cablevision to changes that are required by changes in the law. *Broder*, 418 F.3d at 197. In

9

light of this, of the two interpretations that the Court identified as plausible in ruling on Cablevision's motion to dismiss, it is now clear that only Cablevision's can be correct. (*See* Opp. Br. at 9-10.)

Paragraph 17 thus clearly applies to the Fox Programming Blackout. Paragraph 17 unambiguously provides that Cablevision's programming may change at any time and for any reason in accordance with applicable law. That is exactly what happened here. Due to a contract dispute with Fox, Cablevision's programming changed when the six Fox Channels became unavailable. And, this change was "in accordance with applicable law." Cablevision did not violate any "must carry" rules (which mandate that cable operators carry certain channels) in relation to the Fox Programming Blackout; Cablevision complied with all applicable regulations concerning subscriber notice in handling that change (*see* Opp. Br. at 15 & n.21); and no regulator has found that Cablevision failed to do so. The Fox Programming Blackout was thus a Paragraph 17 event for which no credits are owed.[6]

While the Court previously questioned at the motion to dismiss stage whether Cablevision's interpretation of Paragraph 17 might render Paragraph 4 meaningless and the TOS as a whole illusory (*see In re Cablevision*, 864 F. Supp. 2d at 263-64), it is now clear that this is not the case under Cablevision's interpretation. First of all, in Paragraph 2 of the TOS Cablevision expressly promises to "provid[e] video programming" to subscribers (Ex. 19 ¶ 2), so Cablevision could not simply cancel all channels without implicating that obligation. Moreover, the facts and holding in *Lebowitz v. Dow Jones & Co.*, 508 F. App'x 83 (2d Cir. 2013) are

---

[6] Even if Cablevision had failed to comply with regulations concerning advance notice to subscribers in relation to the Fox Programming Blackout (which it did not), Cablevision would not owe credits under Paragraph 4. This is because there is nothing in the TOS that suggests that a programming change under Paragraph 17 becomes subject to Paragraph 4 if Cablevision does not make the change in accordance with applicable law. If that ever occurred (and it did not occur here) then affected subscribers might have a claim for breach of Paragraph 17, but not Paragraph 4, which is the only claim Plaintiffs assert here.

directly on point and show that the TOS are not illusory under Cablevision's interpretation. In that case, appellee Dow Jones removed one of only two online newspapers that it provided under a pre-paid online subscription service, under a contract provision that gave it the right to "discontinue or change the Services, or their availability to you, at any time." *Id.* at *84. Lebowitz argued that Dow Jones' contractual discretion to remove that content made the contract illusory, but both the District Court and the Court of Appeals rejected that argument, on grounds that Dow Jones was still subject to the implied duty of good faith and fair dealing. *Id.* Just as in *Lebowitz*, Cablevision's discretion to change or remove programming does not render the TOS illusory, because, like Dow Jones, Cablevision is still subject to the duty of good faith and fair dealing. *See id.*

In fact, by enforcing Cablevision's TOS in other contexts, the Second Circuit and other courts have implicitly found that the TOS are not illusory, even when they interpret the operative contract language to afford Cablevision discretion to make changes that affect subscribers. For example, as noted previously, in *Broder*, 418 F.3d at 197, the Second Circuit interpreted a contract provision in which Cablevision's rates for installation and programming were "subject to change in accordance with applicable law" to mean that Cablevision could change its rates at any time, for any reason, and the court did not find that Cablevision's unilateral discretion in this regard rendered the contract illusory. *Id.* Similarly, the court in *Hammer v. Cablevision of Boston, Inc.*, 849 N.Y.S.2d 749, 750-51 (Just. Ct. N.Y. 2007) interpreted another similar Cablevision TOS provision—which authorized "Cablevision to change its programming and pricing in accordance with applicable law"—to mean that Cablevision is free to change its programming at any time for any reason and that it has <u>not</u> promised its subscribers any particular channel line-up, and the court did not find that this discretion rendered the TOS

11

illusory. *See id.* at 750-51 (rejecting the claim that Cablevision's removal of a channel from one of its packages breached the TOS, and stating that plaintiff "received everything he paid for" even though it was "not everything he had hoped for.")[7]

### III. The Fact That Plaintiffs' Alternative Interpretation Cannot Be Correct Further Demonstrates that Cablevision's Interpretation Must Be Correct.

Having abandoned the only alternative to Cablevision's interpretation that the Court identified as "plausible" in its ruling on the motion to dismiss, Plaintiffs are now peddling a new, outlandish interpretation, under which they claim Paragraph 17 restricts Cablevision to making only "permanent" changes to Cablevision's "channel line-ups," while Paragraph 4 covers "temporary" changes to programming, such as the Fox Programming Blackout here. (*See* Dkt. 186 at 2-3.) This argument completely fails because nothing in the TOS supports the existence of this invented distinction, and to the contrary, Paragraph 17 makes clear that Cablevision may change far more than its "channel line-ups" (which term does not even appear in that paragraph). Indeed, by its plain language, under Paragraph 17 all "programming," "program services," "program packages," and/or "number of channels," among other things, are subject to change in accordance with applicable law. (*See* Ex. 19 ¶ 17; *see also* Opp. Br. at 11). In fact, Plaintiffs seem to recognize that the plain language of Paragraph 17 is fatal to their argument, because they take the incredible position that Paragraph 17 is simply not relevant at all: in their opposition to Cablevision's pre-motion letter, Plaintiffs assert—rather remarkably—that "TOS ¶ 17 has no relevance to this case," that "[t]here is no need to reconcile TOS ¶ 17 and TOS ¶ 4," and that "[o]nly TOS ¶ 4 is at issue here." (Dkt. 186 at 2-3.) The fact that Plaintiffs would take the extreme step of urging the Court to ignore the basic rule of contract construction by which courts

---

[7] In addition, Cablevision's subscribers can cancel their service at any time, without any financial penalty, and will be refunded any amounts for service after the date of cancelation that they had pre-paid. (SOF ¶¶ 4, 52.) As a result, subscribers are never in a position where they must pay something in exchange for nothing (as in an illusory contract). Rather, if they are not happy with Cablevision's television service, they can cancel at any time and get any pre-paid amounts returned to them.

12

are to read a disputed contract as a whole and give reasonable effect to all its provisions—and do so in spite of the fact that the Court has already held that "a ***key issue*** in this breach of contract action is whether the unavailability of the Fox Channels falls under the purview of Paragraph Four or Paragraph Seventeen," *Pearlman v. Cablevision Sys. Corp.*, 2015 WL 9462104, at *11 (E.D.N.Y. Dec. 28, 2015)—shows the abject failure of their interpretation.

In addition, it comes as no surprise that Plaintiffs' unsupported interpretation leads to an unreasonable result, and must be rejected for that reason. It is unreasonable to suggest that Cablevision gave itself the unfettered power in Paragraph 17 to make "permanent" changes to programming without incurring the costs associated with providing subscriber credits, but denied itself the lesser power of making "temporary" programming changes on a cost-free basis. And so, Plaintiffs' absurd interpretation must also be rejected. (*See also* Opp. Br. at 12-13).

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants summary judgment and dismiss with prejudice Plaintiffs' sole remaining claim for breach of contract.

Dated: June 13, 2016

                                                     /s/ Andrew M. Genser

                                                  Joseph Serino, Jr., P.C.
                                                  Andrew M. Genser
                                                  Jonathan F. Putnam
                                                  KIRKLAND & ELLIS LLP
                                                  601 Lexington Avenue
                                                  New York, New York 10022
                                                  Telephone:    (212) 446-4800
                                                  Facsimile:     (212) 446-4900
                                                  joseph.serino@kirkland.com
                                                  agenser@kirkland.com
                                                  jputnam@kirkland.com

                                                  *Attorneys for Defendants Cablevision Systems Corporation and CSC Holdings, LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 13, 2016, I served a true and correct copy of the foregoing on counsel of record listed below via ECF:

Carol S. Shahmoon
CSS Legal Group PLLC
1010 Northern Blvd., Suite 208
Great Neck, NY 11021
cshahmoon@csslegalgroup.com

Ralph M. Stone
STONE BONNER & ROCCO LLP
145 West 45th Street, Suite 701
New York, New York 10036
rstone@lawssb.com

Todd J. Krouner
LAW OFFICE OF TODD J. KROUNER
93 North Greeley Avenue
Chappaqua, NY 10514
tkrouner@krounerlaw.com

 */s/ Andrew M. Genser*
Andrew M. Genser