**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re Cablevision Consumer Litigation** | Master File No. |
| | 10-cv-4992 (JS) (AKT) |
| ----------------------------------------------------- | |
| | ECF CASE |
| This Document Relates to: | Electronically Filed |
| All Actions | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**<u>MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................... ii

I.      PRELIMINARY STATEMENT ................................................................. 1

II.     FACTUAL AND PROCEDURAL BACKGROUND......................................... 1

        A.      Nature and Stage of the Proceedings ................................................. 1

        B.      Summary of Claims and Defenses ...................................................... 4

        C.      The Settlement ............................................................................... 7

        D.      The Notice Plan............................................................................. 10

        E.      Class Member Reaction .................................................................. 10

III.    ARGUMENT ......................................................................................... 11

        A.      The Legal Standard ....................................................................... 11

        B.      The Settlement is Fair and Adequate ................................................ 12

                1.      The settlement is procedurally fair ........................................ 12

                2.      The settlement is substantively fair........................................ 13

                        i.       The complexity, expense and likely duration of litigation ........... 14

                        ii.      The reaction of the class to the settlement .................................. 15

                        iii.     The stage of the proceedings....................................................... 16

                        iv.      The risks of establishing liability and damages ........................... 17

                        v.       The risks of maintaining class action status through trial............. 18

                        vi.      The ability of the defendant to withstand a greater judgment ...... 19

                        vii.     The range of reasonableness in light of the best possible
                                 recovery and all the attendant risks of litigation........................... 20

IV.     CONCLUSION...................................................................................... 22

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                                          **Page**

*Babcock v. C. Tech Collections, Inc.*,
    No. 14-CV-3124, 2017 U.S. Dist. LEXIS 44548 (E.D.N.Y. Mar. 27, 2017) .................. 12

*Banyai v. Mazur*,
    No. 00 Civ. 9806, 2007 U.S. Dist. LEXIS 22342 (S.D.N.Y. Mar. 27, 2007) .................. 17

*Bezdek v. Vibram USA, Inc.*,
    809 F.3d 78 (1st Cir. 2015) ........................................................................................... 19

*Brazil v. Dole Packaged Foods, LLC*,
    No. 12-CV-01831, 2014 U.S. Dist. 157575 (N.D. Cal. Nov. 6, 2014) ........................... 19

*Charron v. Pinnacle Grp. N.Y. LLC*,
    874 F. Supp. 2d 179 (S.D.N.Y. 2012) .......................................................................... 19

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974) ......................................................................................... 13

*D'Amato v. Deutsche Bank*,
    236 F.3d 78 (2d Cir. 2001) ........................................................................................... 12

*Dupler v. Costco Wholesale Corp.*,
    705 F. Supp. 2d 231 (E.D.N.Y. 2010) .......................................................................... 14

*Elkind v. Revlon Consumer Prods. Corp.*,
    No. CV 14-2484, 2017 U.S. Dist. LEXIS 24512 (E.D.N.Y. Feb. 17, 2017) .................. 12

*Gen Tel. Co. of the Sw. v. Falcon*,
    457 U.S. 147 (1982) ..................................................................................................... 18

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    MDL No. 1775, 2015 U.S. Dist. LEXIS 138479 (E.D.N.Y. Oct. 9, 2015) ..................... 14

*In re Cablevision Consumer Litig.*,
    No. 10-CV-4992, 2014 U.S. Dist. LEXIS 44983 (E.D.N.Y. Mar. 31, 2014) .................. 13

*In re Citigroup Inc. Sec. Litig.*,
    965 F. Supp. 2d 369 (S.D.N.Y. 2013) .......................................................................... 20

*In re Penthouse Exec. Club Comp. Litig.*,
    No. 10 Civ. 1145, 2013 U.S. Dist. LEXIS 63065 (S.D.N.Y. Apr. 29, 2013) .................. 12

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    163 F.R.D. 200 (S.D.N.Y. 1995) ................................................................................. 12

*In re Sinus Buster Prods. Consumer Litig.*,
    No. 12-CV-2429, 2014 WL 5819921 (E.D.N.Y. Nov. 10, 2014)..................................... 19

*In re Visa Check/Mastermoney Antitrust Litig.*,
    297 F. Supp. 2d 503 (E.D.N.Y. 2003) ............................................................................ 12

*Manley v. Midan Rest., Inc.*,
    No. 14 Civ. 1693, 2016 U.S. Dist. LEXIS 43571 (S.D.N.Y. Mar. 30, 2016)................... 14

*McReynolds v. Richards-Cantave*,
    588 F.3d 790 (2d Cir. 2009)........................................................................................... 13

*Meredith Corp. v. SESAC, LLC*,
    87 F. Supp. 3d 650 (S.D.N.Y. 2015)........................................................................ 14, 17

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972)........................................................................................... 20

*Viafara v. MCIZ Corp.*,
    No. 12 Civ. 7452, 2014 WL 1777438 (S.D.N.Y. May 1, 2014)....................................... 19

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005)............................................................................... 11, 13, 20

*Willix v. Healthfirst, Inc.*,
    No. 07-cv-1143, 2011 U.S. Dist. LEXIS 21102 (E.D.N.Y. Feb 18, 2011) ...................... 17

*Zeltser v. Merrill Lynch & Co.*,
    No. 13 Civ. 1531, 2014 U.S. Dist. LEXIS 135635 (S.D.N.Y. Sept. 23, 2014) ............... 17

## I.    PRELIMINARY STATEMENT

On January 8, 2018, the Court granted Plaintiffs' unopposed motion for preliminary approval of the class action settlement (the "Settlement") with Defendants Cablevision Systems Corporation and CSC Holdings LLC, (collectively "Cablevision" or the "Defendants").   The Settlement affords substantial value to class members automatically without the need for the submission of claim forms, and eliminates the risks, costs and delays that would be incurred if there were no settlement.  Through vigorous efforts, Plaintiffs have achieved a settlement that is fair, reasonable and adequate, and they respectfully request that the Court grant final approval.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    <u>Nature and Stage of the Proceedings</u>

The Action was originally filed on October 29, 2010 by certain of the named Plaintiffs, alleging that, as subscribers of Cablevision's services, they suffered a "program or service interruption" with respect to certain channels owned by News Corp. ("Fox Channels"), in connection with a contract dispute between Cablevision and News Corp. for two weeks in October 2010.  A number of similar cases were filed, which were consolidated on February 1, 2011.  A consolidated amended class action complaint was then filed, and after Defendants' motion to dismiss, only the claim for breach of contract remained.  The second consolidated amended complaint, asserting the breach of contract claim, was filed on April 16, 2012.  On October 10, 2012, Plaintiffs filed a motion for class certification, and on December 3, 2012, Plaintiffs filed a motion for partial summary judgment, seeking a determination that: (i) Cablevision's failure to provide a pro rata credit in connection with the interruption of the Fox Channels between October 16, 2010 and October 30, 2010 constituted a breach of contract; and (ii) Cablevision is obligated to provide a *pro rata* credit to each subscriber, based on the

1

applicable package of channels purchased by that subscriber. *See* Joint Declaration Todd J. Krouner, Carol S. Shahmoon and Ralph M. Stone in Support of Final Approval of Settlement filed herewith ("Joint Decl.") ¶¶11-15.

On March 31, 2014, the Court granted Plaintiffs' motion for class certification, certifying the following class (the "Litigation Class") under Fed. R. Civ. P. 23(b)(3):

> All individuals who contracted with Cablevision prior to October 16, 2010, to receive cable television service on or after October 16, 2010.  Excluded from the Class are Cablevision's officers, directors, legal representatives, heirs, successors, and assigns; and any judicial officer assigned to this case and his or her immediate family.

*See* ECF 108, Memorandum & Order at 42-43 (Mar. 31, 2014).  The motion for partial summary judgment was denied without prejudice with leave to renew after notice of class certification was given to class members and an opt-out period elapsed. *Id*.

The form of the class notice was approved by the Court on June 4, 2014. ECF 117.  The method of distribution and publication of the notice was approved by the Court on October 7, 2014. ECF 146.  Plaintiffs sought to amend the class notice by letter filed on November 3, 2014, which was approved by the Court on November 12, 2014. ECF 162.  Plaintiffs thereafter informed the Court on March 2, 2015 that the time for class members to opt out of the class action had expired on February 27, 2015. *See* Joint Decl. ¶ 34.

Plaintiffs renewed their motion for partial summary judgment on March 31, 2016 (after the opt-out period had expired), and Cablevision cross-moved for summary judgment on June 13, 2016. ECF 187; ECF 205.  At that point, the parties had completed expert discovery, and each side made certain motions to strike experts, which were granted in part and denied in part by the Court on November 30, 2015 and December 28, 2015. ECF 178; ECF 179.  On September 15, 2016, the parties filed a Joint Pre-Trial Order with the Court. ECF 214.  Pursuant to the Joint

Pre-Trial Order, the parties expected to call twelve fact witnesses, and one expert on each side with respect to damages. They sought a trial before a jury and anticipated the need for seven trial days.

On September 19, 2016, the Parties jointly advised the Court that they agreed to attempt to resolve the action through private mediation [ECF 215], and as a result, on September 20, 2016, the Court denied both parties' motions for summary judgment without prejudice and with leave to re-file. Joint Decl. ¶ 21. The parties participated in several in-person mediation sessions and telephonic discussions with the Honorable Richard Holwell (Ret.) during the period November 2016 through March 2017. Joint Decl. ¶ 22. As a result of that mediation process and following extensive arms'-length negotiations, the parties entered into the Class Action Settlement Agreement ("Settlement Agreement"), filed with the Court on July 6, 2017 [ECF 228]. *Id.*

Plaintiffs filed an unopposed motion for preliminary approval of the Settlement and approval of a notice plan with the Court on July 6, 2017. ECF 228, 229. On December 12, 2017 the Court held a status conference, and thereafter on December 21, 2017, the parties consented to proceed before U.S. Magistrate Judge A. Kathleen Tomlinson to conduct the settlement approval proceedings, which was ordered by the Court. ECF 238, 241, 242. The Court issued the Preliminary Approval Order on January 8, 2018, providing for a final approval hearing to be held on May 17, 2018 to determine whether the proposed settlement should be finally approved by the Court, whether to issue the final judgment as proposed in the settlement agreement, and whether to approve the attorneys' fee award to class counsel as set forth in the agreement. ECF 243. The Preliminary Approval Order also set forth the briefing schedule, as well as a timetable and procedure for providing the settlement class notice and a chance to opt out. *Id.*

B.      **Summary of Claims and Defenses**

This is a breach of contract case.  The question is whether the failure to deliver WNYW

a/k/a Fox 5, WWOR a/k/a the My9 Channel, WTXF a/k/a Fox 29, Fox Business Network,

National Geographic Wild and Fox Deportes (the "Fox Channels")[1] during the period from

October 16, 2010 to October 30, 2010 was a breach of Cablevision's Terms of Service at the

time, and if so the amount of damages owed to subscribers in that time period.  Plaintiffs sought

to obtain relief pursuant to Paragraph 4 of the applicable Terms of Service (the "Contract"),

which stated:

> Disruption of Service: In no event shall Cablevision be liable for any failure or
> interruption of program transmissions or service resulting in part or entirely from
> circumstances beyond Cablevision's reasonable control. Subject to applicable
> law, credit will be given for qualifying outages. In any event, if there is a known
> program or service interruption in excess of 24 consecutive hours (or in excess of
> such lesser time period pursuant to state law), Cablevision, upon prompt
> notification of such failure or interruption from Subscriber, will either provide
> Subscriber with a pro-rata credit relating to such failure or interruption or, at its
> discretion, in lieu of the credit provide alternative programming during any
> program interruption. Cablevision shall not be liable for any incidental or
> consequential damages.

*Exhibit B of Declaration of Thomas H. Golden dated March 11, 2011* [ECF 34-5]

Plaintiffs asserted that pro rata credits were owed to subscribers under this provision

because there was a "program or service interruption in excess of 24 consecutive hours" and

because no "alternative programming" had been provided to subscribers.

Cablevision, however, asserted that Paragraph 17 of the Contract was controlling.  That

provision provided:  "Programming: All programming, program services, program packages,

number of channels, channel allocations, broadcast channels, interactive services, e-mail, data

---

[1] Fox 5 and My9 were broadcast channels, also available "over the air" by antenna and were included
in all of Cablevision's subscriber packages. Fox 5 was the most popular of the undelivered channels at
the time.  The other channels were cable channels and were included in Cablevision's higher tiers of
service known as "iO packages." Joint Decl. ¶43

4

offerings and other Services are subject to change in accordance with applicable law." Cablevision asserted that it had made a "programming change" during the two-week period in October 2010 and that it was not obligated to deliver the Fox Channels during that period. Moreover, Cablevision asserted that it was not permitted, pursuant to applicable law, to distribute and/or re-transmit the Fox Channels during that period because it had no longer had a contract with News Corp. that gave Cablevision the right to do so.  Plaintiffs' response was that Paragraph 17 only applied to a programming change made "in accordance with applicable law," and that based on the complex regulations of each of the states in which Cablevision operated, the Fox Blackout was not such a programming change.

Cablevision disagreed that Paragraph 4 of the Contract was relevant to these facts; it asserted that Paragraph 4 was applicable only to interruptions caused by a mechanical or technical problem, which was not the case here.  Under Cablevision's interpretation, there was no contract breach and therefore no entitlement to relief.  These questions as to the applications of Paragraph 4 and Paragraph 17 of the Terms of Service were the subject of the summary judgment motions filed by the parties.

The parties also disputed the question of how damages should be calculated, if Plaintiffs prevailed on the liability question.  Paragraph 4 called for Cablevision to provide, at its option, "alternative programming" or a "pro rata credit."  Plaintiffs argued that the term "pro rata credit" should be interpreted to be reversal of charges paid by the customer for the period at issue (*i.e.*, half the month of October).  Defendants asserted that the loss of value was de minimis and that a reversal of charges would create a windfall benefit to plaintiffs, due to the large number of channels that continued to be available during the two-week period. *See* Joint Decl. ¶ 35, 41.  In addition, Cablevision argued that Class members were not harmed by its failure to deliver Fox 5,

5

the most popular of the undelivered channels, because it continued to be available "over the air" by antenna during the period.

The parties enlisted experts on the damage calculation.  Plaintiffs' expert, Todd G. Buccholz, supported plaintiffs' theory that reversing subscriber charges was an appropriate method for calculating the pro rata credit.  Mr. Buccholz's calculation was dependent on the tier purchased by the subscriber; for example, subscribers of the "Broadcast Basic" tier, charged on average $16.58 per month for the 37 channels in that tier, would be credited $8.29 for the interruption of the two Fox Channels in that tier–Fox 5 and My9.  Mr. Buccholz's aggressive theory resulted in the following per subscriber damages:  $8.29 for subscribers in the "Broadcast Basic" tier; $14.27 for subscribers of "Broadcast Basic +iO"; $27.98 for subscribers of "Family Cable"; $33.95 for subscribers of "Family Cable +iO"; $39.98 for subscribers of "iO Silver"; $49.98 for subscribers of "iO Gold."  The iO Silver and iO Gold tiers did not contain any additional interrupted Fox Channels beyond what was included in the lower tiers.  Thus, Mr. Buccholz offered a second theory, identical to the first theory, but which set damages at $33.95 for the iO  Silver and iO Gold (*i.e.*, the same amount as the next lowest tier, Family Cable +iO).

Cablevision's expert, Mr. Orszag, also a well-respected economist, responded that Mr. Buccholz's calculation created an unreasonable windfall to Class members because only a handful of channels were not delivered during the period at issue.  Cablevision delivered the vast majority of channels in the service plans, which Cablevision asserted were valuable to subscribers, but not accounted for in Mr. Buccholz's damage calculation.  Mr. Orszag had two alternative theories for calculating the pro rata credit amount, both of which sought to isolate the value of the Fox Channels to subscribers.   One method used the proportionate cost to Cablevision of licensing the undelivered Fox Channels as compared to the cost of licensing all

the channels in the packages in that period.  The second method used the proportionate share by number of channels of the undelivered Fox Channels out of the total number of channels in the packages in that period.  Under both of Mr. Orszag's methods, damages to Class members would amount to per subscriber damages of 5-6 cents per day or 78 – 90 cents for the two weeks ($2.7 million in total damages to all Class members for the two weeks).

### C.   The Settlement

The Settlement confers significant benefits (the "Class Benefit") upon members of the Settlement Class,[2] in accordance with their membership in one of three Settlement Subclasses. The Settlement Subclasses are based on whether the Settlement Class member, as of 60 days after final approval of the Settlement, (1) is a current video subscriber with access to Cablevision's Video on Demand ("Group A"), or (2) is a current subscriber who does not subscribe to video services that provide access to Video on Demand ("Group B"), or (3) is a former Cablevision subscriber ("Group C"). Settlement Agreement at ¶ 3.[3]  Each member of the Settlement Class will fall into one of the Settlement Subclasses. Joint Decl. ¶ 23.

As more particularly described in paragraph 9 of the Settlement Agreement, each of the Settlement Subclasses will be provided with benefits automatically as follows:

> A.  Group A Class Members will receive the right to watch two standard or high
>
> definition library catalog movies for free during a 60-day period starting 60
>
> days after the Court has issued a final approval of the Settlement (the "Final

---

[2] The Settlement Class consists of the Litigation Class certified by this Court on March 31, 2014, excluding any class members who have opted out of the litigation as of March 2, 2015, and any class members who opt out of this Settlement in accordance with the Opt-Out Procedure described in Paragraph 8 of the Settlement Agreement.  The Settlement Agreement has been filed with this Court at ECF 228 (July 6, 2017).

[3] Due to logistical issues involving differences in customers' billing cycles, Cablevision needed 60 days after final approval rather than 30 days to provide advance notice to all customers.  ECF 244, Letter from R. Stone to Court (Mar. 6, 2018).  This slight change was made pursuant to section 34 of the Settlement Agreement and paragraph 15 of the Preliminary Approval Order [ECF 243].

Approval Order") (a value of $2.95 or $3.95 per movie, depending on the movie selected by the Class Member);

B.  Group B Class Members will receive one month of Cablevision's Service Protection (a retail value of $6.99), which covers subscribers from unexpected service fees, such as a home visit relating to wiring, jacks or connectors, at no charge, starting on the first day of the month following 60 days after the Final Approval Order; and,

C.  Group C will receive two Wi-Fi day passes (a retail value of $4.99 per pass), which may be used at any of more than 1.5 million Cablevision/Optimum public hotspots within a 120-day period starting 60 days after the Final Approval Order, and which will be freely transferable.

*See* Settlement Agreement at ¶ 9; ECF 244.

These Class benefits will be provided automatically to Class Members without the need for a Class Member to submit a claim under the settlement or any other type of form, and without having to pay any consideration to or make any purchases of any kind from Cablevision to obtain the Class Benefit. Settlement Agreement at ¶ 10.

To further ensure that the Class Benefit is utilized by Class Members, the Settlement Agreement requires Cablevision to undertake a messaging campaign following Final Approval tailored to each Subclass. Group A Class Members will be notified by Cablevision of their right to view the two movies through appropriate messaging in the regular bills of such Class members, beginning at least one month prior to the beginning of the 60-day period during which the free movies are available, and for each of the two months of that 60-day period. The messaging will explain that the Group A Class Member will receive a charge and offsetting

credit on his or her next monthly bill for each of the two eligible movies selected by the Class member. Settlement Agreement at ¶ 9(a).

Similarly, Cablevision will notify Group B Class Members of the Service Protection benefit through messaging in regular bills prior to the beginning of the month of free Service Protection.  Each Group B Class Member who already receives Service Protection shall receive a one-time credit for one month of Service Protection.   When the month of free service is complete, the services being delivered to those who were not already subscribers to it shall terminate, subject to the ability of that subscriber to elect affirmatively to continue it (pursuant to Cablevision's usual charges). Settlement Agreement at ¶ 9(b).

The benefits to Group C Class Members will be delivered to them automatically. Cablevision will provide the technical means for accessing the Wi-Fi Day Passes (through activation codes, web-links, or similar means) via email to the Group C Class Member's last-known email contact information.  In addition, Cablevision is required to provide publication notice of the Wi-Fi Day Pass benefit in the New York Times, Newsday, Star-Ledger, Home News, New Haven Register, Stamford Advocate, and Gannett Journal News during the one month prior to issuance of the Wi-Fi Day Passes.  Also, access to the Wi-Fi Day Passes will be available through Cablevision's website for Group Class C Members upon verifying their eligibility. Settlement Agreement at ¶ 9(c).

The Settlement Agreement requires Cablevision to pay the reasonable costs of notice to the Class of the Settlement and of administering the benefits to Class Members, including providing notice of the availability of the benefits following final approval. Settlement Agreement at ¶ 11.  Under no circumstances will Class Members be required to submit a claim

form or pay any consideration or make any purchase of any kind to obtain the benefits. Settlement Agreement at ¶ 10.

In exchange for these benefits, Settlement Class Members agree to dismiss the litigation and to release Cablevision and its affiliates from claims (other than claims to enforce the terms of the Agreement), "involving, based on, relating to, arising out of, or in any way connected with, directly or indirectly, the factual allegations in the consolidated amended class action complaint filed in this action on February 22, 2011, including without limitation the non-carriage of the six Fox Channels for two weeks in October 2010, at any time from the beginning of such non-carriage in October 2010 through the date of the Final Approval Order." Settlement Agreement at ¶ 16(b); ¶ 16(a)(ii).

### D. The Notice Plan

A comprehensive notice plan was implemented to apprise Class Members of the terms of the Settlement and opt-out procedure. Settlement Agreement at ¶ 4.  The Settlement Agreement provided that the Settlement Notice in the form approved by the Court would be disseminated to Class Members who would be bound by the Settlement via inserts in Cablevision's monthly bills to its current subscribers who routinely receive bills via regular mail, via email through a PDF attachment to subscribers who routinely receive bills electronically, and via publication of an advertisement (in the form and newspapers approved by the Court) giving notice of the Settlement. Settlement Agreement ¶ 4; Joint Decl. ¶¶ 34, 47.

### E. Class Member Reaction

Notice of the proposed Settlement, the opportunity to opt out or object, and the final approval hearing was sent to Class members as of set forth in ¶ 47 of the Joint Declaration. Because the Class benefits are to be provided automatically to Class members, there is no need

for them to file a claim form or indicate that they wish to participate in the Settlement.  Class members may object to, or opt out from the Settlement until April 23, 2018.  To date, however, the reaction has been generally favorable.  The notice was distributed widely, but so far there has been only one objection filed on behalf of three Class members (to which Class counsel will reply on May 4, 2018, in accordance with the Preliminary Approval Order).  The number of people who have excluded themselves from the Class in response to the Settlement notice to date is 18. Joint Decl. ¶ 48.  Although Class members are not required to opt in to the settlement, a number of them have contacted Class counsel to indicate their favorable reaction to the Settlement and their interest in obtaining the Settlement benefits. Joint Decl. ¶ 49.  One Class member who emailed Class counsel to indicate he wants to participate in the Settlement also indicated that he would have preferred cash in lieu of the Wi-Fi passes.  However, the applicable Terms of Service upon which the claims were based does not require Cablevision to provide cash for an interruption, but only "alternative programming" or a "credit," in Cablevision's discretion. *Id*.

## III.  ARGUMENT

### A.  <u>The Legal Standard</u>

Under Fed. R. Civ. P. 23(e), any "settlement, voluntary dismissal or compromise" of a class action is subject to judicial review and approval.  The court reviews a class action settlement to assess whether it is "fair, adequate, and reasonable, and not a product of collusion." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96, 116 (2d Cir. 2005) (citations omitted).  In making the determination, the court examines both the settlement's terms and negotiating process to consider whether the settlement is both procedurally fair and substantively fair. *Wal-Mart Stores,* 396 at 116.  "It is well established that there is an overriding public interest in

settling and quieting litigation, and this is particularly true in class actions." *In re Prudential Sec. Inc. Ltd. P'ships Litig.,* 163 F.R.D. 200, 209 (S.D.N.Y. 1995) (citations omitted)*; In re Visa Check/Mastermoney Antitrust Litig.,* 297 F. Supp. 2d 503, 509 (E.D.N.Y. 2003) (judicial policy strongly favors settlement of class action lawsuits).

      **B.**     **The Settlement is Fair and Adequate**

        **1.**     **The settlement is procedurally fair**

      There is a presumption that the settlement is fair, adequate and reasonable when the settlement arises from arms'-length negotiations after meaningful discovery has concluded. *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001); *Babcock v. C. Tech Collections, Inc*., No. 14-CV-3124, 2017 U.S. Dist. LEXIS 44548, at *11 (E.D.N.Y. Mar. 27, 2017). Also, the involvement of a court-appointed mediator "helps to ensure that the proceedings were free of collusion and undue pressure." *D'Amato*, 236 F.3d at 85; *Elkind v. Revlon Consumer Prods. Corp.,* No. CV 14-2484, 2017 U.S. Dist. LEXIS 24512, at *48 (E.D.N.Y. Feb. 17, 2017) (citations omitted); *In re Penthouse Exec. Club Comp. Litig.*, No. 10 Civ. 1145, 2013 U.S. Dist. LEXIS 63065, at *8 (S.D.N.Y. Apr. 29, 2013) ("A settlement ... reached with the help of third-party neutrals enjoys a presumption that the settlement achieved meets the requirements of due process.").

      This Settlement was achieved as a result of several adversarial in-person mediation sessions and telephonic discussions conducted by a retired federal judge, the Honorable Richard Holwell (Ret.), over many hours in November 2016 through March 2017. *See* Letter from Judge Holwell, Ex. 1 to Joint Decl. ¶ 22 (settlement proceeded at arms'-length, in good faith and involved hard and tenacious bargaining on both sides and achieved a settlement valued at $28.4 million). The Settlement was reached at a stage in the litigation when Plaintiffs' counsel was

fully-versed in the strengths and weaknesses of Plaintiffs' claims.  By the time this Settlement was reached, Plaintiffs' counsel had completed fact and expert discovery and the Court had resolved issues of the scope of permissible expert testimony.  Thus, Plaintiffs had conducted an extensive investigation into the facts of this action, thoroughly researched law pertinent to Plaintiffs' claims and Cablevision's defenses, reviewed more than 350,000 pages of documents, and participated in several depositions. Joint Decl. ¶ 53.  Also, this Court has previously reviewed the qualifications and experience of Plaintiffs' counsel and found Plaintiffs' counsel capable to represent the Class. *In re Cablevision Consumer Litig.,* No. 10-CV-4992, 2014 U.S. Dist. LEXIS 44983, at *27 (E.D.N.Y. Mar. 31, 2014).  Accordingly, the Settlement, which was "reached in arm's length negotiations between experienced, capable counsel after meaningful discovery," is procedurally and presumptively fair. *McReynolds v. Richards-Cantave*, 588 F.3d 790, 803 (2d Cir. 2009) (internal quotation marks and citation omitted).

### 2.     The settlement is substantively fair

Substantive fairness involves a review of nine factors first enumerated in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974):  "(1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." *Wal-Mart*, 396 F.3d at 116 (*citing Grinnell*); *see, e.g., In re Air Cargo Shipping Servs. Antitrust Litig.*, No.

MDL No. 1775, 2015 U.S. Dist. LEXIS 138479, at *137 (E.D.N.Y. Oct. 9, 2015).  Pursuant to the *Grinnell* factors discussed below, the settlement is substantively fair and should be approved.

<b>i. The complexity, expense and likely duration of litigation</b>

"The greater the 'complexity, expense and likely duration of the litigation,' the stronger the basis for approving a settlement." *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 663 (S.D.N.Y. 2015).  Consumer class action lawsuits such as this action are complex, expensive, and lengthy. *See, e.g., Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 239 (E.D.N.Y. 2010); *see also Manley v. Midan Rest., Inc.*, No. 14 Civ. 1693, 2016 U.S. Dist. LEXIS 43571, at *23 (S.D.N.Y. Mar. 30, 2016) ("Most class actions are inherently complex[.]").

This factor weighs in favor of settlement approval.  The case involves complex contract interpretation questions, as to whether the claim was covered by Paragraph 4 or Paragraph 17 of the Terms of Service; factual questions about whether the two-week period at issue was an "interruption" or a "programming change"; and an application of law to facts with respect to the contract term "pro rata credit."  While summary judgment motions were pending on both sides at the time the settlement was reached, it was likely that some or all of those questions would have to be addressed at trial.  In addition, the question of damages (not a subject of the pending summary judgment motions) was complex.  To resolve it, experts were engaged on both sides.  Defendants' expert disagreed with Plaintiffs' expert and concluded, by applying complex economic theory, that damages to each class member would not exceed 78 - 90 cents (or 5-6 cents per day).  Plaintiffs moved to strike Cablevision's damages expert on various grounds, but that motion was denied, leaving the issue of whether the complex economic theory was credible or rational to be assessed by a jury at trial, after the presentation of live testimony and cross-examination. Joint Decl. ¶ 18, 44.

Thus, in the absence of a finally approved settlement, the parties would have had to expend significant amounts of money and time to litigate this case through trial to resolve those complex questions of liability and damages.   Further, a judgment could be appealed after summary judgment or trial, making final resolution of this action a further potentially lengthy road.   The Settlement provides an immediate and definite recovery, while eliminating the significant risk and delay if the case were to go through trial and appeal.   Thus, this factor strongly weighs in favor of final approval.

### ii.      The reaction of the class to the settlement

To date, the Class reaction has been generally favorable.   As to each Subclass, the Settlement benefit was highly negotiated by Plaintiffs' counsel to ensure that the benefit would be valuable to that Subclass and automatically distributed and available, which in turn required a contract commitment from Cablevision to ensure that the proper messaging would be given to members of each Subclass.   Thus, Class members need to submit forms or otherwise make a claim or redemption to obtain the benefits.   Nor must Class members make any purchase, and in the case of Group C Class Members, there is no need for them to take any action to disengage the services being provided after the month of free service elapses.

In response to the Settlement notice, to date, only 18 individuals opted out, and one objection was filed on behalf of three Class members (Class counsel's reply will be filed on May 4, 2018, per the Preliminary Approval Order).   And while Class members were not required to "opt in" or take other action to remain in the Class, still a number of individuals affirmatively contacted Plaintiffs' counsel to indicate their interest in receiving the settlement benefits.   One Class member who emailed Class counsel to indicate he wants to participate in the Settlement also indicated that he would have preferred cash in lieu of the Wi-Fi passes.   However, the

applicable Terms of Service upon which the claims were based does not require Cablevision to provide cash for an interruption, but only "alternative programming" or a "credit," in Cablevision's discretion.

Accordingly, the generally positive reaction of Class members to the settlement favors final approval by the Court.

### iii.    The stage of the proceedings

This settlement was reached after nearly seven years of hard-fought litigation, which included significant discovery and motion practice.  In particular, the claim survived a motion to dismiss; and formed the basis of a class certification motion, which was granted.  The parties engaged in significant discovery.  Cablevision produced over 350,000 pages; and both sides undertook extensive depositions.  Joint Decl. ¶¶ 52, 53.  Plaintiffs' counsel deposed Cablevision's top executives–the Chief Operating Officer (who was employed at another company at the time of the deposition); Senior Vice President of Programming; Senior Vice President of Government and Public Affairs; Vice President of Video Product Management; and Vice President of Media Relations.  Plaintiffs' counsel also defended depositions of the large number of named Plaintiffs.  In addition, each of the parties enlisted two experts–an industry expert and a damages expert. *See* Joint Decl. ¶¶ 3, 18. 44.  Three of the four experts were deposed and filed opening and rebuttal reports.  After motions to strike were filed by both sides, the industry experts were stricken from the case, on the grounds that their opinions would usurp the role of the judge and the trier of fact.  The damages experts, however, remained in the case to present their theories at trial.  The parties prepared and filed their Joint Pre-Trial Order along with exhibits, which indicated the parties' designations, objections and cross-designations of deposition testimony, and the parties' exhibits to be offered in support of their case, with

16

objections by the other party.  Each side also submitted a motion for partial summary judgment on liability, which have been denied without prejudice, after the settlement was reached. Joint Decl. ¶¶ 21.

Thus, there is no question that at the time of settlement, the parties possessed "adequate information about their claims," such that counsel had a record sufficient to evaluate the claims and defenses asserted and their value for settlement purposes. *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 663 (S.D.N.Y. 2015) (citations and internal quotations omitted).  Because of the mature stage of the proceedings here, this factor weighs strongly in favor of settlement.

### iv.     The risks of establishing liability and damages

"Litigation inherently involves risks." *Willix v. Healthfirst, Inc*., No. 07-cv-1143, 2011 U.S. Dist. LEXIS 21102, at *11 (E.D.N.Y. Feb 18, 2011).  "[I]f settlement has any purpose at all, it is to avoid a trial on the merits because of the uncertainty of the outcome." *Banyai v. Mazur*, No. 00 Civ. 9806, 2007 U.S. Dist. 22342, at *29 (S.D.N.Y. Mar. 27, 2007); *accord Zeltser v. Merrill Lynch & Co*., No. 13 Civ. 1531, 2014 U.S. Dist. LEXIS 135635, at *14 (S.D.N.Y. Sept. 23, 2014).  Should this matter proceed to trial, or should the cross-motions for summary judgment which were *sub judice* at the time of settlement be decided, Plaintiffs will face significant risks in establishing liability and damages, and their claims will be vigorously disputed by Cablevision.

First, Cablevision has insisted that the Terms of Service do not permit subscribers any sort of claim under this circumstance, *i.e*., when channels become unavailable due to a dispute between Cablevision and its service provider.  Cablevision has asserted that in the industry the unavailability of channels due to a cable company's failure to reach contract terms with its

17

programming provider is not an "interruption" under the Terms of Service, but a "programming change" for which no credit would be due.

In addition, there are particularly large risks associated with proving damages in this case. Cablevision contends, based on its economic expert (a prominent economist whom the Court refused to strike pursuant to Plaintiffs' *Daubert* motion), that damages were either minimal or nonexistent. Moreover, Cablevision contends that only a tiny fraction of the channels in the programming packages offered to subscribers were unavailable, and as a result, damages on a proportional basis (78 – 90 cents) would be far less than the retail value of the services being provided in settlement (over $8). Ultimately, it is Plaintiffs' burden to prove damages, which is a significant hurdle and would come down to a battle of the experts about intangible value, which entails significant risk. By contrast, the benefit being provided by the Settlement would be delivered to each and every Class member at a value vastly exceeding the amount that was calculated to be "damages" by Cablevision's economic expert. Importantly, the Settlement provides program and service benefits that are analogous to, and in the same currency as, the program and services on which the claim was based; furthermore, "alternative programming" was a remedy that was available to Cablevision under the contract.

For these reasons, the risks of establishing liability and damages strongly support final approval of this Settlement.

### v. The risks of maintaining class action status through trial

On March 31, 2014, the Court granted Plaintiffs' Motion for Class Certification under Fed. R. Civ. P. 23(b)(3). A Court's class certification ruling, however, is not set in stone; courts occasionally decertify class cases based on additional facts or changes in law. *Gen Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the judge

remains free to modify it in the light of subsequent developments in the litigation."); *see also Brazil v. Dole Packaged Foods, LLC*, No. 12-CV-01831, 2014 U.S. Dist. 157575, at *10 (N.D. Cal. Nov. 6, 2014) (decertifying Fed. R. Civ. P 23(b)(3) class in consumer fraud case). Defendants continue to dispute Plaintiffs' damage theory for calculating a pro rata credit and have argued that each subscriber places a different value on the interrupted services, creating the potential for individual issues. While Plaintiffs believe that Defendants would not be successful in seeking to de-certify the class, nevertheless there is a risk that the class could be de-certified, which weighs in favor of approving this Settlement.

### vi. The ability of the defendant to withstand a greater judgment

It is more important that the Settlement Class receive some relief than the possibility of "yet more" relief. *See Charron v. Pinnacle Grp. N.Y. LLC*, 874 F. Supp. 2d 179, 201 (S.D.N.Y. 2012); *see also Bezdek v. Vibram USA, Inc*., 809 F.3d 78, 83 (1st Cir. 2015) ("The fact that a better deal for class members is imaginable does not mean that such a deal would have been attainable in these negotiations, or that the deal that was actually obtained is not within the range of reasonable outcomes."). Furthermore, "[c]ourts have recognized that a [defendant's] ability to pay is much less important than the other *Grinnell* factors, especially where the other factors weigh in favor of approving the settlement." *In re Sinus Buster Prods. Consumer Litig*., No. 12-CV-2429, 2014 WL 5819921, at *11 (E.D.N.Y. Nov. 10, 2014). A "defendant's ability to withstand a greater judgment, standing alone, does not suggest that the settlement is unfair." *Viafara v. MCIZ Corp*., No. 12 Civ. 7452, 2014 WL 1777438, at *7 (S.D.N.Y. May 1, 2014). For these reasons, this factor appears neutral.

       **vii.    The range of reasonableness in light of the best possible recovery and all the attendant risks of litigation**

The Second Circuit has recognized that "[t]here is a range of reasonableness with respect to a settlement–a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Wal-Mart Stores, Inc.*, 396 F.3d at 119 (*quoting Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)). Courts in this Circuit have explained that the question for the court is whether the settlement "represents a *reasonable* one in light of the many uncertainties the class faces," *not* whether the settlement represents the highest recovery possible. *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 384 (S.D.N.Y. 2013) (emphasis added).

Here, the Settlement, which provides significant value to members of the Settlement Class, is reasonable in light of the uncertainties the class faces prevailing at trial and beyond. Moreover, as described above relating to the risks of establishing damages, substantial questions remain concerning what–if any–damages could ever be obtained should the case proceed to trial. The value of the recovery here is substantial, because it can be calculated based on retail market prices charged by Cablevision; because all subscribers will be able to obtain the benefit without submitting claim forms or paying any additional price; and because the benefit has been devised and tailored to the situation of the members of each Subclass.

The value of the Settlement is substantial in relation to what could be expected to be awarded after a trial and appeal process. While Plaintiffs' expert Mr. Buccholz approached the damages issue by looking at tier prices, resulting in per subscriber damages ranging from $8.29 - $33.95,[4] defendants' expert, Mr. Orszag, asserted that Mr. Buccholz's approach creates a

---

    [4] Under a more aggressive theory, iO Gold and iO Silver subscribers, who paid for higher tiers of service, could be credited for their full package price − $39.98 and $49.98. However, those higher tier prices did not correspond to any additional interrupted channels.

windfall to Class members.  Within each tier, most channels were delivered – six channels altogether were interrupted; some Class members had packages that contained only two of the interrupted channels.  Mr. Orszag purported to account for the value of the vast number of channels that were in fact delivered to Class members through calculations resulting in per subscriber damages of 78 – 90 cents.  Thus, plaintiffs faced a significant risk that if a jury adopted Mr. Orszag's methods, damages would be insignificant, especially as compared to the $8.29 average value achieved by Settlement.  Moreover, Defendants' argument that Fox 5, the most popular of the undelivered channels, continued to be available to subscribers "over the air" with an antenna, might have been a basis for a jury to conclude that there were no damages resulting from the incident.  Also, even if the jury would have accepted Mr. Buccholz's damage calculation, Cablevision would have appealed, and could have been successful in arguing that recovery was an impermissible windfall as a matter of law.

The retail value of the Settlement benefit is substantial even as compared to Mr. Buccholz's calculations.  The $8.29 average average value being delivered to each Class member in the Settlement correlates to Mr. Buccholz's lowest tier damages (*i.e*., for "Broadcast Basic"), which is the entry-level tier for a subscriber to obtain Fox 5.  As Fox 5 was the most popular of the Fox Channels that were not delivered, it could be argued that the subscriber price for Broadcast Basic is an important value measurement for the whole Class.  Also, while the Settlement benefit is not being distributed to Class members in the form of cash, there is the risk as a legal matter that Class members would not even be entitled to a cash recovery under the contract, which provides that Cablevision may remedy an "interruption" by providing "alternative programming" or, at Cablevision's option, a "pro rata credit."  The Video on Demand, Service Plan, and Wi-Fi passes to be distributed to Class members under the Settlement

Agreement are, thus, closely aligned with, the type of remedy called for under the Terms of Service.

Importantly, the total value of the recovery in this case of $28.4 million (plus attorneys' fees, which if approved by the Court, would be paid separately and in additional to the benefits) is more than ten times the $2.7 million total damage calculation offered by Cablevision's expert. Accordingly, this factor supports final approval.

## IV.    CONCLUSION

For the foregoing reasons, the proposed Settlement is fair, reasonable and adequate and should be approved by the Court.

Dated:  April 9, 2018                                          Respectfully submitted,

**STONE BONNER & ROCCO LLP**                     **LAW OFFICE OF TODD J. KROUNER, P.C.**

By:   /s/  Ralph M. Stone                                    By:   /s/  Todd J. Krouner
  Ralph M. Stone                                           Todd J. Krouner
  (rstone@lawssb.com)                                      (tkrouner@krounerlaw.com)
1700 Broadway, 41st Floor                               93 Greeley Avenue
New York, NY 10019                                      Chappaqua, NY 10514
Tel: (212) 239-4340                                       Tel: (914) 238-5800
Fax: (212) 239-4310                                       Fax: (914) 238-5820

**CSS LEGAL GROUP PLLC**

By:   /s/  Carol S. Shahmoon
  Carol S. Shahmoon
  (cshahmoon@csslegalgroup.com)
One Great Neck Road, Suite 7
Great Neck, NY 11021
Tel: (646) 517-4399
Fax: (646) 880-9359

*Co-Lead Counsel for Plaintiffs*